1        UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2

3  FOREST RIDGE HOMEOWNERS      )
   ASSOCIATION,                 )
4                               )
              Plaintiff,        )
5                               )
       -vs-                     ) Case No. 1:17-CV-4193
6                               )
   GREATER NEW YORK MUTUAL      )
7  INSURANCE COMPANY,           )
                                )
8              Defendant.       )
                                )
9  _____)

10

11           The deposition of THOMAS IRMITER, called

12  for examination pursuant to the Rules of Civil

13  Procedure for the United States District Courts

14  pertaining to the taking of depositions, taken before

15  Judith T. Lepore, Certified Shorthand Reporter for the

16  State of Illinois, at 222 North LaSalle Street,

17  Suite 1400, Illinois, on May 17, 2018, at the hour of

18  10:00 a.m.

19

20

21

22

23  Judith Lepore, CSR

24  License No.:  084-004040



```
1    APPEARANCES:

2         THOMPSON, BRODY & KAPLAN, LLP

3         BY:  MS. EMILIE KAPLAN

4         161 North Clark Street

5         Suite 3575

6         Chicago, Illinois  60601

7         (312) 782-9320

8         kaplan@tbkllp.com

9              Representing the Plaintiff;

10

11        FORAN GLENNON PALANDECH PONZI & RUDLOFF PC

12        BY:  MR. MATTHEW P. FORTIN

13        222 North LaSalle Street

14        Suite 1400

15        Chicago, Illinois  60601

16        (312) 863-5000

17        mfortin@fgppr.com

18             Representing the Defendant.

19

20

21

22

23

24
```



1                          INDEX

2     WITNESS                          PAGE

3     THOMAS IRMITER

4     Direct Exam by Mr. Fortin          4
      Cross-Exam by Ms. Kaplan         240
5

6

7                        EXHIBITS

8     EXHIBIT NUMBER           MARKED FOR ID

9     Irmiter Deposition

10    Exhibit No. 245                          5
      Exhibit No. 246                          5
11    Exhibit No. 247                         46
      Exhibit No. 248                         49
12    Exhibit No. 249                         65
      Exhibit No. 250                         69
13    Exhibit No. 251                         92
      Exhibit No. 252                        109
14    Exhibit No. 253                        116
      Exhibit No. 254                        207
15    Exhibit No. 255                        214
      Exhibit No. 256                        214
16    Exhibit No. 257                        219
      Exhibit No. 258                        227
17    Exhibit No. 259                        232
      Exhibit No. 260                        232
18    Exhibit No. 262                        235
      Exhibit No. 261                        237
19

20           (Exhibits retained by Mr. Fortin.)

21

22

23

24



1                        (Witness duly sworn.)

2                        THOMAS IRMITER,

3     called as a witness herein, having been

4     first duly sworn, was examined and testified

5     as follows:

6                        DIRECT EXAMINATION

7     BY MR. FORTIN:

8         Q.    Good morning, Mr. Irmiter.

9         A.    Good morning.

10        Q.    You know me.  I know you.  In this matter,

11    I'm representing Greater New York Mutual Insurance in

12    a lawsuit that's filed by the Forest Ridge Homeowners

13    Association, and you understand that you've been

14    disclosed as an expert by the plaintiff in this

15    matter?

16        A.    Yes.

17        Q.    You've given a couple depositions in your

18    life?

19        A.    Yes.

20        Q.    So I'll dispense with the ground rules and

21    formalities with the assumption that you're familiar

22    with the process.

23        A.    That's fine.

24        Q.    Just as a friendly reminder, we can take a



1  break any time today.  I just ask that you answer any

2  question that's pending at the time.

3          I also ask that if I fail, despite my best

4  efforts, to ask a clear question, please let me know.

5      A.   I will.

6      Q.   Thank you.

7                          (Whereupon, Exhibit No. 245 was

8                           marked for identification.)

9  BY MR. FORTIN:

10     Q.   I'm going to hand you Exhibit 245, which is

11 the CV that was produced to us with your expert -- or

12 I'm sorry, plaintiff's expert disclosures in this

13 matter.  Do you recognize this?

14     A.   Yes.

15     Q.   And from a date towards the top of this first

16 page, it looks like this CV was effective of

17 January 16, 2018?

18     A.   Yes.

19     Q.   And when you came in today, you brought with

20 you an updated CV, correct?

21     A.   Yes, I did.

22                          (Whereupon, Exhibit No. 246 was

23                           marked for identification.)

24



1  BY MR. FORTIN:

2      Q.   I'm handing you Exhibit 246.  Just let me

3  know that that is the updated CV you brought with you

4  today.

5      A.   Yes, this is the one I brought today.

6      Q.   And it's my understanding that the only

7  difference between what we've marked as Exhibit 246

8  and what we've marked as Exhibit 245 is that

9  Exhibit 246 has a more current list of depositions

10  and/or other testimony you've given recently; is that

11  correct?

12      A.   Yes.  There's one other -- I'm just looking

13  through.  I'm noticing one other small change as well.

14  Under continuing education on page 12 of 18 of the

15  5/16/18 deposition, there are additional states on

16  there that I have been approved to teach classes for

17  the insurance industry.

18      Q.   Okay.  Thank you.

19           What's your current residence address?

20      A.   657 Lincoln Avenue, St. Paul, Minnesota.

21      Q.   Is that also your business address?

22      A.   Yes.  We shut our -- we closed our brick and

23  mortar a year and a half ago and went virtual with

24  everybody.  So that's our world headquarters now.



1      Q.   When you say "we," just for clarity sake,

2   you're referring to Forensic Building Science,

3   Incorporated?

4      A.   I am, yes.

5      Q.   Is it okay if I refer to that as FBS today?

6      A.   It will be easier, yes.

7      Q.   All right.  And I understand that you are the

8   owner of FBS?

9      A.   Yes.

10     Q.   Are you the sole shareholder?

11     A.   While my wife may dispute this statement,

12   yes, I am.

13     Q.   And FBS was incorporated in 2004?

14     A.   It was, yes.

15     Q.   And you've been the sole shareholder at all

16   times since then?

17     A.   Yes.

18     Q.   What, if anything, did you do to prepare for

19   your deposition today?

20     A.   I spent about five hours yesterday.  Went

21   through all of the photos that were taken by the

22   various participants from our team.  Went through --

23   which I hadn't done before.  I went through some

24   J.S. Held original field notes and original estimate.

1  Went through original field notes from Horvath's group

2  and his report again, comparing field note data to the

3  actual published data in the report.  Went through a

4  weather report from Rocco Calaci.  Went through our

5  entire file that we submitted to you guys in terms of

6  the discovery request, including the supplemental

7  report that I issued.  And then I read bits and pieces

8  of Mr. Nierengarten and Mr. Johnson's depositions.

9      Q.   Does that exhaust the list of documents that

10  you reviewed yesterday in preparation for your

11  deposition?

12     A.   Yes.  And everything that was submitted in

13  the subpoena request, plus anything else I've

14  mentioned, yes.

15     Q.   When you referred to photographs taken by

16  your people, that would include photographs that you

17  took during your site inspection, right?

18     A.   Yes.

19     Q.   That would include photographs that

20  Mr. Johnson and Mr. Steinke took while they were on

21  site?

22     A.   Yes.

23     Q.   It would include photographs taken by

24  Hannah York?



1    A.    Yes.  And in particular, what I do in

2    preparation for a deposition is, I have two screens, a

3    large screen and then a little smaller one, and I put

4    up at the same time two types of photos.  And we have

5    produced all of these to you.

6         In the photo reports that you have, that is

7    the JPEG that has been downsized into a Word document,

8    which is used for report purposes.  For the purposes

9    of trial, we would use the raw JPEGs, and not

10   necessarily all 4,000 of them.  We've all done enough

11   trials to know that after about 50 photos, the jury

12   gets pretty bored, so we have to pick out of there

13   what we consider to be potential for a while photos.

14        So what I was doing yesterday was taking --

15   which I had done in preparation with the report as

16   well is I'm taking those raw photos and I'm blowing

17   some of the closer ones that we took up, that we took

18   on site, that I took and that my people took under my

19   direction to show the fractures that are in the actual

20   mat from the hail.  And there's great representation

21   of that in those photos.  You wouldn't necessarily see

22   those in the Word document itself.  Okay.

23   Q.    Did you also review photographs taken by

24   Mr. Nierengarten yesterday?



1    A.   Yes.

2    Q.   Is there anyone else that took photographs on

3 your side of the equation that you reviewed yesterday?

4    A.   No.

5    Q.   It's my understanding that those are all the

6 people on your side who took photos; is that correct?

7    A.   To my knowledge, yes.

8    Q.   And to your knowledge, though, you would know

9 if someone else had?

10    A.   I would, yes.

11    Q.   You mentioned that you reviewed bits and

12 pieces of Mr. Johnson's and Mr. Nierengarten's

13 transcripts?

14    A.   Yes.

15    Q.   How did you select those bits and pieces to

16 review?

17    A.   I've reviewed hundreds and hundreds of

18 transcripts in my career.  Basically I did a quick

19 read.  I'm scanning through essentially.

20    Q.   So you didn't selectively go to a page to

21 read that testimony and then skip over other pages;

22 you just did a quick scan through the whole

23 transcript?

24    A.   Yes, nobody directed me.  I'm a speed reader,



1  so I can read pretty quickly.  So when I say I picked

2  through, I read every word of it.  I didn't give it a

3  close read where I would have printed a copy,

4  underlined things, and put notes.  Okay.

5      Q.    Was there any testimony from Mr. Nierengarten

6  in his transcript that you disagreed with?

7      A.    I've got to think about it.

8            Not that I recall.

9      Q.    How about in Mr. Johnson's transcript?

10     A.    There was one part in his -- in his, I think

11  it's page 82 and 83, and I actually called him on this

12  yesterday to discuss with him.  I said, have you

13  signed your errata yet, and he said he hadn't.  He

14  wasn't sure if there was still time to do that.  I

15  said, you might want to, because on page 82, counsel

16  asked you a question.  And the way the question was

17  asked, you skipped through it, and you eliminated

18  yourself with some potential testimony, which is not

19  exactly what I think you were trying to say.  And so

20  he was going to look at that and address that issue.

21  But I thought that that was -- having worked with

22  Mr. Johnson for a number of years, that answer was out

23  of form at the bottom of 82 and at the top of 83.

24  Whether it was your intention to trick him or not, it



 1   looked like he was tricked.

 2            There's also -- I guess I should go back.  In

 3   both Johnson's and Nierengarten's testimony, I don't

 4   think they completely understood the sequence of how

 5   the weather data was gathered by me personally, and

 6   how Mr. -- how the meteorologist was brought into this

 7   project under my recommendation based on my search of

 8   weather data.

 9       Q.   And what meteorologist are you referring to?

10       A.   Rocco.

11       Q.   Did you review Hannah York's deposition

12   transcript?

13       A.   I did not.

14       Q.   Any particular reason why not?

15       A.   Didn't have time.

16       Q.   Have you reviewed any other deposition

17   transcripts that have been generated in the course of

18   this litigation?

19       A.   No, not yet.

20       Q.   Do you plan to?

21       A.   Don't know.

22       Q.   How, if at all, do the opinions you intend to

23   give in this matter differ than the opinions that

24   Mr. Nierengarten intends to give?



1        A.   Well, Mr. Nierengarten was a scrivener.  I

2   mean, his job was to essentially draft -- pre-draft

3   the report, do some preliminary weather data searches,

4   make sure that, for example, the right storm data is

5   at the top, the insurance policy numbers are correct,

6   the address is correct.  He'll do a basic weather

7   search initially and put a couple things on the

8   server.  All of those we've sent to you in discovery.

9   And we'll -- I will look at those and assist in

10   inserting those into the document.  He will go ahead

11   through the logbooks, and he'll actually take the raw

12   data out of the logbooks and type that in.  All of

13   that will be highlighted in yellow in a draft.

14        That will then come to me.  The remaining

15   part of the report, causation statement, conclusions,

16   damages section will be from another report.  So that

17   will all be read.  So then I will go in, and I will

18   take the first stab in this case at the causation

19   report, the causation analysis, all of the conclusions

20   in the scope of repair.

21        Then we'll typically go back to Ryan, because

22   quite frankly what happens is, I screw them up, and I

23   get the numbers off.  I don't know how to work those.

24   So he has to go back and reformat so it looks right.



1  He'll check it for spelling, and it will kick over to

2  Brian Johnson in this case.  And then Brian will take

3  a look at it, and that will generate some discussions

4  between Brian and myself to get to a final work

5  product that we both feel comfortable signing.

6         So really that was Ryan's role.  He signed it

7  simply because he had laid his fingers on it.

8      Q.   How did Mr. Nierengarten share his initial

9  draft of the report with you?  Does it go up on a

10  server; does he send you an email attaching it?

11     A.   It goes up on the server, yeah.  I get a

12  text, get a call.  It might come up in a weekly staff

13  meeting, hey, Tom, these reports are coming.  For

14  example, when I get back tomorrow, I know that there

15  will be three reports ready for me to start looking at

16  that we have projects that we've looked at the last

17  couple of weeks.

18     Q.   And then after you do your part and either

19  send it back to Mr. -- or let me rephrase that.  After

20  you did your part and make it available to

21  Mr. Nierengarten again or Mr. Johnson, do you do that

22  again by just putting it up on a server?

23     A.   Yes.

24     Q.   Did you email any drafts of your report to



1    Mr. Nierengarten or Mr. Johnson?

2        A.    I wouldn't have, no.

3        Q.    Did either of them email any drafts or

4    revisions to the report to you?

5        A.    I would imagine they did, yeah.  Because with

6    Brian working as a co-author and not working in our

7    facility any more, now as a subconsultant, he would

8    have had to have gotten a draft of that, yeah, at some

9    point.

10        Q.    You used the phrase I think "logbook" earlier

11    when you described the drafting process.

12        A.    Yes.

13        Q.    What is that?

14        A.    These are our field notes.  Some of our

15    people -- I think Hannah, for example, we produced her

16    field notes.  She did -- I think she does her on a

17    yellow legal pad.  I do mine in an old-fashioned

18    logbook.  So when you look at the documents that we

19    sent to you that say, Tom's notes, I've taken that

20    logbook, opened it, and copied those onto the server.

21            MR. FORTIN:  I don't have those.

22            MS. KAPLAN:  I've produced everything that

23    was turned over.

24            THE WITNESS:  I looked at document production



Thomas Irmiter 05/17/2018

1  again yesterday when I was prepping, and all the notes

2  are in there.

3          MR. FORTIN:  Go off the record for a moment.

4                    (Whereupon, a discussion

5                     was had off the record.)

6  BY MR. FORTIN:

7      Q.   You're aware that Mr. Nierengarten was

8  disclosed by the plaintiff as a retained expert in

9  this matter, correct?

10     A.   No, I don't read the -- read those documents.

11 I know that I was, but I don't know who else was.

12     Q.   You're aware that he gave a deposition

13 because you read his transcript, right?

14     A.   I did, yes.

15     Q.   And you saw in his transcript where he

16 offered or expressed his intent to offer certain

17 expert opinions, right?

18     A.   Absolutely.  He's certainly qualified to do

19 that.

20     Q.   Do you intend to offer the same expert

21 opinions that he does?  Understanding that you may

22 have additional opinions, is there at least some

23 overlap between the opinions you intend to provide and

24 the ones that he intends to provide?



1    A.    Yes, I think there would be.

2    Q.    Is there any difference other than the fact

3    that you have opinions based on the estimate and the

4    supplemental report, or do the differences between the

5    opinions you intend to express and that he intends to

6    express differ in any other way?

7            MS. KAPLAN:  I'm just going to object to the

8    extent it may call for a legal conclusion.  If you're

9    asking about, you know, factual differences between

10   the opinions offered, my objection is not to that part

11   of the question.

12           THE WITNESS:  I'll answer the question by

13   saying, how could I know until you ask the questions.

14   There's no way I could know that, Counselor, until you

15   pose the question to Mr. Nierengarten on one side of

16   the table and the same question to me on the other

17   side of the table.

18           I will tell you generally, based on having

19   worked with him, he's my oldest senior employee, that

20   I would anticipate that at the end of the day, the

21   substance of the answers would be very similar.  We

22   may get there a little bit differently based on our

23   training, education, and experience, mine being much

24   more than his.



BY MR. FORTIN:

Q.   The same question with respect to

Mr. Johnson's opinions, you saw that he expressed

expert opinions in his transcript, right?

A.   Yes.

Q.   Do you intend to offer some of the same

expert opinions that he intends to?

A.   If I'm asked, yes.

MS. KAPLAN:  Same objection for the record.

MR. FORTIN:  Noted.

BY MR. FORTIN:

Q.   Are you aware of any way in which your

opinions differ from the ones that Mr. Johnson

expressed in his deposition?

A.   Not substantively, no.

Q.   How about not substantively?

A.   I said not substantively.

Q.   Right.  So does that mean that --

A.   It means what it says.  No other meaning.

Q.   Does that mean that your opinions differ from

Mr. Johnson's in some non-substantive way?

A.   Mr. Johnson may identify a photo as being

hail damage.  Mr. Johnson may not go to the depth of

blowing the photo up and actually showing the



1  fracture, which I would do.  It may be the same

2  identical photo.  So he may identify it as being a

3  hail strike that has caused granule loss.  I may

4  identify the exact same one through that process as

5  actually having a fracture in the mat by showing the

6  jury that fracture.

7          So typically what we would find is that my

8  ability to explain what the jury is looking at will be

9  more in depth than Mr. Johnson's just based on my

10  training, education, and experience.  I will have a

11  better handle on building codes than Mr. Johnson

12  because I'm a Building Code official.  And certainly

13  with regard to the scope of repair and with the damage

14  numbers that I put together, I would certainly have

15  more experience doing that than him since I put

16  estimates together for the last 40 years.  He hasn't.

17          Lastly, I have installed all of the products

18  that are talked about on this project.  I've installed

19  siding, vinyl siding.  I've taken it off.  I've

20  attempted to put it back on.  I can discuss in detail

21  the problems of removing the siding, not for a single

22  inspection where you zip it open, but to physically

23  remove large sections of siding and what percentage

24  that siding becomes physically damaged to the point



1  that you can't reinstall it based on having physically

2  done that and based on watching that done on

3  large-scale projects.  I've installed thousands of

4  bundles of three-tab shingles.  Mr. Johnson hasn't.  I

5  installed ice and water shield.  I've installed

6  valleys.

7         So again, I bring that experience to the

8  table.  So yes, obviously I would answer the question

9  a little bit different than him.  He may say it can't

10  be done.  I'm going to tell you why it can't be done.

11     Q.   What's the highest level of formal education

12  you've attained?

13     A.   I have four credits towards my master's

14  degree in engineering from the University of

15  Wisconsin.

16     Q.   So what's the last degree that you obtained?

17     A.   Undergraduate degree in Bachelor of Arts.

18     Q.   What was your major?

19     A.   English.

20     Q.   Ever been employed as an insurance adjuster?

21     A.   No.

22     Q.   Ever been employed by an insurance company?

23     A.   Well, I've been retained by insurance

24  companies.



1    Q.    Have you ever been an employee of an

2    insurance company?

3    A.    No, I never have.  No.

4    Q.    Do you have any formal education in the field

5    of meteorology?

6    A.    Yes.

7    Q.    Can you describe that education for me?

8    A.    I have eight hours of training from NOAA as a

9    trained weather spotter.  And in that training, that I

10   took, we specifically spent two hours on how to access

11   NOAA weather data online, how to interpret NOAA

12   reports, SWDI reports, the mesocyclone reports for

13   wind, those kinds of things, to be able to arrive at

14   determining if, in fact, the site that we might be

15   visiting had a storm event that was at least

16   identified by NOAA.

17        We also covered, as a weather spotter, how to

18   measure for hail, how to report hail size in terms of

19   how long it's been on the ground, what the temperature

20   is outside, how much section loss that will have

21   because it's melted down.  So that piece of hail that

22   I pick up that's one inch that has been on the ground

23   for 15 minutes and it's 80 degrees outside wasn't one

24   inch when it hit.  It was bigger than that.



1          We also cover debris pattern.  We cover

2    identification of cloud formations and weather

3    patterns.  We also cover after-the-fact wind damage

4    and different wind speeds that cause different things

5    to happen, like shingles to blow off, siding to blow

6    off, tree branches to break, those kinds of things.

7          MS. KAPLAN:  Could I show him what I got and

8    make sure --

9          MR. FORTIN:  Sure.  Let's go off the record.

10                    (Whereupon, a discussion

11                     was had off the record.)

12          THE WITNESS:  In addition, I have sat through

13    eight hours of continuing education taught by two

14    different meteorologists.

15    BY MR. FORTIN:

16      Q.   So first, you have an eight-hour NOAA course

17    for your spotter training?

18      A.   Yes.

19      Q.   And then you say you have another eight hours

20    from what exactly?

21      A.   From three different -- two meteorologists

22    and one engineer/meteorologist.  And these were at

23    training seminars, I guess, is best way to say it.

24      Q.   Other than those 16 hours, do you have any



1   more qualifications in the field of meteorology?

2       A.   No.

3       Q.   Ever been employed as a meteorologist?

4       A.   No.

5       Q.   Do you hold yourself out as an expert in the

6   field of forensic meteorology?

7       A.   No.

8       Q.   A few moments ago you mentioned your

9   experience actually installing, repairing, or

10  replacing siding and shingles and whatnot.  Do you

11  recall that?

12      A.   Yes, I do.

13      Q.   Do you still do that work in a professional

14  capacity?

15      A.   No.

16      Q.   When did you stop doing that sort of work in

17  a professional capacity?

18      A.   Let's see.  Probably 16 years ago, 2002.

19      Q.   And when you stopped doing that work in a

20  professional capacity, did you shift into what you

21  might call consulting?

22      A.   I was consulting -- I did my first consulting

23  gig 40 years ago when I did my first trial.  I've been

24  consulting my whole life.



Thomas Irmiter 05/17/2018

1      Q.   When you stopped doing actual repair,

2   replacement, installation, what took up that time that

3   was formerly taken by that?

4      A.   This business that we have today.

5      Q.   The eight hours of spotter training you

6   received from NOAA, was that towards your Metro

7   Skywarn Spotter Certification?

8      A.   Yes.

9      Q.   What entity certified you as a vinyl siding

10  installer?

11     A.   Vinyl Siding Institute.

12     Q.   If you turn to page 6 of Exhibit 245.

13          MS. KAPLAN:  245 or 246?

14          MR. FORTIN:  245 just because that's what I

15  have my notes on.

16          THE WITNESS:  Page 5, you said?

17  BY MR. FORTIN:

18     Q.   Page 6.  At the bottom there's a heading that

19  says "Construction Consulting Experience?"

20     A.   Yes.

21     Q.   It says, "Destructive inspections on over

22  2,500 residential properties?"

23     A.   Yes.

24     Q.   Would those 2,500 destructive inspections

1  span 1985 all the way through the present or would

2  they be concentrated or have a cutoff at any point in

3  between?

4      A.   No.  They would span from 1985 to the

5  present.  In the process of the construction company

6  that I owned, as a design-build firm when we went

7  through what we called a Phase 1 design development

8  phase to arrive at a scope, a preliminary plan, if you

9  will, if you are our client, and a preliminary budget,

10  if that was approved, the preliminary budget, then we

11  would do a destructive inspection on every project

12  that we did so that we could avoid change orders.  So

13  we would dig into walls, ceilings, floors to find out

14  if there were pipes.

15           So if I'm going to knock this wall out behind

16  you and there's a bunch of pipes in there, most

17  contractors would deal with that and say, well, we'll

18  just give you a change order.  We found all of that

19  out ahead of time.  So that was the basis for a lot of

20  the inspection work we do today.

21      Q.   From 1985 to the present, did you also do

22  destructive inspections on commercial properties?

23      A.   Yes.

24      Q.   Any rough estimate as to how many?



1    A.   Well, both of these numbers should be

2   updated, quite frankly, on this part of the CV.  I

3   would imagine, as I sit here today, residential

4   inspections is well over 7,500, commercial inspections

5   is probably over 15,000.

6    Q.   And is that -- when you say "inspection"

7   there, are you including both destructive and

8   nondestructive?

9    A.   Yes.

10    Q.   So 7,500 residential, did you say?

11    A.   Yes.

12    Q.   And 15,000 commercial?

13    A.   Yes.  Total.

14    Q.   And would those be inspections that you

15   personally participated in or your company or

16   companies?

17    A.   Personally.

18    Q.   If you turn the page, "Guest Lecturer."

19   There is a 54th Annual IBC Officials Meeting listed

20   there?

21    A.   Yes.

22    Q.   What subject did you lecture on?

23    A.   I gave a presentation on the duties and

24   responsibilities of Building Code officials when



1  interpreting what is called the Existing Building

2  Code.  And the topic was "Just Say No."

3         Building Code officials like to -- because a

4  lot of them come from the trades, they're problem

5  solvers.  So they like when you walk in -- or you

6  bring them to the site and you say, can I do this?  A

7  lot of times, oh, yeah, you could do this or you could

8  do this.  That's really not what they're supposed to

9  do.  A Building Code official is supposed to approve

10  and deny plans.

11         So what that taught this room of 2,000

12  Building Code officials -- and I still hear from them

13  today about how wonderful that was -- is now they

14  basically know that when somebody comes in, they say,

15  bring me a plan that I can approve or deny because

16  that's my job.

17     Q.   What does IFMA stand for?

18     A.   International Facilities Management

19  Association.

20     Q.   I'm sorry?

21     A.   International Facilities Management

22  Association.  These are people who manage buildings

23  like the one we're sitting in today, and this was a

24  discussion on insurance policies, coverage issues, and



1   damages that result from storms.

2       Q.   NAPIA, that's the National Association of

3   Public Insurance Adjusters?

4       A.   Yes.

5       Q.   What topic did you present on there at their

6   midyear meeting in 2017?

7       A.   I think that's later on in here.  Let's see

8   what it says in here.

9            That particular one was on fire loss.

10      Q.   And what's the acronym GAPIA stand for?

11      A.   Georgia Association of Public Insurance

12  Adjusters.  That was a wind and hail talk and a second

13  talk on fires.

14      Q.   At their Fall Educational Conference of 2016?

15      A.   Yes, that was one of the -- when you go later

16  in the CV, I mention the various states that have

17  approved me for continuing education credits.  When I

18  do these talks, I have to apply to the states to be

19  approved so that the people attending, both adjusters,

20  public adjusters, can get their continuing education

21  credits.

22      Q.   And when you give a presentation or lecture

23  for continuing education credits for adjusters or any

24  other professional, do you retain your presentation



1    materials?

2        A.    PowerPoints, yes.

3        Q.    How far back do you keep those?

4        A.    I don't think I have the 54th annual one

5    still.  I might.  I don't think I have the IFMA.  I

6    probably have the 2016, 2017 ones, yeah.

7        Q.    A few headings down, there's a bullet point

8    that says you received a designation as an RBI?

9        A.    Yes.

10        Q.    Can you tell me what that stands for?

11        A.    Residential Building Inspector.

12        Q.    Who bestowed that designation on you?

13        A.    International Code Council.  That was

14    actually a test that had to be taken.  It wasn't an

15    honorary appointment.

16        Q.    Are you familiar with the Xactimate

17    estimating software?

18        A.    Absolutely.

19        Q.    Do you have any certifications related to

20    Xactimate?

21        A.    My start with Xactimate was in the mid-'80s.

22    I have a nice cap that I have as a memory of that time

23    called "Xactimate for Remodelers."  I was one of six

24    companies that worked with them to begin the process



1 of setting up some of the unit of pricing that they

2 use today.  We had over 40 years of records from our

3 construction company.  So I started working with

4 Xactimate from day one.  I haven't had formal training

5 with them because I was there when the product was

6 developed.

7      Q.   You prepared an Xactimate estimate in this

8 Forest Ridge matter, right?

9      A.   Yes.

10     Q.   Do you know what version of the Xactimate

11 software was used to generate that estimate?

12     A.   The 8X, and I'd have to look at the heading

13 to tell you what month we ran.

14     Q.   But the software version was 8X, you said?

15     A.   Yes.

16     Q.   And when you refer to looking at the heading

17 to see what month you ran, are you referring to the

18 price list?

19     A.   Yes.  Whether it was 2015, 2016, 2017 or what

20 it was.

21     Q.   If you'll turn to page 10.  At the top of

22 that page, it looks like those bullet points are

23 listing presentations that you attended at the 2017

24 First Party Claims Conference.  Is that accurate?



1      A.    Yes.

2      Q.    Do you still have the materials, if any,

3  disseminated during those presentations?

4      A.    Probably not.  But I think actually NAPIA has

5  those online, so you can probably just click on them

6  and find them.  Nothing's trying to be hidden, you

7  know.

8           Yeah, the gentleman that I talked about,

9  Matt Phelps, is the one who is actually becoming a

10  meteorologist, another credit to his name.  And he's

11  the one that gave one of the talks on the engineering

12  and meteorology and combining those two processes.

13      Q.    If you turn to page 12, there's a heading

14  "Testimonies, Depositions, and Appraisals?"

15      A.    Yes.

16      Q.    And the first heading under that is

17  "Testimony at District Court Trials."

18      A.    Yes.

19      Q.    Ten cases listed.

20           MS. KAPLAN:  Would it be -- and I'm sorry to

21  interrupt you.  Would it make sense to refer to the

22  new version of the CV since this is the one of the

23  sections that was updated?

24           MR. FORTIN:  I'm about to do that.



1  BY MR. FORTIN:

2      Q.   Mr. Irmiter, you can also turn to page 12 of

3  what we marked as Exhibit 246, which is your more

4  current CV.

5      A.   Yes.

6      Q.   And looks like under that heading "Testimony

7  in District Court Trials," there's also 10 cases

8  listed, but they appear to be different in some

9  respect.  Is that correct?

10     A.   Yes.  This is a document that is put together

11 for federal court purposes, so we cull out every four

12 years.  I would not represent that these are the only

13 10 trials that I have done in my career.  There are

14 many, many more.

15     Q.   So on Exhibit 246, those 10 cases are just

16 the last -- or I'm sorry.  Those are just the trials

17 you've testified at in the four years prior to the

18 effective date of this CV?

19     A.   Yes.

20     Q.   And so any differences between that list and

21 the same list on Exhibit 245 would be due to a case

22 being older than four years or a new case, right?

23     A.   Correct.

24     Q.   And this encompasses both state and federal



1    court, right?

2        A.   Yes.

3        Q.   And those have all been state court cases?

4        A.   Yes.  There are federal court cases, but I

5    haven't had one in over four years.

6        Q.   The next heading is after "Testimony At

7    Federal Court Trials" on page 13, it says, "First

8    Party Appraisals and Expert Testimony?"

9        A.   Yes.

10       Q.   And there are 113 matters listed there?

11       A.   Which document?

12       Q.   Looking at 246.

13       A.   Yes, there are.

14       Q.   Does this list of 113 matters include expert

15   testimony where you were disclosed as an expert for

16   purposes of litigation as opposed to for an appraisal

17   proceeding?

18       A.   It depends on the state.  I'll answer it this

19   way:  I know that there may be overlap on some Texas

20   appraisals where we did the initial engineering workup

21   on it, if you will, and report.  And once we had

22   completed that assignment, it went into appraisal

23   rather than litigation, and I was then asked to serve

24   as the appraiser.



1          I will tell you that typically in those

2    cases, the other appraiser was the original insurance

3    adjuster for the insurance company in most all of

4    those cases.  So that is an interesting little tidbit

5    in Texas that happens.

6          But typically what this would be is either an

7    assignment as an appraiser, an assignment as an umpire

8    or instances where, independent of either one of

9    those, I was brought in to testify as an expert at an

10   appraisal when I was not on the panel.

11         Minnesota has gone through a -- in

12   particular, Minnesota has gone through a process of

13   formalizing the appraisals to the point where they

14   become mini trials, quite frankly.  And so lots of

15   times experts are now being brought in for a day of

16   testimony in front of a panel, and I have done that a

17   number of times.  We've done a couple of those like

18   that in Chicago as well.

19   Q.   Does this list of 113 matters just span the

20   last four years?

21   A.   Yes.  Because if you look at the other

22   document, there's 156 items on there.  There's only

23   113 on here.  So we've culled a bunch out.

24   Q.   So on Exhibit 246 here, the more current one,



1   I'm scanning through this list of 113, and am I

2   correct that there were no instances among these 113

3   where you were the appraiser for a defendant?

4       A.   Just a second.

5       Q.   And just to be clear by that, I mean no

6   instances where you were the appraiser for the

7   insurance company.

8       A.   There is one -- it depends on which document

9   you're looking at.  This is one on here where I was

10  named to be the appraiser for North Star Insurance.  I

11  don't know where that one is.

12           MS. KAPLAN:  I think is it this page 14 at

13  the top, number 50?  Or wait, no.

14           THE WITNESS:  No, that's North Star.

15  BY MR. FORTIN:

16      Q.   If you look at the older CV, No.  34 is North

17  Star versus Anderson?

18      A.   Yes.

19      Q.   And that identifies you as appraiser for

20  defendant insurance company?

21      A.   Yes.  And what happened there is North Star

22  went to court to have an umpire assigned.  My name was

23  on the umpire list from the other appraiser, and the

24  court said that North Star had not assigned an



1    appraiser yet and needed to do that.  So the judge

2    appointed me as their appraiser.  The appraisal didn't

3    happen.  They settled the next day.

4         Q.   And so that would be the only time in the

5    last four years where you served as an appraiser for

6    an insurance company?

7         A.   Yes.  They for some reason just don't like

8    me.  I don't know why that is.

9         Q.   Do you recall when the last time was that you

10   served as an appraiser for an insurance company prior

11   to that North Star matter?

12        A.   No, I don't.  I did my first appraisal

13   20 years ago, but I can't -- they were much different

14   back then.

15        Q.   Other than that North Star versus Anderson

16   matter, have you ever been named as an appraiser by an

17   insurance company?

18        A.   Yes.  I just don't recall.  It's been

19   10 years.  I mean, it's been a long time.

20        Q.   And I see, among this 113 listed in

21   Exhibit 246, a handful that appear to be in Illinois?

22        A.   Yes.

23        Q.   Do you recall whether any of those appraisals

24   concerned a property located in Streamwood, Illinois?



1      A.    No, they did not.

2      Q.    Do you recall whether any of those appraisals

3  concerned damage caused by a storm that occurred on

4  August 2 of 2015?

5      A.    I believe two of them did.

6      Q.    Can you tell me which two?

7      A.    Just a second.

8            No. 104, I believe, Runaway Bay; No. 74, the

9  Willows of Vernon Hills.

10           Appraisals are done under a separate entity.

11  They're not done under Forensic Building Science.

12     Q.    What entity are they done under?

13     A.    Lindsay, L-i-n-d-s-a-y, Consulting Group.

14  It's a separate LLC.

15     Q.    Are you the sole member?

16     A.    No.

17     Q.    Who's the other member?

18     A.    My wife.

19     Q.    Other than the Willows of Vernon Hills and

20  Runaway Bay, did any of the other Illinois matters

21  included in this list of 113 involve alleged hail or

22  wind damage?

23     A.    They all did.  There might be one fire in

24  there, but I think they're all wind and hail.



1    Q.   If we look at No. 75 from Deer Run

2  Condominium.

3    A.   Yes.

4    Q.   Do you recall what storm that insurance claim

5  revolved around?

6    A.   No.

7    Q.   How about No. 76?

8    A.   No.  When I say "no," I know it wasn't the

9  same date as this.

10    Q.   Do you recall what date it was?

11    A.   No.

12    Q.   And would that be true of any of the other

13  Illinois matters on this list?

14    A.   Correct.

15    Q.   Have you ever served as an appraiser in an

16  appraisal against Greater New York Mutual Insurance

17  Company?

18    A.   I'll answer it this way:  I don't keep track

19  of the carriers.  I don't really care.  So I

20  oftentimes don't know who they are.  So I don't

21  recall.  I don't really recall that at all.

22    Q.   Is it fair to say, as you sit here today, you

23  do not specifically recall serving as an appraiser in

24  any appraisal against GNY?



1      A.   I do not.

2           If you'd said Philadelphia, I could have

3  probably named about six or seven on the Illinois list

4  from there.

5      Q.   The next heading, which starts on page 15,

6  and we're continuing ahead with the most current CV

7  here.

8      A.   Yes.

9      Q.   "Depositions and/or Affidavits Filed in

10 Courts."  And this would, again, just be the last four

11 years?

12     A.   Yes.

13     Q.   Are there any among the 64 cases listed here

14 where you were retained by or testified for the

15 defendant and/or insurance company?

16          Actually, let me clarify that question.  I'm

17 asking only now as to an insurance company.

18     A.   Is this trials as well, because some of my

19 trials are...

20     Q.   I don't know.  Does this list --

21     A.   These are just depositions and affidavits.

22 If you go back to the 10 trials, some of those are for

23 the defense side of this.  All right?

24     Q.   Okay.  We'll go back to those in a minute



1    then.  Let's stick with this list of 64.

2           MS. KAPLAN:  I'm sorry.  The question is, on

3    this list, was he retained by any insurance company

4    for these matters?

5           MR. FORTIN:  Yes.  Any of these 64 was he

6    retained by an insurance company.

7           THE WITNESS:  Thank you.

8           No, none of those went to depositions or

9    affidavits.  So no, these are all plaintiff.

10   BY MR. FORTIN:

11      Q.   You mentioned that the list of trials at the

12   beginning of this Testimony's, Depositions, and

13   Appraisals section of your CV does include matters

14   where you testified on behalf of the insurance

15   company?

16      A.   Yes.

17      Q.   Can you point those out to me?

18      A.   No. 4, Park Monaco was for the general

19   contractor.  David and Marjorie Anderson, No. 7, was

20   for the general contractor.  That's it.

21      Q.   So in those matters, you testified for the

22   defendant, right?

23      A.   Correct.  Yes.

24      Q.   But in those instances, the defendant was a



Thomas Irmiter 05/17/2018

1    general contractor, not insurance company, correct?

2         A.   But the insurance company -- I mean, I'm

3    sitting in the room with insurance company counsel.

4    They're paying my bill.  So I'm retained to represent

5    that general contractor by the insurance company, yes,

6    and testify, so...

7         Q.   And that would be a liability insurance

8    carrier for the general contractor, right?

9         A.   Yes.

10        Q.   Back to that list of 64 cases.

11        A.   Yes.

12        Q.   Any of those matters that were litigated in

13   Illinois, did any of them concern a property located

14   in Streamwood?

15        A.   Yes.

16        Q.   Which ones?

17        A.   Southgate, No. 16.

18        Q.   Any others?

19        A.   No.

20        Q.   Did any of the other Illinois cases among the

21   64 concern an August 2, 2015, storm?

22        A.   No, just Southgate.

23        Q.   Did any of the other cases among these 64

24   concern an April 2010 storm?



1     A.   I'm sorry.  Let me back up.  Southgate was an

2  April 2010 storm.  Southgate did not have a storm date

3  of 2016.

4     Q.   You mean 2015?

5     A.   2015.  I think it was already settled by

6  then.

7     Q.   So just --

8     A.   It may have had a storm date.  I just don't

9  know.

10     Q.   Just so I'm clear, this list of 64, the

11  Illinois case on there, none of them concern the

12  August 2, 2015, storm then?

13     A.   Not that I'm aware of.

14     Q.   And one of them, Southgate, concerned an

15  April 2010 event?

16     A.   Yes.  Per your request of information with

17  regard to that storm date and Illinois projects, our

18  data search did not turn up any works that Forensic

19  Building Science had done on that storm date of 2015

20  in Illinois.

21     Q.   Other than this Forest Ridge matter and

22  Southgate matter, have you, either through Lindsay

23  Consulting Group or FBS, been involved in any

24  insurance claims regarding property located in



1    Streamwood, Illinois?

2        A.   No.

3        Q.   Given that it's on this list of 64, I take it

4    that you were deposed as an expert in Southgate?

5        A.   Well, yes, Counsel, you know I was.  It's

6    your former firm.  You were there at the time, I

7    think.

8        Q.   No, I left right after we filed the

9    complaint.

10       A.   Oh, you did.  Okay.

11            MS. KAPLAN:  I thought you wrote the

12    complaint.

13            MR. FORTIN:  I did.  Let's go off the record

14    for a minute.

15                        (Whereupon, a discussion

16                         was had off the record.)

17   BY MR. FORTIN:

18       Q.   In Southgate, you gave a deposition?

19       A.   Yes.

20       Q.   Did you also produce an expert report?

21       A.   Yes.

22       Q.   Did you prepare any rebuttal reports?

23       A.   I don't recall.

24       Q.   Did the case go to trial?

1     A.   It did not.

2     Q.   Do you recall what your opinion or opinions

3   were in that Southgate matter?

4     A.   Yes.

5     Q.   Did you have an opinion as to the extent, if

6   any, of damage to the Southgate Town Home Association

7   caused by hail from an April 2010 storm?

8     A.   I did.

9     Q.   And can you tell me, insofar as you're able,

10   what that opinion was?

11     A.   Significant siding damage, multiple sides,

12   and roof damage requiring the roof to be replaced and

13   siding to be replaced.  I mean, in comparison to this

14   particular case that we're talking about today, there

15   was significantly more siding damage.

16     Q.   And at Southgate did they have vinyl siding

17   or aluminium siding?

18     A.   They had vinyl siding.  And the hits were

19   large in general, the ones that we were finding.  They

20   had metal turtle vents as well.  So unlike this site

21   that doesn't have any -- it has a ridge vent, so you

22   don't have any soft metals really to look at, there

23   were more to look at there and more things to see in

24   terms of the damage.  Bigger storm.



1        Q.   The hail damage that you observed at

2    Southgate, can you tell me approximately what size

3    hail that damage was consistent with?

4        A.   I think we saw -- I saw when I was there size

5    two inch hail signature patterns.  And understand

6    that -- and this is how we explain this to a jury,

7    hopefully there's people old enough on the jury to

8    remember the show "Captain Kangaroo," when all of the

9    ping pong balls would be dropped by Mr. Moose on top

10   of Captain Kangaroo at the beginning of each show.

11   Hail isn't all one size.  It falls in a variety of

12   sizes in a storm.  There are outliers that are larger.

13   There are outliers that are smaller.  And there's

14   different degrees of hardness of the hail as well.

15            But in that particular case, there were

16   signature patterns of large hail, yeah.

17            MS. KAPLAN:  Can we take a quick five-minute

18   break?

19            MR. FORTIN:  Sure.

20                      (Whereupon, a short break

21                       was taken, after which the

22                       following proceedings were

23                       had:)

24



1                        (Whereupon, Exhibit No. 247 was

2                        marked for identification.)

3    BY MR. FORTIN:

4        Q.    Mr. Irmiter, I'm handing you what I've marked

5    as Exhibit 247, which is on an old CV of yours that I

6    found floating around on the internet.

7        A.    Okay.

8        Q.    Does this document look familiar to you as to

9    the content and format of your curriculum vitae?

10       A.    Yes.  Does not look like it is a false copy,

11   if that's what you're asking.

12       Q.    That is exactly what I'm asking.  Thank you.

13             And if you look at the very last page, at the

14   end of that page, it says, "updated August 31, 2006."

15       A.    Yes.  That is old.

16       Q.    There's a Bates stamp on these pages with the

17   abbreviation MOR.

18       A.    Yes.

19       Q.    Does that ring a bell to you at all?

20       A.    Yes.

21       Q.    Do you recall what case that was?

22       A.    Circa 2006.  Could be Morrison.

23       Q.    Do you expect that there's any reference to

24   wind or hail in this CV that we marked as Exhibit 247?



1    A.   Well, sure.  Right under the bullet points

2   that you have on the very first page, it says,

3   "Evaluation of first party homeowner insurance

4   policies, first party loss claim inspections for

5   homeowners, insurance appraisals."

6    Q.   I'm just specifically referring to the words

7   "hail" or "wind."

8    A.   I don't know if that says that or not in

9   here.

10    Q.   Would it surprise you if it did not contain

11   those words?

12    A.   No, not at all.

13    Q.   As of this point in time, 2006, was hail and

14   wind damage as big a part of FBS's business as it is

15   today?

16    A.   No, no.  It wasn't at all.  The first hail

17   case I worked on was when I was 13 years old, and --

18   because we had a business that did roofing, so I was

19   on hundreds and hundreds of roofs that had been

20   damaged by wind and hail back then.  That was how my

21   father got roofing work from insurance companies back

22   in the '60s and '70s.

23          The emphasis of Forensic Building Science in

24   2006, when this was done, was more focused on the ever



1  growing construction defect field that was going on,

2  water intrusion, EIFS, mold.

3      Q.   When did hail damage start to become a more

4  common field of endeavor for FBS?

5      A.   2007.

6          MS. KAPLAN:  Are you putting wind in that as

7  well or just hail?

8  BY MR. FORTIN:

9      Q.   Were you including wind in your answer or

10  just hail?

11      A.   Yes, wind, hail.  We'd done pipe burst, we'd

12  done collapse, we'd done weight of ice and snow for

13  those kinds of claims before.  Wind and hail really

14  starting to come into play in '07.

15      Q.   If you turn to page 12 of Exhibit 247.

16      A.   Yes.

17      Q.   About halfway down the page, it introduces a

18  list, which is described as a partial list of

19  construction defects, water intrusion, and contract

20  dispute cases?

21      A.   Yes.

22      Q.   And these were all matters where you were

23  retained as an expert since January of 2002?

24      A.   Yes.



1        Q.    In any of these cases on this list, would you

2    have been retained by an insurance company, and I'll

3    specify by property insurance company, any first party

4    property insurance dispute?

5        A.    There were some cases where we worked with a

6    gentleman, an attorney named Mark Peschel, and he

7    represented builders.  And I can't tell you today

8    looking at this list which one of these, but there

9    were cases in that time frame when I was going to site

10   inspections, all-party inspections where stucco and

11   EIFS and things were being removed, window spray

12   testing was being done, and I was representing a

13   defendant.  Whether that was a general contractor, a

14   framer, the EIFS installer, the window installer, I

15   can't tell you, but there were cases.  And it was

16   probably a mix of about 40 percent on that side of the

17   fence, and 60 percent on the plaintiff side back then.

18   I don't remember testifying in any cases for the

19   defendants.

20                        (Whereupon, Exhibit No. 248 was

21                         marked for identification.)

22   BY MR. FORTIN:

23       Q.    I'm handing you exhibit Exhibit 248.  Let me

24   know if you recognize that as FBS's website.



1     A.   Yes, it appears to be.

2     Q.   Are you, for lack of a better term,

3   responsible for the substantive content of FBS's

4   website?

5     A.   Well, as owner of the company, the buck stops

6   here.  We have an outside source to put this together.

7   I contributed ideas, photos.  If you go to the

8   website, you'll see that it says -- if you hit case

9   studies, for example, at the top on page 1, that icon,

10  it will say, "under construction."  So we never really

11  completed it.

12          We're on the internet so that people know, I

13  guess, that we have a company.  It's not a generating

14  source of business for us, quite frankly.  It's not

15  where we get our business from.

16    Q.   If you'll turn to -- the page numbers aren't

17  helpful, because they're not consecutive, but there

18  are short profiles of you and your employees.

19    A.   Yes.

20    Q.   If you'll turn to the one for Kevin Steinke.

21    A.   Yes.

22    Q.   It says that Mr. Steinke spent one year as an

23  independent insurance adjuster prior to joining FBS?

24    A.   Yes.



1      Q.   Do you know what insurance adjusting firm he

2   was a part of?

3      A.   State Farm.  He was a CAT adjuster.

4      Q.   Do you know where?

5      A.   CAT assignments.  In Minnesota, but I know he

6   was -- one of the reasons he left, he was on the road

7   300 days of the year, no family life.  So he was

8   looking at everything all over the country.  That's

9   where he got his Xactimate, I think, level two

10  training.

11     Q.   I understand that Mr. Steinke had some role

12  at least in the Forest Ridge matter?

13     A.   Yes.  Kevin performs -- he's down in Houston

14  today climbing on a roof similar to this.  So he

15  performs inspections for us every week, price reports,

16  does estimates.

17     Q.   Other than yourself, Mr. Nierengarten, and

18  Mr. Steinke, did any other FBS employees have a

19  substantive role in FBS's work in the Forest Ridge

20  matter?

21     A.   No.

22     Q.   Is Jim Irmiter your son?

23     A.   He is.

24     Q.   He doesn't get a bio?



1          MS. KAPLAN:  It's still under construction.

2          THE WITNESS:  It's under construction.

3          He actually just rejoined us.  That's why

4    there's not an updated bio.

5    BY MR. FORTIN:

6        Q.   Has FBS ever worked with the Forest Ridge

7    Homeowners Association other than in this matter we're

8    here about today?

9        A.   No.

10       Q.   Has FBS ever worked with Ms. Kaplan's firm

11   other than on this Forest Ridge matter we're here

12   about today?

13       A.   No.

14       Q.   Have you personally ever worked with their

15   firm other than this Forest Ridge matter?

16       A.   No.

17          MS. KAPLAN:  I'm just going to object to the

18   form of the question, worked with.  I'm not sure what

19   the scope of what your question refers.

20   BY MR. FORTIN:

21       Q.   Sure.  I intend my question just to refer to

22   matters where you or FBS or someone was retained as an

23   expert witness?

24          MS. KAPLAN:  No.



 1          THE WITNESS:  No, we have not.

 2    BY MR. FORTIN:

 3        Q.   Would that be true of Lindsay Consulting

 4    Group as well?

 5        A.   Yes.

 6        Q.   Are you familiar with the name Glenn Hankins?

 7        A.   Of course, I read it in the depositions last

 8    night.  And based on that, was able to put two and two

 9    together that he's the contractor that put the tarps

10    on the roof and has done some -- I think he did the

11    initial look at this thing after the storm, and some

12    mitigation kinds of things for them.  But that's all I

13    know of him.  I've not met him.  I've not talked to

14    him.

15        Q.   So you've never spoken to Mr. Hankins?

16        A.   No.

17        Q.   Have you ever communicated to him in writing

18    via email?

19        A.   No.

20        Q.   By phone?

21        A.   No.  I've looked at any documents that were

22    provided to us by counsel that he put his hand on.  I

23    think there's some photos that he took, and there

24    might be an initial estimate or something, if I



1  recall.  But all of that we disclosed to you.

2      Q.   You're familiar with Hannah York, right?

3      A.   Yes, very familiar.  I was the one that

4  initially trained Hannah.

5      Q.   And when was that?

6      A.   It would have been prior to this -- I think

7  this was our first project with her on her own.  And

8  when I say "on her own," that was one of the reasons

9  Kevin Steinke was sent to the project to get up on the

10  first, you know, four, five roofs with Hannah to,

11  again, re-go through -- go back through our process

12  with her.

13          I met with Hannah in Houston, and we went

14  through, I think, five or six roofs together.  I did

15  the marking on the first roof, all slopes, and she --

16  then I asked her to, you know, watch what I'm doing

17  and then asked her to go through and X out anything

18  she didn't think was hail or a question mark that

19  she -- for discussion purposes.  We were tracking on

20  about 90 percent of what I marked.  We had discussions

21  on two or three.  I purposely marked a couple that

22  were mechanical damage and that were manufacturing

23  defects, and she caught those.  And then the next five

24  roofs, she proceeded to mark those, and I repeated the



1    role that she played on those.  And by the time we got

2    done with that inspection and then looking at the

3    windows, the sides, the downspouts, very clear to me

4    she knew what she was doing.  I was very comfortable

5    turning her loose on any inspection that we could do.

6        Q.   Other than your personal experience with her

7    on that occasion and any other interactions you've

8    had, are you familiar with her professional

9    qualifications?

10        A.   Yes.  I also got -- and I can't tell you

11    right now what those were, but I did get some

12    references from people who have worked with her

13    before.  And everything came back glowing.

14            I'll even go on record to say I offered her a

15    job, and she decided at this point not to.  She likes

16    the subcontractor role.  So maybe that will change.

17        Q.   I'm handing you Exhibit 157.

18        A.   Yes.

19        Q.   And that is the FBS Inspection and Consulting

20    Services Agreement with the Thompson, Brody & Kaplan

21    firm in connection with this Forest Ridge matter,

22    right?

23        A.   Yes, it is.

24        Q.   And that's your digital signature dated



1    September 20, 2017, on the last page?

2        A.   It is, yes.

3        Q.   On the first page under the heading, I guess

4    it's 1(a)(1), and this is part of what's described as

5    a Phase 1 Nondeconstructive Building Survey?

6        A.   Yes.

7        Q.   Should that say nondestructive or is that

8    supposed to say nondeconstructive?

9        A.   You know, that's the first time anybody has

10   ever pointed that out.  Because technically

11   deconstruction is a philosophical theory, the

12   deconstructionist movement.  So I guess

13   philosophically speaking, we did more than that.

14           So I appreciate that, Counsel.  We might make

15   a change there.  But yes, this is essentially saying

16   that we are not going to do destructive inspections in

17   that phase without additional authorization.

18       Q.   The first item listed under that heading

19   refers to reviewing all documents in the possession of

20   the building owner and/or building manager, public

21   adjuster, or attorney representing the client.  And it

22   mentions specifically photos, blueprints, insurance

23   company correspondence, repair estimates, adjusters

24   estimates, and maintenance records.  Have I fairly



1  captured that paragraph?

2      A.    You have.

3      Q.    Did FBS obtain all those documents from

4  Forest Ridge in this case?

5      A.    What we retained -- what we received from

6  Forest Ridge would have been sent to you in the

7  document discovery request, and it would be in what's

8  called "Client File."  So whatever is in the client

9  file is what we were given at intake.

10          In addition, there would have been an intake

11 sheet that we filled out, which you also should have a

12 copy of, that would have been, you know, the

13 association, the address.  On there would have been

14 the date of loss that we were given.  That's where we

15 would get the date of loss.  So that should also be in

16 the file.  If not, I can make a call at the break and

17 make sure that that gets sent over.

18          One important point on one that I want you to

19 note, I want to note for the record as well, it

20 doesn't say insurance policy.  We really don't care

21 about the insurance policy.  We don't care about

22 coverage.  We really go out there with a feeling that

23 we're representing the buildings that we're

24 inspecting.



1    Q.   If the documents that have been produced by

2   FBS in this litigation do not include any maintenance

3   records, would that mean that FBS did not receive any

4   maintenance records from Forest Ridge?

5    A.   That's exactly what that would mean.

6    Q.   Would the same be true of blueprints or any

7   other type of document?

8    A.   Absolutely true, yes.

9    Q.   Item 2 states:  Interview property owner or

10   occupants to establish locations where exterior and/or

11   interior damage have occurred.  Did I capture that

12   accurately?

13    A.   Yes.

14    Q.   Did FBS interview the property owner or any

15   occupants?

16    A.   No.  We were told there was no interior

17   damage associated with the claim.  This is a general

18   boilerplate Phase 1 that goes on all of our

19   agreements.  That would be more probative to water

20   damage, water intrusion in a bunch of units in a

21   building like this.  So we got to take -- so we got to

22   come in this room.  We got to look and there's three

23   ceiling tiles that are stained.  We want to find out

24   from that building owner or that person occupying the



1  office when did those stains occur.  They've been here

2  for 20 years.  Oh, okay, it's probably not part of the

3  storm damage.

4      Q.  If you turn to page 2, at the top, cost of

5  services.

6      A.  Yes.

7      Q.  37,000 plus travel expenses?

8      A.  Yes, fixed price.

9      Q.  Has that all been paid?

10     A.  It has.

11     Q.  A few paragraphs down, it refers to the

12  possibility of additional work outside of the scope of

13  services.

14     A.  Yes.

15     Q.  And it says, "This additional work will be

16  billed on an hourly basis?"

17     A.  Yes.

18     Q.  Has any work by FBS in this matter been

19  billed on an hourly basis?

20     A.  I don't think so.  I think the additional

21  work that I did on the supplemental report was done on

22  a fixed fee.  I think it also says, "Or a fixed fee

23  basis."  At least that's the spirit of the agreement.

24  And so I think we gave them the option to say, hey,



1    we'll kick this out for this amount of money.  They

2    agreed to it.

3          And then today's deposition, billing was sent

4    for that yesterday based on the deposition rates that

5    we have.  And that was sent to counsel.

6      Q.   So is there a separate agreement for the

7    supplemental report?

8      A.   No, it's included in this.

9      Q.   Has FBS been paid or will it be paid any

10   additional sums for that supplemental report beyond

11   the 37,000 that's set forth in this document?

12     A.   I can't tell you if we've billed it yet or if

13   we have been paid.

14     Q.   Do you expect to be paid something for doing

15   that?

16     A.   Yeah.  It took some time.

17     Q.   If you have billed it and/or it has been

18   paid, would you produce a copy of that invoice to

19   Ms. Kaplan to send my way?  If it hasn't been billed

20   or invoiced yet, could you see that when it does, a

21   copy of it comes my way?

22     A.   I will.

23     Q.   Thank you.

24          Mr. Nierengarten, I understand, just prior to



1    his deposition did a brief inspection of the property?

2        A.   Yes.

3        Q.   Do you know whether FBS has billed

4    Forest Ridge for that time?

5        A.   Yes, I'm guessing that they bill that as part

6    of his deposition prep, and so there would be an

7    invoice that would have been sent with the travel

8    expense and the deposition.  I don't know the status

9    of payment on that.

10       Q.   When that comes down the pike, if I could get

11   a copy of that, too.  Thank you.

12       A.   Not a problem.

13       Q.   I'm handing you Exhibit 158.  Can you just

14   confirm those are all FBS's invoices that...

15           MS. KAPLAN:  Would have been produced as of

16   the date of our expert disclosures, January 26, 2018.

17           MR. FORTIN:  Yes.  Thank you.

18           THE WITNESS:  Yes.

19   BY MR. FORTIN:

20       Q.   The second to last invoice refers to a report

21   Phase 3.  And the consulting agreement we just looked

22   at I think just had a Phase 1 and a Phase 2?

23       A.   Yes.

24       Q.   So is that just a scrivener's error?



1      A.    Yes.

2      Q.    Should that say Phase 2?

3      A.    Phase 2 is what it should say.

4      Q.    And then the last invoice is for additional

5    work performed, wall measurement report?

6      A.    Yes.

7      Q.    What is that?

8      A.    Well, we noticed in the documents that --

9    well, once we got done inspecting and we knew that the

10   scope of your work, as you see by the document,

11   included putting together an estimate, once we

12   conducted our inspection and determined that the

13   siding needed replacement, we did not have in the file

14   any measurements for that, other than measurements

15   that were taken about J.S. Held in their field notes.

16   They measured all of the buildings for siding.  But we

17   weren't going to trust those measurements.  So rather

18   than going back down there, we ordered EagleView

19   measurements of the siding, and that was the cost for

20   it.

21      Q.    When you refer to J.S. Held's measurements,

22   are you referring to whatever is contained within

23   their estimate?

24      A.    No.  They actually have separate field notes



1  where they on each building -- you know, if you

2  understand and you're trained in how to take field

3  notes for estimating, I interpreted those triangle

4  10-by-10, they're basically mapping out the siding for

5  each building in terms of the square footage.

6      Q.   But you didn't have those when you prepared

7  the initial Joint Storm Damage Report in this case,

8  right?

9      A.   I don't know if we had them or not.  I think

10  we did.  I think we had those.  Maybe we didn't.  I

11  don't know sequence-wise.  At any rate, we didn't have

12  information that we felt we could use, so we ordered

13  the EagleViews as an additional fee.

14      Q.   Should the EagleViews have been part of what

15  was produced to my firm with FBS's file?

16      A.   Yes.  And I would anticipate that the firm

17  that hired us would want to see those as well to

18  verify that we actually ordered them, because they

19  paid for them.  So yes, you should have those.

20      Q.   I'm handing you Exhibit 159.  It's the

21  EZ Claim invoice.  You understand EZ Claim to be

22  Hannah York's company?

23      A.   Yes.

24      Q.   According to this invoice, she was paid a



1    flat fee of -- or to be paid a flat fee of $10,200 to

2    inspect all 51 buildings?

3        A.   Yes.

4        Q.   Has she been paid that amount?

5        A.   She has.

6        Q.   Has she been or will she be paid any more by

7    FBS on this Forest Ridge matter?

8        A.   No.  Any additional work is direct bill for

9    her for trial or deposition.

10       Q.   By direct bill, you mean bill to someone

11   other than FBS?

12       A.   Correct.  Yeah.

13       Q.   And I'm handing you Exhibit 209.  Just take a

14   look at the first page of that, and let me know if

15   that's Brian Johnson's invoice for his services as a

16   consultant in this matter?

17       A.   Please understand I don't see these invoices.

18   Okay.  They go to directly to our bookkeeping/billing

19   department.  But I certainly recognize this as

20   something from Brian Johnson, and it does say -- but

21   it's not marked paid, so I don't know what it's for

22   because it doesn't have a -- there, Forest Lake.

23       Q.   Right.  It says Forest Lake not Forest Ridge.

24   I think he said that was an error.



1    A.    Yeah.  I think you covered that in the
2  deposition, yes.  So yeah, this appears to be -- he
3  agreed to $3,500.  This appears to be that invoice.
4    Q.    Does FBS expect to pay him any more in
5  connection with this Forest Ridge matter?
6    A.    No.  And I know on this one, we booked his
7  flight for him because he was going down with Kevin,
8  and he rode with Kevin in the rental car.
9    Q.    Do FBS employees log their time to a specific
10  file when they're doing a flat-bill project?
11    A.    No.  We used to for the first eight years of
12  our practice, as your former firm was well aware, and
13  we were told often nobody saw bookkeeping like that.
14  And it was to within five-minute increments.  We don't
15  do that anymore.  We've gathered enough information to
16  recognize how long something's going to take and how
17  to bill for it, so we bill on a set price.
18        MR. FORTIN:  I'm going to hand you what I'm
19  marking as Exhibit 249.
20                    (Whereupon, Exhibit No. 249 was
21                     marked for identification.)
22  BY MR. FORTIN:
23    Q.    And I'd like you to turn to page 11 of this
24  exhibit, and you'll see there an email dated



1  September 11, 2017, from Sarah Jin to Tina Shoals

2  (phonetic).  Do you recognize the name Tina Shoals?

3      A.   Yes.

4      Q.   Is she a current or former employee of FBS?

5      A.   Former.

6      Q.   And was she an employee of FBS as of

7  September 11, 2017?

8      A.   Yes.

9      Q.   Understanding that you are not the sender or

10  a recipient of this email, do you recognize it as

11  being part of FBS's file opening process, or I think

12  you used phrase intake form earlier?

13      A.   Well, this is the intake form.  So the intake

14  form was sent to this person, and this person,

15  whoever, filled out the information on here.  So it

16  would have been sent, "A" was empty.  They filled out

17  in dark letters the address.  "E," they filled out

18  date of loss, policy number, claim number.  So

19  anything that is in black is what they filled out.

20  It's programmed to do that.

21          And then I think in our file, we subsequently

22  then printed this off as an actual intake form.

23  Because I looked at it last night in our file, so it

24  would be duplicate to this.



1    Q.   So this email would have been when the

2  August 2, 2015, date of loss was provided to FBS?

3    A.   Yes.

4    Q.   Why does FBS ask what has been covered and

5  not covered by insurance?

6    A.   At the time this comes in as an intake form,

7  we're never sure if this is going to all of a sudden

8  change once we start pricing it, once we start getting

9  into looking at it.  If all of a sudden the client is

10  going to say out of the clear blue, hey, let's go to

11  appraisal.  It happens a lot, particularly in the

12  appraisal market today.  So this could have easily

13  from September 11 to a week later flipped to an

14  appraisal.

15       As an appraiser, it's very important for me

16  to know if there's coverage that's been established or

17  not, because in some states, we can't go to appraisal

18  if there's been no coverage without sometimes a court

19  order.  So that's why that's on there.  Okay.

20    Q.   If you turn the page, in the field for the

21  type of loss, it looks like it says, "property damage

22  to the roofs of 51 multistory buildings as a result of

23  a hail storm/event."  Does this indicate that when FBS

24  first received this assignment that siding was not



1  part of it?

2      A.   No.

3          MS. KAPLAN:  Object to the form of the

4  question.

5          THE WITNESS:  Excuse me.

6  BY MR. FORTIN:

7      Q.   Does this -- at some point -- let me try that

8  again.  FBS inspected siding and roofs out at

9  Forest Ridge, right?

10     A.   Yes.

11     Q.   Do you recall when FBS was first asked to

12  include the siding in their inspection?

13     A.   I included it.  As soon as the intake form

14  came up, what we do -- and you will see this again in

15  the documents we submitted, you'll see some Google

16  Earth photos, and you'll see documents that were sent

17  to us by counsel.  When I pulled it up and saw that it

18  was vinyl siding and that it's a hail storm, I

19  immediately said, we're including looking at the

20  siding, as well, on this.

21     Q.   And who did you communicate that to?

22     A.   Mr. Thompson, Steve Thompson, yeah.  He said,

23  is that going to cost any extra.  I said, no, because

24  quite frankly, we have to put the ladders up anyway --



1    you're laughing at Steve.

2            MS. KAPLAN:  Sounds like him.

3            THE WITNESS:  Is that going to cost any

4    extra.  I said, no, because basically we walk around

5    every building anyway because we're looking for

6    collateral signs, spatter, dents in downspouts, dents

7    in gutters, window screens that are damaged, those

8    kinds of things.  And so that was something we would

9    just do.

10                        (Whereupon, Exhibit No. 250 was

11                         marked for identification.)

12    BY MR. FORTIN:

13        Q.   I'm going to hand you what I marked as

14    Exhibit 250.  And I'll ask you to just note at the

15    bottom of that first page that there is starting there

16    an email from Steve Thompson to Ms. Kaplan and a

17    Henry Kolbe.

18        A.   Yes.

19        Q.   September 22, 2017.  Does that name -- is

20    that familiar to you?

21        A.   No.

22        Q.   I'll represent to you that Mr. Kolbe is a

23    member of Forest Ridge Board of Directors.

24            I take it that you have not seen this email



1    from Mr. Thompson before?

2        A.   I'm not copied on it, so no.

3        Q.   If you'll turn to the second page, the third

4    paragraph down that begins with the word "instead."

5        A.   Yes.

6        Q.   Take a moment, it shouldn't take you long,

7    you said you speed read, just to read that paragraph,

8    and let me know when you're done.

9        A.   I think that I should use him to introduce me

10   at my talks that I give around the country.  Very

11   glowing.

12       Q.   Can I take that to mean that you're done

13   reading the paragraph?

14       A.   I am.

15       Q.   In the first sentence there -- actually, I

16   guess, it's the second sentence.  He says, "I worked

17   with and against Mr. Irmiter's firm."  Do you see

18   that?

19       A.   Yes.

20       Q.   Do you recall any instance prior to

21   September 22, 2017, where FBS had worked with or

22   against Mr. Thompson's firm?

23            MS. KAPLAN:  I'm going to object to the form

24   of the question.  The sentence says, with and against.



1   It's not clear, and I think it's inappropriate to ask

2   the witness to interpret Mr. Thompson's email.  But I

3   think if you want to rephrase the question, to include

4   that wording instead of with or.

5   BY MR. FORTIN:

6       Q.   Yes.  I'm sorry.

7            As of the date of this email, September 22,

8   2017, had FBS ever worked with and against

9   Mr. Thompson's firm?

10      A.   We had never worked with his firm.

11      Q.   Had you ever worked against his firm?

12      A.   I think he represented -- or their firm

13  represented one of the insurance companies in one of

14  the appraisals I worked on.

15      Q.   That would be the Willows appraisal?

16      A.   I don't remember, but maybe.

17      Q.   And as of the date of this email, is that the

18  only time you had come across Mr. Thompson?

19      A.   That I recall.  However, in the history of

20  our firm, we've done a lot of stuff in Illinois even

21  back as far as 2003, 2004.  So is it possible that his

22  firm was involved in some of those, it could have

23  been, but I don't recall.

24      Q.   The third line of this paragraph, in the



1    middle of that line there's a sentence that starts,

2    "Additionally, they advised that they represented a

3    number of associations in the Chicago area where the

4    storm occurred and were successful in recovering for

5    roof damages in each and every instance."  Did I read

6    that correctly?

7        A.   Yes.

8        Q.   Is that information that you had communicated

9    to Mr. Thompson prior to or on September 22, 2017?

10       A.   No.

11       Q.   Had anyone else from FBS communicated with

12   Mr. Thompson or anyone at his firm in connection with

13   this Forest Ridge matter?

14       A.   No.

15       Q.   So is it fair to say you don't know where he

16   got that information from?

17       A.   I have no idea.

18       Q.   Okay.

19       A.   It's a small world out there.

20       Q.   As of September 22, 2017, had FBS represented

21   any associations in the Chicago area in connection

22   with the August 2, 2015, storm?

23       A.   No.

24       Q.   The next sentence says, "I have asked



1  Mr. Irmiter to review the estimates and photographs."

2  I'll stop there.  As of this date, do you recall

3  having received any documentation from Mr. Thompson's

4  firm to look at?

5      A.   Yes.  He sent us -- I said, send us over the

6  preliminary file; I'll take a look at it.  That

7  happens every day in our practice.  That's how we get

8  engaged essentially.

9          So what I would have done at that point of

10  time is, I would have -- the very first thing I would

11  have done is, I would have gone to one of the

12  documents that had the address.  I would have gone to

13  NOAA, the NWSI, Severe Storm Data Inventory.  I would

14  have plugged in that address.  I would have looked at

15  the date of loss.  And I would have seen what is NOAA

16  showing me.  Is there weather in the area that day,

17  and there was a crap load of weather in the area that

18  day on every one of the sites that I looked at.

19          So to me, that was an indication that there's

20  clearly a storm that occurred on that day.  And the

21  reason we do that is, you have to understand,

22  Counselor, 30 percent of the work that comes into our

23  office we say no to, because people send us crap files

24  of damage that really doesn't exist.  And one of the



1    ways that we vet through that is getting an initial

2    file, looking at that file, and checking weather data.

3    Sometimes those evolve into what's called a scoping

4    visit where we simply go down to see, boots on the

5    ground, are we seeing any damage.  Maybe the weather

6    data's wrong, maybe there actually is damage.

7           In this case, everything seemed to stack up

8    to the date of loss on a preliminary basis.  I think

9    that's what he might be referring to.

10      Q.   My question was really just strictly as to,

11   I'm trying to understand what estimates and what

12   photographs he provided you that you had already

13   reviewed by at that point in time.  So let's look

14   at -- I'm going to hand you the Joint Storm Damage

15   Report, which is marked as Exhibit 160.  Just so we

16   have a better digital copy.  You'll see the stamp on

17   the front is electronic rather than --

18           MS. KAPLAN:  And this may shortcut things,

19   but the documents that we provided I think in the

20   email that you marked as 249, there's subsequent

21   reference to our firm uploading documents via Dropbox.

22           MR. FORTIN:  Yeah.

23           MS. KAPLAN:  And then those documents were

24   produced as part of the client file with the FBS file.



1        MR. FORTIN:  Yes, that's what I assumed is

2   what happened.

3        THE WITNESS:  Yes.

4   BY MR. FORTIN:

5      Q.   So you've already turned to the right page, I

6   see, of Exhibit 160.  That's FBS's Joint Storm Damage

7   Report?

8      A.   Yes.

9      Q.   And you were looking at section 1.6?

10     A.   Yes.

11     Q.   The bullet points listed in that section, are

12  you able to tell me, as we sit here today, whether you

13  had received and reviewed all of those documents as of

14  September 22, 2017?

15     A.   Yes, I had.

16          What was that date that you asked me,

17  September what?

18     Q.   22, 2017.

19     A.   Yes, and that would make sense.  Because if

20  you take look at Exhibit 157, all right, and you look

21  at when I signed it and sent it, I'm already in the

22  process of -- I've already developed a scope; I've

23  already developed a price; and I've already sent out

24  an agreement that predates this email.  So, again, I



1   couldn't have done any of that without this

2   information right here.

3       Q.   When you say you've developed a scope, what

4   do you mean by that?

5       A.   A scope of inspection.  Not repair, of what

6   are we going to do down there to inspect these

7   projects.

8       Q.   Other than the documents listed in section

9   1.6, did FBS ever receive any other documents from

10  Forest Ridge or Ms. Kaplan's firm other than -- or let

11  me clarify.  As of the date of this report, had FBS

12  received any other documents from Forest Ridge or

13  Ms. Kaplan's firm?

14          MS. KAPLAN:  So as of November 16, 2017.

15          THE WITNESS:  No.

16          MR. FORTIN:  Turning back to Mr. Thompson's

17  email.  Can someone help me out, we were calling that

18  Exhibit 250, right?

19          MS. KAPLAN:  Yes.

20          MR. FORTIN:  Thank you.

21  BY MR. FORTIN:

22      Q.   There's a sentence maybe about three-fifths

23  of the way through this paragraph that starts out "He

24  believes the damages are much closer to $4 million



1    than they are to 2 million."  Do you see that?

2        A.    Yes.

3        Q.    At this point in time, what was the basis

4    for -- or let me try that again.  Is that an accurate

5    statement as far as your belief at this point in time?

6        A.    Yes, because I thought there was interior

7    damage.  Looking at the tarps and things, I thought

8    that we were also going to be looking potentially at a

9    bunch of exterior stuff, and there wasn't.  It wasn't

10   there.  So from that standpoint, that would have

11   increased the numbers exponentially, so...

12       Q.    Wait.  So the $4 million that was quoted

13   there, is that --

14       A.    It's ballpark.

15       Q.    Right.  I understand.  I'm just trying to get

16   a handle on what's in that ballpark.  Does it include

17   what you anticipated to be interior damages?

18       A.    That ballpark was arrived at by looking at

19   similar projects around the country.  We work in 38 to

20   40 different states.  We do projects of this size.

21   That's looking at similar kinds of projects to say

22   where have the numbers come in with 51 buildings or

23   42, whatever the number was on these buildings.  And

24   the numbers generally come in anywhere from, you know,



1   1.8 million to 5 million.  That was what I recall

2   saying to Steve.  How he chose to use those numbers,

3   okay, I can't control that in how he communicates it

4   to his client.  At that point, we had not produced an

5   estimate.

6       Q.   At this point in time, had you formed a

7   belief as to whether -- let me try that again.

8            At this point in time, had you formed a

9   belief as to whether hail or wind from the date of

10  loss that was provided to you would require

11  replacement of any siding at the property?

12      A.   I hadn't determined at this point in time

13  that hail had even damaged the property.  I hadn't

14  been there.  That would be absolutely egregious of me,

15  as a causation expert, to determine causation before I

16  got to the site and do my own ground truth

17  investigation or have my trained staff and

18  subconsultants do that.

19           So no, I had no opinion other than the fact

20  there was a storm that went over this site on the date

21  of loss.  That's all I had.  I could have gone down

22  there and said, guess what, for some reason this storm

23  missed this entire site, and there's no damage.

24      Q.   Have you ever communicated directly with



1   anyone at Forest Ridge?

2       A.   No.

3       Q.   Have you ever communicated directly with the

4   property manager for Forest Ridge?

5       A.   No.

6       Q.   Have all of your communications

7   regarding -- strike that.  That was a bad question.

8   I'm always disappointed when the transcript comes back

9   and when I say "strike that," it doesn't make it

10  disappear.  It just has me saying "strike that."

11          Did you ever communicate directly with

12  Hannah York regarding this Forest Ridge matter?

13      A.   Absolutely.  Oh, yeah.

14      Q.   And did any of those communications take

15  place in person?

16      A.    No, they were via phone.  In fact, after her

17  first day of inspecting, I remember calling her just

18  to say, hey, how did it go, what did you find, what

19  kind of damage are you finding down there?  I think it

20  might have been the second or third day of her

21  inspection where we began to get data from her

22  downloaded to our server so I could actually start

23  looking at some photos.  Because I'm curious at that

24  point.  It's a big project, you know.  What I'm



1    curious about at that point in time is I received a

2    pretty sizeable downpayment check, am I returning that

3    because we have to stop the inspection, which happens

4    occasionally.  And that was not the case.  There

5    certainly was damage there, so...

6         Q.   Did you ever communicate with anyone with the

7    Village of Streamwood in connection with this

8    Forest Ridge matter?

9         A.   Yeah, I had a conversation with the Building

10   Code official, and I can't remember his name now.  I

11   know you took his deposition.

12        Q.   Does John Peterson sound familiar?

13        A.   Yes.

14        Q.   So you had a conversation with John Peterson?

15        A.   Yeah.  I reminded him that we had done a

16   project there a few years before, wanted to find

17   out -- I said, I looked online.  We got all the data.

18   I'm looking at, you know, circa 2012 stuff.  I'm

19   looking at circa now.  Looks like the rules haven't

20   changed with regard to your matching issues, is that

21   true, and he confirmed that they hadn't.  I didn't ask

22   him to repeat that back in an email.  I didn't ask any

23   of those.  But that's a conversation that I had

24   Building Code official to Building Code official.



1    Q.   When you used the phrase -- or the word

2    "data" a moment ago, are you just referring to local

3    amendments to the Building Code?

4    A.   Yeah, the local ordinances that we have put

5    into the report here, and my interpretation of them

6    was consistent with how he told me he would interpret

7    those.

8         I want to go back on record.  I didn't say

9    this.  I do recall I did read his deposition as well.

10   Q.   In preparation for today?

11   A.   Yes, in preparation for today, I did read his

12   deposition, and have a very clear understanding what

13   he said in his deposition is consistent with how he

14   told me he would interpret siding and roofing

15   replacement.

16   Q.   And when did he tell you how he would

17   interpret siding and roofing replacement?

18   A.   This would have been the call that I made

19   some time between when we were retained and after the

20   inspection.

21   Q.   So it's as part of this phone conversation

22   you've been describing?

23   A.   Yes.

24   Q.   Was that the only communication you had with



1   Mr. Peterson regarding this Forest Ridge matter?

2      A.   Yes.

3      Q.   When you called him --

4      A.   By the way, I did not identify that it was

5   Forest Ridge.

6      Q.   You're saying you didn't identify that to

7   Mr. Peterson?

8      A.   No.  I said we have an association we're

9   working with in the city of Streamwood.  I did not

10  identify Forest Ridge.

11     Q.   When you were describing your phone

12  conversation with him, you mentioned that you had

13  reminded him that you were involved in a previous

14  property out there.  Would that be the Southgate?

15     A.   Yes.

16     Q.   Did you have any communications with the

17  Village of Streamwood in connection with the Southgate

18  matter?

19     A.   I did not.  Brian Johnson did.  I stopped in

20  during my inspection to Southgate, but they were out

21  in the field.  So they only had the front permit desk

22  person there.  I picked up copies of the ordinances

23  when I was there that are also addressed in that

24  report, but I didn't have a chance to have a face to



1    face.

2        Q.   Other than internally at FBS, Mr. Johnson,

3    Ms. York, and Ms. Kaplan's firm, did you communicate

4    with anyone else regarding this Forest Ridge matter as

5    of the date of your Joint Storm Damage Report, which

6    was November 16, 2017?

7        A.   We didn't mention Mr. Johnson in that list,

8    but including Mr. Johnson, no.

9            MR. FORTIN:  Do you want to take five.

10           MS. KAPLAN:  Well, we both are going to have

11   to have some lunch at some point.  I will defer to

12   Mr. Irmiter whether he thinks he can go for a little

13   while longer.  I would prefer personally not to wait

14   more than another 45 minutes before we break for

15   lunch.

16           MR. FORTIN:  That's fine with me.

17           MS. KAPLAN:  But if you want to break now.

18           THE WITNESS:  If I could just have five

19   minutes to use the bathroom, let's come back.

20                       (Whereupon, a short break

21                        was taken, after which the

22                        following proceedings were

23                        had:)

24



BY MR. FORTIN:

    Q.   You did an inspection on November 9, 2017,
right?

    A.   Yes.

    Q.   Do you recall roughly how long you were on
site that day?

    A.   Seven hours.

    Q.   Do you recall how many buildings you went on?

    A.   About 10.

    Q.   And how did you select those 10 buildings?

    A.   In a couple of instances, there was photos
that were taken either by Kevin and Brian or by Hannah
that when I looked at them and blew them up, they were
blurry.  I mean, the camera just didn't focus as well.
So I wanted to go back to some of those individual
roofs, and with my camera holding it about this close
and putting it on the microscopic setting, get some
photos that I would utilize at trial, if this went to
trial.

         Secondly, I wanted to make sure that I was
covering all of the compass points.  Some of the
buildings face, because -- so they're on curves and
things, so you don't necessarily have true north,
south, east, west.  Sometimes you have southeast,



1  sometimes you have northwest directions, those things.

2  So I wanted to make sure I was catching all of the

3  compass points.  And 10 buildings allowed me to do

4  that.

5       I will add one more thing.  The other thing I

6  wanted to document, even though they didn't photograph

7  these, I was told that there were some mechanical

8  damage or manufacturing damages that they saw out

9  there.  So I wanted to document those, and I did.  I

10 think you'll see in my photos where I got two bundles

11 of shingles that are clearly -- and honestly, I

12 don't -- they wanted me to look at those.  They wanted

13 my opinion of what I thought that was.  If you install

14 shingles and you are up on the roof on a hot day and

15 you're pulling them apart and installing them, that's

16 exactly what they look like when they stick together.

17   Q.   Getting those up-close photos and documenting

18 some of the mechanical damage, were those the only

19 two -- I don't want to use the word gaps, but were

20 those the only two things that you felt you needed to

21 supplement Kevin and Brian and Hannah's inspections by

22 addressing?

23   A.   Well, I wanted to also get my own eyes on the

24 site, no question about it.  The other thing I wanted



1  to take a look at the wind issues, the wind damage

2  that had been addressed by Rocco at that point in time

3  and which confirmed my thoughts that there were some

4  pretty substantial winds that day.

5          So you'll see where I'm actually taking

6  photos from the ground, and what we would tell a jury

7  is that if you have enough experience in looking at

8  wind damage on a peaked roof, depending on the slope

9  of the roof, the height of the building, and how tall

10  you are, you can actually put yourself in a position

11  with your camera where you can scan across the roof

12  and from the ground, you can actually see the lift in

13  shingle tabs, and that's what I was taking pictures

14  of.  So, again, that was just to confirm, based on how

15  I look at wind damage, that there was damage to the

16  shingles, many, many debonded shingles.

17     Q.   Did you also look at the siding of those 10

18  or so buildings while you were on site?

19     A.   I looked at the -- I walked around the entire

20  complex.  So I walked, you know, quickly, but I walked

21  every building.  And the problem with determining the

22  siding damage, unlike other vinyl siding projects

23  we've looked at typically, was on one side, depending

24  on how a building was acclimated, you might have had,



1    you know, two sides.  It was limited -- it's also hard

2    to see, quite frankly, and I believe that -- I feel

3    confident there's more damage out there than we were

4    able to ascertain, because you literally would have to

5    put a ladder up and move across the buildings to get

6    all of it.

7        Q.    When you say "ascertain," do you mean

8    document through photographs?

9        A.    Yes.

10            I mean, there's even one, I think, of one of

11   my photos where I had walked around the building, did

12   not see any hail damage to siding.  And then you see

13   me up on the roof, and I'm shooting over to the next

14   building, because as I'm looking, oh, didn't see it

15   from the ground but saw it from up above.  So I took a

16   photo of it.

17       Q.    Am I correct that FBS, including you, did not

18   document hail damage to the siding on every building?

19       A.    Correct.

20       Q.    Do you know roughly how many of the buildings

21   FBS did document siding damage to?

22       A.    Half, about half of them, yeah.

23       Q.    And if we wanted to know exactly how much, we

24   could do that by going through the photographs taken



1  by yourself, by Mr. Johnson, Mr. Steinke,

2  Mr. Nierengarten, Ms. York to see what buildings they

3  took photographs of siding damage on, right?

4      A.   Well, yes.  If one were looking at the only

5  reason to replace or do anything with siding would be

6  damage from hail.

7      Q.   Right.  And that's all I'm asking about right

8  now.

9      A.   Siding is going to have to be manipulated for

10 another reason as well, and in my opinion, that's

11 going to really tip us over the edge on the siding

12 issue.

13     Q.   Right now I'm not talking about repair,

14 replacement, or methods of doing that.  I'm just

15 talking about the existence and identification of the

16 actual physical damage.

17     A.   Yes.

18     Q.   As part of your inspection, you were looking

19 for, I take it, hail and wind damage, right?

20     A.   Yes.

21     Q.   You also said you were trying to document

22 some mechanical damage?

23     A.   Yes.

24     Q.   And earlier you mentioned looking for



1  collateral.  I don't know if you said collateral

2  damage, but you used the phrase "collateral," right?

3      A.   Yes.

4      Q.   Is that something else you were looking for

5  during your inspection?

6      A.   Yes.

7      Q.   And can you describe that for me a little bit

8  more what you mean by collateral?

9      A.   Damage to screens, damage to downspouts or

10  gutters, damage to cedar decking or cedar material,

11  spatter that would show up on concrete, particularly

12  concrete that's got pollutants on it.

13          And then the other thing that I was looking

14  at -- because we knew the hail was small.  I mean, all

15  the reports are, you know, 1 to 1.25, and that's what

16  all the photos seem to indicate as well.  What I

17  wanted to focus on a little closer was -- and you'll

18  see where I've actually got my camera sitting on the

19  deck so that you can see the side view and the actual

20  indentation.  What I'm looking for is the depth of

21  that indentation, as well, because that tells me that

22  we got some pretty darn hard hail.  And the way that

23  we explain that to a jury is, you can have a malted

24  milk ball that is the same size as a marble.  And I



1    can take both of those in this room, and I can shoot

2    them with exactly the same terminal velocity from a

3    sling shot.  And the malted milk ball is going to go

4    poof, and the marble is going to go right through the

5    wall.  So it's not always about size.  And this was

6    clearly some very hard hail because it put holes in

7    the roof in a couple of areas that I saw.

8        Q.   In section 1.7 of the report, there's a list

9    of reference materials?

10       A.   Yes.

11       Q.   And one of those reference materials is the

12   Haag Education, Haag Certified Roof Inspector Program,

13   Residential Edition?

14       A.   Yes.

15       Q.   Is that a program that you had personally

16   participated in?

17       A.   No.  I have listened to Tim Marshall,

18   Richard Herzog speak.  I've read all of their

19   technical papers.  I've read all of the asphalt

20   testing documentation that they've done on various

21   products.  I have read this cover to cover.  And

22   obviously have thoughts and opinions on it.  That's

23   why it's listed here.

24       Q.   When you say you have thoughts and opinions



1   on it, I take it you did not agree with everything it

2   contains?

3       A.   You know, I don't know that I would say --

4   it's how it's presented, that's the issue.  If you

5   really look at it closely, it's a great manual if you

6   don't know anything about roofing products and want to

7   learn about how they're made and how to install them

8   in a compliant manner so that there's not a defect in

9   the design.  Wonderful introduction program.  They

10  then show you examples of what they call mechanical

11  damage, damage that's caused by humans to various

12  roofing products.  And what's really nice is, if you

13  have the actual manual and you go back to the end

14  where they get in very limited about actual damage

15  caused by like hail and you fold over and you compare

16  that hail damage picture to the one that's a

17  mechanical, how would anybody ever be able to

18  differentiate between the two in the field?  They're

19  identical.  That's the problem that I have.  They

20  don't do as good a job really digging into the hail

21  damage issues as much.  And that shows in the reports

22  that they write.  Their focus is always on the four

23  exclusions that are in the policy, as opposed to the

24  actual storm damage.  And the class is geared towards



1   that.

2                       (Whereupon, Exhibit No. 251 was

3                       marked for identification.)

4   BY MR. FORTIN:

5       Q.   I'm handing you what I'm marking as

6   Exhibit 251, and I'll represent to you this is not the

7   entire manual that was produced to us from FBS.  It's

8   just some excerpts from it.

9       A.   Yes.

10      Q.   But starting with the first page, do you

11  recognize this as being the cover page for the Haag

12  Roof Inspector Material that's listed in section 1.7?

13      A.   It's one of them.  I don't know if it's an

14  updated one or which version it is.  But yes, it is

15  one of them.

16      Q.   And based on what you were saying a moment

17  ago, I take it this is a document you were familiar

18  with?

19      A.   Yes.

20      Q.   And have read through?

21      A.   Yes.

22      Q.   And as you leaf through it, you'll notice

23  that there's some handwriting there.  I believe that

24  is Mr. Nierengarten's.  I think this was produced



1  directly from him.

2      A.   How did we produce this without the copyright

3  violations?

4          MS. KAPLAN:  So for the record, this is

5  produced at my direction.

6          THE WITNESS:  Okay.

7          MS. KAPLAN:  I directed Mr. Nierengarten to

8  produce this, because it was requested as follow-up to

9  his deposition, and I explained that it would

10  otherwise be subpoenaed.  And so it was produced at

11  our direction, and that's how it got to him.

12         MR. FORTIN:  So you can't get mad at

13  Mr. Nierengarten.

14         THE WITNESS:  Okay.  All right.

15  BY MR. FORTIN:

16     Q.   I'm not going to use the phrase or the word

17  "authoritative," but is this document at least -- do

18  you view it as a reliable guide for a hail or wind

19  inspection of the type that FBS was undertaking at

20  Forest Ridge?

21     A.   It is a process that is utilized in the

22  industry in terms of using a certain geographic

23  boundary on a roof to determine within that boundary

24  how many imperfections there are in the shingles



1   within that boundary, whether those are due to a nail

2   popping through, somebody hitting it with a hammer, a

3   scuff mark from installation on the edge, hail damage,

4   or wind damage.

5           So yes, there's a method that you can

6   utilize.  It is their method.  It is not a method that

7   is a standard in the industry.  It is an industry

8   practice that is done.  And when I say "standard," I

9   look at industry standards as being things like the

10  Building Code, manufacturer's published instructions,

11  things are that are recognized by engineering

12  communities at large.  So this is really a practice in

13  this situation.  It can work very, very well when you

14  have a lot of buildings, because you can get a good

15  distribution of what's going on.

16          Interestingly enough, when you look at the

17  field notes that were provided from my review by

18  J.S. Held, the counts that they had were very similar

19  to the counts that we had on each roof.  So they were

20  seeing the same kinds of things that we were seeing.

21      Q.   If you'll turn to the second page of this

22  exhibit.

23      A.   Sure.

24      Q.   And you'll see in the bottom left corner the



1   actual page from the handbook that I printed out here.

2   This is page 4.  And it is referring to in the upper

3   left, it uses the term directionality?

4       A.   Yes.

5       Q.   And you're familiar with that term in the

6   context of a hail and wind investigation, right?

7       A.   Yes, I am.  I will tell you that the diagram

8   that they have up here in the left-hand corner showing

9   the roof, I can show you diagrams from other sources

10  that will look different than this in terms of

11  directionality.  This does not show the event of what

12  happens when there is wind and as the hail passes

13  over, you get impact on the back side.  This is only

14  showing one form of directionality, so it can be

15  misleading.  And that's one of the issues I have with

16  the class.

17      Q.   Would you agree at least with the statement

18  below the picture there where it says, "Everything is

19  struck?"  In other words, I take that to mean that

20  hail doesn't discriminate whether it's going to hit

21  the roof or a tree or the hood of a car?

22      A.   Does not discriminate.  Each one of those

23  products will have a different level of robustness to

24  it and will be affected differently.



1    Q.   And the extent to which those things such as

2  plants, trees, car hoods, window screens are affected,

3  is that part of the collateral damage or collateral

4  observations you were referring to earlier as

5  something you look at?

6    A.   Yes.

7    Q.   And what's the reason why you look at those

8  things as part of a hail or wind inspection?

9    A.   Well, sometimes, depending on when we're

10 there, it will allow us to begin to differentiate

11 between different storms.  When you work in Texas,

12 it's not unreasonable to get an assignment, and by the

13 time you get there, there's been three more hail

14 storms and there were seven before that.  So being

15 able to differentiate between storms is important.  We

16 look for those kinds of signature patterns.  We look

17 for spatter marks on certain types of materials that

18 will show up and at some point in time will disappear

19 depending on what the product is.  So these are all

20 signatures that are important to look at, absolutely.

21    Q.   At the beginning of your answer, you

22 mentioned depending on when you're there?

23    A.   Yes.

24    Q.   Do some of these indications or indicia of a



1  recent hail event disappear or fade or otherwise

2  change over time?

3      A.   Yes.

4      Q.   So if you're attempting to differentiate

5  between events, when is the ideal point in time to be

6  able to be at that property to view the damage and

7  these collateral matters we've been discussing?

8           MS. KAPLAN:  Object to the form of the

9  question.

10          THE WITNESS:  Well, in a perfect world, you

11 would conduct a survey over a period of time.  You

12 would conduct a survey as close to the date of loss as

13 possible to look for the spatter and for the damage,

14 collateral damage.  You would inspect it typically at

15 a later date, and then typically, if the work hasn't

16 been done, at a much later date.

17          One of the advantages we have over firms like

18 J.S. Held, over firms like Mr. Horvath who was also

19 involved in this, and we know each other, they

20 oftentimes are inspecting these sites right after the

21 storm.  We often are inspecting them a year and a half

22 to two years later.  So we're going to get different

23 data, no question about it.  When hail strikes this

24 type of a roof, an asphalt roof, it's not



1   self-correcting and the damage will actually worsen.

2   So a lot of times seeing it a year and a half to two

3   years later, we're going to see better hail signatures

4   from that storm event than they're going to see right

5   on that day.  We're also going to lose some signature

6   patterns on materials that oxidize, that leave

7   spatter, because they're going to fill back in with

8   pollutants, and we're going to lose some of that.

9   BY MR. FORTIN:

10       Q.   So in that sense, is there a tradeoff in the

11   advantages and disadvantages of being able to inspect

12   immediately after a storm, as opposed to I think you

13   said a year, year and a half, or two years?

14       A.   Yes, there are tradeoffs.  And you have to --

15   that's why the ground truth investigation is so

16   important.  That's why it's a very tactile process

17   when you're up on the roof.  You wear your fingers out

18   because you are literally feeling.  I will tell you

19   that -- and we would demonstrate this certainly for a

20   jury, and we have in the past.  If I were to take some

21   representative samples of shingles that were damaged

22   in this storm to trial and put those in front of the

23   jury, which I did in the Interlocken case that is

24   mentioned.  I think it's number one on this list now.



1    And what we asked the jury to do was to take the part

2    of the shingle that showed no damage and take their

3    finger and try and rub the granules off, and they

4    could not.  And then I said, okay, now where this hail

5    hit, now take that.  And they would go like that, and

6    the granules just fell off.  That's what a hail shock

7    or a bruise does to the shingles.

8            So you can understand where if somebody's

9    looking at it three days after the storm and we're

10   looking at it a year, year and a half later with the

11   rain and the wind, what's happening at those impact

12   locations is continuing to lose granule, we're

13   continuing to expose the mat.

14       Q.   How long do spatter marks usually last?

15       A.   Depends on the material and it depends on

16   where you're located.  Spatter is really -- there's

17   two things that spatter is removing.  It's either

18   removing a pollutant like a black algae or something

19   like that or it is removing -- like in this picture

20   here, Exhibit 251, page 4, top right-hand corner, this

21   is an electrical box.  If you go up to that electrical

22   box or any electrical box like it even downtown here

23   and rub your hand on it, your hand is going to show

24   gray on the fingers.  That's oxidation of the paint.



1  So what this is doing is it's removing that oxidized

2  paint back to the original surface.  How quickly will

3  that reoxidize depends on the sun and it depends on

4  its exposure to the weather.  I've seen them reoxidize

5  in six months.  I've seen signature hail patterns on

6  different sides of them two years later.

7      Q.   Are you just referring to like electrical

8  boxes right now?

9      A.   Yes.  Electrical box, top of an air

10  conditioner, something that is going to oxidize, yeah.

11      Q.   I recall seeing a few photographs of spatter

12  in your photo log?

13      A.   Yes, on some cement and some windowsills.

14      Q.   Was that the only spatter that you personally

15  observed while you were on site?

16      A.   No.  Our folks had done a good job of

17  documenting.  I was there to look at as much as I

18  could in a seven-hour period, but I was certainly not

19  going to refocus.  I was getting representative

20  samples of what I was seeing.  There's more oxidation

21  on that site, yes -- or more spatter.  Excuse me.

22      Q.   Have you seen any photographs that were taken

23  by Ms. York or Mr. Nierengarten or Mr. Johnson or

24  Mr. Steinke that depict spatter at Forest Ridge?



Thomas Irmiter 05/17/2018

1      A.    I think there's a few, yeah.

2      Q.    Do you recall what materials that spatter

3  appeared on?

4           MS. KAPLAN:  Are you referring to just photos

5  taken by others?

6           MR. FORTIN:  Yes.

7           THE WITNESS:  I think it is, if I recall --

8  and, again, I don't have them in front of me, and it's

9  not a memory test.  But if I recall, I think they took

10  photos of the tops of some of the AC units that had

11  some spatter.  I may be wrong.

12  BY MR. FORTIN:

13      Q.    If you're able to inspect a property say

14  within a week of a hail event of similar magnitude to

15  what you believe occurred at Forest Ridge on August 2,

16  2015, what sort of things would you expect to see that

17  you would not see two years later?

18           MS. KAPLAN:  Object to the form of the

19  question.  Also, object to foundation.  I think the

20  multi-parts of that question, in addition to its

21  hypothetical nature, is inappropriate.  You can answer

22  if you understand.

23           THE WITNESS:  You and I are going to get

24  along much better today if you try not to ask three



1  questions in one.  Maybe break them down a little bit,

2  if you can.  I was going to ask you to do that anyway

3  before she objected.  So maybe we can break those

4  apart a little bit, if you could, yeah.

5  BY MR. FORTIN:

6      Q.   If you're able to inspect a property within a

7  week of a hail event of similar magnitude to what you

8  believe occurred in Forest Ridge in August 2015, are

9  there any things you would expect to see that would be

10  indicative of hail that would not be visible two years

11  later?

12          MS. KAPLAN:  Object to the form of the

13  question again.  Answer if you can.

14          THE WITNESS:  I would not be able to see the

15  granule displacement in the gutters because it

16  typically would have washed out of them by then or

17  been cleaned out.  There was some that we documented.

18  But that would be one thing that I would miss.

19          The exposed fiber mat, and you really get to

20  begin to see this when you blow up these photos that

21  I'm talking about, as I did that yesterday with my

22  photos in particular, as that exposed mat ages, it

23  begins to turn brown.  And when you look at the ones

24  that I looked at yesterday and I blow them up -- they



1  look white.  When you blow them up, you begin to see

2  the subtle brown coming into those, which would be

3  consistent with something that occurred a couple years

4  ago.  You wouldn't see that subtle brown two days

5  after the storm.

6  BY MR. FORTIN:

7      Q.   What would you see?

8      A.   Solid white.

9           So the aging pattern is exemplar of what

10  should be occurring on these roofs right now.  Those

11  are the only two things I could think of.  You might

12  see more spatter as well.

13      Q.   Depending on the season, would you expect to

14  see shredded leaves on trees or flowers and plants?

15           MS. KAPLAN:  I'm going to object to the form

16  of the question, also foundation.  Are we talking

17  about the Forest Ridge property?  Are we talking about

18  any property?  What kind of trees?  What kind of

19  shrubs?  Answer if you understand the question.

20  BY MR. FORTIN:

21      Q.   I mean, the types and trees and shrubs out at

22  Forest Ridge.

23           MS. KAPLAN:  Object to foundation.  We

24  haven't established that he knows what those are.



1          MR. FORTIN:  What trees and shrubs are?

2          MS. KAPLAN:  I don't know what trees are out

3   there.  Do you know the names of the trees and shrubs?

4          MR. FORTIN:  No idea.

5          THE WITNESS:  Yes, if we were there the day

6   after or two days after.  And I've seen plenty of

7   pictures, you know, online that people post.  I've

8   seen plenty of situations where the backyard has got,

9   you know, this much hail in the backyard, and then

10  they pan up and all of the leaves are just shattered

11  on the trees.

12         I don't think this storm had that

13  distribution of hail where you had it literally piling

14  up on the ground.

15  BY MR. FORTIN:

16     Q.   I just want to make sure we're clear.  When

17  you describe seeing, like, videos a moment ago, you're

18  not referring specifically to the August 2015 event in

19  Streamwood, are you?

20     A.   No, no, no, no.  One of the things you learn

21  as a weather spotter is YouTube can be a wonderful

22  tool.  And I'm a bit of a nerd.  So sometimes when I'm

23  sitting around and bored, I will pull up, you know,

24  the latest YouTube videos on storms that have occurred



1    just to see what people are seeing out there.

2        Q.   As part of your inspection of the roofs at

3    Forest Ridge, did you touch all of the marks that you

4    suspected might be caused by hail?

5        A.   Not all of them.  I didn't want to disturb

6    every single one of them.  So some I touched, some I

7    didn't.

8            What interesting is, you'll be able to see in

9    my photos when you blow them up or I blow them up,

10   you'll be able to tell the ones I touched because

11   there's a distribution of little chalk flecks in there

12   that's coming off my finger.

13       Q.   And why do you touch the mark?

14       A.   Well, one, you want to feel if there's

15   indentation.  You want to feel tactilely if you got

16   that indentation, and that's really the main reason.

17       Q.   Are there any other reasons?

18       A.   Well, as I said before, if that -- if a

19   bruise has been created by a hail strike and the mat

20   has been fractured in any way even microscopically,

21   then the area around that, you can just touch that.

22   I've gone like this before and had granules come up in

23   my finger.  I'm not going like this.  I've gone like

24   that.  And then you go like this next to it where



1   there's no hit, and you can't move those granules.  So

2   that is another thing that you can do.  And Haag

3   actually talks about that.  They talk about how

4   important it is to tactilely feel these things.

5       Q.   Did you measure any of the hail impact marks

6   on the shingles at Forest Ridge?

7       A.   No, I didn't.  I certainly -- you can see

8   where I've got my finger next to them.  I've got my

9   hand next to them.  They're all pretty consistent with

10  either side of one inch hail, which is enough to cause

11  damage to this material.

12      Q.   And what material specifically is this?

13      A.   This would be the asphalt shingles and the

14  siding.  And of course, the indentations that on the

15  soft metals as well.

16      Q.   The roofs are fiberglass, right, the shingle?

17      A.   Fiberglass blend, yes.  And it's interesting,

18  because these are a -- there are -- I've actually been

19  to the various plants and seen the shingles

20  manufactured.  There are some that have fiberglass at

21  the top.  There's some in the middle.  There's some on

22  the bottom.  We have pictures underneath on the rake

23  edges sticking out where you can see all the

24  fiberglass on these.  These are heavily laced



Thomas Irmiter 05/17/2018

1    fiberglass.  There's a lot of fiberglass in these

2    shingles, which...

3        Q.    If you turn in Exhibit 251 to page 7.  That's

4    the page number in the bottom right corner.

5        A.    Yes.

6        Q.    You'll see a little table for thresholds for

7    hail caused damage?

8        A.    Yes.

9        Q.    And it has some measurements to the left, and

10   then to the right it describes some material.  There's

11   lightweight composition shingles, heavyweight

12   composition shingles, and wood shingles, and a few

13   more in that list.  Would you consider the roofs at

14   Forest Ridge to be either lightweight composition

15   shingles or heavyweight composition shingles?

16       A.    They're lightweight.  They're not heavyweight

17   at all.  There's a 25 year and a 30 years.  They are a

18   Class A shingle, and they have a C wind rating on

19   them.

20       Q.    What is C wind rating?

21       A.    C wind rating would be a 60 mile an hour

22   shingle.

23       Q.    How do you determine that?

24       A.    Just based on my training, education,



1  experience looking at the shingles, handling them,

2  looking at the seal tabs, lifted up the ones that are

3  debonded, that's what I would rate them at.

4          The point that's important about this

5  one-inch threshold here is, NOAA in their SWDI reports

6  have algorithms.  And they will list probabilities,

7  and they will list the -- for example, they may have

8  100 percent probability that hail fell at a site, and

9  then they may have a 60 percent probability that it

10  was severe or 20 percent that it was severe.  That

11  severe is inaccessible.  That's what they mean.

12          So in this case, if I recall, 100 percent

13  probability, 40 percent severe.  So they're saying

14  there's a 40 percent probability that at this site

15  hail larger than one inch, making it severe, fell.

16  That's how that's interpreted.

17      Q.   That's your understanding of the SWDI tool?

18      A.   It's not my understanding.  That's a fact.

19  That's what it is, so...

20          MR. FORTIN:  What time is it?

21          MS. KAPLAN:  It's 12:35-ish.

22          MR. FORTIN:  Do you want to call it lunch?

23          MS. KAPLAN:  Yes.

24                  (Whereupon, a lunch recess



1                        was taken, after which the

2                        following proceedings were

3                        had:)

4                        (Whereupon, Exhibit No. 252 was

5                        marked for identification.)

6    BY MR. FORTIN:

7        Q.   Mr. Irmiter, I'm handing you what I marked as

8    Exhibit 252, which is a document that I was emailed

9    during the course of today's deposition by Ms. Kaplan.

10   Do you recognize this document?

11       A.   I do.

12       Q.   What do you recognize it to be?

13       A.   These are my field notes.

14       Q.   And earlier did you also refer to this as you

15   go logbook?

16       A.   Yes.

17       Q.   And are these all the notes that you took on

18   site at Forest Ridge?

19       A.   Yes.

20       Q.   And did you take them while you were on site?

21       A.   Yes.

22       Q.   According to the top half of this page, looks

23   like you have notes from Building No. 2, followed by

24   Building No. 5?



1        A.    Yes.

2        Q.    Building No. 2, can you just read your notes

3    for Building No. 2 for me?

4        A.    Sure.  "Front dormer less than 10 square

5    feet, 7 plus.  Front left, 10 plus.  No siding

6    identifiers.  Back, 12 plus."

7        Q.    What does no siding identifiers mean?

8        A.    Means I peeled back carefully a piece of

9    siding and could not find any manufacturer's mark on

10   the siding where up typically would find it.

11       Q.    Did you find weather resistant barrier?

12       A.    In my location, yeah, I did.

13       Q.    Did you peel back any other siding?

14       A.    I don't know.  If I did, it would be in my

15   photos or in these notes.

16       Q.    So if there's no other indication in these

17   notes or in your photographs that you pulled back any

18   siding, that would mean that you didn't do it other

19   than where it's indicated here?

20       A.    Correct.

21       Q.    Building No. 5, the last line of notes with

22   respect to that building looks like it says, siding

23   damage?

24       A.    Yes.



1    Q.   Is there any way for us to tell how much

2    siding damage you saw in Building No. 5?

3    A.   No.

4    Q.   Would your photographs tell us that?

5    A.   It would indicate that I took a picture of

6    siding damage, but I did not quantify it.

7        I will go on record as saying, as I said

8    earlier, there is not a great deal of siding damage on

9    this site.  It's hard to find.  It doesn't present

10   itself like other projects.

11   Q.   What's different about this project?

12   A.   Why is that the case?  I don't understand the

13   question.

14   Q.   Sure.  You said it didn't present itself on

15   this project.

16   A.   Like similar projects.

17   Q.   So what's different about this project?

18   A.   I don't know if the siding is more robust.  I

19   mean, I'm familiar with the siding.  It is a little

20   thicker than some of the vinyl sidings that we see,

21   and so it may have been a little less susceptible.

22   Based on the colors of the siding, it's not a siding

23   that's going to present itself with spatter.  Usually

24   when we get into the darker grays, the darker colors,



1    the browns, we can see spatter.  This is all very,

2    very light in color.  So really couldn't see any

3    spatter, and I don't think anybody did.  I didn't see

4    anybody document spatter on the vinyl siding at all.

5    I was able to touch the vinyl siding, and it is

6    chalky.  So there is the ability for it to effloresce

7    on there, and that would be a condition where you

8    could see spatter if it were a darker color.

9         Q.   Do you have any background that would allow

10   you to say generally how long spatter to vinyl siding

11   will last?

12        A.   Just what we learned in our vinyl siding

13   installer training, and what I've read in the Vinyl

14   Siding Institute manuals.  And essentially they

15   reference color, and the darker colors being something

16   that would show any type of mark more than the lighter

17   colors.  That's all I could reference.  I'm not aware

18   of any tests that I have seen.  And I feel like I'm

19   anal enough to read everything that's available on

20   various products is what I do.  I haven't seen any

21   testing on vinyl for spatter from anybody.  It doesn't

22   mean it's not there.  I just haven't seen it.

23        Q.   Does the fact that you do not reference in

24   Exhibit 252 any siding damage in your notes regarding



1    Building No. 2, does that indicate that you did not

2    observe siding damage at Building No. 2?

3        A.    No, it doesn't indicate that at all.  Hannah,

4    I think, and even Johnson or Steinke indicated there

5    was damage in No. 2.

6        Q.    Did you see siding damage to Building No. 2

7    or would you not recall?

8        A.    I don't recall seeing it.

9        Q.    After Building No. 5 --

10        A.    If I can go back.  Please understand, I

11    cruised around these -- I spent the majority of my

12    probative time on the actual roofs themselves.  That's

13    indicated also by my photos.  As far as walking around

14    these buildings, I walked them quickly.  To do a vinyl

15    inspection, typically what I would have wanted to have

16    with me if I were doing that is about two days, and I

17    would want to have a very, very large light,

18    flashlight, usually a million candle.  We have these.

19    And you stand and you shine that up the siding as you

20    walk, and that's when you can really see the

21    identifiers.  To my knowledge, I have not seen that

22    anybody has done that on this project on either side.

23        Q.    After Building No. 5, am I correct that we

24    see your notes for Buildings No. 49, 48, 46, 27, 30,



1    and 29 on the first page of Exhibit 252?

2         A.   Yes.

3         Q.   And on the next page, we see your notes for

4    Building 41?

5         A.   Yes.

6         Q.   And what does the second line of your notes

7    for Building 41 say?

8         A.   "Wind damage as seen from the ground easily."

9         Q.   And then you have notes from Building 33?

10        A.   Yes.

11        Q.   And then what's after 33?

12        A.   Building 36.  And then -- that is the front,

13   and I did two sample squares on the frontal excavation

14   of Building 36.  And then I moved to Building 37.  I

15   had misrecorded it as 37.

16        Q.   And then is that a Building 35 or a 36?

17        A.   It's a 35, yeah.  So a total of

18   11 buildings -- 13 buildings.

19        Q.   Did you come out with 13?  I come out with

20   12.

21        A.   12.  You're right.  No.

22             MS. KAPLAN:  I got 13.

23             THE WITNESS:  13, yeah.

24



1  BY MR. FORTIN:

2      Q.   Okay.

3      A.   13 buildings, right.

4      Q.   Did you say that Mr. Nierengarten and

5  Mr. Johnson would have also created field notes

6  similar to this?

7      A.   I thought they did.  It appears they didn't.

8  And I think in reading Mr. Johnson's deposition, I

9  recall him saying he did not have field notes.

10     Q.   Did you see any hail damage at Forest Ridge

11 that you believe existed prior to August 2, 2015?

12          MS. KAPLAN:  Are you referring to just his

13 personal inspection on November 9?

14 BY MR. FORTIN:

15     Q.   Thank you for that clarification.

16          At this time, yes, let's just talk about your

17 personal observations while on site.

18     A.   Just a second.

19          There are one or two photos that I believe I

20 took where it looked like the exposed mat material had

21 aged to the point where it was not consistent with the

22 2015 storm event, and that was it.

23     Q.   Do you recall what buildings those one or two

24 marks were on?



1      A.   No, but I would be able to find those in my

2   photo log because I start with the building number and

3   then the next building number.  So anything in between

4   the building numbers would be the building I'm on.

5                     (Whereupon, Exhibit No. 253 was

6                     marked for identification.)

7   BY MR. FORTIN:

8      Q.   This would be a good time for me to hand you

9   Exhibit 253.  And let me know if you recognize that as

10  your photo log.

11          MS. KAPLAN:  When you say "your photo log,"

12  you mean the photos taken by him personally?

13          MR. FORTIN:  Yes.  Correct.

14          THE WITNESS:  Yes.

15  BY MR. FORTIN:

16     Q.   And you think that the one or two marks you

17  were just referring to are in your photo log?

18     A.   Yes.

19     Q.   If you could take a moment, and it looks like

20  you're already doing it, see if you can find those?

21     A.   Figure 449, page 225 and 256.

22     Q.   So figure 449?

23     A.   Yeah.

24     Q.   And what about the impact mark on this



1   photograph indicates to you that it predates August 2,

2   2015?

3       A.   Well, number one, there's no mat -- I mean,

4   there's no fibers exposed on it, and it's got a

5   brownish -- it's beginning to get a brownish color to

6   it, as opposed to more of the black color that we see

7   in the other photos.

8            And then No. 444, and you can see here where

9   the mat fiber is brown.  We're beginning to get that

10  brown tint on a lot of fibers.  This, I did not --

11  this was actually in the field of the bad batch of

12  shingles, and the reason I took this close-up is

13  because I believe this bad batch of shingles is at

14  original install.  So what I wanted to be able to show

15  the jury was what something that's been exposed for a

16  long period of time looks like, as opposed to

17  something say in figure 445, which is a hail strike,

18  and how those look different.

19           So 445 is consistent with something that is

20  in the time slot of our 2015 storm.  444 is in the

21  time slot of something that's probably been there more

22  than 10 years.

23      Q.   Would you say that the mark in 449 is also

24  something that's been there for more than 10 years?



1      A.    It's not 2015.  It's older than that.  I

2   don't think it is as old as 444.

3      Q.    And are you able to say that based on the

4   color of it or are there any other factors that lead

5   you to say that it's not as old as 444?

6      A.    The impression that it made.  It didn't have

7   the depth of any of the other hail marks that I looked

8   at, and it didn't expose the fiber mat.  So this is a

9   smaller one inch size hail that hit and removed the

10  granules, but it did not damage the mat.

11     Q.    That's 449 you're referring to?

12     A.    Yes.  That was inconsistent with the other

13  ones that I was seeing.  I'll see -- we're still on

14  old ones, right?

15     Q.    Yes.

16          MS. KAPLAN:  Well, we're on ones that predate

17  August 2nd, 2015, in your opinion.

18          MR. FORTIN:  Correct.

19          THE WITNESS:  Yes, thank you.

20          416.

21  BY MR. FORTIN:

22     Q.    So that's 416?

23     A.    Yes.  You can see the difference between 416

24  and 415 very clearly in the photo.  415 is a new



1   impact.  416 is an older one.  And, again, these older

2   ones, I saw this in a sample square that I would do

3   where I might say there's 16 hits.  I might see one of

4   these in that 16 hit area.  All right.  So I'm not

5   counting it in my 16.  So within that sample square,

6   there might be 17 hits.  All right.  Of the 17, 16 are

7   from the 2015.  There is one here that is older.  All

8   right.  That's why I'm taking a close-up.

9          And, again, I'm thinking at this point in

10  time, if I have to present this to a bunch of people

11  who don't understand what hail is and how we age hail,

12  I have to be able to show them the differences.

13  That's why I'm doing these photos.

14      **Q.   And the three photos you've identified so far**

15  **as, in your opinion, depicting hail damage from prior**

16  **to August 2, 2015, are those all from Building 37?**

17      A.   Yeah, and that's the other thing that was

18  interesting about that.  I did not see that condition

19  on the other side of the complex.  And I will tell you

20  that based on my training, education, and experience,

21  and one part of my experience is that my

22  ex-father-in-law, who is a farmer, used to do crop

23  inspections once his crops were in Minnesota.  So I

24  had the advantage to go out with him on weekends after



1  hail storms and see the effects of hail on large

2  fields of wheat, soybeans and corn and hay.  And it

3  was interesting to see that sometimes there would be a

4  swath right straight line down the middle separating

5  two fields.  Sometimes there would be something

6  running this direction, it would stop, and then there

7  would be a circle over here.  Sometimes there would be

8  a spot here and a spot here and nothing in between

9  from the same hail storm.  In large associations like

10  this, if you take a look at the map of this place, and

11  I've seen this many, many times, it's not unreasonable

12  to see damage on this side of the association and no

13  damage over here depending on what storm and where it

14  passed by and the edge of it.  That's what this

15  appears to be on 37.  That's why I was interested in

16  it.  It's the only building I found it on.

17      Q.   So of the roofs that you went on, Building 37

18  was the only one where you found hail that, in your

19  opinion, predated August 2, 2015?

20      A.   Yes.  And it's also on the edge of the

21  complex.  That, to me, explained the reason why.

22      Q.   From your review of photographs taken by

23  Ms. York or Mr. Johnson, Mr. Steinke, Mr. Nierengarten

24  at Forest Ridge, do you recall seeing any impact marks



1    in their photos that, in your opinion, predated

2    August 2, 2015?

3        A.    No.

4        Q.    Were all the roofs the same color?

5        A.    No.  There's a black and a brown, kind of a

6    tan and a brown.  Hannah measured the roofs, so I

7    didn't bother.  One of the products was a little

8    thicker.  One was a 30 year; the other was a 25 year.

9    This was based on color.

10       Q.    Did they appear to you to -- let me try that

11   again.  Did the different color shingles appear to you

12   to be of different ages?

13       A.    If I recall -- I'll answer it this way.  If I

14   recall in looking at the permit records originally,

15   this association, like a lot of these, took a couple

16   years to actually construct.  It didn't all go up in

17   one year.  So when I saw the two different colors,

18   that didn't concern me.  When I saw the measurements

19   of two different colors, I haven't done this

20   correlation yet, but in similar situations, we were

21   able to correlate that back to the staging of

22   construction, Phase 1, Phase 2 kind of a development

23   type thing.  So in Phase 1, they use this shingle; in

24   Phase 2 they use this shingle kind of thing.



1     Q.   You referenced permit records a moment ago?

2     A.   Yes.

3     Q.   What specifically are you referring to?

4     A.   I just looked at the original construction

5  dates.

6     Q.   And where did you find those?

7     A.   Online at Streamwood.

8     Q.   So through the Village of Streamwood's

9  website you were able to identify the original

10  construction dates?

11     A.   Yes.

12     Q.   What other data regarding permits were you

13  able to view?

14     A.   That was the only one I was interested in.  I

15  didn't view any other ones.  I was looking at when

16  were these buildings constructed.  What I was looking

17  at -- because we'd seen this in so many other

18  associations.  Brian Johnson pulls back a piece of

19  siding carefully, sees plywood with no weather

20  resistant barrier.  Hannah York pulls back and sees

21  one type of weather resistant barrier.  I pull back

22  and see a third type of weather resistant barrier --

23  or a second type of weather resistant barrier.  Hannah

24  looks at two different types of shingles, but not just



Thomas Irmiter 05/17/2018

1  types, but two different thicknesses of shingles.

2  Okay.  That tells me that these were staged.  And so I

3  was just curious to find out, and in reviewing the

4  records, that was verified.  I didn't note that in my

5  report.  I didn't -- it wasn't probative to my

6  conclusions at that point in time.  It was simply an

7  observation as to why -- it was more of a curiosity,

8  why did this occur.

9      Q.   You were able to access this information via

10  the Village of Streamwood's website?

11     A.   It was either via their website or I -- I

12  can't remember if it was via the website or I called.

13  During that call, they pulled it up, and I said when

14  were these constructed.  And they showed about a

15  two-year construction sequence, start to finish.

16     Q.   Did you obtain any other information in

17  connection with either that phone call or viewing the

18  website, whichever way you were able to access it?

19     A.   No.

20     Q.   If you'll turn to page 8 of your report.

21     A.   Yes.

22     Q.   At the top, the second bullet point states:

23  "Non-matching replacement shingles have been used in

24  some areas for temporary repairs."  Did I read that



1    correctly?

2        A.   Yes.

3        Q.   Do you know -- let me take the beginning of

4    that question back.  That was the beginning of a bad

5    question.

6             Did you observe either during your time on

7    the site or in reviewing others photographs any

8    non-matching replacement shingles on these roofs?

9        A.   Yes.  There are a lot, you know, an

10   individual one here and there, and they match in size.

11   They're pretty -- they were a pretty good match, you

12   know, color-wise as well, but I don't know when they

13   were installed.  And there's no indication, because

14   there were tarps used that were done by the guy who

15   did the temporary repairs.

16       Q.   These isolated non-matching replacement

17   shingles, do you recall whether you saw them

18   personally on site or if it was in someone else's

19   photographs?

20       A.   I believe it was others photos.  Because I

21   looked when I was out there, and I couldn't find them.

22       Q.   Is it your understanding that Forest Ridge or

23   the contractor or whoever did the repair would have

24   been required to obtain a permit to remove and replace



1  these non-matching shingles?

2      A.   Not in a temporary repair, no, or an

3  emergency repair.  Permit is not required for

4  emergency repair.

5      Q.   Do you know whether they were emergency

6  repairs or not?

7      A.   Well, usually if somebody is replacing a

8  missing shingle, they're doing that because they're

9  trying to avoid a bigger problem, which would be

10  leaking, and that would typically be recognized -- as

11  a code official, I would recognize that as an

12  emergency repair.  Installing a tarp would typically

13  looked at as an emergency repair, yes.

14      Q.   So you don't have any other information such

15  as -- I mean, no one told you that those were

16  emergency repairs, right; you're just deducing that

17  from the fact that it's a single shingle?

18      A.   Yes, exactly.

19           I take it back.  Figure 334 shows the

20  different shingles that I saw.  I knew I'd seen it

21  before.

22           MS. KAPLAN:  For the record, the exhibit he's

23  looking at is Exhibit 253.

24



1    BY MR. FORTIN:

2        Q.   Figure 334, you said?

3        A.   Yeah, right below the tarp, you see the brown

4    shingles.

5        Q.   Below the tarp and next to that tree?

6        A.   Yes.  There's about a half a bundle of brown

7    shingles that are laced in there.

8        Q.   And based on the picture directly above that,

9    figure 333, would that be Building 41?

10       A.   Yes, it is.  And the next one, two, three,

11   four pictures are what I spoke of earlier of being

12   able to see the wind damage from the ground if you

13   know what you're looking for.

14       Q.   If you'll turn to figure 27 in your photo

15   log.

16       A.   Yes.

17       Q.   That's a torn cap shingle?

18       A.   Figure 27, you say?

19       Q.   Yes.

20       A.   I went to page 27.  Sorry.

21            Yes, that's called Boston ridge.  This

22   particular material is integrated to what's called a

23   cobra vent, a ridge vent, so it comes with the

24   materials adhered to it.  And this is a corner tear,



1  and then the second corner is torn as well.

2       Q.   Do you intend to testify that the tear

3  visible in that photograph was caused by hail or wind?

4       A.   It would be consistent with wind folding back

5  a corner.

6       Q.   What wind speed would be necessary to cause

7  that type of tear?

8       A.   This is a shingle that's rated at 60 miles an

9  hour.  You can't look just at wind speed.  In my

10 training as a code official where we have to deal with

11 something called ASCE 7, which is the American Society

12 of Civil Engineering 7, which deals with installation

13 of components and cladding.  This would be considered

14 a component or cladding, and so it has to be installed

15 sufficient to withstand wind load, which is different

16 than wind speed.  Wind load is calculated based on the

17 exposure of the building, how much open terrain there

18 is, and the height of the building.  So, for

19 example -- and the meteorologist mentions this and

20 talks about this in his report.  The open terrain,

21 wind coming across that open terrain, by the time it

22 hits the peak of this roof, would be a higher wind

23 load here at this location than it would be let's say

24 at the front door or the garage door.  All right.  So



1    certainly the -- I think it was 69 to 70 mile an hour

2    winds that he finally stuck his pin in in that report

3    would be enough to cause this.

4         Q.   Who is he?

5         A.   Rocco, the meteorologist.  I think that's

6    what he finally arrived at, somewhere in that range.

7         Q.   The report you're referring to, is it what

8    I'm handing to you now, which is marked as

9    Exhibit 161?

10        A.   Yes.  He has 57 to 67 mile an hour winds,

11   yeah.

12        Q.   When did you first see that report?

13        A.   I actually saw it for the first time

14   yesterday in my -- I don't know if I just missed it in

15   the file or what was going on, but I finally read it.

16        Q.   Did you communicate directly with Mr. Calaci

17   regarding Forest Ridge?

18        A.   No.  As soon as our people got back from

19   their inspection and we began to put the report

20   together and the wind damage was documented on site, I

21   looked at the NWSI report for the mesocyclone, and I

22   pulled up the date of loss.  And right up to the left

23   of the property, there was a nice bullet or balloon

24   indicating that there was a digital signature of a



Thomas Irmiter  05/17/2018

1   mesocyclone event at the site on the date of loss.

2   Based on my training with NOAA and sitting in on hours

3   of listening to people like Rocco talk and seeing

4   displays from them, that told me that there was likely

5   a significant wind.  And so I then reached out to

6   counsel and said I think we should bring a

7   meteorologist into this to verify that.

8          Now, what's interesting about that is, when I

9   see this report last night, he pulls up exactly the

10  same data that I pulled up right there.

11      Q.   And what page of Exhibit 161 are you looking

12  at right now?

13      A.   Page 6.  And he indicates the storm basically

14  came from the midway Chicago area and across.  And

15  there's an echo signature pattern consistent with

16  tornadic activity.  That's how he assessed his wind

17  damage.

18          And please understand, when I saw that, okay,

19  what I can't do is, I can't look at that on page 6 and

20  I can't tell you what the wind speed is right there.

21  I can tell you that NOAA is just saying there's a

22  pretty significant wind event right here.  It would

23  take his expertise to nail that down, which is what

24  he's done.  I can then look at that and tell you,



1  based on this style of shingle and the typical wind

2  rating for these shingles, that would be enough to

3  cause the damage I saw.

4      Q.   Am I correct that you do not intend to offer

5  expert testimony as to the meteorologic conditions at

6  Forest Ridge on August 2, 2015?

7          MS. KAPLAN:  He's not going to offer forensic

8  meteorologic opinions.  He will testify to the data

9  that he pulled, which is reflected in his report, and

10  that the data he's reviewed is consistent with the

11  damage that he saw.  But Mr. Calaci has been disclosed

12  and will testify to those forensic meteorology

13  opinions.

14          MR. FORTIN:  Thank you that testimony,

15  Ms. Kaplan.

16  BY MR. FORTIN:

17      Q.   If you'll turn to figure 45 in your photo

18  log.

19      A.   Yes.

20      Q.   And actually, before I ask you that question,

21  can you tell me when did you first become aware of

22  Mr. Calaci's expert opinions in this matter?

23      A.   Yesterday.  I mean, I knew he had been

24  retained.  I just hadn't seen his report.



1     Q.   So prior to yesterday, you did not know what

2  conclusions he had reached regarding the size of any

3  hail or the speed of any wind?

4     A.   No.  But it sure made me feel pretty good

5  when I read it.

6     Q.   Figure 45 in your photo log.

7     A.   Yes.

8     Q.   Is that depicting a hail impact mark?

9     A.   Yes, it is.

10    Q.   The gap between those two shingles, do we

11  know what that measures?

12    A.   That gap is the drain track for the three-tab

13  shingle.  It's three-eighths of an inch.

14    Q.   With that as a control, can you venture an

15  opinion as to the diameter of the impact mark we see

16  in figure 45?

17    A.   Inch and a quarter to inch and three-eighths.

18    Q.   And would that correspond to the diameter of

19  the hail that caused it?

20    A.   Typically, yes.

21         What's more important about this photo, and

22  it doesn't show up here in this because of the

23  reproduction of this, but when you take that raw photo

24  right there and you blow it up, you can actually see



1    the fracture on the shingle below, which indicates to

2    me that we had some spiky hail, as we call it.  Hail

3    that has shards on it.

4        Q.   Was the size of that impact mark generally

5    consistent with the other impact marks you saw at the

6    property?

7        A.   Yes.  They range from three-quarters of an

8    inch to about an inch and a quarter.  Didn't really

9    see a lot of two inch, larger than that.  This was

10   about average.

11       Q.   Turn the page to figure 47.

12       A.   Yes.

13       Q.   Is that, in your opinion, a hail impact mark?

14       A.   Yes.  It's on the ridge.  When you blow it up

15   and you look at it, it's not bird damage, which is

16   what some people will call that signature pattern.

17       Q.   Why would some people call that bird damage?

18       A.   Because that's what some people call it.  I

19   don't know what else to tell you.

20            I don't think in this signature that was bird

21   damage.  I saw no evidence of bird residue on any of

22   these roofs.

23       Q.   Not to be obtuse, so when you say "bird

24   damage," would that mean someone saying it's damage



1   caused by a bird?

2       A.   Yes.  Sorry.

3       Q.   That's okay.

4       A.   There is literature that supports, and I

5   would agree with it, that there is a certain species

6   of bird that when it defecates on a roof like this, it

7   will leave a half circular mark like that.  We

8   typically see that in Texas.  We don't typically see

9   that in Illinois.

10      Q.   So that could theoretically be a bird poop

11  mark?

12      A.   Well, somebody might call it that.  I don't

13  think it is.  That's why I counted it as hail.

14      Q.   The caption to figure 47 just has the figure

15  number and your initials, whereas some of the other

16  hail impact marks say impact damage.  Does that

17  signify anything at all?

18      A.   Yeah, boredom with labeling all of these

19  photos.

20      Q.   Does figure 48, is that a photo that's

21  intended to depict the depth of the impact mark you

22  see in figure 47?

23      A.   Yes.  You don't get that depth with the bird

24  damage.



1    Q.   That would be some serious bird feces.

2    A.   Heavy, heavy bird feces, yeah, that's the

3    problem.  So that's why I took the side shot.

4    Q.   Turn to figure 99.  That's the start of a

5    series of photos that, according to your captions,

6    depict some spatter on a stone sill cap?

7    A.   Yes.

8    Q.   And is this on Building 5?

9    A.   Yes.

10    Q.   Is it your opinion that these marks that

11    you're calling spatter are evidence of hail that

12    struck this stone sill cap on August 2, 2015?

13    A.   Some of it did, yes.  I think there's some

14    older stuff on there, as well, that's filling it.

15    This to me was -- the reason I found this probative

16    was I think it's consistent with the weather analysis

17    I had done at that time with the other observations I

18    was seeing, and also to explain to a jury that not one

19    size falls.  If you see on the top photo, I have a

20    number of different sizes, a lot of them being around

21    one inch, but there are some smaller ones, as well,

22    and a couple that might be a little bit larger.

23    That's what I was trying to depict here.

24    Q.   So in figure 99, you're saying that there's



1  different size hail -- there's different size -- let

2  me try it again.  There's spatter indicative of

3  different size hail?

4      A.   Yes, from the same event.

5      Q.   Is there also spatter indicative of hail from

6  an earlier event?

7      A.   Yes, I think there is.

8      Q.   And what generally is the size of the hail

9  that caused that spatter?

10     A.   Smaller, pea size.

11     Q.   And pea size correlates to?

12     A.   Eighth inch.  Not enough to cause physical

13  damage to any of the building products that are out

14  here.

15     Q.   Did you observe anything based on -- that's

16  another bad question.

17          Figure 101, that's what you call one and a

18  quarter inch spatter?

19     A.   Yes.

20     Q.   So would that correspond to one and a quarter

21  inch hail?

22     A.   Yes.

23     Q.   Is it your opinion that that was hail from

24  August 2, 2015?



1      A.    Yes.

2      Q.    If you'll turn to figure 127.

3      A.    Yes.

4      Q.    That is what you're calling siding damage?

5      A.    Yes.  And that is something that -- if you

6  will, just a second, because I remember when this

7  occurred.

8            So if you take a look at -- figure 121 is a

9  downspout at the back of the building.  Figure 124 is

10  a downspout at the front of the building.  So both of

11  these downspouts have been hit.  At that point I'm

12  coming from the deck area in back, because I've taken

13  pictures of the deck right before that.  I'm coming

14  around the corner.  I'm looking at that downspout.  So

15  the downspout that's in figure 126 right in the corner

16  there, you can see it behind the tree.  You can see

17  the other downspout at the top of that picture.  I'm

18  walking around.  I look at the first downspout.  I

19  look at the siding.  I look at the second downspout.

20  And it's when I look back -- I've already passed the

21  siding.  It's when I look back and the sun hits the

22  siding just right, that I see this.  Otherwise, I

23  would have never noticed it.

24      Q.    Sounds like a magical moment.



Thomas Irmiter 05/17/2018

1      A.   It is.  It's one of those great forensic
2  moments that you have once in a while.  Lighting plays
3  a very important part in seeing some of the damage.
4      Q.   And what building is this?
5      A.   This is No. 5.
6      Q.   If you'll turn to figure 157.
7      A.   Okay.
8      Q.   What are we looking at there?
9      A.   That's a patch that was put on.  I'm just
10  indicating that somebody was up on that roof with some
11  tar at some point in time.
12      Q.   And you don't know when or why that was done,
13  right?
14      A.   No.  But if you take a look at how white it
15  is, that's what happens -- one of the reasons I took
16  this is, again, to help a jury understand what happens
17  to the mat material when it is exposed for a while to
18  the sun.  And a while, I mean two, three, four, five
19  six years down the road it begins to turn color and
20  starts to whiten out.  So if I have a storm that
21  happened in 2010 and the hail that I'm looking at, the
22  damage I'm seeing is from 2010, the whiter part of
23  this material is what all the mat should look like.
24  And I found, as I indicated already, maybe two places



1   on 37 where that occurred.

2       Q.   If you'll turn to figure 171.  Are you of the

3   opinion that that figure is depicting a hail impact

4   mark?

5       A.   Yes, especially when you blow it up.

6       Q.   What about that is indicative to you of hail?

7       A.   It's in the literature with Haag, the crow's

8   foot that's created right here.

9       Q.   When you say "the literature with Haag," can

10  you be more specific?

11      A.   Well, in Haag literature, one of the things

12  that they point to, and I think it's also in the

13  Koontz-Crenshaw literature, not the one on metal, but

14  the one that they did on shingles.  And one of the

15  signifiers that we look at is what we call a crow's

16  foot impression that can be left, and that's what that

17  looks like.  So when this is blown up, you actually

18  will see the fracture at the larger half circle that

19  is through the mat.

20      Q.   And if you'll turn to figure 294.

21      A.   Yes.

22      Q.   What are you photographing?

23      A.   This was the only building I saw this on, and

24  this, at that point of my inspection, would be



1   contrary to what the city of Streamwood would allow.

2   So I was taking a photo to show -- I don't know when

3   this was done, but somebody's attempt at matching

4   siding.

5       Q.   So are you of the opinion that figure 294

6   shows mismatched siding?

7       A.   I'm not of the opinion.  It does.  It's a

8   fact.

9       Q.   And do you see multiple areas of mismatched

10  siding?

11      A.   Yes, that would be consistent with wind

12  damage that occurred at some point in time and blew

13  some siding off and damaged it.  So this would be most

14  likely what was commercially available at the time to

15  do the repair, but I can't tell you when that was

16  done.  I took this as an example to show the jury what

17  the city of Streamwood would not allow.

18      Q.   Do you know whether Forest Ridge obtained a

19  permit for that repair?

20      A.   I don't know if they did, but I can almost

21  guarantee you they didn't.

22      Q.   That extent of repair, am I correct that that

23  would require a permit in your opinion?

24      A.   In the city of Streamwood, yes, because of



1   the matching issue.

2       Q.   But you expect Forest Ridge to comply with

3   the Village of Streamwood Building Code?

4           MS. KAPLAN:  Objection to form, foundation,

5   calls for speculation.  He's not testifying on behalf

6   of the community.  He's here as an expert.

7           THE WITNESS:  I'll answer the question the

8   following way:  The only way the Building Code

9   official can enforce the code is if they're aware of

10  the work being done.

11  BY MR. FORTIN:

12      Q.   Does figure 293 show the faraway vantage

13  point of the elevation that you're showing closer up

14  in 294?

15      A.   Yes, I saw that, and then what I did is

16  rather than -- because I was going the other direction

17  with the boom.  So as I'm turning the boom and getting

18  ready to go down, I look back and see this.  So then

19  figure 294 is with my zoom lens.

20      Q.   Is that Building 27 that's depicted in figure

21  293 and 294?

22      A.   I don't know, but it certainly could be.

23      Q.   Do you know what building you were on when

24  you took this picture?



1      A.    I'm sure I can figure that out.

2            I was on Building 30.  Looks like 27, yes.

3      Q.    Thank you.

4            Figure 326, can you tell me what you're

5      depicting in that photo?

6      A.    Yes.  One of the things that happens when --

7      again, one of those wonderful forensic moments in the

8      field.  When the sun hits the shingles just correctly

9      and you have the right angle, the hail damage will

10     shine.  So I could effectively take an arrow right now

11     and I could do -- recognizing that each one of these

12     is 12 inches --

13     Q.    When you say "these?"

14     A.    Shingle tab.  So the width of the shingle tab

15     is 12 inches.  The exposure is for rough estimate

16     6 inches.  I could effectively count out right here a

17     test square or sample square, and in that sample

18     square, I could tell that you there are 19 hail hits.

19     Q.    Are you taking that photograph from a

20     different building's roof?

21     A.    Yes, from across the way.  But, again, I was

22     just at the right angle to see that at the time and

23     capture it with a photo.

24     Q.    And if you turn to figure 315, it looks like



1  you were on Building 24?

2      A.   29.

3      Q.   So figure 236, that photograph would have

4  been taken from your vantage point at Building 29?

5      A.   Yes.

6           I didn't count this roof in my number of

7  roofs that I inspected.  I suppose I should say now I

8  inspected 14 roofs.

9      Q.   Figure 142.

10     A.   Yes.

11     Q.   What are you depicting in that photograph?

12     A.   Missing shingles.

13     Q.   You attribute those missing shingles to?

14     A.   Wind damage.

15     Q.   On any particular date?

16     A.   Didn't get up to look at it to see how --

17  what the exposed shingle looks like.  It was

18  consistent with other areas where shingles had been

19  missing or covered over as a result of wind from the

20  date of loss.

21     Q.   And when you say "covered over," would that

22  have been in with a tarp?

23     A.   Yes, like in figure 34.

24     Q.   What leads you to believe that -- let me take



1    that back.

2           Do you have any information as to when or why

3    the tarps were installed?

4        A.   It's my understanding that -- again, you can

5    help me with his name.  I think it's Hawkins.

6        Q.   Hankins.

7        A.   Hankins.  Mr. Hankins will testify that he

8    put those tarps in or those tarps were put in his firm

9    after the storm event.

10       Q.   What's the basis for that understanding?

11       A.   I can't remember if that was in Ryan's or

12   Brian's deposition or where that's coming from, but

13   that's my understanding that these tarps were put on

14   by them.

15       Q.   So you think you got that information from

16   either Ryan's or Brian's deposition?

17           MS. KAPLAN:  Objection, mischaracterizes his

18   testimony.  He said he couldn't remember where it came

19   from.

20           THE WITNESS:  It could have come from them.

21   I'm not sure where it came from.  I know that no one

22   at FBS put those on, those tarps.

23   BY MR. FORTIN:

24       Q.   And you never spoke with anyone -- you never



1    spoke with Mr. Hankins, right?

2         A.   Correct.

3         Q.   Do you know if anyone else at FBS spoke with

4    Mr. Hankins?

5         A.   No, I don't.

6         Q.   And figure 408.

7         A.   Yes.

8         Q.   That's showing granular accumulation in a

9    gutter?

10        A.   Yes.

11        Q.   Why did you take that photo?

12        A.   It shows that we have a substantial amount of

13   granular loss on this particular roof in the gutters

14   in figure 408 and further down the gutter in 409.

15        Q.   So what does that mean?

16        A.   It could be consistent with damage caused by

17   hail.

18        Q.   The fact that the granulars are still in the

19   gutter, does that tell you anything as to when the

20   hail that caused that granular loss may have occurred?

21        A.   It depends on how much mud and pollution is

22   in there.  I've seen granules from a date of loss stay

23   in a gutter for three, four years, start growing

24   things out of them.  I've seen it washed out the next



1  day.  It really depends how clean the gutter was to

2  begin with.  If there was a layer of dirt and it's

3  wet, then that stuff's going to turn almost rock hard,

4  and it's not going to wash out unless you take a tool

5  to actually break it up to get it out of there.

6      Q.   Did you see anything growing in this gutter?

7      A.   I did not.

8      Q.   And you don't have any information as to how

9  clean or not clean this gutter was prior August 2,

10  2015, right?

11      A.   No.

12      Q.   By saying no, would that mean that you do not

13  have any information?

14      A.   I do not.

15      Q.   Let's turn to your report, Exhibit 160.  Was

16  this particular report created from a template or a

17  prior report?

18          MS. KAPLAN:  Just going to object to the form

19  of the question to the extent that I think that term

20  "created" is ambiguous, and someone could interpret

21  that in many ways.

22  BY MR. FORTIN:

23      Q.   I mean it in the sense of conjuring into

24  being.



1          MS. KAPLAN:  I don't know what that means.

2          THE WITNESS:  Can we say generated?

3    BY MR. FORTIN:

4      Q.    Sure.  Yes.

5      A.    We have a report generator, okay, that we

6    have created.  And the report generator does not

7    everything we would like it to do, but it does certain

8    things.  So, for example, when the report -- when

9    information is dropped into the report generator, and

10   you note that -- I'll give you an example.  In section

11   2.0, Inspection Notes, page 7 of 56, the third bullet

12   point down, Roofing Type, one layer of three-tab strip

13   self-sealing shingles, the report generator, when you

14   enter that, automatically goes back in section 1.7 and

15   drops in certain documents that we would reference

16   with regard to that particular material.  If we had

17   typed in Moneir (phonetic) half-round cement tile, you

18   would have a completely different list of documents in

19   here, because it's a different product.  So it is a

20   generator that we use to set up, if you will, the

21   template for this individual report utilizing our

22   database of information.

23          So all of the information that is in the

24   inspection notes and the site observations, which is



Thomas Irmiter 05/17/2018

1  section 2.0 and 3.0, is all hand entered manually off

2  of field notes.  Everything that is -- that's a lot of

3  the documents, quite frankly.

4         4.0, it would say causation statement, and it

5  would drop a causation statement in there that would

6  have nothing to do with this project, other than the

7  fact that based upon physical evidence collected from

8  the site inspection and roof assessment, period, and

9  then I would go in and edit that based on what we saw.

10        The Village of Streamwood requirements in 5.0

11  would all have to be hand entered.

12     Q.   Let me stop you there.  4.9, the causation

13  statement?

14     A.   Yes.

15     Q.   Is the content of that section then something

16  that you entered?

17     A.   Yes.

18        5.0, that would have gone in initially

19  because, as I'd indicated, we had already done a

20  Streamwood project a few years before, so we would

21  have gone back into that.  We would have literally

22  just paste and cut this in from the other document.

23  But then based on looking at the new documents, going

24  and make edits specific to this particular matter.



1        6.0 would be completely new, because that

2   would be an evaluation of what roof consultants said

3   on this report, a brief comment.

4        And then 7.0 would be all new, as well.

5        And 8.0 would all be new.

6   Q.   This report generator, is that a special

7   software or is this an elaborate use of macros and

8   autotext in Microsoft word?

9   A.   No.  We hired a -- it's a proprietary

10  software that we developed with a programmer out of

11  South Africa of all places.

12  Q.   Let's go to section 1.1.

13  A.   Yes.

14  Q.   There's an excerpt from the roofing

15  consultants report, and that would be the roofing

16  consultants report that's referenced in section 1.6 as

17  being dated October 17th, 2016, right?

18  A.   Yes.

19  Q.   Then section 1.2 has -- it's a CoCoRaHS

20  report from the NOAA storm event database?

21  A.   That was another reason -- if I can add, that

22  another reason I wanted to retain -- or wanted counsel

23  to retain a meteorologist.  This particular report had

24  a different time of day that they were reporting.



1  This is not the first time we've seen that CoCoRaHS.

2  I had a case out in Colorado where they had the storm

3  at noon, and everybody else had the storm at 3 o'clock

4  in the afternoon.  It caused a big flub in that case

5  or a big question mark on everybody's part.  So I

6  basically don't necessarily rely as heavily on

7  CoCoRaHS particularly when I'm getting different

8  information on the other NOAA data.  And a

9  meteorologist vetted that out for us an evening storm.

10      Q.   And section 1.3 is the Severe Weather Data

11  Inventory, what we've been calling SWDI tool, the

12  filtered hail signatures product for 2015?

13      A.   Yes.

14      Q.   Those three sections we've just leafed

15  through, 1.1, 1.2, and 1.3, is that the only weather

16  data that's specifically identified in the report?

17      A.   That's all that's identified in the report,

18  yes.

19      Q.   Section 1.1, that obviously comes from the

20  roofing consultants report.  As for section 1.2, do

21  you know who obtained this observation from the storm

22  events database?

23      A.   That typically would have been Ryan that

24  inserted that.



1     Q.    It was not you?

2     A.    No.

3     Q.    And the filtered hail signatures from the

4  SWDI in section 1.3, do you know who obtained that?

5     A.    That probably would have been put in by Ryan.

6  And understand that what would happen when this report

7  came to me, and I testified to this earlier, all of

8  this would have been in yellow.

9     Q.    It all would have been in yellow?

10    A.    In yellow.  Indicating that I didn't look at

11 it; I didn't insert it; but I need to look at it and

12 do my own research on it, which I did.

13    Q.    What --

14    A.    Before I approve this and left it in.

15    Q.    So what research did you do?

16    A.    Well, I pulled up the same address, the 2015,

17 and I pulled up the same signature -- same report that

18 the meteorologist pulled up showing the mesocyclone

19 signature.  He shows the overall storm pattern.

20           There's another one where you can just tap on

21 the indication of a mesocyclone.  And what happens in

22 that report is all you have is this bullet right here.

23 There's nothing else on there, just this one bullet.

24    Q.    What bullet are you referring to right now?



1     A.   I'm referring to -- in our report,

2  Exhibit 160, section 1.3, I'm referring to the green

3  bullet.

4     Q.   And the green bullet is the one that's to the

5  left of the property?

6     A.   Yes.

7          MS. KAPLAN:  That has the comment box

8  attached to it?

9          THE WITNESS:  Yes.  And showing 100 percent

10 hail, 40 percent probability of max size, severe hail.

11         When you filter through this database, there

12 are five products that you can look at.

13 BY MR. FORTIN:

14    Q.   And just to be clear, the database you're

15 referring to is the SWDI?

16    A.   Correct.  So right above there, there is a

17 box that says, filtered hail signature, max size,

18 probability from NEXRAD Level III hail product.

19 There's a little arrow there.  You can hit that arrow,

20 and you can have five different products to look at.

21         One of those products is just overall storms.

22 That's what the meteorologist has.  He's got bullet

23 point No. 1.

24         Four bullet points down from there, there's



1    one that's called mesocyclone.  When you do the

2    mesocyclone, this is the only icon that shows up at

3    this exact same location.  That's what I saw.  That's

4    why I wanted to get the meteorologist involved,

5    because that indicated to me that there was high wind.

6        Q.   What, if any, other research into the weather

7    data did you personally do?

8        A.   Other than my own individual and then the

9    teams ground truth investigation.

10       Q.   Well, when you just said now your own

11   individual, are you referring to what you had just

12   described as pulling up the SWDI, what's shown in 1.3

13   here, and then looking at the mesocyclone tool?

14       A.   Yes.  And the ground truth investigation, the

15   actually going on the site to look for hail damage and

16   document hail damage.  That was the extent of what I

17   did.

18       Q.   Do you consider that weather research into

19   weather data?

20       A.   Oh, sure.  Absolutely.  I learned this a long

21   time ago.  When we did -- for example, when we did the

22   McAllen storm in 2010, McAllen, Texas, a monumental

23   storm, we were getting reports of three inch hail in

24   far Texas.  We'd do an entire neighborhood of 70



1   houses, and there wouldn't be one blemish of hail

2   anywhere.  And then we'd go to Edinburg where they

3   said there was one inch hail, and this is NOAA saying

4   this, and there would be three inch holes in the roof

5   from the hail.

6          So the ground truth investigation has to be

7   part of the weather analysis to get to causation.  You

8   can't do one without the other.  They're intertwined.

9   We do ours first so we have some idea of what kind of

10  signature patterns we might be looking at out there.

11         That's why I eliminated the 2010 storm from

12  this site completely, because the signature pattern on

13  the 2010 is two and a half inch hail.  If I had two

14  and a half inch hail in 2010 on these roofs, there

15  would be nothing left of them.

16      Q.   What is the signature pattern of the August

17  2015 storm?

18      A.   One inch to one and a quarter inch hail, very

19  hard hail, very dense hail, hail that fractured the

20  mat, hail that exposed mat fibers, hail that actually

21  punctured through some of the shingles.

22      Q.   And that's based on what you're calling the

23  ground truth investigation?

24      A.   Yes.



1    Q.   And then what does the NOAA SWDI add to that?

2    A.   It tells me that there's a 40 percent

3  probability of hail at the site or very near the site.

4  It tells me that with the mesocyclone signature

5  pattern that I saw and my familiarity with having

6  listened to meteorologists talk about what happens

7  with that signature is that there is a cone that they

8  discuss, and that cone will extend down to the ground

9  as much as five miles.  And in that zone or that cone

10  area is where you could have your damage.  So within

11  the signature of this mark on section 1.3, which is

12  right next to the site of one inch hail, within a five

13  mile area of that with the mesocyclone signature, I

14  could have hail in excess of one inch, which is

15  labeled as severe by NOAA and which, according to the

16  literature, is enough to cause damage consistent with

17  what I saw.

18    Q.   The information in the comment balloon, I

19  guess, Ms. Kaplan coined the phrase so artfully

20  earlier.

21        MS. KAPLAN:  I don't know if that's a

22  technical term.

23        MR. FORTIN:  That's what we call them,

24  balloons.  It's yours now.



 1   BY MR. FORTIN:

 2       Q.   I just want to make sure we're on the same

 3   page as far as what you understand that to mean.  The

 4   date and time, since this is presented in universal

 5   time, UTC, the timestamp that's there would actually

 6   correspond to, I think, 10:00?

 7       A.   Yeah, after 10 o'clock.

 8       Q.   After 10 o'clock on August 2, correct?

 9       A.   Yeah.

10       Q.   And KMKX, do you know what that means?

11       A.   Yeah, that's the closest reporting station.

12       Q.   Closest reporting what station?

13       A.   No, I don't know what KMKX -- I'm sorry.  I

14   don't know what that means.

15       Q.   Do you know if KMKX is the closest NEXRAD

16   radar station to Forest Ridge?

17       A.   Or the closest data point is what it might

18   be.

19       Q.   First question is, do you know if it's the

20   closest NEXRAD station to Forest Ridge?

21       A.   I do not know if it is.

22       Q.   Do you know where KMKX is located?

23       A.   I do not.  Well, it's at that spot.  That's

24   how I read that.  That spot is KMKX.



1      Q.   That's your understanding of what this data

2   presents?

3      A.   Yes.

4      Q.   And then to the right of that, it says, prob,

5   which means probability, and 100/40?

6      A.   Yes.

7      Q.   So what do you understand that 100 to mean?

8      A.   100 percent probability of hail at that spot

9   on that date at that time.  40 percent probability

10  that it was severe.

11     Q.   Severe being one inch?

12     A.   One inch or more.

13     Q.   And the 100 percent probability of hail, what

14  size threshold do you understand that to mean?

15     A.   That can be from pea size all the way up

16  to -- that can be any hail, any hail on their

17  spectrum.

18     Q.   Do you know what the bottom of that spectrum

19  is?

20     A.   Pea, pea size, yes.

21     Q.   And your understanding of the diameter of the

22  pea is what again?

23     A.   Eighth inch.  Not enough to cause damage.

24     Q.   Did you -- let me try that again.



1         A few moments ago you referred to ruling out

2    the 2010 storm, right?

3         A.   Yes, absolutely.

4         Q.   **You mentioned that that one had a different**

5    **signature pattern?**

6         A.   Yes.

7         Q.   **And what was that signature pattern?**

8         A.   2.5 to 2.75 inch hail.

9         Q.   **And where does that data point come from?**

10        A.   The same site.  All you do is you go to -- on

11   1.3 of this chart that's on here, in the left-hand

12   corner where it says, select year, instead hitting

13   2015, you hit 2010.  All right.  And then you'll have

14   a whole list of dates, and then you can go back to

15   those individual dates.

16        What's important to recognize on this

17   particular filter is we're using the filtered hail

18   signature for 2015.  When you do the all hail

19   signature -- and the filtered signature shows

20   April 9th, June 8th, August 3rd, June 21st, and

21   June 17th.  When you hit the unfiltered, this entire

22   left-hand column is filled with dates.  And when you

23   go -- when you see the August 3rd date, which is our

24   storm date, I think it's like 56 entries, those are



1   all hails that are less than an inch.

2          So this can be misleading in that you think,

3   oh, there's only one balloon here near the site so

4   that's the only hail that fell right at that spot.

5   When you look at that other map, this thing is filled

6   with balloons indicating that there was a lot of hail

7   going through there of various sizes.

8      Q.   And did you pull up the 2010 storm with that

9   filtered hail signatures tool in connection with this

10  Forest Ridge project; or did you do that during that

11  Southgate matter, and you just remember what the data

12  was?

13     A.   I had remembered what Southgate was.  As part

14  of this, I went back to check the Southgate data.  And

15  then while I was there, I went ahead and just shifted

16  in this address just to see what it would pull up.

17     Q.   I'm going to hand you what was previously

18  marked as Exhibit 211 B.  Let me know if you recognize

19  this as the SWDI filtered hail signatures for --

20     A.   Yes.

21     Q.   -- the same Forest Ridge address as used in

22  section 1.3 of your report.

23     A.   Yes.

24          MS. KAPLAN:  I'm sorry.  Could you read back



 1   that question one more time?

 2                        (Whereupon, the record

 3                         was read as follows:

 4                         Q. I'm going to hand you what

 5                         was previously marked as Exhibit

 6                         211 B.  Let me know if you

 7                         recognize this as the SWDI

 8                         filtered hail signatures for --

 9                         A. Yes.

10                         Q -- the same Forest Ridge

11                         address as used in section 1.3

12                         of your report.

13                         A. Yes.)

14         THE WITNESS:  I want to amend that answer.

15   This is a severe weather data inventory that is an

16   exemplar of what we have in our report, but it is for

17   a different date.  This is for the 2010 year.

18   BY MR. FORTIN:

19      Q.   Right.

20           MS. KAPLAN:  So what deposition was that

21   from, do you know?

22           MR. FORTIN:  This was I believe

23   Brian Johnson's deposition.

24



BY MR. FORTIN:

     Q.   On the first page of 211 B, do you see --
this is when you find out that I'm red-green
colorblind.  One of the balloons there is a different
color than the rest, right?

     A.   Yes.

     Q.   What color is the balloon that's a different
color than the others?

     A.   That is the -- it's the one to the right next
to the 19.  It's the top one.

     Q.   Could you just tell me what color it is?

     A.   It's green.

     Q.   Thank you.  And other ones are red?

     A.   Yes.

     Q.   So the green balloon, that correspondences to
the shaded row --

     A.   Yes.

     Q.   -- at the bottom?

          In the max size column, we see 2.5?

     A.   Yes.

     Q.   Is that the -- or one of the bookends of the
2.5 to 2.75 range you had mentioned earlier as being
part of the signature for that April 2010 storm?

     A.   Yes.  This is the same exact database I was



1   just talking about.  I pulled up this exact same thing

2   and looked at it.  I've already analyzed this, yeah.

3   Absolutely.

4       Q.   And based on the size given for the April

5   2010 storm, the 2.5 to 2.75, that allowed you to rule

6   out that April 2010 storm as causing the damage that

7   you observed during the ground truth investigation at

8   Forest Ridge?

9           MS. KAPLAN:  Object to the form of the

10  question.

11          THE WITNESS:  Yes.  And I will answer that by

12  saying, if you take a look at Exhibit 251, which you

13  so nicely put in front of me before, and you go to

14  page 7 and you look at the bottom left-hand corner,

15  that's what 2.75 inch and 2.5 inch hail looks like.

16  BY MR. FORTIN:

17      Q.   So that's Exhibit 251, page 7, bottom

18  left-hand corner?

19      A.   Yes.  That is what large hail looks like.

20  That showed up nowhere on this site.

21      Q.   Did you download any of the SWDI data that

22  you looked at in connection with this Forest Ridge

23  matter or did you just view it through the SWDI

24  website?



1      A.   I just viewed it through the SWDI website,

2  yeah.

3      Q.   And that, I take it, would explain why it

4  wasn't included as part of FBS's report -- I'm sorry,

5  as part of FBS's file that was produced?

6      A.   Correct.  And, again, please understand that

7  there are plenty of times when we have been given a

8  storm date, particularly as I said earlier in Texas,

9  where we're given a storm date, and they're telling us

10  it's, you know, inch and a quarter hail, and we get

11  out -- and we pull the weather report.  We get out

12  there, and we literally see a roof that looks like

13  page 7 of this Haag manual.  And we're going what the

14  heck.  So then we go back and we start looking, we go,

15  man, this is three years old.  This is the storm that

16  caused this.

17           So, again, that just didn't ring true here.

18           Is this is a good breaking point for a

19  bathroom break?

20           MR. FORTIN:  Yeah, we can take five minutes.

21                    (Whereupon, a short break

22                     was taken, after which the

23                     following proceedings were

24                     had:)



1    BY MR. FORTIN:

2        Q.    You know what an ITEL report is, Mr. Irmiter?

3        A.    Yes.

4        Q.    Have you obtain an ITEL report for any siding

5    or shingles at Forest Ridge?

6        A.    No.

7        Q.    Has anyone at FBS?

8        A.    No.

9        Q.    Have you applied for a permit for replacement

10   of any roof or siding at Forest Ridge?

11       A.    No.

12       Q.    Has anyone at FBS?

13       A.    No.  Let me add, nor would we.

14       Q.    Why is that?

15       A.    We're not contractors.

16       Q.    If you'll turn to page 50 of your report.

17       A.    Yes.

18       Q.    Section 7.1.2, it states that proper repair

19   of the existing shingle requires a manufacturer's ESR

20   and an approval of the repair from the building

21   official.  What's an ESR?

22       A.    The International Code Council publishes

23   evaluation services reports for virtually every

24   product that is used in the field of construction.  As

1  a code official, you utilize these as a condensed

2  version or a CliffsNotes, if you will, type of report

3  on all of the specifications of the product, including

4  how it has to be installed per manufacture's published

5  constructions, which is what the Code says.  So rather

6  than having to call up the manufacturer and get these

7  huge technical treatises, you get a condensed version

8  of the highlights.

9      Q.  Were you or was FBS able to determine the

10  manufacturer of the shingles at Forest Ridge?

11     A.  No.

12     Q.  If you didn't know who the manufacturer is,

13  how can you obtain the manufacturer's ESR to comply

14  with what you're seeing there in 7.1.2?

15     A.  You can't, and so therefore, you can't repair

16  them, because the repair has to be under the direction

17  of the manufacturer according to the code.  So if you

18  don't note the manufacturer, then you don't know how

19  to repair it.

20     Q.  And therefore?

21     A.  Replace.

22     Q.  Replace what?

23     A.  The entire roof.

24     Q.  On that building?



1      A.    Yes.

2      Q.    Section 7.1.4 refers to damage to roof

3  penetrations?

4      A.    Yes.

5      Q.    And then it has a parenthetical, and then it

6  says, removal and replacement, and the it goes on.  Is

7  there a word missing somewhere there?

8      A.    Yeah, there is.  It's poorly written.

9          The intent is that when you are replacing a

10  vent or an appenditure that comes through the roof

11  like a pipe cap or something like that that's been

12  physically damaged or that quite frankly is used now,

13  it's used material, you have to take shingles off

14  around it.  You can't just take it off.  So usually,

15  for example, when you replace a roof vent, a turtle

16  vent, typically you're including five to seven

17  shingles depending on how the vent is installed,

18  replacing along with the vent.  That's all that this

19  means.  There's additional work involved.

20      Q.    Did FBS observe any damage to the roof

21  penetrations from hail or wind?

22      A.    No.  There are no roof penetrations that

23  really come into play here.  So, again, some of --

24  that's probably a boiler point that came through.



1      Q.   Are there any other sections in 7.0 that you

2   would also call a boilerplate that's not necessarily

3   applicable to this matter?

4      A.   No.  And I don't want to make it sound like

5   it's boilerplate.  There's two reasons that these roof

6   penetrations are going to be replaced.  One is that

7   they're either physically damaged, okay, or you're

8   going to replace them because they're old and used

9   and in the process of removing them, you will

10  physically damage them.  So what we're saying is, and

11  this is reflected in our estimate, if there is a roof

12  penetration -- and I'll give you example here in the

13  photos.

14           Figure 149, these are roof penetrations.

15  There is a saddle that goes around those that's

16  integrated into the shingles with adhesive.  That

17  saddle is going to be physically damaged when you pull

18  the roof off.  So our estimate will include three new

19  pipe caps for that, all right, on that particular

20  roof.  That's what that means.

21     Q.   And in this instance, it's because of the

22  damage you're going to do to the pipe jacks when you

23  remove them to replace the shingles, right?

24     A.   Yes, and there's not a reasonable roofer that



1  I'm aware of who would reuse any of those products

2  based on their age.

3      Q.   Did you do any brittle testing of the

4  shingles at Forest Ridge?

5      A.   I did not personally, no.

6      Q.   Do you know if anyone --

7      A.   And please understand why I didn't.  We talk

8  about wind here, and we've talked about wind today.

9  I'm not replacing these roofs because of wind damage.

10  I'm replacing roofs because of hail damage.  There's

11  enough hail damage.  So in a way, I really don't care

12  about the wind.  It's here.  But the hail is the

13  reason we're replacing these roofs.

14      Q.   Is the wind damage FBS observed on the roofs

15  by itself enough to warrant full replacement of every

16  roof?

17      A.   We didn't investigate that far enough to draw

18  that conclusion.

19      Q.   Is that also true with respect to the siding

20  that the scope of repair replacement in the estimate

21  was for hail damage?

22      A.   Yes.

23           MS. KAPLAN:  Objection, form.

24           THE WITNESS:  Specific to the siding, yes.



 1   Wait.  No.  Can you -- can I ask her to read back your

 2   question?  I can't, can I?

 3          MR. FORTIN:  She can when I'm done.

 4          MS. KAPLAN:  I'm sorry.  Was that to me?

 5          THE WITNESS:  Let me add, okay.  Your

 6   question, the way that you phrased it, okay, concerns

 7   me because -- I know you probably are not trying to

 8   trick me, but there are two reasons that the siding is

 9   being replaced.  The way that I answered that question

10   would lead the reader to believe I'm only saying

11   siding has to be replaced because of hail.  The siding

12   is also going to be physically damaged when it is

13   removed because of the roof replacement.  That is what

14   is going to tip us, more than anything, over the top,

15   along with the hail damage, to full replacement.

16   BY MR. FORTIN:

17       Q.   Okay.

18       A.   Thank you.

19       Q.   But it's not because of wind damage, I guess,

20   is what I want to be able to just put in a box to the

21   side?

22       A.   Not because of wind damage.

23       Q.   The report refers to matching issues in a few

24   places in section 7.0.



1     A.    Yes.

2     Q.    As of November 16, 2017, which is the date

3  this report was signed, what investigation, if any,

4  had FBS done into the availability of matching siding?

5     A.    At the issuing of this report, I relied on my

6  experience primarily.  It's not an education or

7  training thing.  I visually identified the siding as

8  to what I thought was a siding that was no longer

9  manufactured based on similar projects that I have

10  done in other states.  So I went with the -- I didn't

11  rely on anybody else.  That comes from me.  I'm making

12  a judgment at that point in time that the siding is no

13  longer manufactured.  It turns out I was correct, but

14  that, again, was based on visually identifying the

15  siding.  That's why I pulled it back to look for the

16  manufacturing stamp.

17     Q.    So you didn't find a manufacturing stamp, but

18  based on siding you were familiar with from other

19  matters in other states?

20     A.    Including Illinois, yeah.  It had a signature

21  pattern to it in terms of its size and the embossment

22  on it in terms of the grain, the texture, in other

23  words, of a siding that was no longer manufactured.

24     Q.    Aside from what we saw on Building 27 in the



1    photographs you took, was all the siding at

2    Forest Ridge uniform, the same?

3            MS. KAPLAN:  Objection to the form.  I think

4    that's a very vague question.  In what manner?

5    BY MR. FORTIN:

6        Q.   Was it all the same color on all 51

7    buildings?

8        A.   Two different colors.

9        Q.   Was the color the only difference?

10       A.   Yes.  I don't recall seeing a texture

11   difference.

12       Q.   Do you recall whether the two different

13   colors of siding were evenly distributed among the

14   51 buildings?  Or I guess that would be an impossible

15   since there's an odd number of buildings.  But was it

16   basically half and half?

17       A.   I didn't do a calculation of that.

18       Q.   To figure that out, we could piece it

19   together from Ms. York's photographs or anyone else's

20   photographs?

21       A.   Or drive out there for an hour and drive

22   around and count them.

23       Q.   You recall there being two different colors?

24       A.   Yes.  My impression is it's about half/half.



1    Q.    If you'll turn to section 7.9, there's a

2    sentence there that says, "We have been informed that

3    matching siding could not be found."  Is the basis for

4    that statement what you told me a moment ago regarding

5    your experience with what you believe was similar

6    siding?

7    A.    Yes.

8    Q.    Section 7.9 continues:  "Due to this, and the

9    requirements from the Village of Streamwood, the

10   damage caused by the storm event will require complete

11   replacement of the vinyl siding at the affected

12   buildings."  Did I read that correctly?

13   A.    Yes.

14   Q.    The phrase "affected buildings," does that

15   refer to the, I think you said roughly half of

16   buildings where FBS found siding damage or does that

17   refer to all 51 buildings?

18   A.    All 51 buildings.  Damage to the roof will

19   envelope into siding replacement as well.

20   Q.    Is that part of what's incorporated into that

21   sentence?  I read this paragraph 7.9 as saying,

22   complete replacement of the vinyl siding on all

23   buildings is necessary due to the unavailability of

24   matching siding and the requirements from the Village



1    of Streamwood.  Is that accurate or am I

2    misunderstanding it?

3        A.   That is -- well, those are two of the

4    reasons.  The other reason is physical damage and the

5    general scope of work regarding the roofs.  The

6    Village of Streamwood is not going to walk into one of

7    their associations and say, hey, tomorrow, replace

8    your siding.  Something has to trigger that.

9        Q.   Would the physical damage to siding by itself

10   require replacement of all siding on all 51 buildings?

11       A.   The physical damage to the siding from hail

12   would require -- so let's suppose that we have -- I

13   know you guys like to use hypotheticals.  Let's

14   suppose hypothetically on Building 5 we had damage.

15       Q.   So Building --

16       A.   Building 5, just pull one out.  Let's say

17   Building 5 hypothetically.  Let's suppose we had

18   damage on the right facing elevation, and we had

19   damage on the left facing elevation for some reason,

20   okay, from hail.  The city is going to require that a

21   piece of siding from the right elevation be removed,

22   and a piece of siding from the left elevation be

23   removed.  And that those exemplars each are going to

24   have to be compared to available matching or possible



1  matching sidings, and then they are going to be the

2  final judge and juror on whether or not they're going

3  to allow that siding to be installed on those two

4  elevations and the other siding stay or whether

5  they're going to say, no, you touch the one side, you

6  got to take it all off.  They get to decide that.

7          As a building -- licensed Building Code

8  official, I'm trained, and I've been qualified in the

9  courts to interpret the Code.  I can't enforce the

10 Code in Streamwood.  The only person that can do that

11 is the code official in Streamwood.  But based on the

12 conversations and the reading of his deposition,

13 they're putting forth a fairly strong position on what

14 they're going to look for.  So I'm estimating right

15 now you're probably going to be presenting about 120

16 samples of siding to ITEL to fulfill their obligation

17 just to find out if you can even do it.

18     Q.   How did you get to 120?

19     A.   Based on the damage we're seeing, the number

20 of sides that are damaged, the number of pieces.

21 That's, I think, what's going to happen.

22     Q.   So is 120 the total number of pieces you're

23 saying is damaged or that's the total number of sides

24 across all 51 buildings?



1    A.    Total number of sides where we have an

2   exposure issue, yeah.

3        Q.    So what's the math that you do for the 120?

4        A.    51 buildings.  There's not damage -- so 51

5   buildings, I've got damage on a couple of buildings --

6   on some buildings on two sides.  As I said already,

7   I've got buildings on one side.  So I didn't take 51

8   times four, okay.  I took 51 times two and a slop

9   factor.  So maybe it's 80 pieces of siding.  But it's

10  going to be a large number of pieces of siding that

11  physically have to be removed to do this just to get

12  to yes or no.

13       Q.    If this homeowners association was in a

14  different village, not Streamwood where they have this

15  matching ordinance or exception, would the physical

16  damage to the siding at Forest Ridge still require

17  replacement of all elevations on all 51 buildings?

18            MS. KAPLAN:  Objection, relevance.

19            THE WITNESS:  Well, it might have prior to

20  the recent court case that just came down in Illinois

21  regarding the matching issue where it's been codified

22  now like Minnesota that matching is now in play.  So I

23  think had the work been done in a different

24  municipality, but I think that's a legal question that



1    I can't answer.  I just know that there is a recent
2    court case now that supports the Minnesota ruling on
3    matching, and so it's changing the landscape, as
4    happens with the law.
5    BY MR. FORTIN:
6         Q.   So what I'm trying to get at or understand
7    is, I know that it's your opinion that there's an
8    issue as to matching, there's an issue regarding the
9    Village of Streamwood requirements, and then what's
10   going to be entailed by replacing the roofs.  We'll
11   tackle all that next.  I'm just trying to understand,
12   if you just take the physical damage to the siding
13   caused by hail, what's the work necessary to replace
14   that damage aside from the matching and code?
15        A.   I don't think we know the full extent of
16   that, because we haven't pulled siding back on every
17   building.  However, if, for example, the piece of
18   siding that Mr. Johnson pulled back and there is no
19   weather resistant barrier, if that is an elevation
20   where there is a damaged piece of siding, it would be
21   my opinion that that entire side then is going to be
22   detached for the purposes of putting a weather
23   resistant barrier on, and then whatever is salvageable
24   will be put back on and then you would intermix new



1    siding with that.

2        Q.   Is the weather resistant barrier also a code

3    requirement?

4        A.   Yes.  It was not at the time.  It is now.

5        Q.   When you say "at the time," what are you

6    referring to?

7        A.   Building Code did not require weather

8    resistant barrier for a certain slot of time.

9        Q.   Right.  So what time is that?

10       A.   That would have been...

11       Q.   Are you referring to when Forest Ridge was

12   built?

13       A.   Yeah, when it was built.  That's what I

14   meant.  Thank you.

15       Q.   There are some buildings at Forest Ridge

16   where FBS did not find any siding damage, right?

17       A.   Correct.

18       Q.   Is there any reason the siding on those

19   buildings needs to be replaced other than what will be

20   entailed by replacing the roofs on those buildings?

21       A.   I can only think -- the roofs would be the

22   only reason.  I can think of one other possibility

23   that I have run into before with associations.

24   Depending on the bylaws of the association, which



1  sometimes I've seen can require a signoff by a certain

2  percentage of the members or something like that, it

3  may be such a thing where if more than a certain

4  percentage of these buildings are getting replaced,

5  they may say, no, we're replacing everything by our

6  bylaws.  That could be the only other thing I could

7  think of.  I don't know if that's exists here or not,

8  but I've seen it before.

9       Q.   If the Code did not exist or was not enforced

10  and you weren't replacing any of the roofs and if the

11  bylaws don't come into play --

12      A.   Then we're in Texas or Alabama.

13      Q.   But in that scenario --

14      A.   Where they don't care.

15      Q.   In that scenario, in that hypothetical, to

16  replace the physically damaged siding, would you just

17  be able to replace the elevations that contained

18  damaged siding?

19           MS. KAPLAN:  Are you talking about physically

20  able to do it?

21           THE WITNESS:  You can do anything.  I mean, I

22  can't tell you what I've seen around this country.

23  I've seen pieces of metal put in.  I've seen wood

24  intermixed with vinyl.  I've seen shingles nailed in



1    with -- you can do anything you want.

2    BY MR. FORTIN:

3        Q.   I mean that as a matter of...

4        A.   Is that returning it to pre-loss condition?

5        Q.   That's not the question.

6        A.   But that's one of the requirements under the

7    policy.  Come on.  You know, if we're in appraisal

8    right now, I'm arguing this that --

9        Q.   We're not, though.

10       A.   But I have specific training in that field.

11   I cannot think about that and have that on my mind as

12   I'm testifying as an expert.  So returning this to a

13   pre-loss condition is a big issue here.  All the

14   questions that you're giving me don't do any of those

15   things, don't address that issue.

16       Q.   That's your opinion, and that's fine.

17            Are you able, though, to answer the

18   hypothetical with the caveat that you don't believe it

19   would restore the buildings to a pre-loss condition?

20       A.   I will tell you that there is one instance

21   that I can recall where for the purposes of settlement

22   in an association with about 30 buildings and vinyl

23   siding that was only two years old, two years old,

24   that had vinyl siding damage to one side of each



1    building, siding was removed from four buildings

2    completely to harvest the siding for repair to the

3    other buildings because they had weather resistant

4    barriers, there's no fading on the siding, the

5    siding's still under warranty, everything lined up

6    perfectly, the stars aligned, and then the carrier

7    paid or agreed to pay for new siding on those four

8    buildings.

9          So yeah, there's all kinds of workarounds

10   that I've seen and that I have actually been involved

11   in.  We just don't have any of those options here.  It

12   sucks.

13       Q.   Is that option not available here because of

14   the roof work, the Code, and matching?

15       A.   Yes.

16       Q.   Any other reasons why that particular option

17   is not available here?

18       A.   Age, age of the product.  And we also

19   don't -- we have evidence in front of us that there's

20   not a consistent weather resistant barrier on these

21   buildings.  We have some that have it, some that

22   don't.  And so putting together a spec for that repair

23   would be difficult because we have an unknown.  In

24   that other scenario, we had all the perfect alignment



1    to do that.  And I put that forth to let you know that

2    FBS and me, in particular, is not unreasonable at

3    looking at repair options when they're available.

4    Here, it's just not.

5        Q.   Exhibit 129, do you recognize this document,

6    sir?

7        A.   I do.  Thank you.  Yes.

8        Q.   And is this your estimate?

9        A.   Yes, it is.

10       Q.   You're using an Illinois, Cook County

11   November 2017 price list, right?

12       A.   Yes, I am.

13       Q.   Is that the default price list based on the

14   date this estimate was generated?

15       A.   Yes.  This is not based on date of loss.

16   It's based on the fact that the work had not been done

17   at the point when we generated this estimate, so this

18   would be current pricing as of that date.  I would

19   expect that if we ran numbers today, which might not

20   be a bad idea if discovery is still going on, that

21   because of the hurricanes that have occurred, the

22   pricing will be higher in 2018 of June 1st than it is

23   today by probably as much as 10 to 12 percent bottom

24   line.  It's a lot of money, yeah.



1      Q.   On this first page of the estimate, the type

2  of loss, it says hail.

3      A.   Yes.

4      Q.   Is there any particular reason it does not

5  also say wind?

6      A.   Yes.  Because we did not look at this as a

7  wind loss.  There was enough damage here caused by the

8  hail to require the scope that's within this estimate.

9      Q.   So you didn't estimate the cost to repair,

10  replace wind damage to the property?

11      A.   No.  That got rolled into the damages that we

12  see here.

13      Q.   Generally speaking, is the scope of this

14  estimate the replacement of all roofs and all siding

15  on all 51 buildings?

16      A.   Yes, it is -- yes, exactly.

17      Q.   Are you familiar with the term ESX file?

18      A.   Yes.

19      Q.   You understand that to be the native

20  Xactimate file for an estimate?

21      A.   Yes, I do.

22      Q.   Does FBS still have the EXS file for this

23  estimate?

24      A.   Yes, we do.



1      Q.    Who created this estimate?  Or I can ask a

2   better question.  Let me try that again.

3          Did anyone assist you in generating this

4   estimate?

5      A.    Yes.

6      Q.    Who?

7      A.    My son Jim did the data entry on it.

8      Q.    What data did he use to enter?

9      A.    Well, certainly he used the information off

10   the EagleViews.  He used the information off of photos

11   and off of the report.  The estimate is generated

12   after the report is written.

13      Q.    Right.  So the EagleViews are used for the

14   measurements of the structures, right?

15      A.    Yes.  Well, and the number of penetrations,

16   length of valleys, you know, those kinds of things.

17      Q.    What from the photos did Jim look at to

18   assist in putting the data for this estimate?

19      A.    Just one second.

20      Q.    Sure.

21      A.    The only part that EagleView doesn't do a

22   good job on with theirs is the lineal footage around

23   windows, because with the Tyvek system -- and we've

24   all been through Tyvek training in our company.  Tyvek



1   has two options when you're using their product in

2   terms of maintaining a warranty for the Tyvek system.

3   There is a retrofit option.  Retrofit option would

4   allow us to leave the windows in place and to tie into

5   those with a flashing tape.  The non-retrofit option

6   would have required us to remove every single window

7   and put in a sill pan flashing, which probably would

8   have added another million dollars here to this thing.

9           So that could also explain why I'm thinking

10  when I'm talking to Steve about it could go this

11  amount of money, I may have been thinking at that

12  point in time, let's pull the windows, because that's

13  what we had to do in other cases.  Here we deemed that

14  you could leave the windows in place, and that's the

15  way that we estimated it.

16          So, for example, on page 3, line item 22B and

17  23 and line item No. 21, these flashing details, those

18  lineal footage did not necessarily show up on

19  EagleView so we had to generate those costs.

20      Q.   So that would be the reason for looking at

21  photos?

22      A.   Yes.  How many windows are there, what are

23  the size, and do lineal footage takeoffs, yeah.

24      Q.   What would Jim have referred to the report



1    for when inputting the data for the estimate?

2        A.   Just the scope of repair.  He would have

3    reviewed the scope of repair.

4        Q.   That scope being replacing all roofs and all

5    siding on all buildings?

6        A.   Yes.

7        Q.   It's my understanding that there's -- the 51

8    buildings are a few different types, right, there's

9    A, B, C, D, E?

10       A.   Yes.

11       Q.   And the scope of replacement in this estimate

12   is the same for all 51 buildings, right?

13       A.   Well, the scope is, but the takeoffs are

14   different.  The unit price is the same because the

15   pitch is the same, the buildings are generally the

16   same size, but the square footage counts and lineal

17   footage counts will be different by building style.

18       Q.   So all type A buildings, would we expect the

19   line items, their quantities and unit prices to be the

20   same as all other type A buildings in this estimate?

21       A.   Potentially, unless for some reason there is

22   an additional satellite to take off the building,

23   there might be an additional vent that comes through

24   the building, those kinds of things.  There may be



1  something that is an outlier.  Because, for example,

2  when you look on page 2 of Building 1 type A, your

3  general roof ACV price is 40,093, and when you look on

4  page 6, type A, your ACV is 39,861.  So, again,

5  there's a small nuance difference there.  I just

6  haven't done the line items, but we obviously can

7  explain what those are.

8      Q.   So aside from, you know, a deviation in a

9  vent or satellite system, we would expect the line

10  items for each type of building to be uniform?

11      A.   Yes, we would.  And, in fact, there is no --

12  as an example, on Building 4, there are no satellites.

13  On Building 1, there are.  There's five satellites.

14  Those would be the differences.  Otherwise, they're

15  going to be pretty darn close.

16      Q.   And is Jim also looking at the photograph to

17  determine how many, if any, satellites are on a

18  building?

19      A.   Yes.

20      Q.   So I just want to go through one or two

21  buildings, and then we'll jump to the end.

22          Line item 1, you're removing three tab,

23  25 year?

24          MS. KAPLAN:  What building are you on?



1         MR. FORTIN:  Building 1, line item 1.

2    BY MR. FORTIN:

3         Q.   So line item 1, you're removing the existing

4    shingles, right?

5         A.   Yes.

6         Q.   And that's just labor?

7         A.   Yes.

8         Q.   Line item 2, you're replacing those shingles,

9    and you have 15 percent waste added?

10        A.   That looks like a -- yes, because of the

11   number of valleys.  And this was a mistake, in my

12   opinion, that was made by Held in their estimate.

13   They're using an 8 percent waste factor, which would

14   be standard for a roof without valleys and without the

15   complexity of these roofs.  So they are under on their

16   waste.  Anyway, continue.

17        Q.   3A is remove ridge cap?

18        A.   Yes.

19        Q.   Is the ridge cap the ridge shingles that are

20   laid over the ridge vent?

21        A.   Yes.

22        Q.   But that's not captured in the number of

23   squares for removing the shingles in line item 1?

24        A.   Correct, it's not.



1      Q.   Line item 5, ice and water shield, is that

2   line item for removal and replacement or just

3   installation?

4      A.   Installation.  There is no ice and water

5   shield on the buildings.  And this is another item

6   that I found interesting when I was looking at the

7   J.S. Held field notes and looking at their actual

8   estimate.  In their field notes, for example, on

9   Building 1, they have almost the identical square

10  footage, but then in their estimate, they show

11  1,600 square feet.  So they literally didn't take the

12  information off their field notes.  They downsized --

13  which I see an J.S. Held estimates all the time, by

14  the way.  They downsized the square footage.  So they

15  have an estimate that doesn't have enough ice and

16  water shield.

17     Q.   Is the ice and water shield a code

18  requirement?

19     A.   Absolutely.

20     Q.   What's a drip edge?

21     A.   A drip edge is metal edge that goes around

22  the perimeter of the roof.  That is required now by

23  all shingle manufacturers.

24     Q.   What's L flashing?



1      A.   L flashing is at the intersection of any wall

2   to roof, the front edge of the -- not the step

3   flashing, but the L flashing.  And that exists on the

4   lower parts of the roofs.

5      Q.   Line item 8, does that encompass removal and

6   replacement of the step flashing?

7      A.   Yes.

8      Q.   Why did you break out removal and replacement

9   of the L flashing into different line items but not

10   the step flashing?

11      A.   I'd have to go into the ESX that gives you

12   two choices.  I don't think the L flashing gives you

13   two choices -- or gives you a single choice.  Step

14   flashing does give you a single choice.

15      Q.   As we sit here today, though, are you --

16      A.   Comfortable with the price, yeah.

17      Q.   As far as the reason why it's broken out into

18   two line items, I mean, is your answer that you would

19   have to check?

20      A.   Yeah, I'd have to check.  It's still going to

21   be -- the price of 398 plus 54 cents is a reasonable

22   price.  That's very consistent with what I would

23   expect it to be.

24      Q.   10A and 10B, removing and replacing the



1    flashing on the pipe jack?

2        A.   Yeah, there's 10 of them, 10 penetrations to

3    the roof.

4        Q.   Is that 10 pipe jacks?

5        A.   Yes.

6        Q.   And would that come from the EagleView?

7        A.   Yes.

8        Q.   And you're just attaching and resetting the

9    digital satellite system?

10       A.   Yes.

11       Q.   And so that would be Jim, from the photos,

12   counting how many there are.  For Building 1, he

13   apparently found five?

14       A.   Yes.

15       Q.   What's a vinyl J vent?

16       A.   Just a second.

17       Q.   Sure.

18       A.   He's including that in the roofing as opposed

19   to the siding.

20       Q.   Line item 17, detach and reset siding vinyl

21   high grade.  Why are you detaching and resetting the

22   vinyl siding?

23       A.   In that particular location?

24       Q.   Let's take a step back actually.  What



1  location does that line item refer to?

2      A.   That is where the roof to wall intersects.

3      Q.   And so is that one piece -- is that the top

4  piece of siding all the way around the building?

5      A.   No, because the siding comes in like this to

6  the roof.  So your roof is sloped like this.  Your

7  siding comes in like this.  I have to take all of

8  the -- I'm sorry.  This is my roof.  My siding comes

9  in like this on my wall.  I have to take the step

10  flashing off of here, so I have to take all this

11  siding all the way off to get to that step flashing.

12  I could show you better on a picture.

13      Q.   Yeah, if you could, that would be great.

14      A.   So in Exhibit...

15      Q.   253.

16      A.   253, photograph No. 28.  Basically what has

17  to happen is the step flashing goes up this side wall

18  this high.  So in order to get that out of there, I

19  got to take all this siding here off, all this siding

20  here off.

21          MS. KAPLAN:  If we don't have it marked now,

22  I'm going to have to go back and do it.  And I just

23  think to make a cleaner record, can we have him

24  identify on the photo what he's referring to now?



1          MR. FORTIN:  You want him to put pen to

2   paper?

3          MS. KAPLAN:  Yes, please, if you're okay with

4   that.

5          MR. FORTIN:  Yes.

6          THE WITNESS:  So all this siding.  And this

7   actually was in the first J.S. Held bid, as well, or

8   estimate.  So they were doing the same thing.

9          Now, what's interesting in thinking about

10  this is that this estimate was produced prior to the

11  deposition by the representative from the city of

12  Streamwood.  Based on my review of that testimony, I

13  would amend this estimate to, instead of detach and

14  reset, I would remove and replace.

15  BY MR. FORTIN:

16     Q.   Why?

17     A.   Because of the matching issues now that he,

18  in my opinion, has codified that the siding is coming

19  off these buildings and be replaced.  And the fact

20  that we were able to find, based on the supplemental

21  report that I did, that the siding is no longer

22  manufactured.  We have physically verified that, and

23  that's in the supplemental report.  So in this sense,

24  this estimate should be revisited.



1      Q.   Some of the line items for the roof on this

2   first page of the estimate subtract an amount for

3   depreciation?

4      A.   Yes.

5      Q.   Who determines how much depreciation to take

6   and from which line items?

7      A.   I did.

8      Q.   And what was your basis for doing that?

9      A.   My basis for depreciation was the last five

10  or six or seven appraisals that I've been involved in

11  in this general same location of Illinois on other

12  associations where we have depreciated labor only and

13  not -- I'm sorry, where we have depreciated materials

14  only and not labor, where we have depreciated only new

15  materials -- I'm sorry, only existing materials.  So,

16  for example -- let's take a look here.  Just a minute.

17  Yeah, just materials, that's all we're doing.

18         So on line item No. 2, the RCV price of --

19  total of $18,860.47, that is labor and material.

20  Inside that is just a material price.  So we pulled

21  out the material price only out of the 18,000, and

22  then we took a depreciation on that.  I can't remember

23  right now what that was, but the ESX would tell me.  I

24  think it was about 25 percent on material only.



1    Q.   So just from looking at the estimate that we

2  have marked here as Exhibit 129, we can't tell what

3  that material number is within a given line item from

4  which the depreciation taken?

5    A.   Not with the information right here in front

6  of us, but I can -- when I have it on the computer, I

7  can pull it out just like that.  So for trial we would

8  prepare certainly all of that information on how we

9  arrived at the formula, the whole bit.

10    Q.   And what percentage of depreciation did you

11  take -- or actually, let me ask a different question

12  first.  Did you take the same percentage of

13  depreciation across the board for materials in this

14  estimate?

15    A.   Yes.

16    Q.   What percent depreciation did you take?

17    A.   I can't tell you right now, but I think if

18  memory serves me, it was 25 percent on materials only.

19    Q.   And what was the basis for using 25 percent?

20    A.   Well, two things.  One -- well, three things.

21  One, condition, age, and my training, education, and

22  experience as an appraiser who has to do this every

23  day on similar projects.  And in particular, having

24  just completed this on about 10 appraisals in this



1    same area and having panels agree to those general

2    numbers.  In some cases -- so, for example, we just

3    finished one where we depreciated the materials at

4    about 50 or 60 percent, because the roof was -- I

5    mean, it's trashed basically, the condition of that

6    roof.

7        Q.    Would those appraisals be listed in your CV?

8        A.    Yes.

9        Q.    You also said, I think, the age and condition

10   of the materials?

11       A.    Yes.  What I like to explain on that is, I

12   just finished investigating a project down in Texas,

13   you know, last fall.  And it's a hotel that's only

14   five years old, and that roof looked 60 years old on

15   that thing.  So in that situation, I would depreciate

16   the hell out of that, even though it's only five years

17   old, because the condition of it was terrible.  So you

18   can't just base it on age.  You got to look at

19   condition as well.  In general, based on the age, this

20   roof was in pretty good condition in the field of the

21   roof where it wasn't physically damaged by hail.  It's

22   got a lot of life left in it absent of the hail

23   damage.  So I thought 25 percent was a reasonable

24   depreciation.



1      Q.   Your report that we just went through,

2  Exhibit 160, does not address the reasoning behind the

3  depreciation, right?

4      A.   No, it does not.  I had specific training on

5  depreciation when I became certified as an umpire and

6  appraiser.

7      Q.   And who certified you?

8      A.   That was through WIND and NAPIA.  And that is

9  a class that's taught by two attorneys.  It's an

10  eight-hour class and half of it is on appreciation.

11      Q.   And who are those two attorneys?

12      A.   One was from a defense firm, defense

13  insurance firm, and one was from a plaintiff's firm.

14  I can't remember the names.  It was two years ago in

15  California.

16      Q.   Would it be listed in your CV?

17      A.   It should be, yeah.  It's one of the NAPIA,

18  WIND conference things that I attended in Los Angeles,

19  yeah.

20      Q.   Do you have any other training that touches

21  on depreciation and actual cash value?

22      A.   Not specific training, just what I've done in

23  20 years of doing appraisals.

24      Q.   Moving to the exterior of Building 1.



1      A.    Yes.

2      Q.    Line item 18A, remove gutters/downspouts up

3   to five feet?

4      A.    Five inches.

5      Q.    I'm sorry.  Up to five inches?

6      A.    Yes.

7      Q.    What is the up to five inches?

8      A.    It's the size of the gutter.  When you get to

9   six inches and above, it's a commercial size, so the

10  price point goes up.

11     Q.    And 210 linear feet, does that represent all

12  the gutters and downspouts on the entire building?

13     A.    Yes.

14     Q.    And what is the reason for removing and

15  replacing all the gutters and downspouts?

16     A.    Practicality.  One, there is some physical

17  damage that we identified in photos of hail damage.

18  The practicality on a project like this is that the

19  contractor is not going to leave them up there because

20  setting ladders against them and having shingles fall

21  on them is going to dent them and damage.  Them taking

22  them off and storing them on the ground and then

23  reinstalling them typically damages them as well.

24  They get damaged while they're on the ground.  So

1  standard practice is to replace them.  It's not a huge

2  amount of money per line item.  That's why we're doing

3  it.

4      Q.  Does the hail damage to the gutters and

5  downspouts require them to be replaced?

6      A.  Yes.  There's physical damage to them, yes.

7      Q.  But I guess my question is, would that alone

8  warrant or require replacing all the gutters and

9  downspouts?

10      A.  Yes.  There's a change in condition.  There's

11  physical damage from hail, yes.

12      Q.  And that in and of itself to you is

13  sufficient to require replacement?

14      A.  Yes.

15      Q.  19A and 19B call for the removal and

16  replacement of vinyl siding?

17      A.  Yes.

18      Q.  The 8,016 square feet quantify for those line

19  items, is that separate from the 362 square feet of

20  siding that's being detached and reset in line item

21  17?

22      A.  Yes.

23          So effectively what would happen is, the

24  detach and reset, which is $2.17 a unit price is going



1    to jump up to 4.23.  So it's going to be about double.

2    So that's 320 -- so effectively you could say the line

3    item 17, if I redo this estimate, is going to jump to

4    1,800 and change as opposed to 900 and change.

5         Q.   And tell me again why would you be changing

6    that line item.

7         A.   Based on reading the deposition of the

8    Building Code official.

9         Q.   What specifically from his testimony?

10        A.   The matching issue and the siding not being

11   commercially available anymore.  By detaching and

12   resetting, I'm now creating a matching issue.  Because

13   I'm doing new siding below, and I'm going to put the

14   old stuff up on the top.  And now I'm going to have a

15   mismatch.  That's why.

16        Q.   What's the vinyl J trim?

17        A.   That's a J channel.  Right up around all the

18   windows, wherever the siding comes into a window, you

19   have a little piece of material called a J channel.

20   It slips into the channel.

21        Q.   Line items 22A and 22B, they have an asterisk

22   at the end of them, at the end of description.  Can

23   you tell me what that means?

24        A.   No, I actually can't tell you why that's on



1    there.  Didn't even notice that before.

2        Q.   Would that also be the case for the asterisk

3    after the sill flashing manipulation?

4        A.   Yes, that might be a note for a price check

5    that came through at the time, which is usually a note

6    that means the price is going up.

7        Q.   Are you speculating that that's what that

8    means?

9        A.   I'm speculating that's what that means.  I've

10   seen that before.  But right now without having the

11   ESX, I can't tell you what that is.

12       Q.   Do you recall whether Building 1 was one of

13   the buildings where someone pulled back the siding to

14   see if there was a weather resistant barrier there?

15       A.   It doesn't make any difference if there's one

16   there.  The one that's there has to come off if it is

17   there.  I can't reuse the weather resistant barrier.

18   It's full of holes now.

19       Q.   Is that required by code?

20       A.   It's required by the manufacturers.  I mean,

21   I have to have the -- it's part of the vinyl siding

22   package.  I have to have a weather resistant barrier

23   behind there.

24       Q.   Right.  Assuming there's one there, you're



1  saying you need to remove it and replace it because

2  it's full of holes, right?

3      A.   Yes.

4      Q.   Full of nail holes?

5      A.   Yes.  Not hail holes, nail holes.

6      Q.   Is the replacement of that house wrap

7  required by code?

8           MS. KAPLAN:  Asked and answered.

9           THE WITNESS:  No.  I would not put that if I

10  were -- and we do this at appraisal where we will

11  bifurcate out what we think are code-related items

12  under ordinance and law.  And, again, I'm not giving

13  you an opinion here about what's covered and not or

14  whether you have ordinance and law and coverage.  I

15  don't know.  I don't care.

16           In this particular case, I would not put

17  that -- if I were an umpire or even an appraiser on

18  either side of the fence, I wouldn't put that into a

19  code issue.  That's an undamaged piece of material

20  that has to come off as part of the scope of repair.

21  BY MR. FORTIN:

22      Q.   If there was no weather resistant barrier

23  partly on Building 1, would the adjustment to the

24  estimate just be to remove line item 22A?



1    A.   The adjustment would be to remove line item

2    22A, and then the adjustment would be to take

3    $3,088.39 of 22B and move that into an ordinance and

4    law category.

5    Q.   And that would be true throughout the rest of

6    the buildings depending on whether there is currently

7    a weather resistant barrier underneath the siding or

8    not?

9    A.   Correct.

10   Q.   Just flipping back to the previous page

11   momentarily.  Roof line items for Building 1, are

12   there any of those items that you would put in an

13   order and law category?

14   A.   No.

15   Q.   And then same question for the exterior line

16   item Building 1?

17   A.   Just the house wrap if it doesn't exist.

18   Q.   Why are you removing and replacing all of the

19   vinyl siding on Building 1?

20   A.   Because I am removing it at the roof, and

21   it's going to get physically damaged based on my

22   inspection on the site, the way it's nailed in.

23   What's going to get damaged -- the vinyl siding,

24   there's a tool called a zip tool.  You reach under the



1  lip and you run it along and you unzip the vinyl.

2  That's what you see most in pictures.  If that's done

3  correctly, there's no physical damage to the vinyl

4  siding.  However, the vinyl siding is fixed to the OSB

5  sheathing with roofing nails.  They're a galvanized

6  hot dipped roofing nail.  Here's the problem:  The

7  only way to get that out of there is to either pull

8  the siding and break the nail flange on the siding,

9  which now I'm replacing that 16 foot piece of siding

10 because now I've broken the flange, or I have to get

11 underneath and pry, and in the prying process, you

12 break that flange about 60 percent the time.  And

13 that's if you're doing careful, close surgical roof.

14 The reality at the end of day is the labor force that

15 we utilize in the United States to do these kinds of

16 jobs, they don't take care.  They're literally going

17 to rip and pull as quick as they can.

18     **Q.   And that's because of the use of the**

19 **galvanized steel nail?**

20     A.   Yes.

21     **Q.   Is there an alternative that would have**

22 **avoided that issue?**

23     A.   No.  It's a what the manufacturer recommends.

24 These are not designed to be removed and replaced.



Thomas Irmiter 05/17/2018

1    It's a one-time deal.

2        Q.    What manufacturer?

3        A.    Well, vinyl siding -- okay.  The Vinyl Siding

4    Institute which jurisdicts the installation guidelines

5    for all vinyl manufacturers.  They used to allow you

6    to install with staples.  They don't anymore.

7        Q.    Then why do the Vinyl Siding Institute still

8    talk about the zip tool where you can just unzip it?

9    Is that no longer --

10       A.    No, they're talking about unzipping it.

11   That's all they're talking about.  This is where, when

12   you sit in the class and you raise your hand and you

13   ask those secondary questions that the discussion goes

14   to the next level, well, you're right, we talk about

15   zipping it open, but you're right, we really don't

16   address the fact that when you start prying back those

17   nails, you're going to break the hell out of the top

18   channel, which is how you install it, so you're going

19   to have to put a new piece of siding in.  What they're

20   assuming when you zip it open and you pull it off,

21   that you're not reusing that siding.  They're assuming

22   you're putting a new piece of siding in.  Why, because

23   they make siding.  They sell siding.  They don't want

24   you to reuse siding.  That's why they tell you to use



1  galvanized roofing nails.

2      Q.   So can you just replace the top piece of

3  siding?

4      A.   If I had it commercially available.  I don't.

5  What am I going to replace it with, a mismatched

6  piece?

7      Q.   So the difficulty in removing that top piece

8  of siding where it intersects with the roof, that's a

9  function of the fact that you're replacing the roof?

10     A.   Yes.

11     Q.   And then --

12     A.   But see, understand that piece of siding --

13     Q.   Let me finish.  And then the need to replace

14  the rest of the siding below that, is that a function

15  of it's no longer going to match with what you need to

16  replace that top row with?

17     A.   Correct.

18          On the picture that I showed you that we

19  circled, okay, as the roof comes down at an angle like

20  this and the siding -- the siding doesn't run like

21  this with the roof.  I can't just take one piece of

22  siding off and take the flashing off.  On a 20 foot

23  span, I'm going to have 40 pieces of siding that are

24  going to come into play that I have to peel all the



1  way back.  That's 40 times probably 10 fasteners

2  per -- that's 400 fasteners that are potentially going

3  to break the siding during the removal process.

4      Q.   The galvanized steel nails are only used at

5  the top row?

6      A.   Yes.

7      Q.   And did you observe that on all of the

8  buildings you inspected?

9      A.   Yes.  Any time we pulled back siding, we saw

10 that, and that would be standard installation.  We

11 looked for one or two things.  You're either going to

12 have staples or you're going to have the nails.

13     Q.   When you pulled back the siding on the site,

14 that was at ground level, right?

15     A.   No, it's up on here.  It's right here.  I'm

16 up on the roof.

17     Q.   And this is your photo log figure 29?

18     A.   29.  There's your galvanized roofing nail

19 right there.

20     Q.   And that's showing you; you're peeling back

21 the top row of siding, right?

22     A.   Yes.  Well, not the top row.  I'm peeling

23 back a middle row, just a row.  I'm just taking one

24 little piece and peeling it back.



1    Q.   So the galvanized steel nails are used even

2  in the middle rows?

3    A.   Oh, God, yeah.  They're used on every piece.

4  Every piece every 16 inches has a nail.  So a 16 foot

5  piece is going to have 10 nails in it.

6    Q.   So how are you able to peel back that piece

7  of siding?

8    A.   What it does is it channel locks like this.

9  So this right here is where the nails go in.  The next

10  piece lays over and channel locks.  So what I'm doing

11  is, I'm zipping that and pulling this up, and then

12  you're seeing these nails.  So I have to unzip this as

13  well.  So now I got these two pieces flapping.  I've

14  got with one nailed.  I take those nails out.  I slide

15  that piece out.  I slide a new piece in.  I renail,

16  and then I just clip those other pieces back in place.

17  If I had siding that matched, I could potentially do

18  that.

19    Q.   You're taking 10 and 10 for O&P?

20    A.   Yes.

21    Q.   And is that because you think a general

22  contractor would be needed?

23    A.   Yes.  On this size project, absolutely.

24    Q.   The figure for permits and fees, you have



1    77,134.94?

2        A.   Yes.

3        Q.   Where does that number come from?

4        A.   That comes from the work we did on Southgate.

5    Each municipality -- and we did not verify whether

6    that has that changing or not.  But on the Southgate

7    project, what we were told then, which we believe is

8    still true today, is that they charge based on the

9    units, not the buildings.  So each little municipality

10   has their way of charging an additional user tax.  So

11   it's not a permit based on 51 buildings, it's a permit

12   based on -- how many units are there, 510 units or

13   something like that.

14                        (Whereupon, Exhibit No. 254 was

15                         marked for identification.)

16   BY MR. FORTIN:

17       Q.   I'm handing you Exhibit 254.  Do you

18   recognize that as your supplemental report?

19       A.   I do.

20       Q.   The picture on the first page here, that's a

21   picture from the storage unit where some of the

22   original siding is still in some boxes, right?

23       A.   Yes.

24       Q.   Have you physically gone out to the storage



1    unit?

2        A.   No, I have not.

3        Q.   The pictures were provided to you by counsel?

4        A.   Yes.

5        Q.   On page 1, the last sentence of background

6    information, it says, "Based on our review of the

7    labels on the boxes, we were able to ascertain that

8    the Brentwood siding was manufactured by Ply Gem."

9        A.   Yes.

10       Q.   Is Ply Gem then the manufacturer?

11       A.   Yes.  Brentwood is the style.

12       Q.   And what's Mastic?  I've seen that.

13       A.   Mastic was -- Mastic I think purchased

14   Ply Gem or Ply Gem purchased Mastic.  It's one or the

15   other.  That's one of the reasons for the

16   discontinuation was that merger.

17       Q.   How do you know that?

18       A.   How do I know what?

19       Q.   That that merger was one of the reasons for

20   the discontinuation?

21       A.   I'm sorry.  I don't know that.  You're right,

22   that would be incorrect.  I have seen that happen with

23   other mergers of other building product manufacturers

24   where then they discontinue a certain amount of the



1  line and have another product take that over.  I've

2  seen it in roofing.  I've seen it in other things.

3  I'm speculating that's what occurred.

4      Q.   Am I correct that the photographs you

5  received from counsel show boxes of two different

6  colors of that Brentwood siding?

7      A.   Yes.

8      Q.   Desert, and I think the other one was sage?

9      A.   Yes.

10      Q.   But otherwise, is it your understanding that

11  those two different types of siding in storage are the

12  same?

13      A.   Yes.

14      Q.   You had a phone call with someone at Ply Gem

15  on March 22, 2018?

16      A.   Yes, and then an email.

17      Q.   The first bullet point from the phone call,

18  you state that the siding had been discontinued in

19  late 2015?

20      A.   Yes.

21      Q.   The siding, does that refer collectively to

22  both colors?

23      A.   Yes.

24      Q.   And the siding had a unique wood grain



1  pattern, that bullet point continues, that is no

2  longer manufactured; the new product does not have

3  this.  Was that wood grain pattern the same on both

4  colors of siding?

5      A.   Yes.

6      Q.   The next bullet point says, "She indicated

7  that some fading could be expected on a product that

8  was 10 to 12 years old."  Does that accurately reflect

9  what she told you during that phone call?

10     A.   Yes.

11     Q.   Was all the siding at Forest Ridge faded to

12 some degree as far as you could tell?

13     A.   Yes.

14     Q.   Did some areas appear to have faded more than

15 others?

16     A.   Yes.  I mean, I didn't -- the only way to

17 verify that would be to physically remove siding from

18 a north side and bring it over and hold it up to the

19 south side and vice versa.  We know with vinyl siding,

20 in general, and you learn this when you take the vinyl

21 siding class that I took, that that is the biggest

22 issue with vinyl siding is fade.  That's consistently

23 been an issue.  In fact, if I remember right, the

24 Building Code actually addresses it, the fade issue,



1    the actual International Building Code.

2        Q.    If you'll turn to page 4, section 1.1.

3        A.    Yes.

4        Q.    The siding that's depicted in that

5    photograph, do you know if that's the desert sand or

6    the sage color?

7        A.    Just a second.

8            No, I don't, as I sit here right now, no.

9        Q.    Page 6, figure 4, does that show the -- is

10   that Brentwood double four inch what's currently out

11   there?

12       A.    Yes, this is the current available siding.

13   And it makes sense to me that they've gone with a

14   smoother grain like this.  They're trying to compete

15   with Hardie, Hardie board, which has a much smoother

16   grain.  It's kind of the style that people are putting

17   on their houses now.  Nobody likes that rough cedar

18   look any more.  It's kind of an '80s, '90s look, so it

19   makes sense.

20       Q.    Section 2.0, you state that the open box of

21   siding will not be sufficient to return the property

22   to a pre-loss condition for the following reasons, and

23   then you have three bullet points there.  The first

24   one says, "The Building Code prohibits installation of



1  used building products without consent of the code

2  official."  Is there a particular section of the

3  Building Code that would state that?

4      A.   Yes, it's in the Building Code.

5      Q.   Do you offhand know what section that is?

6      A.   It's in the administrative section,

7  section 1, and I think it's 105 or something like

8  that.  I can certainly find it for you.  One thing

9  you'll learn in your training as a Building Code

10 official is, you do not have to memorize the Code; you

11 just need to know where to find it.

12     Q.   Those aren't the local amendments by

13 Streamwood, right?

14     A.   No.  That is in the overall code, yeah.

15     Q.   The second bullet point is that basically

16 that the fading of the siding that's on the buildings

17 means that that siding and what's been the storage

18 shed for the last few years are now different colors?

19     A.   Yes.

20     Q.   And the final bullet point:  "There's not

21 enough siding to accomplish the repairs required to

22 return the property to a pre-loss condition."

23     A.   Correct.

24     Q.   And what is the extent of repair that would



1    be required to return the property to a pre-loss

2    condition, is that all the siding on all the

3    buildings?

4        A.   No.  That would be the damaged siding.  So

5    we'd have to have enough pieces of the damaged siding

6    that matched, and then we'd have to have the ability

7    to not damage additional siding while we're taking off

8    that damaged one.  So this piece right here in

9    section 1.1, which is a hail-damaged piece of siding,

10   that's a 16-foot piece of siding.  All right.  So the

11   removal of that piece of siding is going to manipulate

12   the siding above and the siding below.  So it's going

13   to potentially cause damage to the one up above and

14   below, as well as the one I'm removing because I'm

15   going to remove the nails on the one I'm removing.

16   Then I'm going to have holes in the weather resistant

17   barrier that I've got to deal with.  So I've got to

18   slice the weather resistant barrier.  I've got to

19   slide a new weather barrier under it to plug those

20   holes and tape everything off at that siding, and then

21   I got to put a new piece of siding from this box where

22   this one was removed and hope that it matches within

23   the city requirements.  We don't think it's going to.

24       Q.   The amount of physically damaged siding, is



1    that the -- what you ballparked earlier as maybe 80,

2    maybe 120 pieces?

3        A.    In that range, yes.

4                            (Whereupon, Exhibit No. 255 was

5                            marked for identification.)

6    BY MR. FORTIN:

7        Q.    I'm handled you 255.  And I'm just going to

8    ask you if these are the photographs from the storage

9    site that you received from counsel?

10            MS. KAPLAN:  Are these -- did you pull these,

11   Matt, from the supplemental FBS file report?

12            MR. FORTIN:  Yes.

13            MS. KAPLAN:  Okay.  Because I was going to

14   say I sent him exactly what I sent you guys.

15            MR. FORTIN:  It should be -- yeah, I got it.

16            THE WITNESS:  Yes.

17                            (Whereupon, Exhibit No. 256 was

18                            marked for identification.)

19   BY MR. FORTIN:

20       Q.    And now I'm going to hand you Exhibit 256,

21   and just let me know if this is the email you

22   exchanged with Ply Gem on March 25, 2018, and

23   attachments to it that they sent you?

24            MS. KAPLAN:  Was this also from the FBS



1    supplemental file?

2         MR. FORTIN:  Yes.

3         THE WITNESS:  Yes.

4    BY MR. FORTIN:

5      Q.   And if you'll turn towards the, I guess it's

6    the second attachment to the email.  It's after the

7    snazzy looking color brochure.  It's numbered page 31.

8    It says Brentwood on it.

9      A.   Yes.

10     Q.   That first product there, the Brentwood

11   double four inch, that's what is currently up at the

12   property?

13     A.   Yes.

14     Q.   And the desert sand and sage, that's what is

15   currently in the storage shed?

16     A.   Yes.

17     Q.   And the replacement lines, the Eclipse and

18   the Mill Creek that Mastic replaced the Brentwood line

19   with, that's what's reflected in the first attachment,

20   right?

21     A.   Yes.

22     Q.   Or the first two attachments, I guess?

23     A.   Yes.

24     Q.   And just leafing through the attachment



1    there, it looks like the Mill Creek product, they have

2    double four inch, and they have desert sand color?

3            MS. KAPLAN:  Which page are you on?  What

4    does it looks like?

5            MR. FORTIN:  It looks like that.

6            MS. KAPLAN:  All right.

7            MR. FORTIN:  Are you both with me?

8            MS. KAPLAN:  No, he's on -- you're on the

9    Eclipse, I think.  I think Mill Creek is further back.

10   There you go.

11           THE WITNESS:  Okay.  Yes, this is what I

12   reprinted.

13   BY MR. FORTIN:

14       Q.   So they have the double four inch; they have

15   the desert sand color; and it looks like this product

16   is also .04 inch thickness?

17       A.   Yes.

18       Q.   So the problem, at least with respect to the

19   desert sand one, is the fading of what you have

20   currently out at the site and then the wood grain,

21   right?

22       A.   Grain and/or texture and color, yes.

23       Q.   Right.  Okay.

24       A.   The only thing that I could not verify also



Thomas Irmiter 05/17/2018

1  that may be an issue is they did not have a -- if you

2  take a look right here at the channel lock, the new

3  and improved channel lock, this looks different than

4  the channel lock that I saw on the site.  So one of

5  the problems might be incompatibility of the channel

6  locks because this is a higher wind rated material

7  now.  They may not actually lock together properly.

8      Q.   For purposes of your estimate, based on what

9  you testified to earlier, it's my understanding that

10  the only line item that you would potentially put in

11  an ordinance or law bucket is installing a weather

12  resistant barrier on buildings where there currently

13  is none; is that accurate?

14      A.   Yes.

15      Q.   Can you tell me what the scope of work would

16  be for the siding due to matching that you put in

17  matching bucket?

18          MS. KAPLAN:  Are you talking about just

19  identifying a line item as opposed to cost?

20          MR. FORTIN:  Whatever is easier for him to

21  do.

22          MS. KAPLAN:  Well, I'm asking before I made

23  an objection.  I guess I'll make an objection then to

24  the form of the question, vague.



BY MR. FORTIN:

Q.  Are there any line items in the estimate for parts of line items, for instance, just not an entire quantity that you would put in a matching bucket?

A.  Well, no, I would put it in the commercial unavailability.  It's not a manufactured product anymore.  So I'm taking off the siding.  I believe we'll be able to demonstrate to the jury the damage that will occur as a result of the roofing.  I believe we'll be able to reasonably quantify for them the damages as a result of hail.  I believe we'll be able to quantify for them that the product's no longer commercially available.

In looking now on what you put in front of me at the channel lock right in here and looking at the channel lock on the existing product, they're completely different.  So there's no way that I'm going to be able to take this product and interweave it for repair into what's there.  We have a style difference.  So those reasons alone, I believe, are going to get me all of the siding, and they have nothing to do with code.  Where code would come into play is, in fact, this could be utilized to replace this piece and it didn't match color-wise and the



1  Building Code official said I'm not going to let you

2  do that to the town home association, I'm going to

3  make you replace it all, then I would argue that that

4  probably is a code-related issue.  I don't think

5  that's the argument.  The argument is, we don't have

6  the product to replace the physical damage, and the

7  undamaged pieces that will become damaged when they're

8  removed, and I don't have a product that I can match

9  together, because they changed the design.  It sucks,

10  but I really think that's the issue.  So I would put

11  zero.  That's what I would argue.

12        MR. FORTIN:  Let's go off the record.

13                (Whereupon, a short break

14                 was taken, after which the

15                 following proceedings were

16                 had:)

17                (Whereupon, Exhibit No. 257 was

18                 marked for identification.)

19        MR. FORTIN:  I'm going to hand you

20  Exhibit 257.

21        THE WITNESS:  Yes.

22        MR. FORTIN:  And, Emilie, you'll recognize

23  that from Mr. Peterson's deposition.  I'm just marking

24  it anew because Mr. Peterson wrote on the exhibit.



1   BY MR. FORTIN:

2       Q.   My question for you, Mr. Irmiter, is, do you

3   see any mismatched siding on the first page of

4   Exhibit 257?

5           MS. KAPLAN:  I'm just going to object to the

6   foundation for these photographs.  And in particular,

7   I think without a complete view, it takes the image

8   out of context, and there's various factors, including

9   lighting and the type of camera that was used to take

10  those photographs, that could affect the way it's

11  depicted.

12          MR. FORTIN:  Good answer, Emilie.

13          THE WITNESS:  Yes.  Would you like me to mark

14  the mismatches or how do you want to do that?

15  BY MR. FORTIN:

16      Q.   Do you need to mark particular areas on the

17  first page or can you just say this side is different

18  than that side?

19      A.   Well, this side is different than that side.

20      Q.   Can you say it in a way that would be

21  intelligible on the record?

22      A.   On page 1, the right-hand side is different

23  than the left-hand side at the interlock.  Either the

24  right-hand piece is larger or the left-hand piece is



1  smaller.  I would hazard to say that the reason this

2  is occurring, if, in fact, the panels are identical in

3  size, is exactly what I talked about earlier is that

4  channel interlocks are different, and that's causing

5  this alignment issue.

6         The concern that I would have with this, and

7  I see this around the country, is that the channel

8  lock that is on the new siding is specifically tested

9  and designed to meet the new code requirements that

10  took effect for components in cladding and vinyl

11  siding starting in 2000.  So it's a more robust

12  channel lock, but it also seats the siding a little

13  bit differently.  We learned this in our vinyl siding

14  class.  So there is an alignment issue, and what you

15  generally find that happens is that this -- the piece

16  that is the newer piece, that is the more robust piece

17  will actually dislodge because it doesn't interlock

18  correctly at far below the designated wind load speed

19  of 165 miles an hour.  You now have a siding that

20  isn't performing the way it was designed because it's

21  installed incorrectly.

22         Page 2, again, they're stepping back from

23  this.  Just based on this particular picture, it looks

24  to me like I have a different color going on.  The



1  color on the left is more robust.  The color on the

2  right looks more faded.  And, again, I have an

3  alignment issue that's occurring here.

4          And then on the last picture, it looks to me

5  like I have two pieces that have been put in that are

6  different.

7          Based on my discussions with the Building

8  Code official, these two pieces of siding or the

9  remaining siding around it, one or the other would be

10  rejected by the city if they were to look at these.

11     Q.   Why?

12     A.   Because of the mismatching.  If

13  hypothetically Exhibit 257 was in the city of

14  Streamwood.  I have no idea where these were taken.

15     Q.   Has a court ever barred you from providing

16  expert testimony on the ground that you were not

17  qualified?

18     A.   Yes.

19     Q.   Do you recall if it's more than one court?

20     A.   There is --

21     Q.   Let me actually rephrase that.  Do you recall

22  if that has happened in more than one case?

23     A.   There are two cases that I'm aware of.  One

24  was an interlocutory decision that was done down in



1    Red Wing, Minnesota, some years ago.  Hopperstad I

2    think is what it was.  It's not published.  And then

3    as a result of that ruling, which, by the way, I heard

4    from -- this happened at 10 o'clock in the morning on

5    a Wednesday or Thursday.  I heard from seven different

6    law firms around the country by 3 o'clock that

7    afternoon that we worked with who had heard about

8    this.  So clearly that was a big day for the insurance

9    companies when that happened.  That occurred.

10          Interesting when you do the background check

11   on that particular judge and the number of sanctions

12   that he had thrown against him before this ruling.

13   Must have had a axe to grind or something like that.

14          The second case was the Morrissey case.  In

15   that particular case, I was being asked to testify on

16   the duties and responsibilities of a licensed

17   contractor on a fraudulent concealment case, and I was

18   at the hearing.  The judge -- I was able to hear the

19   judge's ruling on that, and then read it later.  But

20   the judge basically said Mr. Irmiter is certainly

21   qualified to testify on a variety of subjects related

22   to construction and on the defects on this case, but

23   we're not going to let him testify to the duties of

24   disclosure that the contractor had because he's not



1    licensed as a contractor.  That had to do with the

2    revocation of my license that had happened the year

3    before.  Awkward position I was put in by the

4    attorneys in that case.

5          To answer that, in 2006 then I became

6    licensed as a Building Code official interestingly

7    enough from the same department that revoked my

8    license, from the same individual that revoked my

9    license, Mr. Charlie Durenberger, who I have on my

10   speed dial.  Mr. Durenberger clearly recognized that I

11   had rehabilitated myself.  I was allowed to sit for

12   the exam and take the class to become licensed.  I've

13   maintained that license since then with continuing

14   education requirements.  And sorry to have that tough

15   time behind me, but it was a difficult time for about

16   a year and a half.

17        Q.   Are those the only two cases you're aware of

18   where a court has found you not qualified to provide

19   expert testimony?

20        A.   Well, that I was actually involved in.  I can

21   name two others that I found out in depositions about

22   after the fact.

23        Q.   Can you tell me about those, please?

24        A.   Sure.  One of them is down in Oklahoma, and



1   it's a case where the attorneys out of Texas never

2   showed up for the hearing.  The judge ruled that

3   because I hadn't been to the site, he was going to

4   throw out my report.  I have pictures showing me on

5   the site.  I'd never been told about the hearing.  So

6   I disregard that as being bad law.  That attorney's

7   not practicing anymore.  There have been motions in

8   limine filed on that one, and we've passed them every

9   single time.  They don't even bother doing that

10  anymore.

11          And then there's recently one that I'm sure

12  you're aware of on a church here.  I heard about it a

13  year ago.  A church that I -- here in Chicago,

14  downtown Chicago that I looked at for the Voss Law

15  Firm down in Texas.  And, again, I was unaware that

16  Voss had -- that there was a motion or even a question

17  about any of the work that I had done on that.  I

18  never had a chance to know that the motion had been

19  filed and never had to chance to answer it with an

20  affidavit.  The judge made two particular rulings.

21  One, he indicated that I was not qualified to testify

22  on weather because there was nothing on my CV that

23  indicated I had any weather training.  Yet, on the

24  very first page it says I'm a Metro Skywarn NOAA



1  weather spotter.  What they did is, they picked out

2  of -- in their affidavit, they picked out of my resume

3  that I was a Building Code official.  They said,

4  what's a Building Code official talking about weather

5  for?  Had I been able to answer that in an affidavit,

6  the judge might have ruled differently.

7          Secondly, as you know, experts are allowed to

8  rely on firsthand information that they're given, and

9  that's part of our process, interviewing people.  So I

10  went down to look at the church, and the very first

11  question I asked the pastor is, tell me what's

12  happening here in the corner of this entryway, and he

13  said, that's old damage, that's not related today

14  this.  I said, great.  That's what we're -- we're

15  going to cover this.  So I detailed old and new damage

16  and damage that had occurred before but got worse to

17  bifurcate out to give my opinion about what had

18  occurred with the ice damming.  Come to find out that

19  the gentleman who toured me wasn't even a member of

20  the church at the time.  So I guess the lesson there

21  is, you can't trust a minister.

22          I don't mean to make light of it.  But I

23  don't really treat those other two cases as having

24  much weight when they're explained in an affidavit.



1      Q.    Do you recall the name of the Oklahoma case?

2      A.    I do not.

3      Q.    Is it listed in your CV?

4      A.    It's six years ago.  It's old.  I will tell

5  you that every motion in limine that has been filed

6  since then, and the very first one was led by the form

7  firm that you were a part of, has been overturned, and

8  I've been allowed to testify.  I've actually been

9  qualified as both a causation and a damages expert by

10  a number of courts.

11                         (Whereupon, Exhibit No. 258 was

12                          marked for identification.)

13  BY MR. FORTIN:

14      Q.    I'm handing you Exhibit 258.  Please let me

15  know if that is the order in the Hopperstad case that

16  you referred to a moment ago.

17      A.    Yes.  And I think the important part of that,

18  and this is actually what led me to begin

19  rehabilitation, was item No. 3, where the main

20  focus -- I was at this hearing, as well.  And the main

21  focus of his arguments in court, which are really

22  condensed to one line, is he was really having an

23  issue with the fact that -- he wrote the Court fails

24  to see evidence that he has made any substantial



1  changes in that position, in my position to work as an

2  expert or a qualifying expert.  And so the

3  rehabilitation began as soon as he put that statement

4  out there, and obviously I've rehabilitated myself.

5      Q.   You were formerly a residential building

6  contractor the state of Minnesota, correct?

7      A.   Yes.  Our firm went through an acquisition of

8  another company, and within six months, it went

9  through federal bankruptcy and lost everything.

10     Q.   And that contractor's license was revoked by

11 a consent order you entered into with the Commissioner

12 of Commerce dated April 5, 2001; is that correct?

13     A.   Yes, absolutely.

14          If you read the consent order, though, it's

15 not the first consent order they sent me.  The initial

16 draft wanted me to admit to all of the, quote,

17 allegations that had been put forth.  I would not do

18 that.  The final consent order in exchange for giving

19 me back my license was that I did not agree to any of

20 the charges or that any of them were valid.

21     Q.   Do you still have a copy of the consent

22 order?

23     A.   Oh, yeah.  Sure I do.

24     Q.   Am I correct that the commissioner had



1  commenced a formal administrative action against

2  Irmiter Contractors and Builders?

3      A.   Yes.  And what your firm Childress Duffy

4  argued in front of a district court in Minneapolis

5  where this was finally dealt with and where motions in

6  limine started to go -- turn the other direction is,

7  they argued that it would only be proper to have the

8  state here to have Mr. Irmiter question them on those

9  items if you're going to rule on behalf of the state.

10 You can't do that.  And basically the judge agreed

11 that in order for any of this to proceed forward, you

12 would have to have me have the ability to

13 cross-examine the state.  All those charges have been

14 dropped.  They're all old.  They're all done.  The

15 bankruptcy wiped out all of the trailing liability.

16 Done deal as far as the judge is concerned.

17     Q.   Was the formal administrative action by the

18 Commissioner directed against you personally, as well

19 as Irmiter Contractors and Builders?

20     A.   My understanding was Irmiter Contractors and

21 Builders, yeah, the corporation.

22     Q.   You were the individual that held the actual

23 contractor's license?

24     A.   Yes.  In the state of Minnesota, you have



1    to -- you have one individual in the company who holds

2    that license.  It could have been one of my

3    carpenters.  It could be anybody basically.  I

4    happened to hold the license.

5        Q.   In the administrative action by the

6    Commissioner, am I correct that its allegations -- or

7    the Commissioner's allegations included that you had

8    engaged in fraudulent, deceptive, or dishonest

9    practices?

10       A.   Oh, yeah.

11       Q.   Those are the allegations?

12       A.   Absolutely.  Those were the allegations.

13   There was never an administrative hearing.  This was

14   simply a filing.  The hearing was suspended as soon as

15   I agreed to give them back my license.

16       Q.   At some point, you submitted an affidavit in

17   family court, correct?

18       A.   I did.  Are you familiar with what is called

19   a Karon's agreement?

20            Enlighten you.  A Karon's agreement was put

21   in place at my divorce.  The Karon's agreement gave my

22   ex-wife consideration, meaning money and property.

23   And for that consideration, I was given the company

24   business.  As part of the Karon's agreement, I agreed



1    to have the company remodel her kitchen in our former

2    house.  The Karon's agreement was put in place to

3    protect me against upside.  So in other words, if I

4    take the business from a certain dollar volume, three

5    years later it's doing 10 times that amount, she can't

6    come back and ask for contribution because of that

7    increase in the business.  So basically it's a line in

8    the sand that says, we're parting ways, you have

9    nothing to do with my business, but I'm going to give

10   you something for it.  However, the Karon's agreement

11   does not contemplate downside.

12           So when I went bankrupt, her kitchen didn't

13   get done.  She was pissed.  So she sued me.  And so

14   the attorney that I hired basically -- because one of

15   her arguments was, he can go back and start working as

16   an expert, make all this money working as an expert.

17   I was unemployed when this was put forth.  And

18   basically I said, no, I can't.  And the attorney put

19   in their language that said I was persona non grata

20   for the foreseeable future.  Clearly that foreseeable

21   future ended within about a year and a half because I

22   was out testifying again and back paying her full

23   child support and everything else.

24       Q.   That statement you just referred to, that was



1  in the affidavit that you signed, and that was

2  submitted to the family court, right?

3     A.   Yeah.  So it's a family court matter.  It did

4  not mean that I had forgotten all the things I had

5  learned.  I just needed to rehabilitate.

6                        (Whereupon, Exhibit No. 259 was

7                         marked for identification.)

8  BY MR. FORTIN:

9     Q.   I'm handing you Exhibit 259.  Just let me

10  know if this is an affidavit that you signed on

11  August 28, 2006, for submission in a case in Hennepin

12  County, Minnesota, known as Kathy and Jeff Link versus

13  Mark Johnson Construction, Inc.?

14     A.   Yes.

15     Q.   And are your statements in this affidavit

16  true?

17     A.   Yes.  The judge also allowed me to testify in

18  that case after this affidavit.

19     Q.   You provided an additional affidavit in that

20  case, right?

21     A.   I don't know.  Maybe.

22                        (Whereupon, Exhibit No. 260 was

23                         marked for identification.)

24



1    BY MR. FORTIN:

2        Q.   Exhibit 260.  Let me know if that is an

3    affidavit that you submitted in the Link versus Mark

4    Johnson Construction case on August 31, 2006.

5        A.   Yes.

6            MS. KAPLAN:  I'm sorry.  Could you read back

7    the question?

8                        (Whereupon, the record

9                         was read as requested.)

10           THE WITNESS:  Yeah.  This is where I actually

11   answered some of the -- not all of them, but some of

12   the complaints by the -- the allegations by the state,

13   the ridiculous allegations.  Yes, it is my affidavit.

14   BY MR. FORTIN:

15       Q.   And are the contents of this affidavit true?

16       A.   Oh, absolutely.

17       Q.   If you'll turn to page 23 of it.

18       A.   Yes.

19       Q.   There's a heading that says "Fraud Claims of

20   the Commerce Department."

21       A.   Yes, it does.

22       Q.   Were the counts directed against you and --

23   let me try that again.

24           Did the Commissioner's complaint against the



1    company include a count alleging fraud?

2         A.   Yes.

3         Q.   And below that heading after paragraph 26 on

4    page 23, there's an italicized heading that says "The

5    Johnson Complaint?"

6         A.   Yes.

7         Q.   And then turning the page, "The Doty/Tobo

8    Complaint?"

9         A.   Yes.

10        Q.   And then "The Johnson Forgery Allegation" on

11   page 26?

12        A.   Yes.  Which, by the way, I would add that we

13   counter-sued them in bankruptcy court on that forgery

14   allegation, and they quickly withdrew that forgery

15   allegation as being false.  Hence, the problem with

16   administrative actions put forth by states in kangaroo

17   courts, as we like to call them.

18        Q.   The Keye complaint on page 27, are those

19   complaints and allegations I just identified, were

20   those basically the basis for the Commissioner's

21   complaint?

22        A.   That, and there were some subcontractors and

23   vendors that didn't get paid, which happens in a

24   bankruptcy.  There were projects that did not get

 1  completed, which happens in a bankruptcy.  And there

 2  were employees that didn't get their last paychecks.

 3  Some of those were in there as well.  I think the

 4  focus here was really on the four major consumer

 5  issues that were raised in that complaint that we

 6  thought would be problematic potentially and just not

 7  true, so that's why we answered them.

 8                          (Whereupon, Exhibit No. 262 was

 9                           marked for identification.)

10  BY MR. FORTIN:

11      Q.   I skipped a number.  I'll go back to it with

12  my last exhibit.  But here is Exhibit 262.

13           MS. KAPLAN:  Wait.  Did I miss one?

14           MR. FORTIN:  No.  I misnumbered.  So the one

15  that's going to be last will be Exhibit 261.

16           MS. KAPLAN:  Okay.

17  BY MR. FORTIN:

18      Q.   What I've handed you is Exhibit 262,

19  Mr. Irmiter.  Let me know if that's the order in the

20  Morrissey versus Gurtek Custom Builders and Zimmerman

21  Stucco and Plaster case in Ramsey County, Minnesota.

22  That was the second instance where you said you were

23  barred from testifying as an expert?

24      A.   Yes, this is it.  There's his order.

1         What's interesting is this order doesn't say

2    is that the expert on the other side, Jeff Jillson,

3    who is a registered and licensed engineer in the state

4    of Minnesota, was also barred from testimony.  General

5    thinking is this judge did not want to hear this case

6    and got rid of his experts pretty quickly.  But it is

7    what it is, and I have rehabilitated myself since

8    then.

9         Q.   If you'll turn to page 3, the second

10   paragraph that starts out "It is also been suggested."

11   Do you see that?

12        A.   No, I do not.

13        Q.   It's the first full paragraph.  No, the next

14   page.

15        A.   Yes.

16        Q.   There's a reference in the middle of that

17   paragraph to representations to this court currently

18   with regard to his having testified as an expert in

19   Hennepin County in 2007.  Do you see that?

20        A.   Yes.

21        Q.   What is that referring to?  What

22   representations had you made to --

23        A.   That I testified in district court, and I

24   did.  There's a record of it.  He just didn't get it.



1    Q.   What case was that in?

2    A.   It's not on my CV anymore.  I can't remember.

3  But I mean, I testified.  I was sworn in.  I

4  testified.

5    Q.   Do you remember a case entitled "Creekwood

6  Rental Townhomes, LLC, and Richard Lewandowski versus

7  Kiln Underwriting Limited?

8    A.   Yes, absolutely.

9    Q.   Do you recall doing a deposition in that

10  case?

11    A.   Which part of the case?  There were a couple

12  of different cases.  There was a first-party and

13  third-party construction defect case.

14    Q.   This was the first party.

15    A.   I must have if you have it.

16                        (Whereupon, Exhibit No. 261 was

17                         marked for identification.)

18  BY MR. FORTIN:

19    Q.   I've just handed you a copy of what I believe

20  to be the transcript of that deposition, and

21  ironically you'll notice on page 2 that I appeared at

22  the deposition on behalf of the plaintiffs.

23    A.   Yes, because Childress Duffy was representing

24  Mr. Lewandowski at the time.



1      Q.   Yes.  Do you recall this deposition in any

2   way, shape, or form?

3      A.   No, I really don't.  I don't know if this is

4   a result of the appraisal action and the appraisal

5   award that didn't get paid or if this is result of

6   the -- because there were -- there was a water

7   intrusion issue related to stucco.  That was the

8   third-party construction defect case.  There was a

9   first-party element to that that was brought forth

10  with Childress.  There was a third loss, which was a

11  hail damage claim that occurred during all of this to

12  the roofing and to windows where I appeared at the --

13  and testified at the appraisal hearing, I believe.

14  I'm not sure which of those first-party matters this

15  is for.  But I'm guessing it's for the hail damage

16  claim probably.

17     Q.   Yes, I believe it is.

18     A.   Yeah, I think it is, because that other one

19  settled.  In fact, the other one settled, and then the

20  insurance company retained me on the subrogation claim

21  as their expert.

22          MR. FORTIN:  Go off the record for a moment.

23               (Whereupon, a discussion

24                  was had off the record.)



1  BY MR. FORTIN:

2      Q.   Mr. Irmiter, if you would turn to page 145,

3  the transcript from -- or I'm sorry, the transcript

4  that we've marked as Exhibit 261, the page which you

5  helpfully pointed me to.  Starting at line 13, there

6  is a question asked of you regarding a statement in

7  the affidavit you submitted to the family court.

8      A.   Yes.

9      Q.   And there's a portion of that question that

10  purports to quote from your affidavit, and I believe

11  that portion reads:  "I am obviously no longer

12  credible as an expert and will not be hired in that

13  capacity for the foreseeable future."  To the best of

14  your recollection, is that an accurate recitation of a

15  particular statement in that affidavit?

16      A.   Yes.

17          MR. FORTIN:  Those are all the questions I

18  have for you today, Tom.

19          THE WITNESS:  Thank you.

20          MS. KAPLAN:  I just have a couple cleanup,

21  but I need a quick minute.

22          MR. FORTIN:  Sure.

23                      (Whereupon, a short break

24                       was taken, after which the



1           following proceedings were

2                 had:)

3           CROSS-EXAMINATION

4   BY MS. KAPLAN:

5       Q.   Mr. Irmiter, I just have a few questions for

6   you with regard to the family court affidavit that was

7   the subject of the preceding questions by Mr. Fortin.

8           At the time that you authored that affidavit,

9   were you in the business of offering expert or

10  consulting services in the field of hail or wind

11  damage assessment to real property?

12      A.   No.

13      Q.   When did you begin offering expert consulting

14  services in the field of hail and wind damage

15  assessment professionally?

16      A.   Professionally, 2007 as I testified earlier

17  today.

18      Q.   And that was after the affidavits that you

19  were shown previously from the Link case; is that

20  right?

21      A.   Yes.

22      Q.   And with regard to any of the cases of which

23  you're aware and which you've been prevented for any

24  reason from offering expert testimony, did any of



1    those cases involve your providing opinions in the

2    field of hail and wind damage assessment?

3        A.   Yes, the majority of them in the last

4    10 years.

5        Q.   I think you misunderstood my question.

6        A.   I'm sorry.

7        Q.   Let me ask it again.  Is that okay, Matt?

8    I'm not going to draw an objection?

9             In any of the cases in which you've been

10    prevented from offering expert testimony --

11        A.   Oh, sorry.  I thought you said presented.

12        Q.   Prevented.

13        A.   Okay.

14        Q.   Did any of those cases involve you offering

15    expert testimony or consulting services in the field

16    of hail or wind damage assessment?

17        A.   No, I have not been prevented from testifying

18    on wind or hail.  I have also not been prevented from

19    testifying on code.  And I have also not been

20    prevented from testifying on causation and damages,

21    meaning the estimate part of these kinds of things.

22        Q.   And since the family court matter and the

23    Link matter and the other cases in which you may have

24    been prevented from offering expert testimony, have



1  you also been qualified or allowed to testify in an

2  expert capacity by courts of other jurisdictions?

3       A.   Yes, federal courts and district courts.

4       Q.   Earlier in your deposition, there was

5  discussion about the April 6, 2017, storm.  Do you

6  recall discussing that storm?

7       A.   I do, yes.

8       Q.   And there was reference to the size of the

9  hail stones as -- well, pulled from the SWDI tool, and

10  I believe the reference was 2.5 to 2.75.  Does that

11  ring a bell?

12       A.   That is correct, yes.

13       Q.   Other than those size factors that were

14  available through the SWDI tool, were there other

15  factors which allowed you to eliminate that particular

16  storm from having caused the damage that you observed

17  at the Forest Ridge property?

18       A.   Yes.

19       Q.   What factors were those?

20       A.   The onsite visit, the ground truth

21  investigation.  If all of our work involved simply

22  getting an assignment that somebody said was related

23  to hail, going onto the internet and pulling up the

24  SWDIs from NOAA and issuing reports, that would be



1    really, really easy.  But we have to have the physical

2    ground truth to complete that assignment.

3        Q.    And what about the physical ground truth

4    investigation allowed you to eliminate that storm in

5    conjunction with the data from the SWDI tool?

6        A.    There was no sign of physical damage to the

7    site of hail of that size or proportion anywhere on

8    the site, which led me -- us to conclude that either

9    all of the roofs had been replaced after a 2010 event

10   and the siding replaced or, in fact, this site had

11   actually missed the hail from that event.

12       Q.    Was there anything other than the size of the

13   hail impact marks that you observed at Forest Ridge

14   that allowed you to eliminate the April 6, 2010, storm

15   from having caused that damage?

16       A.    Yes, the way that they presented themselves

17   in terms of weathering.  All of the hail, except for

18   two other three that I indicated earlier in my

19   deposition, on the roofing all was consistent with

20   newer hail, consistent with 2015.

21       Q.    At various points in your deposition today

22   the term "matching" has been used with respect to the

23   analysis of replacement or repair of siding at

24   Forest Ridge.  Do you recall being asked and talking



1    about matching at various points today?

2        A.    Yes.

3        Q.    Am I correct that one of the components of

4    this matching issue is the color of the siding, right?

5        A.    Yes.

6        Q.    Are there other components to the matching

7    issue?

8        A.    Yes.

9        Q.    What are those components?

10       A.    Well, size, texture, and the actual design of

11   the product for its compliance with building codes in

12   relationship to wind load requirements.

13           One of the things that happened when the

14   family of building codes, International Building Codes

15   became the standard in 2000 for all of the states is

16   the engineering community lobbied very, very hard

17   starting in 1997, '98, when they knew this was coming,

18   to insert into that special provisions for components

19   in cladding.  In other words, they don't want things

20   blowing off the buildings and killing people.  So as a

21   result of very robust wind testing of various products

22   that the manufacturers began doing in the mid-'90s,

23   this entered into the building codes.  And so we saw

24   dramatic changes in how the products were



1  manufactured, how they integrate with each other.  And

2  the codes are very specific about incompatibility of

3  materials.

4         The easiest way to explain that to a jury is

5  that sitting here on the table, we have at least --

6  and in my briefcase here, we probably have two

7  different pens.  I could take the insides out of one

8  pen and the insides out of the other pen, and I could

9  jam them into each other.  And I could screw them

10  together, and I could maybe duct tape them.  And

11  they'll work for a while, but they're not going to

12  work the way they were designed as a system.  The

13  siding is looked at as a system, and therefore it has

14  to integrate correctly.

15      Q.   Pulling out what was previously marked as

16  Exhibit 256, which I believe you identified as the

17  materials that were forwarded to you from the customer

18  service representative at Ply Gem.  Was there

19  information in the materials that you were provided

20  about the products that are currently on the market

21  similar to the siding at Forest Ridge that caused you

22  to have concern about the ability to match using those

23  products other than color?

24      A.   Yes.



1    Q.    What factors or issues are those?

2    A.    Well, Mastic has published on this document

3  for the Mill Creek siding, which is the compatible

4  siding for this site.  They have their new proprietary

5  design and engineering delivers a panel that achieves

6  superior wind resistance, and it's rated up to

7  165 miles an hour.  And they go through their new

8  double hem-lock system.  And one of the things that

9  became evident on this site when you walk around, and

10  we took pictures of this, there's pieces of siding on

11  various elevations, particularly higher up, that are

12  open, that are flapping.  This system is designed to

13  stop that from happening.

14        And so this particular channel lock that is

15  in the new siding is not compatible with what's on the

16  building.  So interspacing this particular piece of

17  siding with something there won't work.

18    Q.    Anything else besides the channel locking

19  system?

20    A.    The texture and grain is different as well.

21    Q.    Do you have -- do you know if the new Mill

22  Creek siding is rated or -- rated the same as the

23  siding that's currently at Forest Ridge as far as wind

24  speeds it would withstand?



1      A.    Based on my training through the Vinyl Siding

2  Institute, sidings prior to 2000 were not wind rated.

3  The Building Code addressed it in the following

4  manner.  It said that you were not allowed to install

5  vinyl siding higher than 80 feet off the ground.  That

6  was the only thing that it said.  And the reason for

7  that is, because the higher wind speeds it would blow

8  up, so they had a height limitation.  That has now

9  progressed where you could take this new siding and

10  you could install it at higher elevations because of

11  the way it's designed.  So there was no language on

12  that.  So we don't have a wind rating on that siding.

13          MS. KAPLAN:  Those are all my questions.

14  Thank you.

15          MR. FORTIN:  Reserve signature?

16          MS. KAPLAN:  Yes.

17          THE WITNESS:  Yes, please.

18                  (Witness excused at 4:46 p.m.)

19

20

21

22

23

24



Thomas Irmiter 05/17/2018

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  FOREST RIDGE HOMEOWNERS    )
   ASSOCIATION,               )
4                             )
              Plaintiff,      )
5                             )
          -vs-                ) Case No. 1:17-CV-4193
6                             )
   GREATER NEW YORK MUTUAL    )
7  INSURANCE COMPANY,         )
                              )
8              Defendant.     )

9              I, THOMAS IRMITER, being first duly sworn,
   on oath, say that I am the deponent in the aforesaid
10 deposition, that I have read the foregoing transcript
   of my deposition taken 17th day of May, 2018,
11 consisting of Pages 1 through 250 inclusive, taken at
   the aforesaid time and place and that the foregoing is
12 a true and correct transcript of my testimony so
   given.

13
              _____ Corrections have been submitted
14            _____ No corrections have been
                    submitted
15

16            _____

17            THOMAS IRMITER, Deponent

18
   SUBSCRIBED AND SWORN TO
19 before me this _____ day
   of _____ A.D., 2018.
20

21 _____
   Notary Public
22

23

24



1  STATE OF ILLINOIS                )
                                     )  SS:
2  COUNTY OF COOK                    )

3

4          I, Judith T. Lepore, Certified Shorthand

5  Reporter in the State of Illinois, do hereby certify

6  that on the 17th of May, A.D., 2018, the deposition of

7  the witness, THOMAS IRMITER, called by the Defendant,

8  was taken before me, reported stenographically and was

9  thereafter reduced to typewriting through

10  computer-aided transcription.

11          The said witness, THOMAS IRMITER, was first

12  duly sworn to tell the truth, the whole truth, and

13  nothing but the truth, and was then examined upon oral

14  interrogatories.

15          I further certify that the foregoing is a

16  true, accurate and complete record of the questions

17  asked of and answers made by the said witness, at the

18  time and place hereinabove referred to.

19          The signature of the witness was not waived

20  by agreement.

21          Pursuant to Rule 30(e) of the Federal Rules

22  of Civil Procedure for the United States District

23  Courts, if deponent fails to read and sign this

24  deposition transcript within 30 days or make other



Thomas Irmiter 05/17/2018

1  arrangements for reading and signing thereof, this

2  deposition transcript may be used as fully as though

3  signed, and the instant certificate will then evidence

4  such failure to read and sign this deposition

5  transcript as the reason for signature being waived.

6          The undersigned is not interested in the

7  within case, nor of kin or counsel to any of the

8  parties.

9          IN TESTIMONY WHEREOF:  I have hereunto set my

10  verified digital signature this 24th of May 2018.

11

12

13

14

15  _____

16          Judith T. Lepore, CSR

17

18  License No. 084-004040

19

20

21

22

23

24



1           McCorkle Litigation Services, Inc.
              200 N. Lasalle Street, Suite 2900
2                Chicago, Illinois  60601-1014

3  May 24, 2018

4  MS. EMILIE KAPLAN
   THOMPSON, BRODY & KAPLAN, LLP
5  161 North Clark Street
   Suite 3575
6  Chicago, Illinois  60601

7  IN RE:  Forest Ridge v Greater New York Mutual
   COURT NUMBER:  17 CV 4193
8  DATE TAKEN: 5/17/18
   DEPONENT:  Thomas Irmiter

9

   Dear Ms. Kaplan:
10
   Enclosed is the deposition transcript for the
11 aforementioned deponent in the above-entitled cause.
   Also enclosed are additional signature pages, if
12 applicable, and errata sheets.  Per your agreement to
   secure signature, please submit the transcript to the
13 deponent for review and signature.  All changes or
   corrections must be made on the errata sheets, not on
14 the transcript itself.  All errata sheets should be
   signed and all signature pages need to be signed and
15 notarized.

16 After the deponent has completed the above, please
   return all signature pages and errata sheets to me at
17 the above address, and I will handle distribution to
   the respective parties.  If you have any questions,
18 please call me at the phone number below.

19 Sincerely,              Judith Lepore
   Cindy Alicea            Court Reporter
20 Signature Department    (312) 263-0052

21 cc:  M. Fortin

22

23

24

