```
 1           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 2                COUNTY DEPARTMENT, LAW DIVISION

 3   ------------------------------------------------------

 4   SOUTHGATE TOWNHOME ASSOCIATION,

 5                        Plaintiff,

 6      vs.                          File No. 12 l 003185

 7   ALLSTATE INSURANCE COMPANY,

 8                        Defendant.

 9   ------------------------------------------------------

10

11                        DEPOSITION OF

12                        THOMAS IRMITER

13

14

15   DATE:      May 13, 2014

16   TIME:      9:58 AM

17   PLACE:     Paradigm Reporting & Captioning

18              527 Marquette Avenue South

19              1400 Rand Tower

20              Minneapolis, Minnesota 55402

21

22   REPORTED BY:

23              Elizabeth J. Gangl

24              Registered Professional Reporter

25              Notary Public, State of Minnesota
```

```
 1                          APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4          Christina M. Phillips, Esq.

 5          Childress Duffy

 6          500 North Dearborn Street

 7          Suite 1200

 8          Chicago, Illinois 60654

 9          312.494.0200

10          cphillips@childresslawyers.com

11

12    ON BEHALF OF THE DEFENDANT:

13          Mark B. Ruda, Esq.

14          Condon & Cook

15          745 North Dearborn Street

16          Chicago, Illinois 60654-4886

17          312.266.1313

18          mruda@condoncook.com

19

20

21

22

23    NOTE:  The original deposition transcript will be

24    delivered to Mark B. Ruda, Esq.

25
```

1                          INDEX

2    WITNESS:   THOMAS IRMITER                              PAGE

3          EXAMINATION BY MR. RUDA........................    4

4          EXAMINATION BY MS. PHILLIPS...................   186

5          FURTHER EXAMINATION BY MR. RUDA...............   205

6

7    OBJECTIONS:   49, 50, 56, 59, 62, 63, 66, 76, 78, 82, 85,

8    89, 119, 120, 128, 129, 132, 149, 160, 161, 162, 164,

9    166, 170, 171, 172, 175, 200, 209, 210, 213, 215, 217,

10   218

11

12   IRMITER EXHIBITS MARKED:

13   Exhibit 5:   000001-000770 = Thomas Irmiter file.....    5

14   Exhibit 6:   Thomas Irmiter Resume...................   13

15   Exhibit 7:   Cook photos.............................   110

16   Exhibit 8:   Bruno photos............................   111

17   Exhibit 9:   7/24/13 letter to Tom Irmiter from

18          Christina Phillips...........................   111

19   Exhibit 10:   Southgate-FBS002709-714 = Photos of

20          siding damage................................   112

21   Exhibit 11:   Southgate00947960 = 10/17/10 letter

22          to Vanguard Community Management from Siebert

23          Engineers....................................   114

24   Exhibit 12:   Village of Streamwood Reroofing

25          permit procedure.............................   114

**Thomas Irmiter**
**5/13/2014**                                                          **Page: 4**

```
 1    IRMITER EXHIBITS MARKED (Continued):

 2    Exhibit 13:   Storm Events Database.................  186

 3    Exhibit 14:   Southgate004097, 4096, 4098 = Photos

 4         of hailstones...................................  191

 5    Exhibit 15:   Handwritten notes of witness relating

 6         to building sizes.............................  200

 7

 8    MOE EXHIBITS PREVIOUSLY MARKED AND REFERENCED:

 9    Exhibit 1:   Plaintiff's Rule 213(f)(2) and

10         Rule 213(f)(3) Expert Disclosures..............   42

11    Exhibit 2:   Southgate Josh Moe000001-248 = Joshua

12         Moe file......................................  187

13    Exhibit 3:   Forensic Building Science, Inc. Field

14         Report for Initial Storm Damage Investigation..   46

15

16

17

18    (Original exhibits attached to original transcript;

19    copies to counsel.  Previously marked exhibits not

20    attached.)

21

22

23

24

25
```

```
 1                    (Irmiter Exhibit 5 marked.)

 2                      THOMAS IRMITER,

 3         duly sworn, was examined and testified as follows:

 4                        EXAMINATION

 5    BY MR. RUDA:

 6         Q.    Sir, would you state your name for us, please?

 7         A.    Thomas Irmiter, I-R-M-I-T-E-R.

 8         Q.    This is to be the discovery deposition of

 9    Mr. Thomas Irmiter being taken pursuant to notice set

10    today by agreement of the parties.  Sir, my name is Mark

11    Ruda, I'm going to be asking you some questions today.

12    What I would ask is that you listen to each one of my

13    questions and give me a spoken answer to each question,

14    and if I ask a question and for some reason you didn't

15    hear all of it, let me know that and I'll have the

16    question repeated for you, okay?

17         A.    That sound great.

18         Q.    And if I ask a question that you don't

19    understand, just tell me you don't understand it, that's

20    my fault, and then I will give you a different question,

21    all right?

22         A.    Sounds good.

23         Q.    Good enough.  All right.  Let me ask you, sir,

24    in regard to this matter you've been retained to act as

25    an expert witness, is that correct?
```

**Thomas Irmiter**
5/13/2014                                                                Page: 6

```
 1        A.    Correct.

 2        Q.    And who retained you?

 3        A.    Well, the association retained us through the

 4   Childress Duffy law firm in Chicago.

 5        Q.    So the attorneys for the association retained

 6   you or the association contacted you directly?

 7        A.    No, the attorneys contacted us.

 8        Q.    Okay.

 9        A.    Yeah.

10        Q.    Would you take a look at what's been marked as,

11   it's Exhibit No. 5, Irmiter Exhibit No. 5, and tell me,

12   sir, the first thing I want you to do is look at -- the

13   pages are Bates stamped at the top, you see the top right

14   corner?

15        A.    Yes, I do.

16        Q.    That will make it, hopefully, easy.  Look at

17   Bates stamp page 17.

18        A.    Yes.

19        Q.    Okay.  Do you recognize what appears at the

20   beginning of page 17?  It looks like it's a five-page

21   document that's titled "Inspection Agreement."  Do you

22   recognize that?

23        A.    I do, yes.

24        Q.    What is that document?

25        A.    This is an agreement to provide inspection
```

Thomas Irmiter
5/13/2014                                                              Page: 7

1   services at the Southgate Townhome Association, the 55 or

2   56 buildings, I believe, at that complex, and issue a

3   causation report.

4        Q.   Okay.  Is this a standard agreement that you

5   enter into when you are retained to provide opinions in

6   regard to legal matters such as we have pending here?

7        A.   Yes, fairly standard.

8        Q.   And the agreement is entered into with Childress

9   Duffy, is that correct?

10       A.   Correct.

11       Q.   Does the agreement indicate it's entered into

12  with the Southgate Townhome Association or does it

13  indicate it's entered into with Childress Duffy?

14       A.   It indicates that the project address is

15  Southgate Townhome Association and is entered in with

16  Childress Duffy.

17       Q.   Okay.  And does this contain the initial

18  agreement of terms of compensation for the opinions that

19  you are going to provide in this case?

20       A.   Yes.

21       Q.   Could you tell me, sir, and certainly you can

22  refer to the agreement if you need to do so, but what are

23  the charges in regard to your review and opinions in this

24  matter?

25       A.   Our costs were 22,500 on a fixed fee basis plus

1    flights and hotel and car rental.

2        Q.    Okay.

3        A.    And then that is for the inspection process and

4    the issuing of the report.  When that is done we are

5    completed with our assignment, and any additional work,

6    including depositions, trial preparation, appearances at

7    trials, mediations, those types of things are all done on

8    an hourly basis.

9        Q.    Okay.  And the hourly charge for your work is

10   how much, sir?

11       A.    Currently my hourly charge is 350 an hour.

12       Q.    This agreement says 250, so it is 350 an hour

13   today, or is it 250 an hour today?

14       A.    It's 350.  We raised our, those prices were

15   raised in January of this year.

16       Q.    Okay.  And then in regard to Brian Johnson, who

17   we will be deposing later, what is his charge per hour

18   currently?

19       A.    I think it's 225, if I remember right.

20       Q.    And the agreement indicates 200 an hour, other

21   work 225 per hour.

22       A.    Right.

23       Q.    But was his rate raised, too?

24       A.    I believe it's 225 straight across the board

25   now.

Thomas Irmiter
5/13/2014                                                    Page: 9

1      Q.   So that's for reviewing, talking to lawyers,

2   testifying, trial, that sort of thing?

3      A.   Sure, yeah.

4      Q.   Same thing for you, 350 an hour?

5      A.   Yes.

6      Q.   Do you charge portal to portal?  By that I mean

7   from when you leave the house until you're back home?

8      A.   That depends.  By that I mean the assignment,

9   where we're going.  My rate is 350 on everything that I

10  do now.

11     Q.   So, for example, this case is pending in Cook

12  County in Chicago.  You reside in Minneapolis, sir?

13     A.   I do, yes.

14     Q.   So if you have to testify at trial, will you be

15  charging from when you leave your house in Minneapolis

16  until you return; go to Chicago, time spent there

17  testifying and your return to Minneapolis, is it going to

18  be a fee from when you leave Minneapolis until you

19  return?

20     A.   Well, typically, yeah, the travel, the time, the

21  45 minutes that I'll be in the airline will be accounted

22  for.  If I am, having done enough trials in the past,

23  those are typically 10-hour, 12-hour days.  It's not just

24  the trial time.

25     Q.   You have to make sure you get there in time, you

Thomas Irmiter
5/13/2014

1   don't know when you're called and you're not sure when

2   you're back?

3       A.   Correct, but I'm not charging for when I'm

4   sleeping in a hotel at night.

5       Q.   I got it.

6       A.   Okay.

7       Q.   When you're off the clock after business hours?

8       A.   After business hours.

9       Q.   Other than traveling for --

10      A.   Other than travel, unless after business hours

11  we're working on trial prep for the next day.

12      Q.   Okay.  Now, sir, would you take a look at Bates

13  stamp page 583 towards the bottom?  Right around there

14  (indicating).  So 583.

15      A.   Okay.  Yes.

16      Q.   If you look at the beginning of page 583, there

17  are invoices, is that a good way to put it?

18      A.   Yes.

19      Q.   Okay.  So just let's go through, the invoices

20  begin at 583 and forward.  The invoice at 583, which is

21  dated 5/6 of 2014, that's one of the invoices that your

22  firm has generated, is that correct?

23      A.   Correct.  And it appears on here that we are

24  billing Mr. Johnson at 250 an hour.

25      Q.   And what is this invoice for?

**Thomas Irmiter**
**5/13/2014**                                          Page: 11

```
 1        A.   This is for deposition prep, this is a large
 2   file to review, and prepare for this deposition.
 3        Q.   Okay.  Then would you look at Bates stamp page
 4   584, and this is another invoice dated 5/5 of 2014.  What
 5   is this for?
 6        A.   This is for the actual time to sit here today
 7   and have this engaging conversation with you.
 8        Q.   Okay.  I note in looking at it, the date is 5/5.
 9   That's not the date you did it.  Today's 5/12.
10        A.   This is the date it was billed.
11        Q.   Okay.
12        A.   Yeah.
13        Q.   So I note here, for example, it looks like for
14   you it's a half-day depo fee, $1,300 flat rate, so it
15   isn't -- is it by hour, or do you just charge a half day
16   if that's how long it -- for every deposition?
17        A.   We bill half-day or full-day rates, set rates.
18   That is pretty standard.  We've established that in the
19   last year and a half, two years.
20        Q.   Okay.  Would you look at Bates stamp 585?
21        A.   Yes.
22        Q.   This is an invoice dated 11/26/13, and is that
23   for, basically the charge for writing the report?  Do you
24   want to look back at your original contract?
25        A.   Yeah, I mean it's billed at the phase 2 portion
```

1    of it, so this is -- we don't, we don't track it that

2    way.  We don't, we don't track it that way.

3        Q.    All right.

4        A.    This is just the second part of the agreement

5    that says when the report is issued we want to be paid

6    our second amount.

7        Q.    So the phase 2 charge was 11,250?

8        A.    Correct.

9        Q.    And then if you look at Bates stamp page 586,

10   that's dated 7/23/13, and that reflects a charge of

11   11,250.  Is that the phase 1 charge then?

12       A.    Yes.

13       Q.    And I assume, as of the moment, that consists of

14   all of your invoices that you've sent as of today?

15       A.    Yes.

16       Q.    Okay.  So if, for example, you've got to come to

17   Chicago and testify, is there a set fee then, such as

18   you're doing for the deposition today?

19       A.    No.

20       Q.    So that's actual time spent, I take it then?

21       A.    Yes.

22       Q.    Now, sir, would you take a look at what's been

23   marked as Exhibit No. 1?  And if you need to, you can

24   refer to that, but in particular I flagged, we'll be

25   going back and forth, so you can put --

Thomas Irmiter
5/13/2014                                                              Page: 13

```
 1        A.    Yep.

 2        Q.    I flagged at the bottom your resume, if you need

 3   to refer to it.

 4        A.    Yeah, I will put on the record that that is

 5   dated at the top 1/7/14, and I have brought with me

 6   today, which is my typical practice, an updated

 7   curriculum vitae with a date of 5/13/14.

 8        Q.    All right.  So let's, why don't we mark this.

 9              MR. RUDA:  Can we get copies of this?

10              (Break taken from 10:09 a.m. to 10:12 a.m.)

11              (Irmiter Exhibit 6 marked.)

12        Q.    BY MR. RUDA:  All right.  Would you take a look

13   at what's been marked as Exhibit No. 6?

14        A.    Yes.

15        Q.    Is this your current resume?

16        A.    Yes.

17        Q.    And I looked at the old one, so can you tell me,

18   what did you add to it from the attached disclosure?

19        A.    The additions would be related to pages 11

20   through 15, and primarily that would have to do with

21   first-party appraisals and depositions and/or affidavits

22   filed in trials.  That's a continuing process, and so I

23   would have added probably, let's see, how many do we have

24   on this document here?  (Examining document.)

25   First-party appraisals is 58 on that document and
```

**Thomas Irmiter**
5/13/2014                                                    Page: 14

1    first-party appraisals is 82 on this document.  So since

2    January to -- actually, I have one this afternoon and

3    that's on there, so after this deposition, so through

4    today that's another, what, 30-some appraisals that I've

5    done.

6        Q.   Okay.  And now that we're on the issue of

7    appraisals, in terms of looking at your resume it appears

8    that, for the most part, most of the appraisals in which

9    you've been involved you've acted as the appraiser for a

10   plaintiff, is that a fair way to put it, the overwhelming

11   majority of them?

12       A.   Yeah, there's one instance where a district

13   court judge here in Minnesota appointed me as appraiser

14   for the insurance company, North Star.  They went to

15   court seeking to appoint an umpire, which often happens,

16   and the judge noted that they hadn't appointed an

17   appraiser yet for the insurance company, and I was on the

18   list as an umpire and he appointed me as appraiser.

19            I will also put on the record that in all of the

20   instances that are on there where I have been named as an

21   umpire, I have been selected by the appraiser or

22   appraisers that I have been adverse to from the other

23   side.  So in every instance I have been recommended by

24   them and have been suggested to be used as a neutral

25   umpire.

Thomas Irmiter
5/13/2014

```
1       Q.   In order for someone to be selected as an

2   umpire, the appraisers have to agree on who the umpire

3   is, and if they cannot the court will select an umpire,

4   right?

5       A.   Typically, yes.  There are a number of times

6   where the umpire is not needed even though they're

7   selected.

8       Q.   You only appoint an umpire if the parties can't

9   come to agreement?  That is, the appraisers can't?

10      A.   Well, I would disagree with that approach.  At

11  least in the appraisals I'm involved in, we name our

12  umpire, we put that umpire on the record, we meet and

13  then we take our differences, if there are any, to the

14  umpire.

15      Q.   It's not bad practice to name an umpire

16  immediately just to speed up the process if there's

17  disagreement, but if the appraisers agree, the umpire is

18  not involved?

19      A.   Correct.  Absolutely.  Takes two out of the

20  three on the panel to sign the order.

21      Q.   Did you add to the depositions or affidavits

22  that you've filed?

23      A.   Yeah, I think there's been a few depositions,

24  two or three, I think.

25      Q.   Are they added at the end then?
```

Thomas Irmiter
5/13/2014                                                              Page: 16

```
 1        A.    Yes.

 2        Q.    Is that how you do it, chronologically?

 3        A.    Yes.

 4        Q.    All right.  So tell me, how long have you been

 5   engaged in the practice of acting as an expert witness?

 6   When did you first start doing that?

 7        A.    1984, I think.  '85 is the first case I worked

 8   on.

 9        Q.    What sort of expert were you initially?  What

10   did you --

11        A.    First case I worked on I represented Marvin

12   Windows in a product defect case.  They were on the

13   defense part of that.  In fact, most of the cases I did

14   initially were on the defense side.

15        Q.    Now in terms of your educational background,

16   sir, let's turn to your resume, which is page 7, I think

17   it has education?

18        A.    Yes.

19        Q.    All right.  So you graduated, I take it, from

20   Hamline University, is that correct?

21        A.    Yes.

22        Q.    What's your degree in?

23        A.    Bachelor of arts degree in English.

24        Q.    And you graduated in 1979?

25        A.    I did, yes.
```

1        Q.    By the way, what's your date of birth?

2        A.    10/19/57.

3        Q.    So you graduated at 22, I take it, or you were

4    going to be 22?

5        A.    Yes.

6        Q.    Standard high school, et cetera?

7        A.    Took a little time off but, yeah.  Didn't go

8    straight through.

9        Q.    And so after you graduated from high school, did

10   you take any additional -- strike that.  After you

11   graduated from college, did you take any master's program

12   courses or pursue an advanced degree?

13       A.    Yes.  I began pursuing an advanced degree in,

14   master's in engineering at the University of Wisconsin.

15   I tested out of, based on my experience, two of the

16   first-level project management courses and progressed

17   into the most advanced one that they offered.  I took

18   that class, passed that class.  I think I have four

19   credits towards my master's degree in engineering.  And

20   then since then have not continued pursuing that.  I've

21   been too busy.

22       Q.    All right.  So you do not hold a master's degree

23   in engineering?

24       A.    I do not.

25       Q.    I also note on your education you have something

```
 1    here for AWCI International.  What is that?

 2        A.   That's the American Wall and Ceiling

 3    International.  This was a certificate class that I took

 4    on EFIS and stucco water intrusion issues, which was part

 5    of our practice, and still is today.

 6        Q.   So I'm correct that the college degree you hold

 7    is an English degree, correct?

 8        A.   Yes, it is.

 9        Q.   And no other degrees of any kind, right?

10        A.   Correct.

11        Q.   Now in terms of your current position, what's

12    your current employment?

13        A.   I work for Forensic Building Science.  I own

14    that company.

15        Q.   Did you found the company?

16        A.   I did, yes.

17        Q.   When did you found it?

18        A.   2004.  We just celebrated our 10th anniversary

19    last week.

20        Q.   And what is Forensic Building Science,

21    Incorporated?

22        A.   Forensic Building Science is an inspection

23    company that deals with all types of building failures;

24    collapses, fires, construction defect, product failure.

25    We also do some trip-and-fall personal injury type work.
```

**Thomas Irmiter**
5/13/2014                                                              Page: 19

1   We've done some OSHA-related work in terms of personal

2   injury type things.  Let's see, what else.  I have, we

3   have done in the last year, I have in particular, done

4   some work on some bad faith claims in terms of the claims

5   handling process and the inspection process with a firm

6   out of Houston and issued reports on that.

7       Q.   All right.  How many employees does FBS

8   currently have?

9       A.   Well, counting my wife and I as employees of the

10  company, we have 11.

11      Q.   What's your wife's position?

12      A.   She basically runs our marketing.

13      Q.   So the other nine employees that you have, what

14  type of positions do they hold?  What are they?

15      A.   Yeah.   Three, I have three registered

16  professional engineers on staff.  Brian Johnson, our

17  chief engineer, is licensed in, I think, 18 states.

18  Peter Korolchuk is our chief operating officer, he's a

19  licensed PE in Minnesota and has applied for licensing in

20  those additional 18 states, and then Shawn Peatrowsky

21  runs our Dallas office, and he's licensed in the states

22  of Texas, Colorado and Phoenix, and then Ryan

23  Nierengarten and Jim Irmiter, my son, are both field

24  technicians and do inspections for us.  Ryan, for

25  example, has gone through the Haag certification classes,

Thomas Irmiter
5/13/2014                                                              Page: 20

```
 1   does a lot of our inspections, helps with report writing.
 2   And then I have three office administrative people who
 3   keep us all in line.
 4       Q.   Now prior to founding, and it's okay if I call
 5   it FBS?
 6       A.   Yeah, please.
 7       Q.   My guess is that you probably call it that, too?
 8       A.   We do.
 9       Q.   Prior to founding FBS, where were you employed,
10   sir?
11       A.   Advanced Building Solutions for just short of
12   one year.  Advanced Building Solutions was a bit of the
13   incubator, if you will, for the company that FBS is
14   today.  It was primarily a building causation and
15   inspection company, failure company.
16       Q.   And you weren't an owner, you were employed
17   there?
18       A.   That's correct, I was not an owner.
19       Q.   And when did you leave that job?
20       A.   Left that job the last day of April of 2004, and
21   opened the doors of FBS May 1st, the next day.
22       Q.   Prior to working at Advanced Building Solutions,
23   Inc., where did you work at?
24       A.   Donnelly Management Services.
25       Q.   What kind of company is that?
```

Thomas Irmiter
5/13/2014                                                          Page: 21

1          A.    Donnelly Management Services was a spin-off

2     company for Donnelly Stucco, the company I worked at

3     before that.   That was essentially the launching pad, if

4     you will, for the company that FBS is today.   It was the

5     forensic inspection business that was set up by Donnelly

6     Stucco primarily focused on exterior envelope and

7     cladding window failures related to construction defects.

8          Q.    And before you worked at Donnelly Management --

9     well, strike that.   At Donnelly Management Services, what

10    exactly did you do?   What was your job there?

11         A.    Pretty much what I do today at Forensic Building

12    Science.   Led the inspection effort.   Served on all of

13    the cases that we worked on as the designated expert.   We

14    did estimating, we produced project specifications, and

15    about 40 percent of the matters that we worked on, our

16    clients pursued what we called fix and chase back then,

17    where once the, once all the notices had been sent out,

18    everybody had a chance to do their inspections, they

19    actually dug into their own pockets and fixed their

20    buildings or their residences, and we managed or oversaw

21    the reconstruction process as a third-party owner's rep.

22         Q.    Basically as a project manager?

23         A.    Yeah, and we still do that today under a sister

24    company that I have called Lindsay Consulting Group.

25         Q.    How long has Lindsay Consulting Group been in

Thomas Irmiter
5/13/2014                                                                Page: 22

1   operation?

2       A.   About five years.

3       Q.   And you're the owner?

4       A.   My wife owns it.  I own 50 percent of it.

5       Q.   And what are your job duties at Lindsay

6   Consulting Group, if any?

7       A.   Well, Lindsay Consulting Group is really a

8   holding company, I mean, for lack of a better word.  So

9   when someone wants to retain us to perform site

10  observations or help manage a reconstruction of their

11  property, we're retained to do that.  So we'll actually

12  put together a Request For Proposal, RFP, we'll submit it

13  to the marketplace, we'll get bids, review all of those,

14  we'll review contracts and we'll establish timelines for

15  the contractors, make site visits, we'll handle the

16  payment draws, change orders, all of those kinds of

17  things.

18      Q.   So for example, in regard to Southgate, if you

19  were, if they wanted you to manage that project and

20  organize it in terms of any repairs, replacements to be

21  done, you would do that out of Lindsay Consulting Group,

22  not out of Forensic Building Science?

23      A.   Correct.

24      Q.   At Donnelly Stucco Sales, what were your job

25  duties there?

**Thomas Irmiter**
5/13/2014

1    A.    I basically joined Donnelly when they were on a

2    pretty significant downward slope.  Tom Donnelly is about

3    15 years older than I am, our families had done business

4    together for three generations, and I found myself

5    needing a job.  Went to work for him and helped him

6    basically reorganize his company.  He handled the

7    production end and I handled the sales and marketing end,

8    and we basically re-jumpstarted it over a two-year

9    period, and part of that was doing some, getting into

10   some water intrusion issues on stucco buildings, and

11   that's where we spun off the Donnelly Management Company

12   to keep an arm's length away from, from that.

13      Q.    Were your primary job duties at Donnelly sales

14   and marketing of their products?

15      A.    Sales, marketing.  I did get into some, just

16   because I grew up in it, I did do some field work for

17   them.  I got out onto some of the projects that, where

18   there was, you know, construction defect issues that they

19   were working on, and actually worked in the field once in

20   a while because I like doing it.

21      Q.    How often did Donnelly Stucco get involved in

22   construction defect issues?  I guess -- I'll strike the

23   question.  What percentage of your time was spent on

24   construction defect issues at Donnelly Stucco Sales?

25      A.    Well, it started out initially as zero until I

1    ran into a 16,000-square-foot house on Lake Minnetonka

2    here and they wanted to recolor their stucco, and I

3    indicated to them in about the first five minutes that

4    they had a bigger issue probably, and so that was in

5    January of 2002, little over a year after I joined

6    Donnelly.  So in that first year, zero percent of it.  I

7    focused primarily just on the core business.  And then

8    that second year at Donnelly is when we really, I would

9    say almost a hundred percent of my work in that second

10   year ended up being in that area because I had trained

11   additional salespeople to handle the other stuff.

12       Q.   Did that matter that you indicated in January

13   2002, where you discovered a house that had issues, water

14   intrusion issues, did that turn into a lawsuit of some

15   kind?

16       A.   Yeah.

17       Q.   What was the name of that?

18       A.   Tony and Carolyn Johnson.

19       Q.   Did you act as an expert on their behalf in that

20   case?

21       A.   I did, yes.

22       Q.   Now prior to working at Donnelly Stucco Sales,

23   where were you employed at?

24       A.   I owned Irmiter Contractors & Builders.

25       Q.   How long did you have Irmiter Contractors &

1    Builders?

2         A.   17 years.

3         Q.   And what did Irmiter Contractors & Builders do?

4         A.   We were, when I formed the company I purchased

5    the company from my father, so it was a four-generation

6    business.  He had a, I can't remember if it was an LLC or

7    a limited, or a sole proprietorship, but I purchased it

8    in '84 and expanded it from a five-person operation up to

9    about 70 employees at its height, and we were a

10   design/build firm.  We did residential and light

11   commercial construction.  We did some ground-up,

12   brand-new construction, and a lot of historic restoration

13   kinds of things.

14        Q.   Primarily residential?

15        A.   Yeah, primarily.  Although some of the

16   residential stuff we were working on, I mean they were

17   10,000-square-foot homes and we were building

18   5,000-square-foot additions.  I mean they were built out

19   of steel and concrete, very much like commercial in some

20   of them.

21        Q.   So was it primarily restoration, remodeling work

22   as opposed to build from scratch?

23        A.   Primarily.  We did design a 12,000-square-foot

24   house in Edina ground up and built that, a brick house.

25        Q.   At Irmiter Contractors & Builders, Limited

**Thomas Irmiter**
5/13/2014                                                          Page: 26

1    during that period from '84 to 2000, did you do any

2    construction defect consulting with regard to legal

3    matters?

4         A.   Yeah, I started, when I started that first case

5    in '84 for Marvin, I did probably five to ten cases a

6    year as an expert.  Primarily because I was the, I ran

7    the ethics committee for the National Association of the

8    Remodeling Industry, Minnesota chapter, and as the

9    chairman of that ethics committee I dealt with internal

10   disputes between subcontractors and contractors in the

11   association.  And through my work in that area I was

12   introduced to various attorneys over the years who had

13   problems with projects, and so I was brought in to work

14   on those.  A couple of cases I was named by a district

15   court judge here to serve as an official arbitrator on

16   construction defect cases to try to settle those, which

17   is kind of interesting work, so I did about ten a year.

18        Q.   What sort of construction defects did you do

19   during that time period when you were at --

20        A.   Boy, everything.

21        Q.   Well, tell me what you did.

22        A.   Sure.  We did foundation failures, we did

23   improper, we did a lot of workmanship issues, design

24   issues, installation of products that were improper, did

25   a lot of roofing, roof leak issues, roof flashing issues.

**Thomas Irmiter**
5/13/2014                                                         Page: 27

1    Let's see.  Got into some mechanical issues.

2         Q.    Meaning what?

3         A.    Well, one house that I remember working on back,

4    this is back when whole-house ventilating systems called

5    Van-EE systems were first coming into play, and one home

6    had developed a severe mold problem.  And after bringing

7    in numerous experts, including HVAC mechanical engineers

8    and contractors, I was the only one to ascertain that the

9    system had been put in backwards and was literally

10   pumping moisture-laden air into the house causing mold

11   everywhere.  So, again, it was just a variety of all

12   kinds of things.

13        Q.    So besides what you've indicated, foundation

14   failures, improper workmanship, design issues,

15   installation issues, roof issues and mechanical issues as

16   you've described the ventilation system, anything else

17   that you can recall that you did?

18        A.    Boy.  Did a slip/fall case for the Kahler Hotel

19   down in Rochester, Minnesota and ascertained that they

20   had put in all of the wrong shower doors.  They were not

21   a laminated-over-tempered shower door, and they had used

22   the wrong type tile on all the floors.  I worked on one

23   of those.

24        Q.    Anything else that you can recall?

25        A.    No, I can't recall.

Thomas Irmiter
5/13/2014                                                    Page: 28

```
1        Q.   Now at Donnelly Management Services,
2   Incorporated, were most of the construction defect issues
3   related to water intrusion and/or mold in houses?
4        A.   Yes, yes.  That's how they started, I think, the
5   majority of them.
6        Q.   What percentage would you say Donnelly
7   Management Services were water issues/mold, because they
8   go obviously hand in hand?  What percentage would you say
9   your consulting was in regard to acting as an expert
10  while at Donnelly Management Services, Inc. concerning
11  water intrusion and mold?
12       A.   Hundred percent.
13       Q.   Now do you have any training in the insurance
14  industry of any kind?
15       A.   I've never worked for an insurance company so,
16  no, only what I have picked up as a result of the
17  practice that I'm in.
18       Q.   Okay.  So --
19       A.   And let me qualify that if I can.  Prior to
20  Minnesota two years ago codifying, the insurance
21  commissioner coming down on the storm chasers who were
22  coming into town and serving as public adjustors, and I'm
23  not a public adjustor, for about a six-year period we
24  engaged insurance companies directly, so I spent hundreds
25  of cases where I would, we would go out and investigate
```

**Thomas Irmiter**
5/13/2014

```
 1   an issue and then direct the homeowner to go ahead and

 2   contact their insurance company, and then we would

 3   typically meet an adjustor out at the site, show them the

 4   damages that we were seeing, and in some instances they

 5   would say, well, can you produce an estimate for us, and

 6   we would do that, and then they would typically issue a

 7   repair, a check for repair.  We did that on an hourly

 8   basis.  We weren't tied to the outcome like a public

 9   adjustor or a contractor, we were literally just

10   providing an inspection service and a report.

11        Q.   So you say for a six-year period you did what

12   you described.  Did that stop at some point?

13        A.   Well, we could still do it today.  We just made

14   a decision not to do that because we're so busy.  I mean

15   we're busy doing so many other things in so many other

16   states that we really don't engage in that kind of work

17   anymore.  Now, for example, I had a call yesterday from

18   someone who said they think they've got possible roof

19   collapse from ice and snow from this last year.  They

20   were up in the attic, they've got all kinds of mold.  I

21   said, what have you done?  Well, I called my insurance

22   company and they sent somebody out and they said there's

23   no coverage for this.  I said, well, why don't you -- I

24   gave them the name of three public adjustors.  I said why

25   don't you call these public adjustors, give them a call.
```

```
 1    And then it may come back to us later, who knows, but

 2    that's the not the kind of business that we're going to

 3    try to drum up.

 4        Q.   You mentioned a moment ago that the insurance

 5    commissioner codified something.  What was that reference

 6    to?

 7        A.   Well, maybe codified isn't the correct word, but

 8    he sent out a bulletin to all licensed contractors in the

 9    state of Minnesota and essentially said that contractors

10    are forbidden by statute from directly engaging

11    homeowners and putting homeowners under a power of

12    attorney, like a public adjustor might do or can do in

13    the state of Minnesota.  It's interesting because even

14    though they are not supposed to do that, we still see it

15    happening.  It's all over.

16        Q.   When did the insurance commissioner issue that

17    bulletin?

18        A.   It was after a 2010, August 2010 or September

19    2010 storm, so probably would have been November of 2010.

20        Q.   Okay.

21        A.   Somewhere in that range.  2011, I think.

22        Q.   Is that when your company stopped doing what you

23    described, which was, you know, being engaged to some

24    extent directly with insurance companies in regard to

25    assessment and evaluation of losses to homeowners'
```

1    properties or commercial owners' properties?

2        A.   Yes.  We directed clients who called us to

3    either engage the appraisal process or to contact a

4    public adjustor or to contact an attorney.

5        Q.   In regard to your experience in the insurance

6    industry then -- strike that.  In regard to your

7    insurance experience, let's make it that broad, your

8    experience is based upon just your interactions with whom

9    over the years?

10       A.   Well, my interactions with hundreds of

11   adjustors.  We hired a law student out of William

12   Mitchell five years ago, Brian Lake, he's now an

13   attorney, and we hired Brian for a five-month period.

14   And we had Brian, during that period, review every

15   insurance policy for every client that we were working

16   with, their homeowner's policies, and put together a

17   pretty significant report for us about coverages,

18   coverage issues, cases, case laws, those kinds of things.

19   And he and I worked on that project together, and of

20   course that was important for me to understand generally

21   what coverages are, where there's coverages, where there

22   aren't coverages, those kinds of things.  And then just

23   generally working with law firms you learn a great deal

24   about those kinds of things.

25            So in other words, have I sat and read through a

**Thomas Irmiter**
**5/13/2014**                                                        Page: 32

1   90-page insurance document for a homeowner with all of

2   the declaration pages and all of the exclusions and all

3   of the adds-on?  Yes, I know how to do that.  I

4   understand that.  I understand where to look for the

5   exclusions and the inclusions and those kinds of things.

6       Q.   So tell me if there's anything else.  So your

7   knowledge of insurance-related matters is based upon your

8   interactions with adjustors over the years and a law

9   clerk's review of all your existing clients' policies and

10  some sort of memo he did, and you also did a report that

11  you did together regarding those coverages and the law

12  that applies to those coverages, and in addition you said

13  your interactions with law firms, too?

14      A.   Correct.  And I've attended, I've attended the

15  WIND conference in Florida, I've attended three NAPIA

16  events where I've sat in, you know, they're four-,

17  five-day events where I've sat in seminars that are being

18  taught by attorneys, that are being taught by adjustors

19  on both sides of the fences and listened to them, for

20  example, talk about the appraisal process, talk about how

21  coverage, where is coverage triggered, when is coverage

22  triggered, those kinds of things.  And I continue to

23  attend those kinds of events.

24      Q.   Now in regard to your other experience, or prior

25  to the time that you began working, started your, well,

**Thomas Irmiter**
5/13/2014                                                    Page: 33

1   purchased your, the company in 1984, it appeared that,

2   you know, you had worked as an apprentice, a carpenter.

3   Is that working part-time while you attended school?

4       A.   Yeah, I started, the very first project I worked

5   on with my father was roofing.  In the summer we -- I

6   have six brothers, and so he had a natural crew.  And so

7   starting March 15th until about November 1st we did all

8   types of roofing.  That was the main business that he was

9   involved in.  And back then we did insurance work.  A lot

10  of our work came from insurance claims to replace roofs

11  after storm damages, tornadoes, those kinds of things.

12  So, yeah, my first job at age 13 was climbing around on

13  roofs and tearing off shingles or tearing off flat roofs

14  and putting those products in.

15      Q.   Are you a union member of any --

16      A.   No, we were a nonunion shop.

17      Q.   Nonunion shop?

18      A.   Yeah.  We paid union scale, we followed all

19  those guidelines.  We followed those guidelines in terms

20  of the number of hours that you had to put in as an

21  apprentice before you became a journeyman and those kinds

22  of things.

23      Q.   So you had training as an apprentice, as a

24  carpenter, and that's --

25      A.   Well, my dad --

**Thomas Irmiter**
**5/13/2014**                                                                          Page: 34

```
1        Q.    -- the initial training in the trades I take it?
2        A.    Well, my dad went to Dunwoody here, which is a
3    trade school, and he had training in the late 1930s in
4    four different trades, and so he taught all of his sons
5    those various trades.  So carpentry was one of them,
6    cabinetmaking was one of them.  The mechanical trades,
7    electrical, plumbing and heating was all encompassed in
8    one of them, and then the other one was called the
9    decorating trade, which is wallpapering, painting,
10   plastering, staining, varnishing, refinishing, all those
11   kinds of things, so those were the primary four trades
12   that I learned.  In the carpentry trade, because until I
13   bought the company in '84 we did everything inhouse; we
14   dug our own holes, we put in our own foundations and we
15   did ground up.  As I developed the construction company,
16   we began to subcontract more of that out as the markets
17   changed over the years.
18       Q.    Currently do you hold any licenses of any kind
19   from any governmental authority such as State of
20   Minnesota, State of Illinois, et cetera?  Are you
21   licensed anywhere in the area?
22       A.    Yes.
23       Q.    Where do you hold licenses?
24       A.    I'm licensed in the state of Minnesota as a
25   building code official, and that is with the Department
```

Thomas Irmiter
5/13/2014                                                    Page: 35

```
 1    of Labor and Industry.
 2         Q.   Minnesota Department of Labor and Industry?
 3         A.   Yes.
 4         Q.   And what does that license entitle you to do?
 5         A.   I could go and work for any municipality in the
 6    state.  I could, based on my training and education and
 7    the number of points that I have accumulated, I could run
 8    a building department, I could be the chief building code
 9    official in a city, in a municipality or something like
10    that if I wanted to.
11         Q.   For all types of construction; residential,
12    commercial, et cetera?
13         A.   Yes.
14         Q.   You also could go out to a site, I take it, take
15    a look at a building and process and evaluate the same in
16    terms of code analysis?
17         A.   Exactly.
18         Q.   Do you hold any other licenses of any kind?
19         A.   No.  I hold two certificates with the
20    International Code Council out of California.  One is a
21    building inspector and then one is a property maintenance
22    inspector.
23         Q.   All right.  So in regard to any other licenses
24    from governmental authorities the answer is no, is that
25    correct?
```

1      A.    Correct.

2      Q.    Okay.   What's the International Code Council?

3   Is there a larger name?   What is that?

4      A.    It is the International Code Council.

5      Q.    Okay.

6      A.    In 2000, through an act of the U.S. Government,

7   we, the United States decided to take five or six

8   different building codes from around the country and fold

9   them into one building code called the International

10  Residential Code and the International Building Code, and

11  there's a bunch of subcodes that go underneath that for

12  plumbing, heating, electrical, existing buildings, those

13  kinds of things, and we now have, all 50 states have now

14  adopted the international codes.   It took about five, six

15  years to get them all in line with that, but now

16  typically -- and Minnesota is one of the only states that

17  actually licenses and trains building code officials.

18          So as part of our practice, it's important to

19  understand what those codes are.   So when I go into

20  Chicago, for example, or go into Streamwood, one of the

21  very first things that we do in a project like this is we

22  pull up the building codes, take a look at those and see

23  what kind of effect those might have on scopes of repair.

24      Q.    And the certifications you said that you have,

25  when did you obtain a certification in the, as a building

**Thomas Irmiter**
**5/13/2014**                                                        **Page: 37**

1    inspector?

2         A.    I think it was '07.

3         Q.    Does it have to be renewed?

4         A.    Yes.

5         Q.    Has it been renewed?

6         A.    Yes.

7         Q.    When was it most recently renewed?

8         A.    I can't recall.  I know they're current.

9         Q.    Do you know how to check on your certifications?

10   Is there some site that you can go to?

11        A.    International Code Council.  ICC, yeah.

12        Q.    And then --

13        A.    I have to take 24 hours of continuing education

14   to keep my license here in Minnesota, and as part of

15   that, then I have to turn in credits to ICC Code Council

16   as well.

17        Q.    So in taking, in order to be a licensed building

18   code official in Minnesota, you have to do continuing ed,

19   and that can count towards your recertification?

20        A.    Yes, absolutely.

21        Q.    Okay.  When did you become a property

22   maintenance inspector, get that certification?

23        A.    '07, same time frame.

24        Q.    Does it also have to be renewed periodically?

25        A.    Yes.

Thomas Irmiter
5/13/2014

1    Q.    Has it currently been renewed most recently?

2    A.    I believe it is.

3    Q.    And in order to get those certifications, what

4    exactly did you have to do?

5    A.    Well, studied.  There's a bunch of books that

6    you look at and then you sit down and you take an online

7    exam and you have to pass it.  If you don't, you can

8    retest, I think, three months later.  I passed on both

9    times so I didn't have to retake.

10   Q.    How long does each exam take?

11   A.    I think a couple hours.  Maybe it's a three-hour

12   limit.  I can't remember.

13   Q.    Now in regard to this particular matter, as

14   we've already covered, you were retained by Childress

15   Duffy.  Your retention was, according to the contract, on

16   July 23 of 2013.  Was that your first contact with

17   Childress Duffy or was there some prior contact?

18   A.    On this project?

19   Q.    Yes, on this matter.

20   A.    It may have been a couple weeks before that.  I

21   mean it's typically when someone is calling us or talking

22   to us about a project, the germination period from

23   initial contact to agreement is a couple of weeks.

24   Q.    Let me ask.  Other than this project, have you

25   ever been retained by Childress Duffy previously in any

1    matter to provide advice concerning some sort of a legal

2    dispute or issue?

3         A.   Yes.

4         Q.   How many times?

5         A.   Probably 25 times, I would think, over the

6    years.

7         Q.   Since when?

8         A.   2006 was the first matter that I worked on with

9    them.  And back then, I don't know that, I can't tell you

10   if we were retained by them or retained by clients.

11   Probably was retained by clients back then.  I just don't

12   know.

13        Q.   So when you say 25 times, you mean they were the

14   law firm involved --

15        A.   Yes.

16        Q.   -- 25 times, and maybe they retained you

17   directly and maybe sometimes it was the actual client of

18   theirs?

19        A.   Right.

20        Q.   Okay.  Are all the times that you've been

21   retained by them identified in your resume?

22        A.   Yes.

23        Q.   Okay.

24        A.   Well, no, because my resume doesn't go back, it

25   only goes back four years.  Doesn't go back any further

**Thomas Irmiter**
5/13/2014                                                    Page: 40

```
1    than that.
2         Q.   All right.  Now have you been retained by
3    them -- in how many different states have you been
4    retained by them to act as some sort of an expert?
5         A.   Eight or nine.
6         Q.   Besides -- I assume Minnesota is a state you've
7    been retained in, is that correct?
8         A.   Yes.
9         Q.   Okay.  And obviously Illinois, our case is
10   pending in Illinois, correct?
11        A.   Yes.
12        Q.   Besides Minnesota and Illinois, what other
13   states?
14        A.   New York, New Jersey, Florida, Texas, Colorado.
15        Q.   That's seven, I think.
16        A.   I don't know if there's an Iowa or South Dakota.
17   There might be an Iowa or South Dakota in there, too.  I
18   just can't remember.
19        Q.   Other than this matter pending in Illinois, have
20   you ever been retained by them to act as an expert in
21   Illinois, that is Childress Duffy or one of their
22   clients?
23        A.   Yes.
24        Q.   How many times?
25        A.   About six cases I think with them in Illinois.
```

Thomas Irmiter
5/13/2014                                                    Page: 41

1    Q.    Are any of those six cases identified in the,

2    your list here?

3    A.    (Examining document.)  I don't think so.  No, I

4    don't think they've germinated to that point yet.

5    Q.    Okay.  Do you mean you're a consulting expert

6    other than this one?

7    A.    No, we've issued reports, they just, there's

8    just been no depositions, there's been no affidavits

9    filed in federal court that would list on here.

10   Q.    Okay.

11   A.    No, we've issued reports, we've issued

12   estimates, we've done all that stuff.

13   Q.    Is this the first case for Childress Duffy that

14   you've given a deposition in that's pending in the state

15   of Illinois?

16   A.    Yes.

17   Q.    Have you been retained by other clients, whether

18   Childress Duffy or some client that they don't represent,

19   meaning somebody separate from them as we've described

20   it, in the state of Illinois?

21   A.    We have a Minnesota project that the law firm is

22   from Chicago, so I'm not sure how to answer that

23   question.

24   Q.    So it's a matter pending in Minnesota?

25   A.    It's a matter pending in Minnesota but we're

1    retained by a Chicago law firm.  It's actually for

2    Cincinnati Insurance is on the defense side, so I don't

3    know how to answer that.  But, no, I don't recall any

4    other Illinois work that we've done with other firms.

5         Q.    Now would you take a look at, again, put your

6    resume aside for a moment.

7         A.    Yep.

8         Q.    Exhibit No. 1, and your report, sir, I tabbed it

9    there.

10        A.    Yep.

11        Q.    Please take a look at that.  Is that the

12   report -- let's make sure it's the right one.  I assume

13   it is, but is that your report?

14        A.    Well, yes, this is a report that is co-authored

15   by Brian Johnson and I, yes.

16        Q.    Now in looking at the report, I believe it is 37

17   pages long, is that correct, sir?

18        A.    Yes.

19        Q.    All right.  And on page 37 of 37, how they're

20   designated, it appears that the report is signed by you

21   and dated January 7th of 2014, is that correct?

22        A.    Yes.

23        Q.    Is that when this report was completed,

24   January 7th of 2014?

25        A.    Yes.

Thomas Irmiter
5/13/2014                                                    Page: 43

1        Q.    Now can you tell me, sir, have you -- well,
2   strike that.   When this report was completed, who did you
3   transmit it to?
4        A.    The law firm.
5        Q.    Anyone else?
6        A.    No.
7        Q.    Do you know when it was transmitted?
8        A.    It would have been probably right after this.   I
9   mean probably that day.
10       Q.    Is your regular practice to send it the day it's
11  done?
12       A.    Yeah.
13       Q.    And the lawyer that you've been dealing with
14  there, is that Ms. Phillips in terms of your
15  interactions?
16       A.    Yes, it is.
17       Q.    Okay.   Now besides this report, did you prepare
18  any drafts of this report prior to when this one was
19  prepared?
20       A.    Oh, yes.   Yeah, there's always draft reports
21  that we do.
22       Q.    How many draft reports did you do?
23       A.    Maybe I can explain our process and that will be
24  an easier way to do that.   When we receive an assignment
25  like this, Martha Miller in our office, who is one of our

**Thomas Irmiter**
5/13/2014                                                    Page: 44

1   project managers, will take the information and put it

2   into files.  She will then create a draft report

3   template, and that will include, for example, the items

4   on page 1, which is the storm dates, the storm details.

5   She'll do the research on that.  She would -- so all of

6   the items that you would see up to 1.5, up through 1.5,

7   she would put into the report.  The items that are in

8   1.5, which are all of the technical reports, would

9   typically be much larger than that and they would be

10  highlighted in yellow, meaning that that's something that

11  I need to review and Brian needs to review to determine

12  which reports we're going to include.  So it's a much

13  larger --

14      Q.   You basically use a template where everything

15  that you believe is likely is plugged in there and then

16  you remove it or modify it?

17      A.   Yeah.  I mean we, for example, we looked at over

18  a million square of roofing last year, so this isn't the

19  first three-tab shingle roof with vinyl siding project

20  we've looked at.  So we're going to use other reports

21  that have been created to put this information in there.

22  She's not making the decision of what goes in, she's just

23  saying this is all the stuff we've used in the past.

24  Then when the inspection is completed, the sections that

25  actually show the data that we gathered on the site, that

**Thomas Irmiter**
5/13/2014                                                    Page: 45

1    would have been gathered by me when I was there, by Josh

2    Long when he was there, by Jim Irmiter when he was there.

3    That is then put into the report from their field notes.

4        Q.    And where does that data appear in the report,

5    since we're going through it?

6        A.    That would be, for example, starting in

7    Section 1.7, "Inspection data."  That would be Section

8    2.0, "Site Observations," and then that would be Sections

9    2.41 all the way through to, boy, 2.5, these are all

10   these building observations, up until the "Causation

11   Statement."

12       Q.    Which is?

13       A.    4.0.

14       Q.    4.0, thank you.

15       A.    Yeah.  And I apologize here.  It looks like when

16   this thing got printed into pdf the numbering is off.

17   It's kind of crazy.  So 4.0 should be the causation.

18   That is done by Brian Johnson with input from me in terms

19   of the causation, and then the comments, the

20   requirements, the conclusions, that's then a process that

21   goes back and forth between Mr. Johnson and myself with

22   track changes.  And then the final report, when it is

23   signed, is issued, and all of the draft reports, all of

24   the track change reports are all discarded.

25       Q.    So your file does not contain any draft reports

**Thomas Irmiter**
**5/13/2014**                                           Page: 46

1   at this point, sir, is that correct?

2       A.   No, no.

3       Q.   Would you take a look at what's been marked

4   previously as Moe Exhibit No. 3?

5       A.   Yep.

6       Q.   And tell me do you recognize what that is?  Take

7   a look at it.

8       A.   Yes, I do.

9       Q.   What is that?

10      A.   This is a report that was sent to Josh Moe when

11  Josh was designated by the Childress firm as the person

12  who was going to put together the cost on this.  We do

13  cost estimates, we're asked to do those on a lot of our

14  projects.  We were not asked to do cost estimates in this

15  case.  There was a tight timeline at the end to get all

16  of this information pulled together between our firm and

17  Mr. Moe's firm, who was doing the estimating, so this was

18  sent out to him as one of the last drafts.  It's about 95

19  percent comparable to the final, and it doesn't change

20  any of the information that he would have needed to put

21  his estimate together.  And so this is, this was sent to

22  him in that form.

23      Q.   What is that draft dated?

24      A.   I don't know if it is because it's not signed.

25  Yeah, there is no date on it.  So, no, don't know.

**Thomas Irmiter**
5/13/2014                                                    Page: 47

```
 1        Q.    Do you know when that draft was sent to Mr. Moe?

 2        A.    It would have been obviously prior to our final

 3   on 1/17/14, and it would have been -- or 1/7/14 -- and it

 4   would have been before he finalized his estimate, so

 5   sometime in that time frame.

 6        Q.    Do you have any idea when?

 7        A.    No.  As I sit here today, I don't.

 8        Q.    So you were retained in July, the final report

 9   was done the following January, so it's sometime between

10   July and January?

11        A.    Well, my guess is -- yeah, definitely sometime

12   between that, that's obvious, but it would be more

13   towards the end of that.  It probably would have been

14   January.  Or I mean December.  It would have been late.

15        Q.    And how was that transmitted to Mr. Moe?

16        A.    Email.

17        Q.    And did you send it?

18        A.    I didn't.

19        Q.    Okay.

20        A.    One of staff would have, I think.

21        Q.    We've asked for all the emails and things, I

22   haven't seen that email, so who would be in charge of --

23        A.    They might have Dropboxed it.

24        Q.    So you might have set it up so he could go look

25   at it?
```

Thomas Irmiter
5/13/2014                                                    Page: 48

```
 1        A.    Yeah, it's probably Dropbox.

 2        Q.    And there would an email telling him that?

 3        A.    Typically.  Or a phone call.  We don't do a lot

 4   of emails.  That's our standard practice.

 5        Q.    Who would have been in charge of informing him

 6   of that?

 7        A.    That it was ready to go?

 8        Q.    Yeah.

 9        A.    Could have been Martha, could have been Tina.

10        Q.    And you said the report is 95 percent, what, 95

11   percent the same as the final report?

12        A.    Well, I would have to sit here and do a

13   line-by-line, but just in looking at it now, it looks

14   like it's pretty --

15        Q.    How many pages is that report?

16        A.    32, and the other one is 37.

17        Q.    What are the changes, do you know?

18        A.    Don't know without looking at it.

19        Q.    If you don't know what the differences are, how

20   is it that you know that the information Mr. Moe needed

21   to do what he had to do didn't change from the final

22   report?

23        A.    Because the part that he needed to see was page

24   31, which is the beginning of the specifications -- not

25   specifications -- the recommendations for repair,
```

1  requirements and recommendations in Section 8, and by the

2  time this report is put together, the data that is

3  gathered for each building that talks about the damage,

4  which is listed in Sections 2.1 all the way to 2.5, I

5  think I talked about that already -- just a second.

6  2.5.51, this is each one of the building damages, that

7  hasn't changed.  That's the same.  That would have been

8  incorporated very early on in the draft reports.

9       Q.   Okay.  So as far as --

10      A.   I will go on record and also say that Mr. Moe

11 called me once he got this and we did have a discussion

12 about this.  So it's not just the document itself, it's,

13 he had questions about what, about scope, and those would

14 be important for him to know if he's putting together his

15 estimate.

16      Q.   So there's nothing in the final report that he

17 needed to see in order to do his estimate concerning the

18 cost to make repairs, is that correct?

19           MS. PHILLIPS:  Objection, form, foundation.

20      Q.   BY MR. RUDA:  I'll rephrase.  As far as you're

21 concerned, sir, there's nothing in the final report

22 that's new or adds information other than what Mr. Moe

23 needed to see in order to do his estimate concerning

24 repair, replacement than what was already contained in

25 the draft, is that correct?

Thomas Irmiter
5/13/2014                                                          Page: 50

```
 1              MS. PHILLIPS:  Objection to form.
 2        A.   No, I don't believe that there is.  As I've
 3    already stated, I have not had a chance to lay the two
 4    documents side by side and see what the final changes are
 5    between the two.  I will tell you that I did, in
 6    preparation I did review Mr. Moe's estimate that he put
 7    together, and I did find that there is a mistake in his
 8    estimate.
 9        Q.   BY MR. RUDA:  In regard to the conversations
10    that you had with Mr. Moe, did you have one or more than
11    that conversation with him?
12        A.   Just one.
13        Q.   When was that conversation?
14        A.   I don't recall.  Before his estimate was
15    produced and after this draft was sent out.
16        Q.   Other than that, you can't be more particular?
17    It's December, it's August?  You can't say?
18        A.   No, I don't know.
19        Q.   And was that over the telephone?
20        A.   Yes.
21        Q.   Was anyone else on the call other than you and
22    Mr. Moe?
23        A.   No, just me.
24        Q.   Who called who?
25        A.   He called me.
```

```
 1      Q.    And why did he call you?  What did he ask you?
 2      A.    Because he had gotten the draft and he had
 3   questions about it, the estimate he was putting together.
 4      Q.    What did he ask you?
 5      A.    He wanted to know about the firewalls, he wanted
 6   to know about that, I told him we were still vetting that
 7   issue out.  He wanted to know about the, we talked about
 8   windows, detach/reset versus replace.  We talked about
 9   the roof framing, were there roof framing issues that had
10   to be dealt with in terms of the decking.  General
11   scoping questions more than anything that would be
12   important for somebody putting an estimate together.
13      Q.    So he had questions about the firewalls, the
14   windows, the roof framing and what else?  What other
15   specific scope questions, if you recall?
16      A.    I don't recall.
17      Q.    How long was the conversation would you say?
18      A.    Probably an hour.
19      Q.    Do you have any notes of that conversation?
20      A.    No.
21      Q.    Did you bill for that conversation?
22      A.    No.
23      Q.    Why not?
24      A.    I didn't.  I probably considered it as part of
25   our services.  Part of our fixed fee.  We try not to
```

Thomas Irmiter
5/13/2014

```
 1    nickel and dime our clients.
 2         Q.   All right.  Let's go back to your report then.
 3    I see on the front cover that it's the, there's a stamp
 4    on it, "Licensed Professional Engineer," and "Brian Craig
 5    Johnson."  Is that correct?
 6         A.   Correct.
 7         Q.   Mr. Johnson is employed by your company, I think
 8    you said, is that correct?
 9         A.   Yes.
10         Q.   And the first page of the report contains
11    information concerning storm damage investigation.  Am I
12    correct that this information came from one of your
13    employees, Martha, or is it something that you did or
14    from some other source?
15         A.   No, she puts in the, Martha does the initial
16    research for us on the storm, the date of loss.  So if
17    we're given a date of loss of April 5th, 2010, she will
18    typically, our practice is to go to NOAA, to pull up
19    information from the NOAA website and event details.
20    NOAA does a pretty good job of listing things that have
21    occurred in or around the general area.  These are
22    typically not site specific, they are generalized for the
23    storm event that went through the area.
24         Q.   Okay.  And so that's in 1.1 of the report, is
25    that correct?
```

Thomas Irmiter
5/13/2014                                                    Page: 53

```
 1        A.    Yes.

 2        Q.    And that relates solely to the storm event on

 3   April 5th, 2010, is that correct?

 4        A.    Yes, it does.

 5        Q.    Okay.  Now in 1.1.1, there's a reference to

 6   Forensic Weather Consultants, LLC.  Who is Forensic

 7   Weather Consultants, LLC?

 8        A.    It's one of the reports that we received from

 9   the Childress firm.  Howard -- what's his last name.  I

10   can't remember.

11        Q.    Altschule.

12        A.    Altschule, yeah.  This is Howard's report, and

13   he's a meteorologist and he put a site-specific report

14   together, which was part of the documents that we

15   reviewed.

16        Q.    All right.  You didn't retain Forensic Weather

17   Consultants, is that correct?

18        A.    No, we did not.

19        Q.    Okay.  Did you rely on the report, let me ask --

20   strike that.  Did you rely upon their report?

21        A.    In part, yes.

22        Q.    How did you rely upon the report?  I'm speaking

23   to you personally.  What did you rely upon it for?

24        A.    For comparing the site conditions that I

25   witnessed when I did my inspection and that I reviewed
```

Thomas Irmiter
5/13/2014

1  from the photos that I reviewed that our data gatherers

2  took, Jim and Josh Long, Jim Irmiter and Josh Long.  So I

3  compared what I saw on the site and what we saw on the

4  site to what Howard had opined in his report in terms of

5  the size of hail, in terms of the wind and the effects of

6  those on the building.

7      Q.   Do you know Howard Altschule?

8      A.   I do not.

9      Q.   Ever worked with him previously on any matter

10  where he's been an expert the same case you've had?

11      A.   I have one case I'm working on where he has been

12  retained as an expert.

13      Q.   In regard to American Building Contractors,

14  Inc., have you worked on them in any cases where they've

15  also been retained as an expert to act on the same side

16  of a case?

17      A.   I may have done an appraisal with Josh Moe five,

18  six years ago, but that's the only time that I'm aware of

19  that we've worked together.

20      Q.   So your reliance on the report was that

21  Mr. Altschule prepared his report, you reviewed his

22  report obviously, and you said you used his report to the

23  extent to which it related to what you visually saw and

24  what your employees visually saw there, is that correct?

25      A.   Yeah, we approach all of these inspections from

1    a backwards process.  We want to eliminate causation and

2    get to the most reasonable and logical conclusion, kind

3    of an Occam's razor type of approach, and a report like

4    this is part of that examination.  That's why we, in

5    Section 1.1, that's why, when we receive an assignment,

6    the very first thing we do is we pull up NOAA reports to

7    find out is there even a storm that somebody, some

8    definitive source is telling us occurred at or around

9    this location on this reported date of loss, because we

10   get calls all the time to look at a storm event and we

11   pull up the information and there's nothing six months on

12   either side of this alleged event that occurred.  This

13   one, clearly there was stuff that was coming out from

14   NOAA, and then it dovetailed with his report.

15        Q.    Now turn to page 2 of 37.  Section 1.1.2, I take

16   it the numbering is off a little bit, that probably

17   should be up a little bit?

18        A.    It should be, yes.

19        Q.    And that's consistent through the report, I

20   think?

21        A.    Yep.

22        Q.    There's also notations of other national

23   climatic data from July 1st, 2003 to July 1st, 2013, is

24   that correct?

25        A.    Yes.

Thomas Irmiter
5/13/2014

1    Q.    Okay.  What other events are noted in your

2  report?

3    A.    Well, we're noting a -- other than these right

4  here, these three?

5    Q.    Well, I'm just asking, in your report, you can

6  refer to it if you want, what other climatic events did

7  you refer to in this report?

8    A.    Well, we looked at a ten-year period.

9    Q.    Why ten years?

10   A.    Just that's what we do in our practice.

11   Q.    So there's no reason other than it's ten years;

12 it could be five years, it could be 20 years?

13   A.    Well, 20 years, they don't go back that --

14        MS. PHILLIPS:  Hold on.  Objection to form.

15 Go ahead.

16   A.    Excuse me.  They don't go back that far.  20

17 years is, I mean ...

18   Q.    BY MR. RUDA:  So I'm asking.  Is there any

19 reason it's ten years and not five years, 15 years?

20   A.    No, there's no reason.  We typically pick six to

21 ten years.  We went back ten years, we looked at, we

22 researched data and came up with these three storm events

23 in '03, '04 and '06 that would have had hail at this

24 location.  And in all instances the hail was smaller than

25 the hail that we saw, that Howard has in his report, and

**Thomas Irmiter**
5/13/2014

1    it's smaller than the damage that we saw on the site.

2        Q.   So what was the size of the hail that Howard

3    reported?

4        A.   He has a range, which would be consistent with

5    all hail, he has it between 1.43 and 2.16 inches in

6    diameter, with an average between those of being about

7    1.57 inches.

8        Q.   And in regard to the hail event that occurred on

9    August 1st of 2003, what was the size of the hail?

10       A.   .75 to 1.25.

11       Q.   And for the event that occurred on May 9th,

12   2004, what was the size of the hail?

13       A.   One inch.

14       Q.   And for the event that occurred on

15   September 22nd, 2006, what was the size of the hail?

16       A.   .75.

17       Q.   I noted in what's reflected in the report that

18   for May 9th, 2004 and September 22nd, 2006, there's just

19   a single size of hail and not a range reflected.  Why is

20   that the case?

21       A.   That's what the report indicated.

22       Q.   Meaning the NOAA report?

23       A.   Yes.

24       Q.   Do you have the NOAA report in your file

25   somewhere?

Thomas Irmiter
5/13/2014                                                      Page: 58

1      A.    I do not.

2      Q.    So you don't, you did not personally review the

3  NOAA report?

4      A.    I did.  I went online as part of the, when

5  Martha prints these up, part of Brian and my research as

6  we go through these is to read each of those reports.

7      Q.    Okay.  Are you aware of a hail event that

8  occurred on July 21st, 2013 at the Southgate Townhome

9  Association?

10     A.    No.

11     Q.    Your research did not include that time frame,

12  is that correct?  You stopped as of July 1st?

13     A.    Yeah, we typically go up to date of loss, we

14  don't go after date of loss.

15     Q.    Did you discuss a hail event that occurred on

16  July 21st, 2013 with Mr. Joshua Moe by any chance?

17     A.    No.

18     Q.    Are you aware if a meteorologist was retained to

19  do any assessment of the hail events reflected in your

20  report on August 1st of 2003, May 9th of 2004 and

21  September 22nd of 2006?

22     A.    I do not recall if Howard has data in his report

23  on other storm events.

24     Q.    If I told you it does not, that may help you,

25  but I'm asking if you're aware if any meteorologist was

1    retained to assess the climatic data concerning the

2    events in '03, '04 and '06?

3              MS. PHILLIPS:  Objection to the form of the

4    question.

5        A.   No, not aware of it.

6        Q.   BY MR. RUDA:  Okay.  You did not consult a

7    meteorologist in regard to those events?

8        A.   No, we did not.

9        Q.   Sir, would you take a look at the bottom of

10   page 2?  This report reflects that the April 5th, 2010

11   event, and not the 2003, 2004 and 2006 storm events, were

12   the, were more likely the cause of the damage; is that a

13   good way to put it?

14       A.   Yes.

15       Q.   Sir, the sentence there, that last paragraph on

16   the page says, "In our opinion, to a reasonable degree of

17   engineering certainty, the damages observed at the

18   complex were more likely than not to have occurred

19   because of the April 5th, 2010 storm event and not the

20   2003, 2004 and 2006 storm events," is that correct?

21       A.   Correct.

22       Q.   So this is not your opinion, is that correct?

23       A.   It's not my opinion?

24       Q.   Yes, sir.  It' not your opinion --

25       A.   Because it says "engineering certainty" and I'm

**Thomas Irmiter**
5/13/2014                                                    Page: 60

```
1    not an engineer?  Is that why you're saying it's not my

2    opinion?

3         Q.   No, my question is:  This not your opinion, is

4    that correct, yes or no?

5         A.   "In our opinion."  This is a joint opinion

6    formed by Mr. Johnson and I.

7         Q.   You were retained as an expert, sir, and you're

8    offering up your opinions in regard to this matter, is

9    that correct?

10        A.   I am, yes.

11        Q.   And Mr. Johnson has been retained as an expert

12   to offer up his opinions in this case, is that correct?

13        A.   Yes.

14        Q.   Okay.  I'm just asking your opinions, I'm not

15   asking his opinions.  So in regard to that sentence, sir,

16   is it your opinion "to a reasonable degree of engineering

17   certainty, that the damages observed at the complex were

18   more likely than not to have occurred because of the

19   April 5th, 2010 storm event and not 2003, 2004 and 2006

20   storm events," is that your opinion, sir?

21        A.   It is my opinion, based on my education,

22   training and experience, that the damages observed at the

23   complex were more likely than not to have occurred

24   because of the April 5th, 2010 storm event, and not in

25   2003, 2004 and 2006.
```

1      Q.    Okay.

2      A.    And I base that on having inspected thousands of

3   roofs and over three million square of shingles that have

4   been damaged by hail impact.

5      Q.    If that is the case, sir, why did you write in

6   the report that you signed that your opinion is "to a

7   reasonable degree of engineering certainty"?

8      A.    That's not what I just said in my deposition.

9   That's not how I answered.

10      Q.    I know.  That's why I asked the question.

11      A.    I said my opinion is based on my education,

12   training and background.

13      Q.    My question is:  Why did you write in the report

14   that it's based upon --

15      A.    I didn't write that in the report.

16      Q.    I'm sorry, sir, can we turn again to page 37?

17      A.    Yes, that is my signature on page 37.

18      Q.    Is that your signature on page 37?

19      A.    This is a joint report.  It's co-authored by

20   Mr. Johnson and myself.  Mr. Johnson is a licensed

21   engineer and holds out an engineering opinion, which he

22   gets to do.  I hold out an opinion based on my training,

23   education and experience.

24      Q.    So just so I'm clear, on page 37 it says,

25   "Digitally signed," and it has your digital signature on

**Thomas Irmiter**
5/13/2014                                                      Page: 62

1    it and it's dated January 7th, 2014, is that correct?

2              MS. PHILLIPS:  Objection, asked and

3    answered.  Go ahead.

4         A.   Yeah, I have answered that.  It's on the record.

5    Absolutely, I signed that.  You bet.

6         Q.   BY MR. RUDA:  And it's indicated it's signed as

7    President of Forensic Building Science, Inc.,

8    International Code Council, Residential Building

9    Inspector and Property Maintenance Inspector, is that

10   correct?

11        A.   It is, yes.

12        Q.   So you're signing the report and representing

13   that it's based upon -- well, your title is President of

14   FBS, and then your certifications as International Code

15   Council, Residential Building Inspector and Property

16   Maintenance Inspector, is that correct?

17        A.   No, you're representing that.  I'm representing

18   those are some certificates that I hold.

19        Q.   So I'll ask the question one more time, sir.

20   Based on your answer, which is, you said it's your

21   opinion based upon your experience basically, why did --

22        A.   Training and education, not just my experience.

23        Q.   Okay, your training as you've described it, your

24   education as you've described it, and your work

25   experience as you've described it, correct?  That's what

1   you based it on?

2        A.    Right.

3        Q.    I'm just asking why did you author a report that

4   says the cause was the April 5th, 2010 hail event based

5   upon a reasonable degree of engineering certainty?  Why

6   did you sign a report that has those words in it is a way

7   to put it?

8              MS. PHILLIPS:  Objection to the form of the

9   question, asked and answered.  Go ahead.

10       A.    I've already answered that question.  It says,

11  "in our opinion."  It is a co-authored report.

12       Q.    BY MR. RUDA:  Okay.  Sir, would you agree that

13  you then have no opinion based upon a reasonable degree

14  of engineering certainty because you're not an engineer?

15       A.    I'm not an engineer.  I would agree that I'm not

16  an engineer.

17       Q.    Would you agree with me that you cannot offer up

18  an opinion to a reasonable degree of engineering

19  certainty because you do not hold a degree as an engineer

20  and you are not licensed as an engineer in any state?

21       A.    I would agree.

22       Q.    Okay.  So on page 2 of the report, where it

23  states, "In our opinion, to a reasonable degree of

24  engineering certainty," that is, I take it then, that

25  must be Mr. Johnson's opinion, not yours, is that

Thomas Irmiter
5/13/2014                                                          Page: 64

1    correct?

2        A.   As far as the engineering certainty part, yes,

3    that would be his opinion.

4        Q.   Okay.  At the end of that page, in the last

5    line, it says, "In particular, the impact damage on the

6    shingles did not show weathering consistent with an event

7    that occurred more than seven years before we inspected

8    the roofs."  Do you see that, sir?

9        A.   Yes, I do.

10       Q.   All right.  Did you write that or did

11   Mr. Johnson write that?

12       A.   It's co-authored, as I indicated before.

13       Q.   You both wrote that, is that correct?

14       A.   Yes.

15       Q.   Okay.  Could you explain what significance that

16   sentence has to the opinions that you hold?

17       A.   The impact damage that I saw on the shingles

18   was, the discoloring that I saw was consistent with

19   granule loss and exposure to UV that would have occurred

20   within a couple years after an event.  Granule loss and

21   exposure of the mat material that is five, six, seven

22   years old shows a completely different type of, it

23   presents itself differently, for lack of a better word.

24            When we start getting into seven-year-old stuff,

25   we're going to see graying in color, we're going to see,

Thomas Irmiter
5/13/2014                                                    Page: 65

1    when closely examined, and when I say closely examine, we

2    take our photographs, you'll see a number of photographs

3    that we take very close up, where the camera is sitting

4    on the edge of the roof to show the indentation.  When

5    those are blown up to 300 percent on a high-definition

6    screen, you can see the cracking and the etching and the

7    alligatoring that occurs to strikes that are old, that

8    have been there a long time.  This building just did not

9    present any of that when we were doing our inspections.

10   It all looked very fresh, if you will.  Fresh within the

11   last couple of years.

12       Q.   All right, so --

13       A.   It had some early stages of graying, which would

14   not have been able to occur on a storm event that had

15   happened in 2013.  That's why we didn't pay any attention

16   to the 2013 storm event, because the materials that we

17   were seeing had begun to age and showed aging consistent

18   with something older than two or three months.

19       Q.   Okay.  So you can determine from looking at a

20   hail strike on shingles -- strike that.  Are you talking

21   about weathering shingles, is that correct?

22       A.   Yes.

23       Q.   So it doesn't have anything to do with siding or

24   soft metals; strictly weathering on shingles, is that

25   correct?

Thomas Irmiter
5/13/2014                                                      Page: 66

```
 1        A.    Correct.

 2        Q.    So would you agree with me that you cannot

 3   determine from looking at hail strikes on siding whether

 4   it happened, you know, a month or five years before?

 5        A.    Depends on the type of siding.

 6        Q.    Well, the vinyl siding on this complex.

 7        A.    That would be difficult to do.

 8        Q.    Okay.  Is it the same for the soft metal

 9   strikes, too; that you can't date them based upon their

10   visual appearance at any particular point in time?

11        A.    Depends on the location of where you are.  Down

12   in Phoenix, Arizona where we get dust storms, it's much

13   easier to do than it would be in Chicago.

14        Q.    But up in Chicago, which is like here in

15   Minneapolis for the most part, pretty similar, you can't

16   really date by appearance hail strikes on soft metals

17   then?

18        A.    Correct.

19        Q.    Okay.  So going back to the shingle, is a good

20   way to put it you determined, based upon the weathering

21   on the shingles and the granular loss to the parts of the

22   shingles, that you assessed or determined that it was the

23   April 5th, 2010 hail event?  Is that a good way to

24   summarize what you said?

25             MS. PHILLIPS:  Objection to form.
```

Thomas Irmiter
5/13/2014

```
 1        A.    Well, that's one piece.

 2        Q.    BY MR. RUDA:   What else?

 3        A.    That's one piece of it.

 4        Q.    Besides weathering, which I include to mean

 5    graying of it, that grays over time, and granule loss,

 6    what else?

 7        A.    The report from the meteorologist, photographs

 8    that I saw.  I brought those today if you haven't seen

 9    them.  I'm pretty sure you have.  Photographs of hail,

10    inch-and-a-half size hail being held in the hand of one

11    of the residents from the April 5th storm event.  Their

12    hand is wet.  The hail that they're showing, when you

13    measure the hand and you measure that picture, it's an

14    inch and a half this direction.  Their hand is wet.  It's

15    gone down in size.

16             When that hail comes through the upper

17    atmosphere, at least the studies that I've seen from

18    Haag, the studies I've seen from Petraeus, those

19    hailstones are sub, subzero temperature, and so they

20    diminish in size as they're falling, and they diminish

21    very, very rapidly once they're on the ground.  So this

22    guy is picking up, this hand is holding inch and a half

23    hail, the hand is wet, that hail was larger than that

24    when it fell at that point in time.  It's pretty simple,

25    in my mind at least, cause and effect.
```

Thomas Irmiter
5/13/2014                                                    Page: 68

1      Q.    Okay.   I was just asking about the opinion that

2  you indicated is your opinion that the impact damage on

3  the shingles did not show weathering consistent with an

4  event that occurred more than seven years before we

5  inspected the roofs.   So again I want to go back to that.

6  So other than weathering, is there any other reason why

7  you hold the opinion that the only weather event that

8  caused the damage to the shingles was the April 5th, 2010

9  storm?

10      A.   The tactile feel of the shingles, the

11 impressions that I was seeing and feeling, and that my

12 data gatherers, my technicians felt as well, would be

13 consistent with larger hail than was reported in '03, '04

14 and '06, and more consistent with the larger hail in '05.

15 The process that we used to --

16              MS. PHILLIPS:  I think you mean '10?

17              THE WITNESS:  '10, excuse me.  Yeah.

18      A.   The process that we use to tactilely feel for

19 the hail strike, once it's been circled and before it is

20 X'd out as not being a hail strike, is to use your thumb

21 to rub into that location and feel the indentation, and

22 that was a pretty consistent theme that we saw on this

23 building.

24      Q.   BY MR. RUDA:  Does your report reflect any

25 tactile analysis of the hail strikes on the shingles?

**Thomas Irmiter**
5/13/2014                                                    Page: 69

```
1        A.    I don't understand the question.

2        Q.    Well, you just described that one of the things

3    you did besides the weathering that was a visual

4    inspection, as you described it, was the tactile feel of

5    shingles.  Does your report reflect any tactile feeling

6    of shingles?

7        A.    I don't know if the report actually goes through

8    that step-by-step process.  It might.  I know that that

9    is a fairly well-established industry practice, and it's

10   taught actually in the Haag certification classes.

11       Q.    Do you have Haag certification, sir?

12       A.    No, I've been through their classes but I

13   haven't certified.  My other people, I've got three

14   people on staff that are.  Two of the people inspecting

15   here were certified, for what it's worth.

16       Q.    So you've indicated the weathering, as reflected

17   in your report as you've described it, and the tactile

18   feel of shingles, as well as photographs you saw of

19   people holding hail in their hand after the event are the

20   bases for your opinion that the April 5th, 2010 storm was

21   the event that occurred, pardon me, that caused the

22   damage to the shingles, is that correct?

23       A.    Yes.

24       Q.    Anything else?

25       A.    Yeah, one last opinion of mine.  The, I've been
```

Thomas Irmiter
5/13/2014                                                    Page: 70

```
 1    blessed with being on appraisal panels all over the
 2    country with adjustors working for insurance companies,
 3    engineers who primarily are retained by insurance
 4    companies, from Haag, Rimkus, Project Time & Cost, from,
 5    I can't remember all the names, Donan, and I base my
 6    opinion on what I believe is hail damage not only on all
 7    of the things I've testified to thus far, but on
 8    universal agreement on appraisals between all three
 9    people on the appraisal panel, the umpire and the two
10    appraisers, who are typically adverse to each other,
11    agreeing that this is hail.  When we see this every
12    single time, we will agree as a panel that it's hail.  So
13    I know, for example, if I'm going to call this hail on
14    this job, on this particular project, that I can go to 50
15    or 60 other adjustors, engineers, attorneys, retired
16    judges who sat on these panels and have agreed that it is
17    hail.  So I'm basing it on a very consistent theme that I
18    see nation-wide as well.
19        Q.   Is that it?  Any other bases for the opinion as
20    expressed here that "the impact damage on the shingles
21    did not show weathering consistent with an event that
22    occurred more than seven years before we inspected the
23    roofs"?
24        A.   No.
25        Q.   Can you tell me, is there some authoritative
```

1   source that you rely upon for your explanation of

2   weathering as you've described it?  Is there some

3   journal, some authoritative source, some source that you

4   can go to to point that describes how you assess the

5   weathering of hail damage so that you can date it in

6   time?

7       A.   Just a second.  Well, see, you had to throw in

8   the word "authoritative," so that's why I have a problem

9   with that.  I think Haag certainly has their opinions

10  about it.

11      Q.   Okay.  In particular, where in Haag?  You

12  indicate at page 4 of 37 of your report that "The

13  following documents were used for reference."  I note

14  that you indicate, "Haag Education Haag Certified Roof

15  Inspector Program, Residential Edition" in particular.

16  What in that?

17      A.   There's hundreds of pictures in there that they

18  show examples of things.

19      Q.   Can you tell me, sir, specifically what section

20  of Haag you relied upon to --

21      A.   Not without having a book here in front of me.

22      Q.   Would you take a look --

23      A.   And --

24      Q.   If you want, you can take a look at Exhibit 5

25  and find that section in Haag that you're relying upon

Thomas Irmiter
5/13/2014

```
 1    and explain it to me.

 2         A.   It's not in Exhibit 5.

 3         Q.   These are all the documents that we received

 4    from the other side in the case that you relied upon,

 5    so --

 6         A.   But --

 7                   MS. PHILLIPS:  Wait a minute.  Let him

 8    finish.

 9         Q.   BY MR. RUDA:  So you can look through, I think

10    all those documents are at the end of 5.

11         A.   We may need to take a break here.  We may need

12    to take a break here.

13         Q.   That's fine.  I was just saying --

14         A.   You're misstating what I said, okay?  That's why

15    we need to take a break.  You said authoritative source.

16    I didn't say that Haag was authoritative.  The fact that

17    I list it here, you're putting words in my mouth.  I'm

18    not saying Haag is authoritative.  I'm saying we put

19    people through the training.  That doesn't mean that we

20    think it's authoritative.

21         Q.   Okay.

22         A.   All right?

23         Q.   The reason I used the term is you indicated Haag

24    was a source that you referred to, so --

25         A.   A source, I didn't say authoritative.
```

Thomas Irmiter
5/13/2014                                                    Page: 73

1      Q.    Did you rely upon Haag or not, yes or no?

2      A.    No.

3      Q.    Okay.  So is there any authoritative source that

4  you relied upon, sir, for the opinions that you've

5  expressed here today concerning how you determine

6  weathering so that you can place a date on when a hail

7  damage event occurred to a property?

8      A.    No, there is no authoritative source that I'm

9  aware of that can do that.

10            MS. PHILLIPS:  Let's take a break.  We've

11  been going at this for an hour and a half.

12            MR. RUDA:  Sure.

13            (Break taken from 11:33 a.m. to 11:39 a.m.)

14  BY MR. RUDA:

15      Q.    Sir, I want you to take a look at what's been

16  marked, previously marked as Moe Exhibit No. 2, and it's

17  Bates stamp page 36.  For example, I just marked it with

18  a little tab there.

19      A.    Yep.

20      Q.    Okay.  Are you familiar with a company called

21  EagleView?

22      A.    Oh, yes.

23      Q.    Would you take a look at that report?  If you

24  need to move the clip, you can, just to see the top of

25  it, and I don't want to mislead you.  Please take a look

```
 1    at it.  This is a report for one of the addresses at the

 2    Southgate townhome complex.  At the top it reflects that?

 3        A.    Yep.

 4        Q.    And the EagleView report reflects that the last

 5    recorded hail event within one mile of that address was

 6    on July 21st of 2013.  Do you see that on Bates stamp

 7    page 36 there?  I'll reach over and (indicating).

 8        A.    Yeah.

 9        Q.    Okay.  And you also see the next section that

10    says, "Hail Count:  19," is that correct?

11        A.    Hm-hmm.

12        Q.    Okay.  And then at the bottom of that page it

13    reflects that the hail was at least three-quarters of an

14    inch, if not larger, on that date, is that correct?

15        A.    Within a mile, yes.

16        Q.    Within a mile.  And I just want to grab this so

17    I can be precise.  And then hail count is described in

18    this report as the number of hail events in excess of

19    three-quarters of an inch that have occurred in the last

20    three years, is that correct?  At the bottom of what's

21    reflected in the last sentence below "Hail Count:  19"?

22        A.    Yes, but you -- and we work with this service.

23    We work with them all the time.

24        Q.    I'm just asking you if that's what it says, so

25    I --
```

1      A.   That's what it says, but you need to know how to

2  interpret what it says to understand what it says.  So

3  you're saying what it says, but I don't think you're

4  interpreting what it says correctly.

5      Q.   Am I correct that what EagleView's report

6  reflects is that within three years prior to January --

7  sorry -- July 21st, 2013 there had been 19 separate

8  incidents of hail in excess of three-quarters of an inch

9  that had fallen?  Is that correct or not?

10     A.   That's what it states, yes.

11     Q.   Okay, thank you.  Did you take that, did you

12 ever see that report before today, sir?

13     A.   No.

14     Q.   Okay.  I had asked you before, let me, you can

15 hold on to it, that's fine, I just don't want to -- I'm

16 worried about things getting mixed up.

17     A.   I know.

18     Q.   Because I do it myself.

19     A.   It's not my first rodeo, Counselor, I'll make

20 sure I don't mix them up.

21     Q.   No, no, it's not you, it'll be me.  If it's

22 clipped, then it doesn't get mixed up.  If you need to

23 refer to it, you may.  But I had asked you previously,

24 you know, if you had talked to Mr. Moe about that hail

25 event and that incident, you said no.  So this again, now

1    that you saw the report, this isn't anything that you and

2    Mr. Moe talked about, I take it?

3        A.    No, no.

4        Q.    Okay.  Let me ask you, sir, based upon your

5    experience as you've described, and your qualifications

6    as you've described, could -- and this is could -- could

7    the hail event on September 22nd of 2006 have caused

8    damage to shingles at the Southgate townhome complex?

9        A.    What date is that?

10       Q.    The storm event on September 22nd of 2006.  It's

11   reported at page 2 of your report.  In other words, I'm

12   asking could hail of .75 have caused damage to shingles?

13              MS. PHILLIPS:  Objection to the form of the

14   question.

15       A.    I don't think it could have in this particular

16   situation on these roofs.  These were fairly robust

17   shingles.

18       Q.    BY MR. RUDA:  And the basis for your opinion

19   that the hail of .75 on September 22nd of 2006 could not

20   have damaged the shingles at Southgate is they were

21   robust.  Can you be more specific what you mean by that?

22       A.    Well, our report indicates, for example, that

23   the red shingles, which we deemed were a 30-year shingle

24   based on our measurements of the shingles, the thickness

25   of the shingles, they're a thicker shingle and a bit more

1    robust, they did show damage which we attributed to the

2    April 5th, 2010 storm, but they showed less damage than

3    the gray shingles, which were a 25-year shingle.  I think

4    both shingles were fairly robust and would be less

5    susceptible to something .75 in size, and I base that on

6    looking at hundreds of storm events with that size hail.

7        Q.    Okay.

8        A.    And smaller.

9        Q.    Is robust a term of art in the roofing business,

10   or do you just mean robust as we commonly understand the

11   word?

12       A.    Robust as we commonly understand the word.

13       Q.    Okay.

14       A.    Stronger, more resilient and would deflect

15   without showing damage.

16       Q.    Okay.  Any other bases for your opinion that the

17   event on September 22nd, 2006 could not have caused any

18   hail damage to the shingles?

19       A.    Yes, I didn't see aging of the mat that would be

20   consistent with something that old.

21       Q.    All right.  So my question first was a

22   theoretical one; if hail of .75, as depicted on the

23   September 22nd, 2006 NOAA reference, was large enough to

24   cause hail damage, and you said no, based upon, you know,

25   the type of shingles.  You also then added that based on

```
1   your visible inspection the hail damage you saw wasn't

2   old enough, I take it, sir?

3       A.   Correct.

4       Q.   It wasn't weathered?

5       A.   Correct.

6       Q.   Any other bases?

7       A.   No.

8       Q.   What about, and this is a theoretical question

9   based on your experience, sir.  On May 9th, 2004 there

10  was hail that was 1.0, you know, an inch in size.  Would

11  hail of one inch be sufficient to cause damage to the

12  type of shingles present in Southgate?

13             MS. PHILLIPS:  Objection to the form of the

14  question.

15      A.   It could on the gray shingles.

16      Q.   BY MR. RUDA:  And is the basis for your opinion

17  that it could on the gray shingles, but not the red I

18  take it, the 25-year versus 30-year, is that why?

19      A.   Yes.

20      Q.   30 years are, what, more robust, to use your

21  term?

22      A.   Yes.

23      Q.   Any other basis?

24      A.   No, I would only say that it, that would be

25  large enough to cause damage on the gray shingles.  We
```

**Thomas Irmiter**
5/13/2014                                                                                    Page: 79

1   didn't see damage from that storm event on the gray

2   shingles.

3        Q.   And, again, that's because of your assessment

4   that you described; the weathering of the hail damage to

5   the shingles, is that correct?

6        A.   Correct.

7        Q.   Okay.  In regard to the storm event that

8   occurred on August 1st of 2003 with hail size of .75 to

9   1.25 inches, would that, sir, strictly the size of that

10  hail, be enough to cause damage to any of the shingles at

11  the Southgate townhome complex?

12       A.   Yes.

13       Q.   And in your opinion, is it the same that

14  anything more than 1.0 would be big enough to damage gray

15  shingles?

16       A.   Yes.

17       Q.   How about red shingles?

18       A.   Red shingles on that upper end would potentially

19  have some damage, some blemishes, yes.

20       Q.   And you're of the opinion, though, that in

21  regard to the August 1st, 2003 storm, that you didn't see

22  any evidence that that storm caused any of the hail

23  damage that you saw; again, it's because of the lack of

24  weathering, I take it?

25       A.   Correct.

Thomas Irmiter
5/13/2014

1    Q.    Okay.  Now in regard to the siding damage that

2    was found at the Southgate complex, is it possible that

3    any of these prior storms in '03, '04 and 2006 caused the

4    hail damage that, you know, your company discovered, that

5    you saw and the other individuals from your company saw

6    when they did their inspections?

7    A.    It's possible but not likely based on the

8    information that was provided to us by members in the

9    association.

10    Q.    Okay.

11    A.    And photos that we reviewed that were taken by

12    association members the day of the April 5th, showing

13    displaced siding and showing damage to siding from hail

14    from that particular day.

15    Q.    Okay.

16    A.    There was no reported siding damage by the

17    association prior to that.

18    Q.    So let's go through that.  So it's possible the

19    prior storms could have caused siding damage but it's

20    your opinion that it's not likely?

21    A.    It's possible that it didn't.  Not likely.  It

22    did not.

23    Q.    All right.  So your opinion is not that it's

24    possible it could have caused the damage, your opinion is

25    it did not?

**Thomas Irmiter**
**5/13/2014**                                                    Page: 81

1     A.   My opinion is those, some of those storms had

2  hail that would have been large enough to cause damage to

3  the vinyl siding.  There was no reported vinyl siding

4  damage by the association prior to the April 5th, 2010

5  storm event, leaving that as the event that caused the

6  damage.  There was also photographs that were taken the

7  day after that storm showing some of that damage.

8     Q.   Okay.  So your opinion, I guess a good way to

9  put it, there's a theoretical possibility, as far as

10  you're concerned, that the prior hail events in '03, '04

11  and '06 could have caused damage to the siding based upon

12  the size of the reported hail, is that correct?

13     A.   Yes.

14     Q.   But it's your opinion that those events did not

15  cause damage to the siding because it was reported to you

16  that there was a storm on April 5th of 2010 that caused

17  damage to siding, and you have seen some photographs

18  taken either that day or the day after that showed some

19  damage to siding, is that correct?

20     A.   Correct.

21     Q.   No other bases for your opinion?

22     A.   Well, the directionality.  Our damage on the

23  siding typically is west focused and west, southwest or

24  northwest focused, and that is very consistent with the

25  direction of the April 5th storm event.  So that is

**Thomas Irmiter**
5/13/2014                                                                    Page: 82

1    another correlation that we used to form that opinion.

2        Q.    Okay.   Do you know what the direction of the

3    storm events were in '03, '04 and 2006?

4        A.    Not without digging back into those NOAA reports

5    at this point.

6        Q.    Now, sir, when you and others were inspecting

7    the Southgate property, you found evidence of repairs

8    that had been made to shingles, did you not?

9        A.    Yes, some of the roofs had been replaced

10   already.   16 of them.

11       Q.    Let me be more specific.   When you did your

12   inspection, you found, did you not, evidence of partial

13   repairs done to roofs that had not been completely

14   replaced, not the 16 roofs which had been replaced after

15   this hail event?   In other words, you found evidence of

16   other repairs to other roofs in the complex, did you not,

17   that had been made, partial repairs?

18       A.    Sporadic, yeah.   Yeah.

19       Q.    Did you come to any conclusions concerning those

20   sporadic repairs that had been made to roofs as to the

21   cause of why they needed to be repaired?

22       A.    Wind damage.

23       Q.    Could it be wind damage from these prior events

24   in '03, '04 and 2006?

25              MS. PHILLIPS:   Objection to form.

Thomas Irmiter
5/13/2014                                                      Page: 83

1      A.    We don't know.

2      Q.    BY MR. RUDA:   Okay.

3      A.    We couldn't get information on the maintenance

4   on that.

5      Q.    BY MR. RUDA:  So it would only be wind damage,

6   not any prior hail damage in your opinion that caused the

7   need for these repairs that you saw that had been done on

8   the roofs other than the 16 that were completely

9   replaced?

10     A.    Typically.  Yeah, I mean typically when we, when

11  we see shingles like that that are installed sporadically

12  here or there, it's because a shingle is missing.  That's

13  usually what triggers someone on a maintenance crew to

14  install a single shingle here or there, because they see

15  it from the ground that there's a missing shingle.

16  Typical maintenance approach.

17     Q.    Now in regard to inspections of the premises,

18  when were you at the premises to do an inspection that

19  you did, sir?  You can certainly look at your report.

20     A.    Yeah, it's in my report.  (Examining document.)

21  July 30th, 2013.

22     Q.    How long were you at the structure?

23     A.    I was there for three-quarters of a day.

24     Q.    By three-quarters of a day, do you mean

25  three-quarters of an eight-hour day?

**Thomas Irmiter**
5/13/2014                                                          Page: 84

1        A.    Yeah.  I think I was on four roofs.

2        Q.    Okay.  Do you know what roofs you went on?

3        A.    It would have been the ones -- let's see.

4        Q.    Well, let me ask.  Were they the ones that are

5    identified as full inspections being done or --

6        A.    No, I did two full and two partial.

7        Q.    So which roofs did you go on?

8        A.    I can't, at this point I can't recall.

9        Q.    Okay.  Is there a protocol that you use when you

10   look at a roof to determine if there's hail damage or

11   wind damage?

12       A.    Yes.

13       Q.    Is there a different protocol for wind versus

14   hail or is it the same thing?

15       A.    It's different.

16       Q.    What's the protocol for hail damage,

17   determining, you know, if there's hail damage or not?

18       A.    We do not use test squares.

19       Q.    What's that, test squares?

20       A.    Test square is something that was developed by

21   Haag Engineering as a methodology for looking at a large

22   complex like this and extrapolating the extent of damage.

23   So a ten-by-ten area, which is one square of roofing, a

24   hundred square feet.

25       Q.    So ten feet by ten feet?

**Thomas Irmiter**
5/13/2014                                                        Page: 85

```
 1        A.    Ten feet by ten feet, a hundred square feet,
 2   it's marked off, and then within that, the boundaries of
 3   that square, you look for damaged shingles and you mark
 4   the damaged shingles and then you assess a count to that.
 5   And that's just not a philosophy that we believe in or
 6   adapt based on having been on inspections with Haag and
 7   with other firms that use that approach.
 8        Q.    Do you know in the roofing industry if the test
 9   square approach is commonly used or not?
10        A.    I think it's commonly misused.
11        Q.    Okay.  Not my question.  Your opinion is it's
12   not a good approach, I understand that.  In the roofing
13   industry, is it a protocol that's commonly used as far as
14   you know?
15        A.    For a quick and dirty extrapolation, yes.
16        Q.    And when you say commonly used -- strike that.
17   I said commonly used, but you agreed that it's commonly
18   used.  Who uses the ten-by-ten approach?  Roofing
19   contractors, insurance companies, public adjusting firms,
20   outside adjusting firms, who uses this practice?
21              MS. PHILLIPS:  Objection, form of the
22   question.
23        A.    Everybody.
24        Q.    BY MR. RUDA:  Okay, fine.
25        A.    We see lots of people using it.
```

1        Q.    Okay.

2        A.    I should say, excuse me, misusing it.

3        Q.    When you say misuse, what do you mean?

4        A.    Well, we actually have trailed along six other

5   engineering firms and/or, and along with adjustors, and

6   I'll give an example.  We did 42 buildings in Phoenix and

7   the engineers who did the inspections on those buildings

8   did test squares on every building, and they typically

9   had counts of zero to five hail hits.  And in every

10  single instance we took the same boundaries of the test

11  square and moved it right, left, up or down, keeping at

12  least one square foot of space within their test square,

13  so we're taking a corner of it but we're doing our own

14  test square, and we were getting hits of 15 to 20.

15  That's the misuse piece.

16              If you actually go through the Haag

17  certification and training, Haag tells you very

18  specifically to find the area with the most damage on the

19  roof and that's the area that you should use for your

20  test square.  And what has happened in the industry is

21  the insurance companies have flipped that upside down and

22  all the inspectors that are working for the insurance

23  companies are now going on the roofs and they're finding

24  the area of least damage that has the most cover from

25  trees and other things and that's where they're doing

Thomas Irmiter
5/13/2014

```
 1   their test squares.  So we have abandoned the test square
 2   practice and we count all the damage.  Doesn't take that
 3   much longer to do.
 4        Q.   All right.  So the misuse is that Haag's
 5   protocol that they've taught, right --
 6        A.   It's right in their literature.
 7        Q.   -- is that you find the area of most damage and
 8   you use it for a test square; that's not misuse, that's
 9   the correct use of the Haag protocol?
10        A.   Yeah, it's their protocol.
11        Q.   But would you agree that that's a correct way to
12   do it or would you say that in your opinion that's an
13   incorrect way to do it?
14        A.   I think that still can skew.
15        Q.   How can that skew something in your opinion?
16   Because you explained that misuse is people aren't going
17   to the most damage and doing the test square, they're
18   going to the least damaged area, and the area that's
19   provided the most cover by shrubbery or whatever,
20   adjoining roof or whatever it may be, and then taking a
21   square there.  That's what you said is the misuse.  So do
22   you have an opinion concerning the use of the ten-by-ten
23   square foot area where there are the most hits on a roof?
24        A.   Sure.  That can give you false information as
25   well.
```

**Thomas Irmiter**
5/13/2014                                                        Page: 88

1    Q.    How so?

2    A.    Give you too many, too much damage.

3    Q.    All right.  So --

4    A.    My training as a building code official, okay, I

5    work with very exact information.  The building code is

6    prescriptive.  It tells you specifically what size nail,

7    where to place the nail, how far to drive the nail, what

8    size screw, what size fastener.  It's very, very precise.

9    I'm very linear and precise that way.  So I'm not going

10   to guess about how much damage there might be by doing a

11   mathematical formula of one area on a hundred-square

12   roof.  One percent of the roof is being marked.  It

13   doesn't take that long to walk the whole roof.  Walk the

14   whole roof and count it.  That's what we do.  It's much

15   more accurate.

16   Q.    All right.  I got it.  So the problem with using

17   the Haag protocol, if it's done according to their

18   dictates, is you can actually determine that there's more

19   hail damage than there actually was to a roof?

20   A.    Possibly, yeah.

21   Q.    Okay.  You're aware that MKA, the architectural

22   firm that looked at the Southgate property, used a test

23   square analysis?

24   A.    Yeah, I believe they did four buildings and they

25   extrapolated from there, based on the directionality,

**Thomas Irmiter**
5/13/2014                                                      Page: 89

1   that this is what one would expect to see on all of the

2   roofs, yeah.

3       Q.   So is it your opinion, sir, that based upon

4   MKA's test square analysis, if they did it correctly, if

5   they did it according to Haag dictates, that they would

6   have come up with more damage to roofs than there

7   actually is?

8       A.   I don't have --

9            MS. PHILLIPS:  Objection to the form.

10  Foundation.

11           THE WITNESS:  Sorry.

12      A.   I don't have an opinion on how they did their

13  test squares because I haven't asked them, I didn't

14  witness their test squares, so I really can't give you an

15  opinion on that.

16      Q.   BY MR. RUDA:  You have no opinions about what

17  they did or didn't do, is that correct?

18      A.   Other than what we've listed in our report, and

19  I think we do comment on some of their stuff, but, no.

20  Other than what's in the report I have no other comments.

21      Q.   Okay.  Other than what's in your report you have

22  no comments?

23      A.   No.

24      Q.   All right.  So other than FBS, your company, are

25  you aware of any other companies that does a hail

1    assessment the way you do?

2        A.    There's more of them that are starting.

3        Q.    Can you identify any of them by name?

4        A.    Let's just say a great deal of the public

5    adjustors who are in the NAPIA groups have moved into

6    that process of evaluating.

7        Q.    All right.  So public adjustors, some.

8        A.    Some public adjustors.  The appraisal panels

9    that I'm involved in, we're starting to move to that

10   issue, if there is an issue.  A lot of times there isn't,

11   but if we get into that issue then we spend the time and

12   we count.  That's what I'm aware of.

13       Q.    Okay.  So you're not aware of any roofing

14   companies, contracting companies, general contracting

15   companies, architectural firms, engineering firms, other

16   than yours, that are moving to the system you use, is

17   that correct?

18       A.    That is correct.  I'm not aware of it at this

19   point.

20       Q.    Can you identify any public adjustors

21   specifically by name that are moving to the analysis that

22   you do?

23       A.    Jim Pierce does this, Paul Norcia does it, Tim

24   Barthelemy does this.  I'm trying to think who else.

25   David Greeson, Peter Ridulfo, Clay Morrison, Steven

Thomas Irmiter
5/13/2014

```
 1   Hadhazi.  Bunch of different names.
 2        Q.   Are these all public adjustors in Minnesota?
 3        A.   No, most of them are out of state.
 4        Q.   Are any of them in Illinois?
 5        A.   Don't know.
 6        Q.   So you're unaware of any of them in Illinois.
 7   You just don't know?
 8        A.   Just don't know.  I don't know where they carry
 9   their licenses.
10        Q.   And I apologize, I missed the last name of Paul.
11   It was after Jim Pierce.
12        A.   Norcia, N-O-R-C-I-A.
13        Q.   Mr. Pierce, have you worked with Mr. Pierce
14   before in cases where you've represented, or provided
15   opinions, pardon me, for plaintiffs or insurance
16   claimants?
17        A.   Yes, yes.
18        Q.   How many times?
19        A.   Probably 25 times of things I've been involved
20   with him.  Fire losses and tornadoes and all kinds of
21   different stuff.
22        Q.   And these public adjustors you've identified,
23   have they retained your company to do the analysis that
24   you do in claims that they have concerning hail damage?
25        A.   No, no.  Typically public adjustors don't retain
```

1   us, the client retains us.  The homeowner basically,

2   yeah.

3       Q.   Have these public adjustors' clients, the

4   insureds, retained you; that is, they've recommended, you

5   know, Mr. Pierce or Mr. Barthelemy, et cetera, they

6   recommend that you should be hired to do the analysis so

7   they get a correct assessment of hail damage to a house?

8       A.   Yeah, we're typically brought in when, after the

9   insurance company has retained an expert to come out and

10  typically their report will say that there is no damage

11  ever, and then we're brought in to do an assessment to

12  see in fact if there is.

13      Q.   Okay.  Now in regard to the protocol that you

14  use, let's go back to it for a moment here because we got

15  sidetracked on test squares.

16      A.   Yep.

17      Q.   So tell me what the protocol is.  The first

18  thing you told me is that you don't use test squares, so

19  we got off on the tangent there, so what's the protocol

20  that you do use?

21      A.   We get up on the roof.  We start at the ridge

22  and we essentially walk the roof in three to four rows at

23  a time, and we do this not from a completely standing

24  position but bent over so you can actually see, and we go

25  through and we mark what we believe is physical damage to

1    the shingle.

2         Q.    When you say mark it, do you use chalk?

3         A.    Chalk.  So we are circling it for hail or for

4    any impact mark that we see, or any perforation that we

5    see.  Sometimes we'll see a nail pop or something like

6    that.

7         Q.    Basically anything you find --

8         A.    Anything we see that looks like it's damage,

9    we're going through and we're marking the whole thing.

10   Very quick, quick pass.

11        Q.    Okay.

12        A.    Then we go back and we get down on our hands and

13   knees and we begin to feel tactilely each one of those

14   marks.  And we cross off and eliminate things that are

15   mechanical in nature, damage that might be a blister,

16   damage that may be related to manufacturing of the

17   shingle.  In order to do that, you really need to

18   understand how shingles are made, you need to have been

19   to the factory, in my opinion, and watch shingles being

20   made, which I have.  You need to have installed thousands

21   of squares of shingles and pulled them off the bundles

22   and see what the effect of taking them out of the package

23   can do to a shingle before you install it, which I've

24   done, and then you eliminate anything that you think is

25   not hail.  And as part of that process, that's when

**Thomas Irmiter**
5/13/2014                                                    Page: 94

1    you're wearing out your thumb and your finger.  By the

2    end of the day, you'll literally have no skin left on

3    your fingers because you --

4        Q.   So are you quite literally taking your thumb and

5    placing it into the hole and feeling them?

6        A.   Feeling it, and if you -- and what's interesting

7    is that if you take a shingle that has no granule loss on

8    it at all and it looks pristine and you put your thumb on

9    that shingle and you move it back and forth, you can't

10   displace those granules.  You take an area where it looks

11   like there's a blemish and you do that and they come off

12   very, very easily, and that's right in the Haag manual as

13   well in terms of that tactile piece, so we do use that.

14   So then we, we mark those, and then we typically will

15   take close-ups of those photos, of those shingles.

16       Q.   Let me ask you a question.  So everything is

17   marked to begin with, basically anything that's unusual,

18   and then you go back and look particularly for what is a

19   hail hit, is that correct?

20       A.   Typically, yeah.

21       Q.   So when you document, you know, by circling, you

22   know, whatever is unusual, is that photographed?

23       A.   Yes.

24       Q.   Was that photographed in this case?

25       A.   A representative sample of those.  It would be

**Thomas Irmiter**
5/13/2014                                                      Page: 95

1   impossible to take a photograph of every single hail hit,

2   even in the full inspection that we do.

3        Q.   So, for example, if you take one side of a roof

4   and everything's marked on that particular roof, because

5   that's what you said that you did, is there a photograph

6   taken of that entire side of the roof that shows all the

7   circles on the roof?

8        A.   Typically there would be, yeah.

9        Q.   Okay.  Because I haven't seen any such

10  photographs.  I know the report has some representative

11  photographs.

12       A.   That photo right there that shows (indicating).

13       Q.   Okay, all right.  So in the report there's a

14  collection of five or six photos.  Those are the photos

15  you're speaking of, sir, that were done in this

16  particular matter, is that correct?

17       A.   Without looking through all of our photos, I

18  would have to take ...

19       Q.   I'm asking what the protocol is.  This is a

20  protocol question.

21       A.   Yes.

22       Q.   So the question is protocol is that, so every

23  roof that was examined and marked with all of the

24  particular defects, not hail defects, all of them, is it

25  photographed to show all of them?

```
1        A.    No.  God, no, no.  We don't take photos of nails

2   and we don't take photos of blisters and all that kind of

3   stuff.

4        Q.    That's what I wanted to know.

5        A.    No, no, no.

6        Q.    Okay.

7        A.    We'd have 10,000 photos.

8        Q.    You may have misunderstood my question.

9        A.    Okay, okay.

10       Q.    In your initial assessment somebody marks

11  everything.  You don't photodocument the everything?

12       A.    No, God no.

13       Q.    It's only after you go back and check everything

14  for what is a hail mark and once you determine it is,

15  then you photograph it?

16       A.    Correct.

17       Q.    Okay.

18       A.    Yeah, yeah, yeah, that's what we're doing.  And

19  then we take a representative sample of some close-ups of

20  that, maybe five or ten, that show, so that later when

21  I'm showing, in a trial situation if I am showing, for

22  example on our report, the photo on page 11 that shows

23  the southwest elevation of Building 42 and it shows one,

24  two, three, four, five, six, seven, eight, it says

25  20-plus hits in this location.
```

1        Q.    Hm-hmm.

2        A.    I can look right at that and I can tell you

3    right now, now there's no test square here, okay, but I

4    can tell you that each one of those shingle tabs is one

5    foot, and I can tell you, running across the page and

6    running down the page, the exposure is five inches.  So I

7    could blow that up on a screen for a jury and I could

8    tell you right now that, guess what, that area is

9    ten-by-ten.  There's 20 hits right there in a ten-by-ten

10   area.  So if somebody wanted to, I could put a test

11   square on that very easily just by counting the number of

12   shingles.

13       Q.    All right.  So going back to the protocol then.

14       A.    Yeah.

15       Q.    So after the tactile test, as you've described

16   it, is done, and then I take it you must remove

17   everything that's been circled, erase on the roof

18   anything that's been circled that's not a hail hit?

19       A.    Yeah.

20       Q.    Is that the way it's done?

21       A.    Yeah.

22       Q.    How do you remove it off the roofs?

23       A.    A rag.

24       Q.    Just comes right off?

25       A.    Yeah, just rag it off.

**Thomas Irmiter**
5/13/2014                                                    Page: 98

```
 1        Q.   And then it's photodocumented?

 2        A.   (Nods head.)

 3        Q.   What's the next thing that's done in the

 4   protocol?

 5        A.   That's basically it.  I mean we count the

 6   number, that's put into a logbook, and then that's later

 7   transposed into this report in terms of the actual counts

 8   that we saw.  That would be for a full inspection.

 9        Q.   Okay.

10        A.   Then we have a protocol for what we call a

11   limited inspection.

12        Q.   I'm not done with the full inspection yet.

13        A.   Okay.

14        Q.   So in this particular matter with regard to

15   Southgate, full inspections were done of how many

16   different roofs?

17        A.   Seven, I think five or seven, somewhere in that

18   range.

19        Q.   If you want to look at your report you certainly

20   can do so.

21             MS. PHILLIPS:  6 of 37.

22        A.   Six of 37.

23             MS. PHILLIPS:  No, no, no, page 6 of 37.

24        A.   Five.  Yep.  Five of the 56, yeah.  In fact, we

25   explain on page 7 of our report, I think we explain
```

Thomas Irmiter
5/13/2014                                                    Page: 99

```
 1   pretty well the process that I just explained to you.
 2        Q.   BY MR. RUDA:  So five roofs were completely
 3   inspected.  How many roofs in the complex, do you
 4   remember?
 5        A.   No, that's not true.  Every roof was completely
 6   inspected.
 7        Q.   Pardon me, I misspoke.  So five roofs there were
 8   full inspections done, is that correct?
 9        A.   Five roofs -- there were full inspections done
10   on every single roof.  Five roofs, full tabulation, and
11   getting down on your hands and knees and the full marking
12   system was used on five roofs.
13        Q.   So I'm clear, when you say five markings were
14   done, full markings done, so on five roofs they were
15   completely inspected and every side of the roof was
16   marked, is that correct?
17        A.   Yes.
18        Q.   All right.  On the other roofs in the complex,
19   were they fully marked; yes or no?
20        A.   No.
21        Q.   Were they marked at all?
22        A.   Yes.
23        Q.   Does your report contain pictures of any of
24   those other roofs --
25        A.   Yes.
```

**Thomas Irmiter**
**5/13/2014**                                             Page: 100

```
 1        Q.    -- that were partially marked?

 2        A.    Yes.

 3        Q.    Would you tell me where?

 4        A.    Oh, does my report?  No, I don't think -- no,

 5   the report doesn't.  The overall photographs do.

 6        Q.    Okay.  So let's go back to the protocol then.

 7   So after a roof is fully inspected and fully marked and

 8   fully documented, the full inspection and documentation

 9   is done for that particular structure, is that correct?

10        A.    On the roof part, yeah.

11        Q.    On the roof part.  Yeah, we're just talking

12   about shingles now.  What about limited or partial

13   inspections, what do you call that?

14        A.    Limited inspection.

15        Q.    What about limited inspections, what's the

16   protocol for that?

17        A.    Limited inspection, we basically start, just

18   like we do on the other inspection, we start up on the

19   ridge and we work in basically four-foot segments, so you

20   walk, you know, four rows down or, I'm sorry, eight rows

21   down, and you walk the entire ridge.  You count visually

22   shingles that look and appear like the ones that we have

23   already marked on other roofs that we determined are

24   consistent with hail damage.  Some of those we circle and

25   take some pictures of.  Usually we want to take about
```

Thomas Irmiter
5/13/2014

1   five or six or ten pictures of that roof to show those

2   pictures.

3       Q.   So when you're doing the limited inspection,

4   you're walking the roof the same as you do with a full

5   inspection?  Is it the same thing or not?

6       A.   Doing the overall walk --

7       Q.   Is the same?

8       A.   -- is the same.  You're not getting down on your

9   hands and knees on every single hit.  You're literally

10   reaching down and checking randomly in ten locations.

11       Q.   So every roof is checked in ten locations?

12       A.   Yeah.

13       Q.   Okay.  If there's ten?

14       A.   If there's ten, right, if there's ten marks.

15       Q.   So if somebody might think they saw 50 marks,

16   they would only check ten?

17       A.   Right.  But they would note that there's 50.

18   This is an example.  I've taken a picture on Building 42

19   where I did a limited inspection.  I walked it, I counted

20   42 total hits on the roof and here's five pictures of

21   what those 42 looked like, and that's it.  That's how we

22   do it.

23       Q.   Okay.  So when they're doing the limited

24   inspection then, so they, do they circle the limited

25   number of hits that they're just going to look at and

1   then photograph it?

2        A.   Not all of them.

3        Q.   Some of them?

4        A.   Yeah, some of them.

5        Q.   Okay.  So on every roof that had ten or more

6   hits, would they all be circled for limited inspections

7   and photodocumented or not?

8        A.   Not necessarily, no.

9        Q.   Okay.  Is there somewhere in notes or the report

10  indicating a specific number of hits on each of the roofs

11  then?

12       A.   It's in the report.

13       Q.   Okay.  And again I had asked you which roofs you

14  were on, both full and limited; you said you don't

15  recall?

16       A.   I don't recall, but my photos are, have a "TJI"

17  after them, so it would be the photos that I took in the

18  overall photo logs.

19       Q.   And the photos in the report that are indicated

20  by TJI --

21       A.   No, they're not.

22       Q.   -- are they indicated by date?

23       A.   No.

24       Q.   Okay.  If the photos in the report are dated a

25  day other than the day you were there, does that mean you

1    didn't take them?

2        A.    That would be, that would be true, yes.

3        Q.    All right.  All the photos in the report are

4    dated, you were there -- strike that.  What date were you

5    there, again, sir?  I apologize, I know you told me

6    before, but you probably remember better than I do.

7    July 30th?

8        A.    July 30th.

9        Q.    All the photos in the report are dated other

10   than July 30th, so that would mean none of these photos

11   are yours, right?

12       A.    That would be correct.

13       Q.    All right.  Can you tell me -- let's do this.

14   On page 8 of 37, the photograph of, we'll just call it

15   Building 7.

16       A.    Yeah.

17       Q.    And by the way, when it's Building 1, 2, 3, 4,

18   et cetera, that's based upon the photograph, I take it,

19   that's attached, the Google shot on page 3?

20       A.    Yes, we labeled them.

21       Q.    All right.  So apples to apples, right, so we

22   know what we're talking about?

23       A.    Correct.

24       Q.    Got it.  So Building No. 7, do you know who took

25   that photograph?

**Thomas Irmiter**
**5/13/2014**                                               Page: 104

1      A.    I can't tell you that today, but we could

2   certainly tell you that and would be prepared.

3      Q.    How so?

4      A.    When our photos are downloaded onto our server,

5   the -- in fact, that's what we sent you in our, in our

6   documents.

7      Q.    We don't have those yet, sir.  We don't have the

8   photos.

9      A.    You don't have any of our photos?

10     Q.    Not those.

11     A.    Sure you do.

12     Q.    Are these your photos?

13     A.    Yeah.

14     Q.    Okay.  Then we've got them all.  All right, then

15  we'll get to those.  Because I'm not sure that these are

16  your photos.

17              MR. RUDA:  There were photos that were

18  being produced from Irmiter's report that you and Matt

19  corresponded with that you didn't have on Friday, so I

20  don't have those photos.

21              MS. PHILLIPS:  I had zero correspondence

22  with Matt on Friday.

23              MR. RUDA:  Emails or telephone calls then.

24              MS. PHILLIPS:  I likewise had none of

25  those.  There's another Christine in my office.

```
 1                    MR. RUDA:  Oh.

 2                    MS. PHILLIPS:  So maybe she was speaking

 3      with him.

 4                    MR. RUDA:  He said Christine, so I don't

 5      know what ...

 6         Q.   BY MR. RUDA:  Then we'll mark them and look at

 7      them, sir, because I had them identified as photos

 8      from --

 9         A.   No, those are all our photos.  I'm sure those

10      are all of our photos.

11         Q.   They may not be, but we'll get to that in a

12      second.

13         A.   Yeah.  So the, back to your question on the

14      photos.  If Josh Long takes a photo of Building No. 7,

15      all right, it's going to give the address, it's going to

16      say Building No. 7, it's going to say JOL and the date,

17      Josh Long, so we know that he took the photos on that

18      date of this building.  And on our server it's all set up

19      on building.  So if you open up a building, you're going

20      to see all the photo logs in there, and I believe that's

21      what you would see in FBS reports that we dropped.

22         Q.   Okay.

23         A.   So all of those photos have been labeled and put

24      into Word documents.  What you may not have gotten in

25      Dropbox, and I know we put it there but you may not have
```

**Thomas Irmiter**
5/13/2014                                                    Page: 106

1   printed it up, is we also would have dropped off all the

2   raw photos.  So we take a photo and we drop it into a

3   Word document, and that's where we might label it or tell

4   you what it is.

5        Q.   Sure.

6        A.   We also have all the raw photos that we send

7   you, and that's a huge file, but you should have gotten

8   that as well.

9        Q.   Well, keep in mind that we're getting things

10  through counsel for the parties.

11       A.   Got it.

12       Q.   So you're giving it to the lawyers, I take it,

13  right?

14       A.   Got it, yep.

15       Q.   You know what you gave the lawyers and we have

16  what we have.

17       A.   Yep.

18       Q.   All right.  So you can tell, by looking at the

19  raw photos in the photo log, who took the photos?

20       A.   Absolutely.

21       Q.   By initials, just like --

22       A.   Yes, by initials.

23       Q.   Okay.

24       A.   Yep, yep.

25       Q.   Let's go back to your report, sir, on page 3 of

**Thomas Irmiter**
5/13/2014                                                    Page: 107

```
1   37.
2        A.   Yes.
3        Q.   In Section 1.2, you indicate the documents that
4   you've reviewed before you came to, you know, have the
5   opinions that you've indicated.
6        A.   Yes.
7        Q.   Is that correct?
8        A.   Yes.
9        Q.   Is that an exhaustive list, I take it, at this
10  point?  In other words, is there anything not identified
11  that you've reviewed --
12       A.   Yes.
13       Q.   -- that was omitted or missed?
14       A.   No.  There's, the only thing that I would add,
15  and I mentioned this earlier, that I did review Mr. Moe's
16  final estimate, which was not done at the time of this
17  issuing of this report.
18       Q.   That doesn't change any of your opinions, I take
19  it, correct?
20       A.   Well, if I'm asked to give an opinion on the
21  cost --
22       Q.   That's not what I asked you.
23       A.   -- that would change my opinion.
24       Q.   I asked if it changes any of the opinions you
25  have in your report?
```

```
 1        A.    No.
 2        Q.    Okay.  And you have not been disclosed nor have
 3   you been asked to provide an opinion as to cost, is that
 4   correct?
 5        A.    Not that I am aware of.  I don't know.  I have
 6   not seen the disclosure on what I'm being asked.
 7        Q.    Take a look at Exhibit 1.
 8        A.    All right.
 9        Q.    Turn to page 3.
10        A.    Hm-hmm.
11        Q.    Take a look at Section (b).
12        A.    Yep.
13        Q.    And tell me if you've been, as you understand
14   it, your report doesn't indicate a cost, does it, sir?
15   And by cost, I mean cost to do repair work, right?
16   Slightly different question.  I asked you your report
17   doesn't indicate a cost to do the repair work, is that
18   correct?
19        A.    Our report does not.
20        Q.    So does the disclosure indicate that you'll
21   offer up opinions concerning cost?
22        A.    No, I don't see it in there.
23        Q.    Okay.  All right.  So we're not going to worry
24   about that then.  So going back to 3 of 37 and then to 4
25   of 37, everything that you've looked at to offer up
```

**Thomas Irmiter**
5/13/2014                                                    Page: 109

1    opinions in this matter, you looked at -- I just want to

2    go through this real quickly.  You looked at photos from

3    Madsen, Kneppers & Associates, MKA.  Did you rely upon

4    those photos in any way or just looked at them?

5         A.    Just looked at them, yeah.

6         Q.    Okay.  So you did not, none of your opinions are

7    based on what their photos show?

8         A.    No.

9         Q.    Okay.  Would you agree their photos were taken

10   prior to the date that you took your photos, you and your

11   people took photos?

12        A.    Yes.

13        Q.    And then you also looked at American Building

14   Contractors' estimate dated August 6th of 2010, 16

15   photographs.  Did you rely upon their estimate or the

16   photos for any of your opinions?

17        A.    No.

18        Q.    You looked at 57 photographs from Cook, not

19   dated.  Did you rely on any of those photographs for your

20   opinions?

21        A.    No.

22        Q.    It's also indicated that you looked at Madsen,

23   Kneppers & Associates' estimate --

24        A.    Well, let me back up.  57 photos from Cook.  Are

25   those, is Cook one of the residents?

1      Q.    I don't know.

2      A.    Okay.  If it's one of the residents, I would

3  have to see those 57 photos.  But, yes, we would have

4  relied on those if they are from the residents.

5      Q.    I think we better mark this.  Are those the

6  photos you're speaking about, sir?  We'll mark them in a

7  second if they are.

8      A.    (Examining document.)  See, I don't know when

9  they're dated.  Yeah, they're not dated.  No, we didn't

10 rely on these because they're not dated.

11             MR. RUDA:  Let's mark them as an exhibit

12 then.

13             (Irmiter Exhibit 7 marked.)

14     Q.    BY MR. RUDA:  All right, sir.  Exhibit No. 7,

15 these are photographs that you just reviewed and

16 indicated you did not rely on those for your opinions, is

17 that correct?

18     A.    We did not.

19     Q.    Next item is MKA's estimate dated April 2nd and

20 six photographs.  Did you rely on the estimate or any of

21 the photos for any of your opinions?

22     A.    No.

23     Q.    Next item, again MKA's revised estimate dated

24 August 25th, 2011; did you rely on anything in that for

25 your opinions?

Thomas Irmiter
5/13/2014                                    Page: 111

```
 1        A.   No.

 2        Q.   Next page, it says, "Photos from Bruno, 6

 3   photos, dated February 18, 2013."  Did you rely upon

 4   those photographs?

 5        A.   I would have to see them.

 6                  (Irmiter Exhibit 8 marked.)

 7        Q.   Exhibit No. 8, I believe, are the six photos

 8   from Bruno that are referenced in the report but I'm

 9   asking if you relied upon them?

10        A.   (Examining document.)  No, because they weren't

11   dated.

12        Q.   There's a letter from Childress Duffy dated

13   July 24th, 2013.  Did you rely upon that letter for any

14   of your opinions?

15        A.   Probably not, but I would like to see it before

16   I ...

17                  (Irmiter Exhibit 9 marked.)

18        Q.   Take a look at Exhibit No. 9.  It's a letter

19   dated July 24th, 2013 from Childress Duffy, and I believe

20   that's the letter referenced in your report.  Did you

21   rely upon that letter for any of the opinions that you've

22   provided?

23        A.   (Examining document.)  No.

24        Q.   Okay.  Thanks.  The next item here is "Pictures

25   of hail damage, dated April 5, 2010."  Did you rely upon
```

```
1    those?

2         A.    I'll need to see them.  Sorry.

3               (Irmiter Exhibit 10 marked.)

4         Q.    Look at Exhibit No. 10.  I believe, sir, those

5    are the photographs that are referenced in your report?

6         A.    Yes.

7         Q.    Are those the photographs?

8         A.    Yes, and we did rely on those.

9         Q.    How so?  What did you rely upon?

10        A.    They're dated April 5th, 2010, and that was

11   based on the JPEGs, pulling them up and looking at the

12   JPEGs and the dates on them.

13        Q.    Who took the photos, do you know?

14        A.    I don't know who took them.  They are of the

15   complex, that's not in question, and it shows, showed us

16   both wind damage and impact damage on the siding.

17        Q.    Does it show any damage to shingles?

18        A.    No, does not.

19        Q.    Okay.  And are you relying upon these photos for

20   your opinion that the April 5th, 2010 event caused siding

21   damage?

22        A.    Yes.

23        Q.    And is that based upon the photos dated, as you

24   believe they're dated, April 5th, 2010, that show damage

25   to siding and looks like some soft metals, gutters?
```

Thomas Irmiter
5/13/2014                                                    Page: 113

1       A.    Yes.

2       Q.    Okay.  And so I take it strictly, these are

3  photos that are dated April 5th that shows damage, so you

4  say they indicate the damage caused by the storm?

5       A.    Well, we don't just say that.

6       Q.    For all the other reasons you've expressed?

7       A.    For all the other reasons I've expressed, yeah.

8       Q.    All right.  The next item is Siebert

9  Engineering, Inc. report dated October 17th, 2010 and 11

10  photos.  Did you rely upon that, sir, for any of your

11  opinions?

12       A.    Only, only what may have been noted in our

13  report.  I know we did discuss some rebuttal on some

14  reports and things, and I can't remember if this is one

15  of them.  So if it's in our report, then we would rely on

16  them.

17       Q.    Do you want to take a look at your report and

18  tell me if you relied upon Siebert Engineering for any of

19  your opinions, and specifically if you did so?

20       A.    (Examining document.)  Does not appear we did.

21       Q.    So you did not rely upon them, their report?

22       A.    No.

23       Q.    Okay.  Sir, I would like you to take a look at

24  that Siebert Engineering report for a moment.

25            MR. RUDA:  Let's mark it as an exhibit.

Thomas Irmiter
5/13/2014                                                          Page: 114

```
 1              (Irmiter Exhibits 11 and 12 marked.)

 2       Q.   BY MR. RUDA:  Would you turn to the end of the

 3   report, sir?  There's photographs.  Just look at the

 4   first photograph you find.

 5       A.   Yeah.

 6       Q.   Can you tell me, can you use that photograph to

 7   describe to me the weathering of shingles?  Can you

 8   determine that from the first photograph there?

 9       A.   No.

10       Q.   Can you determine that from any of the

11   photographs?

12       A.    Not from these photographs.  I would need the

13   JPEGs.

14       Q.    Meaning what?

15       A.    I would need the raw photo so that I could blow

16   it up on a screen to 300 percent and take a look at it.

17   Photo 3 is a possibility.  Photo 6 is a possibility.

18   Photo 5 is a possibility.  That's it.

19       Q.    Okay.  Thanks.  All right.  The next item

20   indicated that you reviewed is the Streamwood Code

21   Handout dated 2010.  Did you rely upon that for any of

22   your opinions?

23       A.    Yes.

24       Q.    Did you rely upon that for your opinions, sir?

25   I'm asking specifically your opinions, not Mr. Johnson's.
```

**Thomas Irmiter**
5/13/2014                                                    Page: 115

1      A.   Yes.

2      Q.   Okay.  So how did you rely upon that for your

3    opinions?  What's important in that?

4      A.   Well, it says in our report, pages 26 through,

5    pages 26 through 30, which would end at Section, start at

6    Section 5.0 and would end at Section 5.2.3, and it

7    relates to requirements that the City of Streamwood has

8    and will put in place when these buildings are, undergo

9    their repairs.

10     Q.   Okay.  So you relied upon the code in Streamwood

11   for some of your opinions, correct?

12     A.   Yes.

13     Q.   So tell me specifically which of your opinions

14   are based upon the code that you refer to in this report?

15     A.   The roof sheathing, based on limited attic

16   inspections that we did, and based more on walking the

17   roofs, which are very soft and spongy, we found that H

18   clips were missing between the deck sheathing joints.

19   These are trusses that are 24 inch on center.  And in

20   order to support that span, either blocking has to be put

21   in at each one of these seams or a thing called an H

22   clip, and those were deficient, and so we are

23   anticipating that that's going to require some additional

24   work on the roofs that may have to be done to the roof

25   decks, and we cite the code provisions in that, on page

Thomas Irmiter
5/13/2014

1    26 of our document.

2         The attic ventilation we think is a little light

3    under new provisions in the energy code, so additional

4    roof vents will need to be added.  Again that's minor, a

5    minor issue, but that's going to have to happen.

6         Q.   Is there anything else that --

7         A.   I'm looking, excuse me.

8         Q.   Take your time.

9         A.   Yeah, they have an interesting provision in

10   their code about siding matching and requirements within

11   that, and being within a, that you need to submit the

12   siding to ITEL for an examination in terms of color

13   matches within a 1 to 2 percent value.  I actually pulled

14   an ITEL chart when I was on the site during my

15   inspection.  I have that here with me today and I can

16   show you how that works.  And there's nothing on the ITEL

17   chart that we use as a field guide that would even make

18   it worth sending these to ITEL in my opinion so we didn't

19   bother.  So we believe that the, there is siding that is

20   physically damaged from the storm event that has to be

21   removed.  We believe that the City of Streamwood

22   requirements, in our discussions with the building

23   inspector, that they're going to end up requiring all the

24   siding to be removed when this project starts.

25        Q.   Okay.  Just so we're clear, the code, you're

**Thomas Irmiter**
5/13/2014                                                    Page: 117

1    referring to the code section relating to siding and it

2    has to be submitted to ITEL if, what, if you're going to

3    do replacement of part of the siding it has to go to

4    ITEL?

5         A.   Yeah, if you're going to patch in or do partial

6    siding.

7         Q.   Okay.  And you haven't, I take it your company

8    has not submitted any of the siding to ITEL, is that

9    correct?

10        A.   ITEL has a field app that you can use, I have it

11   here on my phone, it's pretty cool, and you basically can

12   take a picture of the siding and you can compare it to --

13             THE WITNESS:  Can you grab that book for

14   me?

15        A.   This is the ITEL field thing that you use.  And

16   basically what you do, it's our matching kit, and you

17   take a measurement of the siding, you take their color

18   guide and you put it up to the siding, you take pictures

19   of the siding, and you basically say I think the closest

20   that I have is the 052 or an 023 or 021.  When that was

21   done by me on the site during my site inspection, there

22   was nothing on these that came even close.

23        Q.   Okay.

24        A.   So I didn't even bother submitting it.  We also

25   looked, as we indicated in our report, on every building

**Thomas Irmiter**
**5/13/2014**                                                      Page: 118

1    we pulled siding back to look for manufacturing markings

2    and couldn't find any, which also makes it, I haven't

3    seen ITEL yet match a siding that doesn't have a

4    manufacturer's mark.  If it doesn't have one, they can't

5    match it.  So we eliminated ITEL as being even an option

6    at this point.

7        Q.   So you decided there was no reason to submit the

8    siding to ITEL to see if it could be matched?

9        A.   Correct, based on similar, using these tools and

10   doing similar things with ITEL.  I'm trying to think if

11   there's anything else.

12       Q.   Let me finish up on ITEL.

13       A.   Sure.

14       Q.   So submission to ITEL is only required if you

15   would determine that replacement of damaged siding was

16   appropriate as opposed to re-siding the entire structure,

17   is that correct?

18       A.   Or piecing it.  So in other words, if I have a

19   damaged, if I have two pieces of siding with hail impact

20   on a northwest elevation, which isn't true west, and I've

21   got 30 on a west elevation, the question is what do you

22   do on that northwest side.  Well, it's my opinion, in

23   talking with both the city, looking at their statute and

24   their requirements, that as soon as we start removing

25   siding on these buildings, all of the siding is coming

Thomas Irmiter
5/13/2014                                                    Page: 119

1    off because we're not going to be able to find a match.

2         Q.    Okay.  We'll get to matching in a second.

3         A.    Yep.

4         Q.    All right.  So you explained the ITEL.  Anything

5    else in here that you relied upon for any of your

6    opinions?  Your reference is to the Streamwood Code

7    Handout.

8         A.    Yeah, Streamwood actually specifies Tyvek in

9    there, which is very unique, because that's a, usually

10   they talk, most jurisdictions talk about a house wrap or

11   a weather-resistant barrier, but they actually specify

12   Tyvek.  And so I read that, as a trained building code

13   official, to mean that then it has to be installed per

14   Tyvek's current published installation instructions,

15   which then would require some additional work to be done

16   at the windows, meaning detaching and resetting windows

17   for installation of flashing details that currently don't

18   exist.  So by specifying that the way they did, they

19   really stepped into a problematic box from my standpoint.

20        Q.    So one way to deal with that, if there was

21   replacement to be made, would be to ask for a variance to

22   replace siding without having to replace all the Tyvek?

23   That would be one option, right?

24        A.    Well, I think --

25              MS. PHILLIPS:  Objection to the form of the

Thomas Irmiter
5/13/2014

1   question, calls for speculation.

2       A.   Yeah, I think all the Tyvek has to come off

3   regardless.  There's going to be nails in it and things.

4   It's the question of how do you put the new Tyvek on, and

5   the requirements for the new Tyvek call for it to be

6   wrapped into the openings.  So how do you physically wrap

7   it into the openings without detaching and resetting.

8       Q.   BY MR. RUDA:  But you would agree with me that

9   one way to deal with that would be to seek some sort of

10  variance from the village, would it not?  That could be

11  an option to be pursued by a homeowner or, in this case,

12  the townhome complex?

13           MS. PHILLIPS:  Objection to the form of the

14  question, foundation.

15      A.   I will answer it this way.  Within the building

16  code there is the alternative design approach under

17  Section 104, and it allows you to essentially do anything

18  you want provided that you have a licensed design

19  professional practicing in the state sign off on it and

20  provide shop drawings, providing that you have a

21  third-party independent testing agency that has tested

22  the assembly and it is approved, or signed off on by that

23  engineer, and then the city has to then approve that, so

24  it's a three-step process.  And, quite frankly, in

25  talking with this building department, they're pretty

1  anal.  They're going to make you go through that process.

2  And I don't know that you're going to find the engineer

3  that's willing to do that because the assembly is not

4  tested that way.  That's the problem.

5      Q.   BY MR. RUDA:  Moving on.  You indicated that you

6  also reviewed John Peterson's deposition transcript.  Did

7  you rely upon his deposition transcript for any of your

8  opinions?

9      A.   Yes.  And we talked about that in our report.

10     Q.   Which opinions, sir?  And this is your opinions,

11  not Mr. Johnson's.

12     A.   Right.  That there's an email from Peterson to

13  Daphne Morton, it's noted in the deposition, Exhibit 12,

14  and it says, quote, and this is on page 28 of our report,

15  "We have not issued permits for partial roofs in the past

16  unless the shingles were less than a year or two old and

17  the color matched well."  And then another email that

18  says, "Attached, please find the building permits that

19  you submitted.  The applications have been denied based

20  on the local building code amendments listed below."  So

21  essentially that's really what we're referring to.

22     Q.   Okay.  So is it the emails or his testimony that

23  you're relying upon, just so I'm clear?

24     A.   I think it's both.  I mean I think they kind of

25  say the same thing.

**Thomas Irmiter**
5/13/2014                                                                    Page: 122

1      Q.    And do you specifically indicate where in the

2    deposition transcript you rely upon his testimony?  Do

3    you have that information?

4      A.    I don't have that in front of me.

5      Q.    Well, is it in the file?  We have your file.  I

6    didn't see it in there.

7      A.    I think we list in here it's within certain

8    number of pages.  It's not the whole depo that we're

9    relying on.  Just a second.  (Examining document.)  No.

10   I can't tell you right now where it is within the depo.

11     Q.    All right.  Next item is Southgate exhibits to

12   deposition of John Peterson.  So did you rely upon the

13   exhibits to the dep, and if so, which ones?  The emails

14   were part of the exhibits so we can move past that.

15     A.    The emails.

16     Q.    Anything other than the emails?

17     A.    No, I think just the emails.

18     Q.    Then Southgate exhibits to Juergen Fuss's

19   deposition.  Did you rely upon any of those?

20     A.    Yeah.

21     Q.    That means the exhibits to that dep transcript,

22   so which ones did you rely upon?

23     A.    Oh, we didn't rely on exhibits, we just -- other

24   than the building code stuff that he had already

25   reprinted.

Thomas Irmiter
5/13/2014                                                   Page: 123

```
1        Q.    Okay.  So the same stuff that you --

2        A.    Same stuff, same stuff we reprinted, yeah.

3        Q.    So the only exhibits are building codes --

4        A.    Yeah, just building code stuff.

5        Q.    And then you've got Southgate exhibits to James

6   Stefanek deposition.  Which exhibits to Stefanek's

7   deposition did you rely upon for any of your opinions?

8        A.    Just a second.  (Examining document.)  None of

9   them.

10       Q.    Okay.  And then next item is Southgate

11  deposition transcript of James Stefanek.  Did you rely

12  upon any of Mr. Stefanek's testimony?

13       A.    No, we just reviewed it.

14       Q.    Then Southgate deposition testimony transcript

15  of Juergen Fuss.  Did you rely upon any of Mr. Fuss's

16  testimony?

17       A.    Yeah, we actually talk about that in the report

18  and we are specific to what that is.  Just a second.

19       Q.    Sure.

20              MS. PHILLIPS:  Page 30 of 37.

21              THE WITNESS:  Page 30, yeah.

22       Q.    BY MR. RUDA:  Which pages of his testimony?

23       A.    Page 30 of 37 on our report, and pages 88

24  through 93, and this is his, he's relating his

25  conversation with the city building code official, John
```

1    Peterson.  He's recalling what the requirements were.

2        Q.   All right.  And is your opinion that, "We concur

3    with Mr. Fuss's interpretation and we also believe that

4    the damage is extensive enough to warrant full

5    replacement," is that what you took from Mr. Fuss's

6    deposition?

7        A.   That's what we took that he was recommending,

8    yes.

9        Q.   So it's your opinion that that's what Mr. Fuss

10   recommended based upon the testimony at pages 88 to 93,

11   is that correct?

12       A.   Yes.

13       Q.   It's not that Mr. Fuss was repeating what

14   Mr. Peterson said on those pages?

15       A.   I think Mr. Fuss has the opinion that full

16   replacement is required because he's given that opinion

17   by the building code official.

18       Q.   Okay.

19       A.   Who is the one that ultimately would make that

20   decision, not Mr. Fuss.

21       Q.   Then you also indicate you rely upon the

22   Forensic Weather Consultant's report, and we talked about

23   that at the beginning of the deposition; that's

24   Mr. Altshule's report, correct?

25       A.   Correct, and we paraphrase that on page 1 and 2

**Thomas Irmiter**
5/13/2014                                                    Page: 125

1   of our report, the areas that we relied on.

2        Q.   And then the last item here is Village of

3   Streamwood Roofing Ordinance, not dated.  Do you remember

4   what that is, sir?  I actually have a copy of that if you

5   want to see it.

6        A.   Yeah, I haven't looked at it in a while.  I

7   didn't pull it up.  I looked at it briefly yesterday but

8   I didn't bring it along.

9        Q.   Well, did you rely upon it for any of your

10  opinions?

11       A.   Yes.

12       Q.   Okay.  How so?

13       A.   Well, we paraphrase the parts that are important

14  in our report, but generally the number of roofs that are

15  permitted, the sheathing requirements and the H clip

16  requirements, which is bullet point No. 2 on here.  A lot

17  of it is pretty standard stuff in terms of flashings.

18  The attic ventilation requirement, I talked about that.

19  Ice barrier is required on these roofs.  And then item

20  No. 8, which is the siding requirements that they have on

21  this.  So these -- and the ITEL issues that I talked

22  about.  So these are the things that we referenced.

23       Q.   All right.  Let's turn to page 27 of your

24  report.

25       A.   Okay.

1    Q.    On page 27 of the report, middle the paragraph

2   8, you're quoting from the Streamwood code, correct?

3    A.    Yes.

4    Q.    And it goes on to the next page, on 28 of 37, is

5   that correct?

6    A.    Yes.

7    Q.    The quote that you've got that starts on 27,

8   that's the current code as of when you wrote the report,

9   is that correct?

10    A.    Yes.

11    Q.    And that code pertains to both roofing and

12   siding, is that correct, that section of the code?

13    A.    Yes.

14    Q.    Is there any exception in this section of the

15   code to partial replacement of roofing and siding?

16    A.    Yes, if it meets the color match of 1 to 2

17   percent value on the siding match chart as distributed by

18   ITEL Laboratories.

19    Q.    Does ITEL Laboratories have anything to do with

20   shingles?

21    A.    Yes.

22    Q.    In regard to shingle matching, explain to me how

23   ITEL works.

24    A.    Same, same way.  I can use the same exact tool

25   to, that I just talked about.  There's two different

**Thomas Irmiter**
5/13/2014                                                          Page: 127

1  ways.  I can ship a shingle to ITEL down in Florida, or I

2  can take a photograph of it and measure it and fill out a

3  form online and send it to them and they will analyze it

4  and give you a probability of availability basically.

5      Q.    Did you do so in regard to the Southgate

6  complex?  Did you submit any shingles, either the gray or

7  red shingles, to ITEL?

8      A.    No.

9      Q.    So it's possible that there could be a match for

10  the gray and/or red shingles, is that correct?

11      A.    In my opinion, no, not based on the age of the

12  shingles.  Shingle manufacturers, if you're in this

13  business, you learn that about every ten years they

14  change their mixtures and their color patterns.  They

15  want to sell shingles.  They don't want to sell

16  individual shingles, they want to sell whole roofs.  So

17  these are a blended shingle and you're not going to find

18  a match for these.

19              MS. PHILLIPS:  Can we take a break real

20  quick for two seconds?

21              MR. RUDA:  Sure.

22              (Break taken from 12:50 p.m. to 12:55 p.m.)

23  BY MR. RUDA:

24      Q.    Sir, I want to go back to the code reference on

25  page 28.

**Thomas Irmiter**
5/13/2014                                                          Page: 128

```
 1        A.    Yes.
 2        Q.    Am I correct that the exceptions contained here,
 3   it says, "In addition to any other requirements contained
 4   herein, permits for partial replacement of roofing and/or
 5   siding in all structures may be allowed with written
 6   approval of the building official when the following
 7   conditions are met."  Is that's what it says, that's the
 8   prefatory comment, right?
 9        A.    Yep.
10        Q.    And then it lists the different things, is that
11   correct?
12        A.    Correct.
13        Q.    I am correct, am I not, that the only ITEL
14   submission that's required is in regard to siding?
15        A.    You are correct.
16        Q.    So there is no ITEL submission in regard to
17   roofing replacement?
18        A.    You are correct.
19        Q.    So according to code, you could partially
20   replace shingles on a roof, is that correct?
21              MS. PHILLIPS:  Objection to the form of the
22   question, foundation.
23        A.    I don't think that's what it says so I would
24   disagree with that.
25        Q.    BY MR. RUDA:  Okay.  Would you agree with me
```

**Thomas Irmiter**
5/13/2014                                                    Page: 129

```
 1    that the code actually allows there to be an exception

 2    granted to partial replacement for shingles?

 3              MS. PHILLIPS:  Objection to the form of the

 4    question, foundation.

 5         A.   (Examining document.)  Yes.

 6         Q.   BY MR. RUDA:  In regard to this particular

 7    matter, the Southgate matter, do you know, did Southgate

 8    ever seek to do any partial replacement of roofs, seek to

 9    get permits issued in regard to the same?

10         A.   Not that I'm aware of.  In our permit review of

11    the files we didn't see anything in there seeking that.

12    We know that 16 of the roofs have been replaced.  We did

13    inspect those 16 roofs as part of our process.

14         Q.   In terms of -- strike that.  Pardon me.  You had

15    earlier mentioned, if you recall, matching, you used the

16    word "matching," right, sir?  You remember that?

17         A.   Hm-hmm.

18         Q.   I take it hm-hmm means a yes?

19         A.   I'm sorry, yes.

20         Q.   That's fine.

21         A.   Mouthful of peanuts.

22         Q.   That's all right.  In regard to any opinions

23    that you've authored in this report, are any of them

24    based upon your understanding of what matching is?

25         A.   Well, I have an opinion about matching.
```

**Thomas Irmiter**
5/13/2014                                                    Page: 130

```
 1        Q.    Let's start with that.  We'll start that way.

 2        A.    Yeah.

 3        Q.    Do you understand, when I use the term

 4   "matching," what I mean?

 5        A.    Yes.

 6        Q.    Is it a term of art in a particular industry?

 7        A.    Yes.

 8        Q.    What industry?

 9        A.    Certainly the insurance industry.

10        Q.    So when I'm using the term "matching," you

11   understand it to be a term of art in the insurance

12   industry.  What do you understand matching to mean?

13        A.    Well, I think there are two, from my standpoint,

14   I think there are two parts to that, to that question.  I

15   think there is a policy question, what's in the policy,

16   what does the policy allow for, what are the provisions

17   within the policy, that's one part of it, and then I

18   think that the other part is the reasonable expectation

19   that the consumer might have in terms of what their

20   expectations are for restoring damaged property to a

21   pre-loss condition.

22        Q.    Okay.  Your report does not contain any policy

23   analysis, is that correct?

24        A.    That is correct.

25        Q.    And your report does not contain any opinions
```

Thomas Irmiter
5/13/2014                                                      Page: 131

```
1    concerning the reasonable expectation of a consumer

2    arising out of a policy of insurance, is that correct?

3         A.   That is correct.

4         Q.   So in regard to this particular matter, am I

5    correct that you have no opinions in regard to matching

6    as it applies to this matter vis-a-vis the terms of this

7    insurance policy?

8         A.   Not with regard to the policy, correct.

9         Q.   Okay.  In regard to matching then, do you have

10   any opinions concerning matching that apply in some

11   fashion to this particular loss at Southgate?

12        A.   I think the uniqueness of this building code

13   really formulate our opinions here.

14        Q.   Okay.

15        A.   And the, I have an opinion that both the

16   shingles and the siding are no longer commercially

17   available, both in terms of color and in terms of texture

18   on the siding in particular, so that if partial repairs

19   are attempted it's going to kind of look like a car that

20   was in an auto accident, went to the auto shop and came

21   out with a new fender but the new fender was a completely

22   different color.

23        Q.   So the idea of matching, it's not an insurance

24   concept or what's in the policy or what a consumer might

25   expect from reading what's in the policy, your opinions
```

Thomas Irmiter
5/13/2014                                          Page: 132

```
 1   about matching relate solely to your interpretation of

 2   the building code and the fact that shingles and siding

 3   in your opinion are no longer available, is that correct?

 4               MS. PHILLIPS:  Objection to the form of the

 5   question.  Go ahead.

 6       A.   Correct, but the commercial availability I think

 7   is the biggest issue from my standpoint.

 8       Q.   BY MR. RUDA:  Okay.

 9       A.   Yeah.

10       Q.   Well, sir, you would agree with me that the

11   policy of insurance controls in terms of what an

12   insurance company would have to pay for to replace in

13   regard to anything that's damaged, is that correct?

14       A.   Yeah, the contract is the contract.

15       Q.   Okay.

16       A.   Yeah.

17       Q.   Now I noted in looking at your report, and if

18   I'm wrong, tell me, but all the siding damage that's

19   noted is all to north or west sides or elevations, is

20   that correct?

21       A.   Yeah, some southwest as well, little bit of,

22   yeah.

23       Q.   A handful, right?

24       A.   Right.

25       Q.   If you have four sides to these buildings, that
```

**Thomas Irmiter**
5/13/2014                                                    Page: 133

```
 1    would mean there's some sides that have no hail damage,

 2    is that correct?

 3        A.   Yes, based on our look, yes.

 4        Q.   Does your opinion encompass replacing sides of

 5    the building, that is the siding on sides of buildings

 6    that sustained no hail damage?

 7        A.   Yes.

 8        Q.   Why?

 9        A.   Because of the ordinance requirements within the

10    City of Streamwood.

11        Q.   Based upon your interpretation of the same?

12        A.   Yes.

13        Q.   Okay.  In that regard -- strike that.  Is there

14    also no damage to certain soft metals, gutters, vents,

15    things of that nature, on certain sides of these

16    buildings?

17        A.   Yes.

18        Q.   Same as the siding I take it, correct?

19        A.   Yes.

20        Q.   The damage is primarily on the north and west

21    with a handful of southwest elevations, right?

22        A.   Yes.

23        Q.   Okay.  Is your opinion that all those need to be

24    replaced, even the undamaged soft metal portions, to kind

25    of put that all together in one simple statement?
```

**Thomas Irmiter**
5/13/2014

1    A.    Yes, and this is, again, based on discussions

2    with the building code official.  They, I don't know, I

3    didn't see that this was necessarily vetted out in his

4    deposition, because I don't know that whoever was taking

5    the deposition knew to ask the question, but they look at

6    the siding and the window wrap and the fascia wrap as all

7    being a system, so this color match issue for them is

8    really the envelope of the building, if you will;

9    everything that is on that exterior envelope is all kind

10   of one system.  So if you're replacing the metal on two

11   sides because it's damaged, it would be my

12   interpretation, in talking to them, that when the rubber

13   hits the road at the end of the day they're going to

14   require it on all four sides for that same reason.

15       Q.    And the opinions in the report about what code

16   requires, those are your opinions, correct?

17       A.    Well, they're my opinions based on talking with

18   the building code officials and how they will choose to

19   interpret.  Understand that building code officials --

20   this is why I find it unique that in this particular case

21   they actually specify Tyvek.  I do a class for building

22   code officials around the country, and it's called, "Just

23   Say No," and building officials are supposed to approve

24   and deny, they are not supposed to design.  And by

25   installing into their building code the word "Tyvek,"

1   they've put an element of design in which is not what

2   they're supposed to do.

3       Q.   They do it all the time, though, don't they?

4   Sometimes?

5       A.   That's why we give them classes.  That's why

6   we're trying to give them a class telling them don't do

7   that.

8       Q.   Sometimes building inspectors are doing design,

9   they're just telling you you have to do it this way, not

10  the other way, right?

11      A.   And they're not supposed to do that.  They're

12  supposed to say put a shop drawing together, I'll deny or

13  approve it.  So we never know at the end of the day what

14  they're going to do, we have to base it on those

15  conversations, and my sense is is they're going to be

16  pretty picky in this jurisdiction.

17      Q.   I might be wrong, but in the -- I'm saying it

18  this way, if I'm wrong, I'm just trying to get it all.

19  Does your report reference any conversations with

20  building code officials, Mr. Peterson or otherwise?

21  Maybe I missed the conversations.

22      A.   (Examining document.)  Cryptically it does.

23  Like Conclusion 7.1.1.

24      Q.   What page is that?

25      A.   Page 30.  "City has indicated repair or patching

Thomas Irmiter
5/13/2014                                                    Page: 136

1   is not applicable and will not be permitted."  Those are

2   the comments essentially.  They're laced through here.

3       Q.   Okay.

4       A.   Yeah.

5       Q.   So you'll agree with me the report doesn't say a

6   conversation with Mr. Peterson or some other building

7   code official?

8       A.   No, it does not enumerate that conversation word

9   for word, no.

10      Q.   How many conversations did you have -- well,

11  strike that.  Who did you talk to at the building

12  department at the Village of Streamwood?

13      A.   John Peterson.

14      Q.   When did you talk to Mr. Peterson?

15      A.   I can't recall.  Before the report was issued.

16  It's towards the end of issuing these reports, I know

17  that.  Mr. Johnson had conversation with them as well.

18  Section 7.9, for example, says, "Per communication with

19  John Peterson, City of Streamwood, 1/2" plywood (with H

20  clips) is the minimum sheathing acceptable to

21  Streamwood."  So that would be where we were -- we were

22  looking at their code and calling and saying we have some

23  questions, okay?

24      Q.   Is that your telephone conference with him

25  concerning sheathing or Mr. Johnson's?

```
1        A.    That one was Johnson's.

2        Q.    There's an email from Johnson with some issues

3    about sheathing, et cetera?

4        A.    Yeah.

5        Q.    That's a follow-up because he had a question?

6        A.    Exactly.

7        Q.    So you have one conversation with Mr. Peterson?

8    I'm asking you specifically.

9        A.    One conversation, yeah.

10        Q.    And what did Mr. Peterson -- was it over the

11    phone or was it in person when you were visiting?

12        A.    No, just over the phone.

13        Q.    Anybody else on the call other than you and

14    Mr. Peterson?

15        A.    No.

16        Q.    Tell me, as best you recall, what Mr. Peterson

17    told you during that telephone call.

18        A.    I asked about the siding issues and he again

19    reiterated this ITEL thing that they're doing, and I

20    indicated to him that we had, I had the ITEL charts with

21    me and I didn't find anything that I thought, you know,

22    was close, and would that be sufficient to use the

23    charts, and he said, well, we're probably going to make

24    them, you know, actually ship a piece of siding down

25    there to give a final opinion on that.
```

**Thomas Irmiter**
5/13/2014                                                          Page: 138

1    Q.    So he said, he was being particular, the code

2  says you've got to ship it down there so you have to do

3  it, right?

4    A.    Yeah.

5    Q.    Did he say anything else about the siding other

6  than that?

7    A.    No, that was really it.

8    Q.    Was there anything else he said during the

9  conversation?

10    A.    I asked about the roofing.

11    Q.    Hm-hmm.

12    A.    And I said that the concern, I gave him an

13  interpretation that I have of the building code and

14  wanted his take on it.

15    Q.    What was your interpretation that you told him

16  about?

17    A.    My interpretation had to do with the fact that

18  the shingles needed to be installed per manufacturer's

19  published instructions, did he agree with that?  He said

20  yes.  And he said all products have to be installed per

21  manufacturer's published instructions.  I said okay, so I

22  have shingles on these roofs and someone is advocating

23  partially removing and repairing them and sliding new

24  shingles in.  He said okay.  I said I can't identify the

25  manufacturer of the shingles that are on the roof

**Thomas Irmiter**
5/13/2014                                                    Page: 139

1    currently and so therefore, as a building code official,

2    if I'm in your shoes, I can't identify a repair protocol

3    because I need the manufacturer to do that, and he said

4    you're correct.  So how do I physically install new

5    shingles into existing shingles when I can't find the

6    brand, the new shingle isn't tested with the old shingle

7    in terms of the wind load requirements that are in the

8    code?  And he said, well, you're going to have, under the

9    alternative design you're going to have to have a

10   professional sign off on all of that.  I said I haven't

11   found one in the country that will do that, and he said I

12   imagine you haven't.  So in a nutshell --

13        Q.   Did he say anything else?

14        A.   No, that was basically the conversation about

15   thinking a little bit about what the code really

16   requires.  So in that sense I was left with the feeling

17   that these roofs all have to be replaced and partial

18   replacement is not going to be even contemplated by the

19   city.

20        Q.   You recall earlier in the deposition you

21   testified that, either you or your employees, when they

22   were out there, found evidence that there had been

23   partial repairs made to roofs other than the 16 that were

24   replaced?

25        A.   Yep.

**Thomas Irmiter**
5/13/2014                                               Page: 140

1      Q.   Did you do a building code analysis to see what

2  permits had been issued previously?

3      A.   There were no permits issued.  No permits were

4  issued on those that I could see, and they were done by

5  maintenance, probably maintenance people of some kind or

6  somebody who came by and patched in a few shingles.

7  Might have even been individual homeowners.  This happens

8  all the time.

9      Q.   So you did go into a search of the building

10 department records?  Did you do that personally?

11     A.   No.

12     Q.   Who did it?

13     A.   We can do that online.

14     Q.   So who did it?

15     A.   Martha Miller.  And there was no, no indications

16 of partial repair permits at all.

17              MS. PHILLIPS:  Off the record one quick

18 second.

19              (Discussion held off the record.)

20     Q.   BY MR. RUDA:  Does your report reflect that your

21 company did a search of all the building permits issued

22 to Southgate?

23     A.   (Examining document.)  Just a second.  Right

24 above, on page 4, it should say 1.2 where the numbers are

25 off?

**Thomas Irmiter**
5/13/2014                                                                  Page: 141

1      Q.    Okay.

2      A.    It says, "According to the Cook County website."

3   We do a search on the Cook County website and then the

4   city, and that just gives us a -- but it does not

5   indicate that we did that.  That is a standard practice

6   for us.

7      Q.    Let me ask you a question.  You know that Martha

8   did it because it's a standard practice?

9      A.    Yeah.

10      Q.    And she would have put it in the report if there

11   were some other permits issued?

12      A.    Yeah, we only note it if there's a, if it's

13   probative to the work that we're doing.

14      Q.    So it's possible there were other permits issued

15   but not for roofing or siding?

16      A.    It could be a permit for an air conditioner.

17   Yeah, we just, I mean if we were to list, on all these

18   searches that we do, you know, we had a department

19   complex out in Phoenix, 18 buildings, and they had 300

20   permits.  It would take too many pages to list every

21   permit.  So only things that we think are related that

22   may be probative, and there was nothing with regard to

23   roofing.

24      Q.    Did you do a search of building permits issued

25   in Streamwood to determine if, for example, they have

Thomas Irmiter
5/13/2014                                            Page: 142

1    allowed homeowners to do partial roofing or siding

2    replacement as opposed to replacing the entire roof or

3    all the siding on a structure?

4         A.    No, did not.

5         Q.    Okay.  If Streamwood had done that, would that

6    indicate to you that they might be willing to allow

7    partial replacement of shingles or siding be done in

8    regard to the Southgate complex?

9         A.    Not necessarily.  A single-family residence in

10   terms of line of sight where you would see only the front

11   and the right elevation at a time as you're walking by

12   the building, as opposed to these where you can stand in

13   one of the courtyards and you can literally see all fours

14   sides of buildings in the same lines of sight in multiple

15   times, multiple directions, that would be a different

16   take in terms of how these are sited on the land.

17        Q.    Well, you wouldn't be able to see all four sides

18   of the building if you stand in one location, would you?

19        A.    Not of one building, but you'll see all four

20   sides of five buildings.

21        Q.    Of certain buildings.

22        A.    Yeah, that's the problem.  So you'll see

23   different elevations and the buildings are pretty close

24   in.

25        Q.    I take it it's your opinion, sir, that the

Thomas Irmiter
5/13/2014                                                    Page: 143

1    weathering on the siding is all uniform throughout the

2    entire complex; all the buildings looked identical to one

3    another at the time that you and your employees were

4    there?

5         A.   No, the weathering is different.

6         Q.   So on individual buildings there's different

7    weathering even within the building itself from side to

8    side, is there not?

9         A.   Yes, there's different weathering on south side

10   exposures where there's trees and where there's not

11   trees.  So, yeah, the weathering, and that really, I'll

12   tell you when that really shows up.  That shows up when

13   you look at -- I had a complex down in Iowa very similar

14   to this in Des Moines where they had done this exact same

15   contemplated situation and they replaced sides and

16   sections, and I mean it looked like, it looked like

17   Joseph's technicolor dream coat when it was done in terms

18   of the multiple colors and patterns that were on these

19   buildings.  It looked terrible.

20        Q.   Is there a way to treat siding in some fashion

21   to make it appear uniform?

22        A.   It can be painted.

23        Q.   Other than painted?

24        A.   No.

25        Q.   Turn to page 6 of 37.

Thomas Irmiter
5/13/2014

1    A.    Okay.

2    Q.    I think it's 2.3, where it says, "Generally."

3    Are we evened up to the right section?

4    A.    Yes.

5    Q.    Okay.  That's a description of the damage that

6    you found on the buildings.  When I say "you," I mean you

7    and your company, correct?

8    A.    Correct.

9    Q.    When you indicate impact damage, are you

10   referring specifically to the hail damage from April 5th

11   or are you referring to just impact damage from whatever

12   source and/or prior events?

13   A.    No, at this point in the report we are typically

14   referring to impact from hail from this storm event.

15   Q.    So were chipped shingles caused by the hail?

16   A.    In some cases, yeah, there are some chips.

17   Q.    In all cases or some cases?

18   A.    In some cases.

19   Q.    What else could cause chipped shingles besides

20   the hail event on April 5th?

21   A.    Ice dams, chipping off at the, in the first two

22   feet of the roof area if somebody was up there cleaning

23   off snow and ice.  We tried to, we did see some of that

24   on the roofs.  We tried to, we stayed out of those areas,

25   not tried.  I want to add that when we are, and you'll

```
1   notice this on, just a second (examining document.)

2   Yeah, we typically are staying out of what we call

3   walking paths, walking areas on roofs, which are next to

4   walls and things like that, to stay out of the argument

5   of this is mechanical, foot traffic damage, those kinds

6   of things.

7       Q.    And mechanical just means induced from some

8   other source, whether accidental or intentional, right?

9       A.    Correct.

10      Q.    Creased shingles, would that be caused by

11  something other than hail?

12      A.    Yep.

13      Q.    Is it caused by hail at all or --

14      A.    Creased shingles are typically not caused by

15  hail.  It's a wind issue.

16      Q.    Broken and torn shingles at rake edge and in the

17  field, that's caused by what?

18      A.    Wind.

19      Q.    Unsealed shingles are caused by what?

20      A.    Wind.

21      Q.    Missing and displaced shingles are caused by

22  what?

23      A.    Wind.

24      Q.    Is it your opinion that the wind in the storm of

25  April 5th caused the broken, torn shingles, unsealed
```

Thomas Irmiter
5/13/2014

1    shingles and missing and displaced shingles?

2        A.   Just a second.  (Examining document.)  Yes.

3        Q.   Could the prior events have caused the ones in

4    '03, '04 and '06 that we talked about earlier as

5    reflected in your report?

6        A.   No.  We don't think so, because on the loose

7    shingles that we saw, what we didn't find -- these

8    shingles have a glue tab on the bottom, all right, that

9    glues them down, and on the shingles that we found that

10    were loose, there was seal transfer and granule transfer

11    to the back side of the shingle that's lifted.  In the

12    manufacturing process, the way the shingles are designed

13    and the way they're manufactured, I mean they're

14    processed, you have your mat and they put a hot adhesive

15    glue over the top of that and then they drop their

16    granules into that and they put it through a roller, and

17    then it's cut to size and then those glue tabs are

18    squirted, the glue is squirted on the shingle, so the

19    only way that you can have granule transfer on the back

20    side of that shingle is if it was sealed and then it

21    pulled.

22        The other thing you look for is you look for

23    debris and dust and discoloration under the field of the

24    shingle and we didn't see that, and that's shown in our

25    pictures.  So these are shingles that had been recently

Thomas Irmiter
5/13/2014                                                    Page: 147

```
1   unsealed and hadn't been unsealed, you know, five, six,

2   seven, eight years ago, with other events.

3        Q.   And they would be unsealed as a result of the

4   hailstorm in 2010?

5        A.   Hail and wind, yes.

6        Q.   All right.  And when you say you can tell that

7   it wasn't recent, it's based upon what you just

8   described, that's why you can tell it was not recent?

9        A.   Yes, and this is actually fairly well-detailed

10  in the literature, the peer-reviewed literature that's

11  out there in terms of inspecting these kinds of things.

12       Q.   Is there a source that you refer to for this?  I

13  use the term "authoritative."  By that what we lawyers

14  mean is some source that you look to that describes this,

15  that describes the protocol or the testing or indicates

16  if you see this, this is what it means.

17       A.   McNulty's report 2000, January 2000,

18  "Composition Performance, Function and Standards of

19  Asphalt Shingles, Reroofing Versus Tear-Off," the ARMA

20  Technical Bulletin 223 talks about some of that issue,

21  the, the ASTM standard test method for measurement of

22  asphalt shingles with uplifting talks about that sealant

23  transfer issue.  "Self-Sealing Asphalt Shingles,"

24  Technical Bulletin 3.0, "Is My Roof Wind Damaged" talks,

25  from Donan Engineering, talks about proximate cause to
```

**Thomas Irmiter**
5/13/2014                                    Page: 148

1   wind damage and what you look for.  These are all other

2   sources that are out there that give us some, I wouldn't

3   call them guidelines, I would call them other approaches

4   that are used to look for signature patterns that would

5   indicate that it's a shingle that is recently displaced.

6       Q.   So these are authoritative in the sense that

7   everyone agrees these are guidelines that are used for

8   people doing inspections to try and make determinations

9   as to causality on what they see?

10      A.   Yes.  Or to eliminate causality as well.

11  Equally as important.

12      Q.   On page 8 of 37 through 11 of 37, there are

13  certain photographs of certain building sites, is that

14  correct?  That's what reflected there?

15      A.   Yes.

16      Q.   And those pages all document the hail hits;

17  they're circled and marked in some fashion, is that

18  correct?

19      A.   Yes.

20      Q.   And for these buildings, these are all the

21  buildings that were fully inspected, correct?  So it's

22  all the hail hits that's reflected in the

23  photodocumentation?  In other words, every hail hit is

24  reflected in these photos on these buildings, right?

25      A.   Yes, exactly.  Yeah, there's 20.

**Thomas Irmiter**
**5/13/2014**                                                                              Page: 149

```
1              MS. PHILLIPS:  But only of that elevation.

2       A.   Only of that elevation.  That photo is only

3   showing that elevation.

4       Q.   BY MR. RUDA:  Of that particular elevation.

5       A.   Right.  I'm showing 20 --

6       Q.   For example, yeah, look at page 8 of 37,

7   Building 7.  Which elevation is that?

8       A.   North.

9       Q.   And it shows how many hits on the north roof?

10      A.   Six, I think, on there.  No, there's some over

11  in the corner.  One, two, three, four, five, six, seven,

12  eight, there's some over by the chimney.  I think it's

13  eight.  Eight or nine.

14      Q.   All right.  I'm not trying to be argumentative.

15  The photograph that's attached in your report here, I

16  can't really see the hits.  You probably can.  I can see

17  circles, you know, but --

18      A.   Right.

19      Q.   -- does this photo adequately in your opinion,

20  you're the expert, show me the hits?  Can you point to

21  them?  Other than to say it's a hit in the circle?

22              MS. PHILLIPS:  Objection to the form of the

23  question.  Go ahead.

24      A.   This is an overview photo --

25      Q.   BY MR. RUDA:  Okay.
```

1    A.    -- to show you that in fact there are eight to

2    ten hits, areas that we have marked.

3    Q.    This is to show me that here's the areas that

4    are marked, this does not necessarily specifically

5    describe the individual hits and show it.

6    A.    Specific to this particular roof slope on this

7    particular building, which is Building No. 7, in our

8    photo logs we can then show you a representation of four

9    or five of these where we actually put the camera like

10   this (indicating.)

11   Q.    Hm-hmm.

12   A.    So, for example, that one right there

13   (indicating), we may have chosen.  We may have chosen

14   this one (indicating).  But if we circled it, we will

15   then take a representation to be able to say here's what

16   we saw on this roof slope, there were eight of them,

17   here's the overview, and here's what they looked like

18   specifically.  Not every single one of them, but here's a

19   representation of what they looked like.

20   Q.    And does your photo log indicate which of the

21   eight circled hits are more particularly photographed in

22   a close-up?

23   A.    Yes.

24   Q.    Okay.  So your photo log is going to show in, in

25   regard to the photograph here in regard to 245-254

1    Butternut Lane, Building 7, which of the hits are

2    circled?  There will be a photo log saying here's a

3    close-up of whatever I'm pointing, I'm just using this as

4    an example, of this particular one I'm pointing at?

5        A.   Right.

6        Q.   Okay.  Would you agree with me that this photo

7    that's attached to your report -- well, strike that.

8    Maybe you don't.  Can you show me in the photograph

9    that's attached to your report the weathering?  Can you

10   show it to me and describe it to me, in this particular

11   photograph, which would be indicative that the hit

12   occurred back in April of 2010?

13       A.   No, not in that photo.  I could probably do it

14   on page 10 of that photo, and I could probably do it on

15   page 11 of the upper photo.

16       Q.   Let's turn to page 10 then, which is the 533-539

17   East Avenue Building 31.  Which elevation does that show?

18       A.   This would be the northwest-facing lower left

19   roof elevation.

20       Q.   Okay.  I wanted to ask a question, and I think

21   this is covered but I just forgot to ask the complete

22   question.  Did you or did any of your employees find any

23   hail damage that predated April 5th of 2010 on any of the

24   roofs?

25       A.   No.

Thomas Irmiter
5/13/2014                                              Page: 152

```
 1        Q.    Okay.   Back to this photo then on page 10.   So

 2   you said this photo can be used for you to explain to me,

 3   by using the photograph, the weathering process that you

 4   described which indicates to you the date of when the

 5   hail event occurred.   Please do so.

 6        A.    This photo, in its JPEG form when I blow it up

 7   to 300 percent, I can do that.

 8        Q.    How about this photo?

 9        A.    I can't do it on this one.   At court that's what

10   we would do.

11        Q.    Does your report indicate that you would need to

12   blow it up to 300 percent in JPEG form to do it?   The

13   reason I ask, sir, is we only have what we have and what

14   we've been given, so we're working with what's been

15   disclosed and what your opinions are based upon that we

16   have.

17        A.    I don't know if it indicates that that's what

18   one would need to do.   That is a --

19        Q.    I'm just asking --

20        A.    No, I don't think it indicates that.

21        Q.    All right.

22              MR. RUDA:   So at this point I may reserve

23   the right to complete the deposition when we have JPEG

24   photographs that are blown up to 300 percent.

25        Q.    BY MR. RUDA:   That's on a computer screen, I
```

1    take it, sir, that you do that?

2        A.    Yeah.  Basically we, what we do is in trial

3    situations, typically now we're seeing high-definition

4    TVs used, and when I'm at the stand and I've got my

5    mouse, I can pull the photo up and then I can zero in and

6    really, I can go from 150 up to 400 percent, and you can

7    even see the tactile, I mean the indentations, all kinds

8    of things.  It really works very, very well.

9        Q.    Let me ask you a question.

10       A.    The old-fashioned ELMO doesn't work well with

11   these, okay?  It just doesn't.

12       Q.    It just gives you an image that's not quite as

13   exact as the one you started with.

14       A.    That's right.

15       Q.    I understand that.  Take a look again at Exhibit

16   No. 5 and tell me, flip through real quick, can you tell

17   me, are the photos, you know, the individual photos of

18   hail damage contained therein somewhere that you can tell

19   me?

20       A.    Let me take a quick peek.  (Examining document.)

21            MS. PHILLIPS:  I did follow up with my

22   office, and the Christina from the office, and she did

23   say that apparently her and Vera were having some

24   conversation about the downloading of images and that

25   they're working on getting you guys a thumb drive --

**Thomas Irmiter**
5/13/2014                                                    Page: 154

```
 1              THE WITNESS:  Oh, these aren't our photos.

 2              MS. PHILLIPS:  -- of all of the photos, so

 3    I was unaware of that.

 4              THE WITNESS:  These are not our photos.

 5    Can't help you.

 6        Q.    BY MR. RUDA:  Got it.  So the photos in Exhibit

 7    No. 5, I think they're all MKA photos?

 8        A.    Yep, these aren't ours.  That's probably why you

 9    are confused.

10        Q.    I'm not confused.  I was certain of what I had.

11        A.    You were certain, right.  Yes.  I would testify

12    today that this photo that's on page 10 will be in our

13    overall report, photo logs.  We have a JPEG of it, we put

14    it into a Word document, and there will be, along with

15    this, anywhere from three to five additional photos that

16    will be close-ups of some of these hits.

17        Q.    And then was there another photo in this report

18    that you indicated?

19        A.    Yeah, the next page.

20        Q.    Page 11?

21        A.    Yeah, the JPEG, we would be able to --

22        Q.    Of both photos?

23        A.    No, of the top photo.  And I'll just, I'll just

24    represent to you that even here you can see, if you look

25    very closely right here where my finger is (indicating),
```

1    you can see a little black dot.  You can see a little

2    black dot.

3        Q.    I can see the, in some of them I can see a dot

4    sort of almost in the middle of many of the circles.

5        A.    Yeah.

6        Q.    That's the hail hit, right?

7        A.    That's the hail hit.  And if this were aged

8    seven years, I wouldn't, with this gray-colored shingle I

9    wouldn't be able to see that black dot in this small

10   photo.  It would be the same color as the gray shingle,

11   and that's, that's the issue.

12       Q.    Well, let me ask.  Would there be hail hits then

13   that happened to some of these roofs that you or your

14   people wouldn't be able to see if you were doing a visual

15   inspection?

16       A.    No, no, you would see the hail hit.

17       Q.    Okay.

18       A.    You'd see it, but you wouldn't -- you would

19   still see the displaced granule.

20       Q.    Okay.  So there would be a depression --

21       A.    Depression, you'd see the displaced granule, but

22   it would be gray in color, it wouldn't be black.

23       Q.    Now I want to ask a question about the limited

24   building inspections.  Every elevation of the roofs were

25   looked at for the limited building inspection as you

**Thomas Irmiter**
**5/13/2014**                                                    **Page: 156**

```
 1   described?
 2        A.    Every roof on the property was walked.
 3        Q.    And every side of each building was examined,
 4   too?
 5        A.    Yes.
 6        Q.    Okay.  So it wasn't just that your people went
 7   and looked at a building and found a hail hit on a couple
 8   shingles and stopped?
 9        A.    No.  It's the difference between spending about
10   four hours on a roof and two hours on a roof, you know.
11        Q.    The opinions that have been expressed in this
12   report in regard to what code requires, those are your
13   opinions, correct, sir?  You have those opinions?  I'll
14   start there first.
15        A.    Yes, I have those opinions, yes.
16        Q.    Is Mr. Johnson expressing, as you understand it,
17   any opinions in regards to the code?
18        A.    You are certainly more than welcome to ask him
19   that question.
20        Q.    I'm going to, but I'm asking if you understand
21   he's offered up any opinions as to what code requires?
22        A.    Yes, Mr. Johnson is qualified to answer
23   questions regarding building code as well.
24        Q.    Turn to page 25 of 37, sir, "Causation
25   Statement."  I think that should be 4.0, right?
```

Thomas Irmiter
5/13/2014                                                    Page: 157

```
 1        A.    Okay.

 2        Q.    Now do you, in the report in the end of that

 3   first paragraph there under "Causation Statement," you

 4   make reference to certain buildings and photographs.  For

 5   example, see the first one that indicates, "See photos

 6   including but not limited to: 280-286 Butternut (building

 7   11)?

 8        A.    Yes.

 9        Q.    All right.  Are these photos that are, these are

10   not photos contained in the report, these are other

11   photos, correct?

12        A.    Well, they are part of the report.  Our report

13   is a narrative and our report is a series of photo logs.

14        Q.    Let me --

15        A.    You haven't received the photo logs apparently.

16             MR. RUDA:  Again, I'll just reserve the

17   right to depose Mr. Irmiter in regard to the photo log

18   and those photos once we get them if need be.  I don't

19   know.  After we see them maybe we'll know.

20        Q.    BY MR. RUDA:  So the report that you've got

21   here, sir, it's part of Exhibit No. 1, which is 37 pages

22   long, your report must be longer then.  Is there a photo

23   log attached to it?

24        A.    The photo, I believe the entire report is

25   probably more like seven or 800 pages long with the
```

1    photos.

2        Q.    Okay.  And that's, besides the 37 pages of the

3    report, it's a photo log and photos.  Is it anything

4    else?

5        A.    For each building there's a photo.

6        Q.    Anything else?

7        A.    No.

8        Q.    Sir, if you take a look at the

9    second-to-the-last paragraph on page 25?

10       A.    Yes.

11       Q.    It reads as follows, "Based upon a reasonable

12   degree of engineering certainty," and states an opinion.

13   You are not expressing, you personally are not expressing

14   any opinions to a reasonable degree of engineering

15   certainty, is that correct?

16       A.    No.  I've been qualified in the federal courts

17   as a building damage causation expert.  My opinions would

18   be based on my education, training and experience

19   regarding building failures.  As a trained and licensed

20   building code official I have to understand the parts of

21   the building code that deal with engineering,

22   specifically components in cladding, wind load

23   requirements, those kinds of things.  So ancillary to

24   that I have to understand the principles.  I am not a

25   licensed professional engineer.

1    Q.   Okay.  So the opinion part of it says, "The

2    impact damages we observed to the exterior of the

3    buildings are related to the storm event," that's just

4    based upon what you described as your qualification,

5    experience and training, et cetera, is that correct?

6    A.   Yes.

7    Q.   And, again, your opinion that it was based upon

8    the April 5th, 2010 event is, as you've described it,

9    that weather report, the inspection you did, the

10   inspection that your people did concerning the weathering

11   of the shingles, correct?

12   A.   And the process of eliminating other things,

13   yes.

14   Q.   Now at the bottom of page 25 of 37, you have the

15   opinion that "based on the age of the buildings and

16   changes to the building and energy codes from the date of

17   original construction to the date of loss, and specific

18   requirements of the City of Streamwood, additional costs

19   to repair will be required to meet the current required

20   code."  Is that a long way to say that the Village of

21   Streamwood's current requirements, as you understand them

22   to be, as you hold the opinions as to what they are, will

23   require increased construction costs beyond merely

24   replacing what's damaged?

25   A.   Yes.

1          MS. PHILLIPS:  Objection to the form.

2      A.    There will be undamaged portions of the building

3   that will require replacement, yes.

4      Q.    BY MR. RUDA:  I'm trying to circumvent this.

5   You've described in your report what you relied upon in

6   terms of the building code, conversations with

7   Mr. Peterson, his deposition, Mr. Fuss's deposition, et

8   cetera, for the building code portion of it in addition

9   to your experience, training, certifications, et cetera.

10  Is there anything else in regard to the bottom of page 25

11  of 37 that you're relying upon other than what you've

12  already mentioned for these opinions?

13     A.    No.

14     Q.    Sir, the siding that was removed from the

15  clubhouse, did you determine that the siding had any

16  identification on it?  You know, a manufacturer's

17  identification of some sort?

18     A.    We didn't see the siding, it was already -- I'm

19  confused by the question.

20     Q.    I'm just asking for the clubhouse.

21     A.    No, not for the clubhouse we didn't, no.

22     Q.    When you were out there the clubhouse was

23  already done?

24     A.    Correct.

25     Q.    Are you aware if the clubhouse siding had any

**Thomas Irmiter**
**5/13/2014**                                                    **Page: 161**

```
 1   identification on it?

 2       A.   The original?

 3       Q.   Yeah.

 4       A.   No, not aware of that.

 5       Q.   Did you consult with Mr. Moe about that by

 6   chance?

 7       A.   No, did not.

 8       Q.   Okay.  If the siding did have identification

 9   marks on it from the manufacturer, would that be a

10   potential source to determine if replacement siding could

11   be obtained for other buildings in the complex?

12       A.   Absolutely.  We would go directly to the

13   manufacturer and bypass ITEL.

14       Q.   Your report indicates that there was no roofing

15   and siding all put on right around the time this

16   converted from rental to condominium property?

17       A.   Correct.

18       Q.   Around 2000, is that correct?

19       A.   Correct.

20       Q.   So does it stand to reason that all the siding

21   was, that was put on was purchased from the same

22   manufacturer?

23            MS. PHILLIPS:  Objection, calls for

24   speculation.

25       A.   It would make sense that it probably came from
```

Thomas Irmiter
5/13/2014                                                    Page: 162

1    the same source.  I know there are four different colors

2    out there of siding.

3         Q.   BY MR. RUDA:  What I mean is for those buildings

4    there's four different colors --

5         A.   Right.

6         Q.   -- that within that variety every building

7    that -- by the way, what are the four colors that are

8    there?

9         A.   Tan -- boy, I have to look at my photos again.

10        Q.   Whatever.  There's a blue, for example.

11        A.   There's a light blue.

12        Q.   For all the light blue buildings, it would be

13   the same manufacturer that was done when it was all

14   re-sided around the year 2000?

15        A.   Yes.

16             MS. PHILLIPS:  Objection, calls for

17   speculation.

18        A.   It would make sense.

19        Q.   BY MR. RUDA:  Well, according to the

20   declarations and according to code, it would have to be,

21   right?

22        A.   Correct.

23        Q.   Sir, I wanted to ask about the reference to

24   CertainTeed shingles.  That's one word, C-E-R-T-A-I-N,

25   capital T-E-E-D.  You make reference to that.  You're

Thomas Irmiter
5/13/2014                                                    Page: 163

1    relying upon the CertainTeed shingle applicator's manual

2    for some of your opinions, I take it?

3        A.    Yes.

4        Q.    Those relate only to CertainTeed shingle

5    products, correct?

6        A.    They do.

7        Q.    Okay.  So unless these are CertainTeed shingle

8    products, they wouldn't have any application to this

9    particular matter, is that correct?

10       A.    Correct.

11       Q.    Did you or did any of your employees determine,

12   in the areas that had been patched at the time that you

13   were inspecting it, if there were any problems as a

14   result of the patching of shingles on those building?

15   And again we're talking about the buildings that had not

16   been completely reshingled.

17       A.    We saw no performance issues.

18       Q.    As a matter of fact, your report indicates that

19   all the roofs were performing well, as far as you could

20   tell, until the storm event of April 5th, 2010?

21       A.    Appeared to be, yes.

22       Q.    How much patching had been done throughout the

23   Southgate townhome complex?

24       A.    On the roofs?

25       Q.    Yeah.

```
1        A.    Percentage-wise, 1 percent.

2        Q.    One percent?

3        A.    Yeah, pretty small amount.

4        Q.    You mean of total roofs?

5        A.    Yeah.

6        Q.    One percent total roof space?

7        A.    Yeah.

8        Q.    Do you know how many buildings, let's say, out

9   of the 50 -- I'm sorry --

10       A.    56.

11       Q.    I keep mixing up 16 and 17.

12       A.    Yeah, I don't recall at this point how many.

13       Q.    More than a handful?  I mean more than two or

14  three?

15             MS. PHILLIPS:  Objection to the form.

16       Q.    BY MR. RUDA:  If you know.

17       A.    I wasn't on every single roof.  What I recall,

18  in driving through the property, you know, because you

19  could see them from the ground if you know what you're

20  looking at, that --

21       Q.    Did any of your employees -- pardon me, go

22  ahead.

23       A.    If it's, you know, 1 percent, it probably

24  affected six to eight buildings total.

25       Q.    So 1 percent is based upon your visual
```

**Thomas Irmiter**
5/13/2014                                                                 Page: 165

1    inspection of all the buildings driving through the

2    complex?

3         A.    Yeah, walking and driving the complex, yeah.

4         Q.    Did any of your employees document how many

5    buildings were patched?

6         A.    No.

7         Q.    On page 32 of 37, if you look toward the top,

8    the fourth bullet point says, "Matching may not be

9    possible."  Am I correct, sir, we've already covered that

10   with your prior testimony?  When you're talking about

11   matching here, you're making reference to what you

12   believe to be primarily that the manufacturers are no

13   longer making the shingles or siding that was at

14   Southgate?

15        A.    Correct.

16        Q.    Did your, either your inspection or any of your

17   employees' inspections, determine that there was any

18   water penetration on any of the roofs?

19        A.    We, we asked for, from the association, a list

20   of any interior water damage that had occurred as a

21   result of, or after, during or after the storm event, and

22   we were told that there had been none reported to the

23   live-in units.  We did, in the attic inspection, I think

24   we did two attic inspections, we did see limited evidence

25   of water intrusion at the parapets, which is the roof

**Thomas Irmiter**
5/13/2014                                                    Page: 166

```
1   jump between a lower roof and an upper roof where the

2   flashings come together, we did see some indication of

3   water intrusion there, but it was minor to the point

4   where it most likely wouldn't reach the ceilings below.

5   It might get the insulation a little wet but it wasn't

6   enough to ...

7        Q.   You made no determination what the water

8   penetration that your people found, as to cause of that,

9   did you?

10       A.   No, we did no sampling, no spray testing.

11       Q.   So it could be totally unrelated to any hail

12  damage?

13       A.   Correct.

14       Q.   Now, sir, is it your understanding, since you

15  indicate you do have some experience in insurance

16  matters, that if there's a hailstorm and there's hail

17  damage to roofs, that the insurance policy covers

18  replacement of shingles and/or the entire roofs that are

19  damaged by hail?

20            MS. PHILLIPS:  Objection to the form.

21       A.   That's really, that's a specific policy

22  question.

23       Q.   BY MR. RUDA:  Okay.

24       A.   And a contract question to that policy, so I

25  can't give you an answer on that.
```

**Thomas Irmiter**
5/13/2014                                                    Page: 167

1      Q.   In terms of your industry, the business that

2   you've described that you're in, is hail damage to a

3   roof, and we'll talk about residential structures, even

4   though this is not, it's multifamily, you know,

5   residential, but they're basically like individual

6   houses, that merely because there's a hailstorm and

7   there's some hail damage to shingles, does that mean that

8   the roof really should be replaced in your opinion?

9      A.   Yes.

10     Q.   Okay.  And why is that?

11     A.   The granule loss has occurred exposing the mat

12  to degradation to UV rays.  Typically what we see in

13  these kinds of roofs is while no reported leaking is

14  happening as of the time of our inspection, I can't tell

15  you today what they're saying.  We typically see in these

16  storms, two to four years after these kinds of events

17  when they are not replaced and/or repaired, that water

18  damage then begins to start forming on the interior.  The

19  shingle is no longer a watertight membrane at that point

20  because of the loss that's occurred, and it really has to

21  do with the sun.  I mean those granules are put on there

22  to protect against the UV.  That's the main focus for

23  them.

24     Q.   And in this particular matter, you indicated

25  that generally speaking between two to four years you see

**Thomas Irmiter**
5/13/2014                                                  Page: 168

1   water penetration occurring after hail damage to

2   shingles, is that correct?

3       A.   Yes.

4       Q.   In this particular matter though, your

5   inspections were done in excess of three years after the

6   hail loss that you determined was the causative event and

7   there was no water penetration, is that correct?

8       A.   Well, as I indicated, we saw evidence of water

9   infiltration on some roof deck areas, some staining on

10  roof decks, but we didn't have water getting to the

11  conditioned living spaces yet.

12      Q.   Maybe I misspoke.  Sir, I am correct that your

13  report does not reflect that there is any water

14  penetration caused as a result of the hail damage event

15  on April 5th, 2010?

16      A.   That is correct.

17      Q.   Okay.  And, therefore, there is no water

18  penetration, as far as you're concerned, in regard to the

19  April 5th, 2010 event as of the time of the inspection,

20  which was done at the end of July and beginning of August

21  2013?

22      A.   That is correct.

23      Q.   Okay.  So if there's no water penetration and

24  it's been in excess of three years, is that indicative in

25  fact that there isn't going to be any water penetration?

1      A.    Not at all.

2      Q.    Is that a possibility, that there won't be any

3  water penetration as a result of the hail damage event?

4      A.    I would not expect any water penetration on the

5  undamaged shingles.

6      Q.    What about on the damaged shingles, would you

7  expect that to occur at some point?

8      A.    Depending on the degree of damage, yes.

9      Q.    Can you provide any opinion as to when it might

10  occur since it hasn't happened after three years to any

11  of these shingles?

12      A.    Well, number one, we don't know that it hasn't

13  happened.  Because it hasn't been reported doesn't mean

14  that it hasn't happened.  We have plywood and OSB roof

15  decks, which are installed with seams that are tight, and

16  so water could be entering and collecting on the roof

17  deck itself and not actually penetrating into the attic

18  locations.  There's a lot of attic insulation up there as

19  well that could be collecting water.  So I don't think

20  anybody can rule out that water isn't getting in there

21  yet.

22      Q.    Let's assume, for purposes of my hypothetical --

23      A.    I don't assume, sir.  I can't.

24      Q.    It's a hypothetical question so you must assume

25  to answer to my question.  Assume for my hypothetical

**Thomas Irmiter**
5/13/2014                                                    Page: 170

1    question that there is no water penetration as a result

2    of the hail strike event of April 5th, 2010 as of the end

3    of July 2013, beginning of August 2013; given that

4    assumption, can you offer up any opinion as to when you

5    might believe that there would be water penetration

6    occurring?

7         A.   No.

8              MS. PHILLIPS:  Objection to the form of the

9    question.

10        A.   No, that is dependent on the amount of rain, the

11   direction of the rain, wind, all kinds of things.  That's

12   a moving target.  I don't think anybody could give that

13   opinion.

14        Q.   BY MR. RUDA:  So it's possible there may never

15   be any water penetration, in other words, is that

16   correct?

17             MS. PHILLIPS:  Objection to the form of the

18   question.

19        A.   I doubt that.

20        Q.   BY MR. RUDA:  You doubt that?

21        A.   To say that there would never be water

22   penetration on these roofs would be impossible.

23        Q.   I did not say that, sir.  I said --

24        A.   You did say never.

25        Q.   I said it is possible that there might not be

1    any water penetration because of the hail strike event of

2    April 5th, 2010; do you disagree or agree?

3                    MS. PHILLIPS:  Objection to the form of the

4    question.

5        A.    Disagree.  If these roofs are not replaced and

6    if the damaged shingles are not taken care of there will

7    be, those shingles will fail, absolutely.  They'll

8    continue to lose granule loss, they will continue to

9    degradate.  It's not self-correcting, that's the problem.

10       Q.    BY MR. RUDA:  Can you tell me, sir, for example,

11   in regard to page 8 of 37, which is 248-254 Butternut

12   Lane, Building 7, when you think these shingles would

13   begin to fail and show water loss?

14                   MS. PHILLIPS:  Objection to the form of the

15   question.  Calls for speculation.

16       A.    Don't know.

17       Q.    BY MR. RUDA:  Would you turn to page 33 to 37 of

18   your report, sir?  At the bottom it says, "Authors

19   Statement."  Do you see that there?

20       A.    I do.

21       Q.    Is what's written there correct or do you need

22   to modify or change any of that?

23       A.    (Examining document.)  No.

24       Q.    Okay.  It says, "Mr. Johnson contributed to the

25   causation analysis of the report."  Is Mr. Johnson's

Thomas Irmiter
5/13/2014                                                    Page: 172

1   opinion a contribution to causation analysis or the

2   entire opinion concerning causation analysis?

3                   MS. PHILLIPS:  Objection to the form of the

4   question.  Foundation.

5        A.   I don't know.  I mean we --

6        Q.   BY MR. RUDA:  We'll ask Mr. Johnson.

7        A.   You'll ask Mr. Johnson.

8        Q.   We'll ask Mr. Johnson.

9        A.   Yeah.  We worked jointly on this report.

10       Q.   To what part of the causation analysis did

11  Mr. Johnson provide opinions, sir?

12                  MS. PHILLIPS:  Objection to the form of the

13  question.

14       A.   Cause and effect; was the wind, was the hail

15  sufficient in size to damage the shingles, damage the

16  siding, damage the soft metals on the building.

17       Q.   BY MR. RUDA:  Next sentence says that you

18  contributed to the scope of repairs and specific industry

19  standards and requirements within the building codes and

20  ordinances.  Did you offer up more opinions other than

21  merely scope of repairs and specific industry standards

22  and requirements within the building codes and ordinances

23  in this report, sir?

24                  MS. PHILLIPS:  Objection to the form.

25       A.   Well, yeah, I mean I certainly have --

**Thomas Irmiter**
5/13/2014                                                    Page: 173

```
 1        Q.    BY MR. RUDA:  You have a causation, right?
 2        A.    How can you not have a causation opinion and do
 3   scope?  I mean ...
 4        Q.    Well, scope is the extent of damage.  It may
 5   have nothing to do with why the damage caused to answer
 6   your question.  But what did you --
 7        A.    Well, why are you doing -- I disagree with you.
 8   Why are you repairing?  Why are you even writing a scope
 9   of repair if there's no damage?
10        Q.    I didn't say there wasn't damage.
11        A.    But intuitively I can't get to scope of repair
12   without damage so you have to have some causation.
13        Q.    Well, for example, your report reflects certain
14   comments concerning H clips and sheathing, et cetera,
15   which has nothing to do with the hail event, correct?
16        A.    Absolutely.
17        Q.    So that's a scope of repair that has nothing to
18   do with why.
19        A.    Right, that would be if they, if these folks
20   hired us and they were just redoing their roofs, you
21   know, what would we recommend.  Yeah.
22        Q.    It says here that both, you know, you and
23   Mr. Johnson reviewed each other other's contributions to
24   this report.  What was Mr. Johnson's contribution to the
25   report that you reviewed?
```

Thomas Irmiter
5/13/2014                                                    Page: 174

1        A.    Mr. Johnson's contributions to the report would

2    have been starting after, let's see (examining document.)

3    Starting on page 25 until the end of the report, page 37,

4    would have typically been the co-authored sections of the

5    report where we are reviewing each other's work and peer

6    reviewing back and forth.

7        Q.    How would you be peer reviewing an engineer's

8    work, sir?  You're not an engineer.  I'm just --

9        A.    Well, show me --

10       Q.    Sir, I'm asking because you said you peer

11   reviewed it.  Technically you're not his peer, you're not

12   an engineer.

13       A.    I'm not his peer.

14       Q.    Okay.  So you didn't correct any of his

15   engineering work, I take that, or comment on it?

16       A.    Well, there are no engineering calculations that

17   are done on this report.

18       Q.    Okay, all right.

19       A.    So from that standpoint I'm not correcting or

20   reviewing his engineering calculations.  I'm reviewing

21   photographs with him, we're looking and saying do you

22   agree that this is in fact hail damage, did this match

23   what you saw when you went to the inspection.

24       Q.    Okay.

25       A.    We compared photographs, we compared our take on

**Thomas Irmiter**
**5/13/2014**                                                    **Page: 175**

1    looking at things.

2        Q.   Let me ask --

3        A.   Does this look like mechanical damage to the

4    siding or does this look like hail damage to you.

5        Q.   Does Mr. Johnson, as you understand it, since

6    you consulted with him, does he use a different analysis

7    than you did in regard to determining whether there was

8    hail damage to the structure?

9             MS. PHILLIPS:  Objection to the form of the

10   question.

11       A.   You will have to ask him.

12       Q.   BY MR. RUDA:  Did Mr. Johnson do any analysis as

13   to the aging of the hail strikes, if you know?

14             MS. PHILLIPS:  Objection, foundation.

15       A.   You will have to ask him.

16       Q.   BY MR. RUDA:  Okay.  So as far as you know, in

17   this report in terms of the part of it that says the

18   events that, that is the hail events that predated the

19   April 5th, 2010 event, you're unaware if Mr. Johnson

20   holds that opinion or not, is that correct?

21             MS. PHILLIPS:  Objection to the form.

22       A.   Again, you will have to ask him that question.

23       Q.   BY MR. RUDA:  You never asked him, sir?

24       A.   That part of the report, as I indicated, was

25   joint authored by both of us.  We talked about those

**Thomas Irmiter**
5/13/2014                                                                Page: 176

```
 1   events, we reviewed the weather data on those events.  I
 2   certainly believe, as I sit here today, that he has the
 3   same opinion that I have, that in fact the most logical
 4   storm date that caused the damage that we saw was the
 5   April 5th, 2010 date and not dates that preceded that and
 6   not dates that postdated that.  And the reason we ruled
 7   out the 2013 storm is because 16 of the roofs had been
 8   replaced already and we saw no indication of damage at
 9   all on those new roofs.  If the storm event after the
10   fact had caused damage, we would have anticipated at
11   least seeing subtle, some kind of damage.  We didn't see
12   any.
13       Q.   Did you examine all of the roofs that had been
14   reroofed?
15       A.   Yes, we walked all of them.  There was no
16   physical damage to the new roofs at all.
17       Q.   That's reflected in your report, correct?
18       A.    It indicates that we walked all the roofs.  Yes,
19   it does say that.
20       Q.   Where does it say that in your report?
21       A.    Just a second.
22       Q.   What page?
23       A.    (Examining document.)  Very first paragraph
24   basically says, "Our inspection was limited to damage."
25   It says we inspected, "FBS was retained by Childress
```

Thomas Irmiter
5/13/2014                                                    Page: 177

```
 1    Duffy to provide an inspection of the above-mentioned
 2    properties to ascertain the extent of damage caused by
 3    wind and hail, which was reported to have occurred on
 4    April 5th, 2010.  Our inspection was limited to damage to
 5    the roofs, exterior cladding, windows and some attics."
 6        Q.   So is that what you're referencing, saying that
 7    you looked at the roofs that had already been replaced?
 8        A.   Yes.
 9        Q.   That means that you were able to look at those
10    roofs, is that right?
11        A.   Yes.
12        Q.   Okay.  Are there any notes or records that are
13    contained in your file there that reflect any assessment
14    of damage to the roofs that had been replaced, those 16
15    roofs?
16        A.   Yeah, there was no damage.
17        Q.   But are there notes that reflect that somewhere?
18    Not in here, other than what you read, but notes that
19    anybody made?
20        A.   No.
21        Q.   Okay.  Almost done here.  Page 2 at the bottom,
22    sir, where there's the opinion expressed as to a
23    reasonable degree of engineering certainty about the
24    damages at the complex?
25        A.   Yes.
```

Thomas Irmiter
5/13/2014                                                    Page: 178

```
 1        Q.   All right.  That's, that part of it, that
 2   engineering certainty, that's Mr. Johnson's opinion,
 3   correct?  That's one of his?
 4        A.   Specific to the term "engineering" --
 5        Q.   Yes.
 6        A.   -- yes.
 7        Q.   Okay.  Do you know how he, as an engineer, would
 8   determine that the hail events in '03, '04 and '06 did
 9   not cause any damage?  Do you know how he does that?  Has
10   he ever explained it to you?
11        A.   Yes.
12        Q.   How does he do it?
13        A.   Exactly the same way I explained that I do it.
14        Q.   Okay.
15        A.   By eliminating, by looking at the weather
16   pattern and looking at the, how the shingle itself, how
17   the hail impact presents itself.
18        Q.   Basically the weathering of it?
19        A.   It's a visual, it's a visual identification,
20   yep.
21        Q.   In Exhibit 5 here, turn to Bates page stamped
22   89.
23        A.   Are you done with 1 here?
24        Q.   We're almost done.  Beginning at page 89 and
25   thereafter, it looks like a bunch of notes on, looks like
```

1    legal, maybe not legal size, 11 by --

2                    MS. PHILLIPS:  8 1/2 by 11.

3                    MR. RUDA:  8 1/2 by 11.  Thank you.

4        Q.    BY MR. RUDA:  Whose notes are those?

5        A.    Jim Irmiter and Josh Long's.

6        Q.    And what do those notes pertain to?

7        A.    These are site visit notes that they took while

8    they were on each building.

9        Q.    Okay.  And are these notes used then to plug

10   information into the report that you authored?

11       A.    Yeah.  Martha Miller takes these notes,

12   transposes them into the site observations per building,

13   and then that is reviewed by the person who took the

14   actual notes and comparisons to make sure that nothing is

15   omitted or put in incorrectly.

16       Q.    So from Bates stamp page 89 through 110, are

17   these all of the notes from Jim Irmiter and Josh Long?

18       A.    Well, these two are right here, so.  (Examining

19   document.)  Yes.

20       Q.    All right.  Are there any other notes that you

21   have in your file other than these notes --

22       A.    Nope.

23       Q.    -- that they prepared?

24       A.    Nope.

25       Q.    Okay.  The 2/13 disclosure reflects that your

**Thomas Irmiter**
5/13/2014                                                    Page: 180

1    opinions are based upon witness interviews.  I'm not

2    exactly sure what that means.  You mentioned that you

3    talked with Mr. Peterson and you talked to Joshua Moe at

4    some point.

5         A.    Hm-hmm.

6         Q.    Other than those two gentlemen, are there any

7    other witnesses that you interviewed?

8         A.    I know that when Jim and Josh were there

9    inspecting for the two weeks that they were there off and

10   on, that there were individual tenants who might come out

11   and say, hey, you know, what are you putting a ladder up

12   for, so there, I mean our standard practice would be to

13   engage that person.  If you came out of your condo and,

14   you know, hey.

15        Q.    So if I said what are you doing here, you would

16   probably talk to me?

17        A.    I would say, yeah, I'm seeing some hits here,

18   can you tell me when that occurred.

19        Q.    All right.

20        A.    And the consistent theme we heard was that

21   occurred with that storm three years ago.  That occurred

22   with that storm three years ago.

23        Q.    Where are --

24        A.    We can't identify, we don't identify who those

25   people are.

Thomas Irmiter
5/13/2014                                              Page: 181

1        Q.   Is any of that in the notes?  Are there any

2   witness interviews or notations regarding speaking to

3   occupants of the various townhomes?

4        A.   I don't know.  Sometimes Josh puts them in, and

5   I don't know if he did here.  (Examining document.)  At

6   first blush I'm not seeing any here.  Yeah, here's -- I

7   mean I would consider this to be a note.

8        Q.   Which Bates stamp page, sir?

9        A.   This would be Bates stamped --

10            MS. PHILLIPS:  102.

11       A.   -- 102.

12       Q.   BY MR. RUDA:  And which line?

13       A.   I would look at 593 East.  See, the first, it

14   says, "Leak in Unit 593."  The only way we're going to

15   know if there's a leak in 593 is if the person in 593 was

16   standing there and told us, oh, yeah, I've got a leak.

17   So, yeah, those kinds of things would typically be as

18   much as you're going to get in terms of our conversations

19   with them.

20       Q.   Turn to page 103 for a second.

21       A.   Sure.

22       Q.   On the side of that page, you see it follows the

23   same pattern, there's a date and then buildings are

24   identified, or addresses, pardon me, not buildings.

25       A.   Yeah.

Thomas Irmiter
5/13/2014                                            Page: 182

1        Q.    209-301.  But to the side it's written, "roof

2   repaired," and then it's written, "all buildings have had

3   roof repaired."

4        A.    Correct.

5        Q.    Do you see that?  What's that in reference to?

6        A.    Roof replaced.

7        Q.    So which buildings -- are they all the ones that

8   on identified on this page?

9        A.    Well, these are some of the ones, yeah.  So 226

10  Ivy, 509 East, 503 East, these are roofs that would have

11  been done already.

12       Q.    Okay.  So at the time you were out there they

13  were done?

14       A.    Yeah.

15       Q.    And these roofs reflect impact damage; for

16  example, 226 Ivy reflects impact damage to west-facing

17  pillars, multiple impacts to siding and west-facing LE

18  elevation 20-plus, is that correct?

19       A.    Yep, 20-plus hits on the siding, yep.

20       Q.    Okay.  Do you know if they went on the roofs of

21  these buildings?

22       A.    They did.  Yes, I know that they did.

23       Q.    And you know that based upon what you indicated

24  in the report?

25       A.    Our conversations with them as well.  They were

**Thomas Irmiter**
5/13/2014                                                          Page: 183

1    instructed to look at each one of the roofs, even the

2    ones that had been replaced, albeit they didn't spend a

3    lot of time on those roofs.  There was no reason to.

4         Q.    Would you look at 209?  At the very top it says,

5    "Roof repaired, not covered, damage to siding on front."

6    Do you see that?

7         A.    Hm-hmm.

8         Q.    What does "Roof repaired, not covered, damage to

9    siding on front" mean?

10        A.    I don't know.  I don't know what the "not

11   covered" means.  Unless this is one where temporary

12   repair work was done.  That's how I would interpret that

13   based on how our guys take field notes, that 209 is one

14   that the roof had not been replaced yet and, but some

15   repairs had been done after the storm event.

16        Q.    Are you aware of any repairs being done after

17   the storm event?

18        A.    Other than what I just read to you, no.

19        Q.    No one's told you that any repairs were done at

20   the association, right?

21        A.    No, they have not.

22        Q.    Which building code do you think applies to this

23   complex, sir, that is Southgate?  The International

24   Residential Code or the International Building Code?

25        A.    I think there's three codes that apply; the

1    International existing Building Code applies, the

2    International Residential Code applies to parts of it and

3    the International Building Code applies to other parts of

4    it.

5        Q.   What parts of the International Residential Code

6    apply to as relevant to any opinions you've offered?

7        A.   The siding and the roofing, the sheathing, the

8    wall sheathing, window flashings.

9        Q.   How does the International Building Code, in

10   your opinion, apply at all to the structure?

11       A.   Anything that is not within the, the only reason

12   the International Building Code ever applies to anything

13   that has a residential code to it is if there is nothing

14   in the prescriptive -- the International Residential Code

15   is prescriptive.  It is a step-by-step how to build

16   something.  If it is not listed in the prescriptive path,

17   then engineering is required under the rules of the

18   International Residential Code.  That flips it to the

19   International Building Code, which is all engineered.

20       Q.   Is any part of your opinion then based upon the

21   International Building Code in regard to this matter or

22   does it entirely, in terms of your opinion, fall within

23   the International Residential Code?

24       A.   The only reason it falls tangentially into the

25   International Building Code is because of the zoning of

1    these buildings and how they're put into the zoning part

2    of the code in terms of --

3        Q.    Meaning what?  I mean explain what you mean.

4        A.    Mixed-used building -- I mean it's not a

5    mixed-use, it's a multi-family residence.  That's the

6    reason.

7        Q.    But under Streamwood's code, doesn't it still

8    fall under the International Residential Code --

9        A.    That's how they --

10       Q.    -- based upon how they have placed it and the

11   descriptive nature of the code?

12       A.    Yes.

13       Q.    Okay.  So it is basically all International

14   Residential Code?

15       A.    Yes.

16       Q.    All your opinions are based upon that, not

17   anything to do with the International Building Code --

18       A.    No.

19       Q.    -- yes or no?  Meaning -- I apologize to the

20   form of the question.

21       A.    My opinions will follow in lockstep with what

22   the City of Streamwood has classified these buildings as.

23   How's that for a simple answer?

24       Q.    All right.  So then your opinions are based upon

25   the International Residential Code and not the

**Thomas Irmiter**
5/13/2014                                                        Page: 186

1    International Building Code in terms of what's in your

2    report and what you've offered up here in the deposition

3    today then?

4        A.   Correct.

5        Q.   Okay.  All right.

6             MR. RUDA:  I have no other questions.

7    Christina?

8             MS. PHILLIPS:  Can I have a sticker?

9             (Irmiter Exhibit 13 marked.)

10            MS. PHILLIPS:  I don't have another copy of

11   this, but this is a document that Matt produced last week

12   at Howard's deposition.

13                        EXAMINATION

14   BY MS. PHILLIPS:

15       Q.   Tom, I'm going to show you a document marked as

16   Exhibit No. 13.  Can you tell me what that document is?

17       A.   This is a storm events database.  I've seen

18   these before.  You can order these up from NOAA, and you

19   can go back, I think ten years roughly, and you can order

20   it up for, generally for counties.  It's cities or

21   counties.  You can't go to NOAA and say give me 1495

22   Selby Avenue as an address.  They don't do that, okay?

23   These are general area maps.

24       Q.   And in fact, that website is the same website

25   that you would have utilized in pulling the weather data

1  from 2003, '4 and '6 that's in your report, correct?

2      A.   Yes, we did, correct.

3      Q.   So you're familiar with this database and

4  website?

5      A.   Yes.

6      Q.   Counsel earlier directed your attention here to

7  Exhibit No. 2 and the EagleView documents that referenced

8  a July 21st, 2013 hail event.  If you look at Exhibit

9  No. 13, is that hail event listed therein?

10     A.   No.

11     Q.   What's the ending date of the event data listed

12  within Exhibit No. 13?

13     A.   11/17/2013.

14     Q.   Okay.  So the date of July 21st, 2013 presumably

15  would be consumed within the dates from April 5th, 2010

16  to November 17th, 2013?

17     A.   Yes, that's one of the reasons we don't use the

18  EagleView hail count or hail information.  We have found

19  it to be consistently unreliable.  I don't know why

20  EagleView even lists it because it's not -- anyway, we

21  don't use it.

22     Q.   Okay.  And earlier, when Mr. Ruda was asking you

23  some questions, you had said it's really important to

24  understand how these are interpreted.  What did you mean

25  by that?  And when I mean "these," I'm referring back to

Thomas Irmiter
5/13/2014

1    the EagleView as part of Exhibit No. 2 from Mr. Moe's

2    deposition yesterday.

3        A.    Yeah, and this is one of the things we found

4    when we've actually been to sites and looked at these.

5    Because we do estimating so we order EagleView all the

6    time, and it says that -- on here they say, "within a

7    one-mile radius."  What they don't tell you is how far

8    out they go.  So these 19 events, they typically start at

9    a one-mile radius and they go out 20 miles.  So you could

10   have 18 of these that could be 17 miles away from this

11   property, and it would mislead you to think, if you

12   didn't understand how to interpret them, that on 7/21/13

13   there were 19 hail events at this property.  That's not

14   what this says, okay?

15       Q.    All right.  We talked a lot today about the

16   difference in what a hail strike on an asphalt shingle

17   that's seven years old looks like compared to a strike

18   that's, you know, three years old, correct?

19       A.    Hm-hmm.

20       Q.    Yes?

21       A.    Yes, excuse me.

22       Q.    Thank you.  Is there a difference between a hail

23   strike that's three years old and, let's say, this

24   July 21st, 2013 storm actually happened and you guys went

25   out on July 30th, so that's nine days; is there a

**Thomas Irmiter**
5/13/2014                                                    Page: 189

```
1    difference between a nine-day-old hail strike and a

2    three-year-old hail strike?

3         A.    Yes.

4         Q.    And can you tell me what the difference is?

5         A.    Well, one of the terms that is bantered around

6    in the industry is it's still hot.  It looks like hot

7    tar.  I mean it literally is still very, very dark.  What

8    happens with these is, if you look at your coffee cup

9    here in front of you and it's very black in color, that's

10   really what your mat looks like at the time it's being

11   manufactured before the granules are being put onto it,

12   because that's the color of the asphalt material, it's a

13   shiny black material.  The granules get put onto it in

14   the manufacturing process.  So when those are immediately

15   brushed off, this is the color that occurs, and this is

16   actually a pretty good representation, because then you

17   look at your laptop in front of you and you look at the

18   typing board here and you see this color that I'm

19   pointing to (indicating), which is another shade of

20   black, and then you look at her HP right here and you see

21   this gray (indicating).  If I were to compare these, I

22   would say this is a fresh hail hit (indicating), this is

23   a hail hit that's been sometime within the last two years

24   (indicating), this is a hail hit that's probably five

25   years or older (indicating).
```

**Thomas Irmiter**
5/13/2014                                                    Page: 190

1        Q.    The five-year-older, you're pointing to the

2    grayish color in the room?

3        A.    Yeah.  I mean it's really that easy to

4    distinguish when you're looking at it.  Where it gets to

5    be problematic is when you're in areas in Texas and areas

6    in Phoenix where we get a lot of dust storms, so we get

7    dust and things into those, so in those inspections you

8    actually have to have a whisk broom with you and a rag to

9    clean dust out so you can see what's going on.

10       Q.    And this concept that you've discussed of

11   identifying the aging, that's something that you've

12   picked up in your background, training and experience in

13   performing these types of investigations?

14       A.    Yes.

15       Q.    As well as your knowledge of the components of a

16   shingle or things of that nature?

17       A.    Well, yeah, and I think that's very important.

18   It's very interesting, when you're sitting on a roof with

19   an adjustor from an insurance company, or even other

20   engineers who practice in this, or consultants who

21   practice, and you ask them, well, geez, have you ever

22   been to the factory, have you ever seen how these things

23   are made?  No.  They have no concept.  To me, that's a

24   very important part of this is understanding the

25   products, feeling the products and working with the

**Thomas Irmiter**
5/13/2014                                                     Page: 191

1    products, and I've done that with these kinds of shingles

2    and siding and these things before.

3         Q.    How many hail inspections in your career have

4    you performed?

5         A.    Over 7,000.

6         Q.    Over what period of time have those inspections

7    been performed?

8         A.    As I said before, when I first started roofing

9    we were doing hail things, so it's over 40 years.

10        Q.    I believe earlier you said you had also looked

11   at photographs of the hailstones from the date of the

12   loss --

13        A.    Yes.

14        Q.    -- and you had those with you?

15        A.    I do.

16        Q.    I didn't see them in the file materials.

17        A.    I think I have them.  Oh, yeah, here they are.

18             MS. PHILLIPS:  Could I have another sticker

19   please?

20             (Irmiter Exhibit 14 marked.)

21        Q.    BY MS. PHILLIPS:  Looks like these are

22   photographs previously produced, Southgate 4097, 98 and

23   96.

24        A.    Yes.

25        Q.    Were those parts of your file materials?

1      A.    Yes.

2      Q.    And did you rely on these photographs in

3   formulating your opinions?

4      A.    Yes.

5      Q.    What about those photographs did you rely upon?

6      A.    Well, the 4097 is, I think, one of the more

7   telling.  I would estimate that, based on the hand size,

8   that this hail is inch and a half on its length side by

9   about an inch and a quarter.  It's obelisk in shape, it's

10  not truly round, which is typically what hail -- hail

11  doesn't always come in a round shape.  It also, the

12  person who is holding it, their hand is shiny so it

13  indicates that it's melting, so that would tell me that

14  it's actually smaller here in this picture than it was

15  when it fell.  This next picture, which is shown at

16  night, it has a flashlight, and it shows varying sizes of

17  hail.  I think this is important, because a lot of

18  people, when they look at a hail report, even our, the

19  person that you've retained as the weather expert on this

20  thing, he estimates the hail size, and that's one of the

21  reasons they do that is because not all hail falls at the

22  same size, so in a pattern of hail you're going to have

23  some very large, you're going to have some very small, so

24  when a meteorologist is saying it's between this and

25  this, they're taking the average of what they think is

1   going to occur.  This is a great picture that shows that.

2   So we had some pretty large hail and some small hail on

3   this, which is typical.

4        Q.   And did the evidence of the impact marks and the

5   damage that you saw, were those consistent with what you

6   looked at in those photographs of varying hail sizes?

7        A.   Yes.  And in particular on the soft metals, when

8   you look at the soft metals, there are some pea-size hits

9   but there's also some larger indentations, and that would

10  be consistent with that dark photo showing the varying

11  sizes of hail.

12       Q.   Just so we're clear, you're not serving as an

13  engineer here today or in regard to the report that's

14  been authored by Forensic Building Science, correct?

15       A.   That is correct.

16       Q.   Your area of expertise is what again?

17       A.   Building failure causation, what causes

18  buildings of all kinds to fail.  That can be defective

19  construction, it can be improper products, it can be

20  weather events, it can be manmade causes like fire,

21  arson, it can be building, vehicles that strike

22  buildings.  It can be all kinds of different events.

23       Q.   And in regard to this capacity as a building

24  causation failure expert, have you been qualified by a

25  court before?

**Thomas Irmiter**
5/13/2014                                                    Page: 194

```
 1        A.    Yes.

 2        Q.    Have you been qualified by multiple courts?

 3        A.    Yes, I have.

 4        Q.    And do you know what states?

 5        A.    Colorado, Minnesota -- I think that's it.

 6    Colorado, Minnesota.  Federal and district.

 7        Q.    And in connection with the building causation

 8    failure expertise, have you been qualified as an expert

 9    in events associated with a weather event?

10        A.    Yes, yes.  The one in the federal court in

11    Colorado was wind and hail, and it was a three-tab

12    shingle, and it was on complexes similar to these.

13        Q.    We talked today about the application of codes,

14    correct?

15        A.    Yes.

16        Q.    And in your report, I actually think, if you

17    wouldn't mind opening that back up for me again and

18    looking to page 27 and 28 is going to be where I'm going

19    to direct your attention.

20        A.    Yes.

21        Q.    Okay.  And I note there's a comment that says,

22    "The above section was amended and was put in place after

23    the loss."  Do you see that?

24        A.    On which page?

25        Q.    I'm on page 28.  My apologies.
```

1      A.    Yes.

2      Q.    It looks like there was an original code that

3  was in effect at the time of the loss, is that correct?

4      A.    That is correct, yes.

5      Q.    And it looks like -- well, can you tell me,

6  based on your background and experience in reading the

7  codes, what the difference is between the two codes?

8      A.    Very little.

9      Q.    Okay.

10      A.    Yeah.

11      Q.    The original code that was in effect, it looks

12  like it had a date of 2008?

13      A.    Yes.

14      Q.    That does not appear to have the ITEL exceptions

15  that we see?

16      A.    Correct.  This is the building code official, in

17  talking with them about that, they recognize, as they

18  should, that there is an alternative design approach that

19  can be used.  This is the building code official and the

20  city basically, him saying, you know what, I want to go

21  one step further and I want to have this third-party

22  source help in making that determination on the siding

23  issue, and so it relates just to the siding.

24      Q.    As for the policy in this case, whether the code

25  at the time of the loss would apply or whether the code

Thomas Irmiter
5/13/2014                                                    Page: 196

1    at the time of the replacement would apply, you would

2    agree that the policy would dictate which code would

3    apply?

4        A.   Yes, that's in the policy.

5        Q.   And you're not offering an opinion on that?

6        A.   No, I haven't reviewed this insurance policy,

7    I'm not offering an opinion on that.

8        Q.   So to the extent that the policy applies, the

9    original code, there is no exception for ITEL?

10       A.   Right.

11       Q.   And all the siding would need to be replaced?

12       A.   Correct.

13       Q.   As it relates to the idea of the replacement of

14   the shingles, am I correct that it's the opinion, both of

15   yourself as well as the opinion of Mr. Johnson, that the

16   shingles are being replaced because of the direct

17   physical loss or damage, not the application of the code?

18       A.   Correct.  Right, correct.  There's not a code

19   issue related to those that we saw.  It's the physical

20   damage and returning them to a pre-loss condition.

21       Q.   When you walked the property, was there a

22   uniformity to the siding of these buildings?

23       A.   Yes.

24       Q.   So we had discussed before that the fading was a

25   little bit different on an elevation depending on

1   shading, do you remember that?

2       A.   Yes.

3       Q.   As far as the overall appearance, it appeared as

4   though the buildings were generally in the same

5   condition; in other words, one building didn't appear to

6   be 60 years old and one building appeared to be 12 years

7   old?

8       A.   Correct.

9       Q.   They all appeared to be about the same age and

10  use and wear, it's just maybe a certain exposure had a

11  little bit more fading than something else?

12      A.   Yes.  And the issue with that is really that

13  standing 10 feet back or 15 feet back and looking at

14  siding, the blue siding for example, and saying that

15  there's a degree of fade that's more on one elevation

16  than the other is virtually impossible to do with the

17  human eye until you take the siding off of that building

18  and try and reclaim it and piece it in onto another

19  being.  That's when you'll notice it.

20      Q.   Based on your review of the code, you would

21  agree with me that the, and the review of Mr. Peterson's

22  deposition, that the city doesn't permit that piecemeal

23  or patchwork siding to be done?

24      A.   Right, it's an eyesore as far as they're

25  concerned.  Talking to the building code official, that's

**Thomas Irmiter**
5/13/2014                                                    Page: 198

1   what they don't want to have happen.

2       Q.   So the, I'm going to use the term "salvage," the

3   taking off of building A and putting it into building C

4   and D is not permitted under the code?

5       A.   It's not permitted under the code.  Yeah, it's

6   just not going to happen.

7       Q.   As it relates to the 16 buildings that were

8   reroofed, your people went up on those roofs, correct?

9       A.   Yes.

10      Q.   All right.  Can I direct your attention in the

11  report to page 7 of 37?

12      A.   Yes.

13      Q.   This section actually began on the, on page 6 of

14  37, it says "Roof and Siding Inspection Methodology," and

15  if we turn to 7 of 37, partway through this second

16  paragraph?

17      A.   Yep.

18      Q.   We see a notation that "we worked across the

19  roof slope from top to bottom in three to four foot

20  increments circling each impact location or displaced

21  shingle," do you see that?

22      A.   Yes.

23      Q.   That's that process of walking the roof that you

24  discussed, correct?

25      A.   Correct.

Thomas Irmiter
5/13/2014                                                    Page: 199

1    Q.   And if we drop down here (indicating), we see

2    the sentence that says, "The limited inspections were

3    performed by accessing the roof of each building," do you

4    see that?

5    A.   Yes.

6    Q.   Is that the additional walking of the roof that

7    you discussed earlier?

8    A.   And each building, meaning all 56.

9    Q.   The word "briefly" is used within that sentence;

10   do you see that?

11   A.   Yes.

12   Q.   You had said earlier that the difference in the

13   inspections was a two-hour inspection versus a four-hour

14   inspection?

15   A.   Yes.

16   Q.   Is that, the use of the word "briefly," is that

17   the context here?

18   A.   Yeah, that's the context.

19   Q.   So it's not a matter that they went up there for

20   five minutes and walked off?

21   A.   No.

22   Q.   You had said earlier that you noticed a mistake

23   in your review in the estimate of Josh Moe --

24   A.   I did.

25   Q.   -- do you remember that?

```
 1        A.    Yeah, I did.

 2        Q.    Can you tell me what that is?

 3               MR. RUDA:  Objection, this is an

 4    undisclosed opinion.

 5        A.     Apparently there are 16 buildings.  Buildings 1,

 6    9, 10, 13, 15, 16, 21, 22, 26, 32, 45, 51, 52, 53, 55 and

 7    56, that these are the, these represent the 16 buildings

 8    that had new roofs installed on them.  He failed to

 9    include in his estimate the siding replacement for these.

10    So even though we have calculated siding damage on these

11    16 buildings, his estimate does not show that.

12               MR. RUDA:  Can I ask, can I -- you were

13    reading from a document.  What document is that, just so

14    I know what you're reading from?

15               THE WITNESS:  (Indicating.)

16               MR. RUDA:  Okay.

17               THE WITNESS:  I went through and looked --

18               MR. RUDA:  I was just asking because you're

19    reading from a document.

20               MS. PHILLIPS:  We'll mark it.

21               MR. RUDA:  You don't have to mark it.  I

22    was just wondering what it is.

23               MS. PHILLIPS:  Can I have a sticker,

24    please?

25               (Irmiter Exhibit 15 marked.)
```

1    Q.   BY MS. PHILLIPS:   Okay.   Now we've got

2  Exhibit 15.   When did you make that document?

3    A.   I made that last night as I was preparing for my

4  deposition and doing review.   Of these, going back then

5  through his estimate, there are two building sizes.

6  There's a building size where he has attributed

7  $26,228.84 RCV cost for siding-related costs, and there's

8  a building cost where he has come up with a cost of

9  $25,581.80.   There are two different size buildings on

10  the structure.   So of the 16 buildings, four of them are

11  the $26,228.84 size and 12 of them are the $25,581 size,

12  and when you multiply those together using his numbers,

13  it comes up to roughly $412,000.   When you then take the

14  10 and 10 that he has taken, which is a reasonable markup

15  for contractors to take, he ends up at just shy of

16  $500,000 that he is deficient on his estimate.   That does

17  not include additional costs for general conditions,

18  dumpsters, those kinds of things that would be attributed

19  to that, so I would ballpark it at about $525,000 that

20  his estimate appears to be deficient.

21    Q.   That is based on your background, training and

22  experience in putting together estimates at FBS?

23    A.   Well, yeah, and my training in Xactimate.   I was

24  one of the first people in the country to use Xactimate

25  when it first came out and I've been using it ever since.

Thomas Irmiter
5/13/2014                                                    Page: 202

1  We produce an average of 25 estimates a week through our

2  office.

3      Q.   And I'm going to separate back, we've got his

4  estimate previously marked --

5      A.   Do you want me to separate this?

6      Q.   -- so let's not clip that because this is your

7  copy.

8      A.   That's mine.

9      Q.   All right.  I want to touch on something real

10  quick.  There was a discussion before about the reference

11  to the Haag materials.  Could you explain to me how it

12  was that you considered or reviewed the Haag materials

13  that were addressed earlier?

14      A.   We sent our people to Haag, and I've

15  participated in some of the Haag stuff simply because the

16  industry seems to have attempted to, the insurance

17  industry seems to have attempted to put them out as the

18  definitive source for all things to do with roofing.  I

19  have heard it stated numerous times that the term "the

20  Haag standard" is used, trying to indicate that it has

21  been a standard that has been adopted by either, by

22  someone, by the building code councils, by ASTM, by ANSI,

23  by any recognized engineering community in the world.

24  And based on the research that I did when I started

25  hearing that, I found no definitive source that has

1  endorsed what they do as a standard.  It is simply their

2  opinion.  It is the things that they do and it is their

3  opinion.  And we're all entitled to have our opinions,

4  we're all entitled to shoot ice balls at products and do

5  all kinds of things and extrapolate from that that this

6  is what's going to happen, but to call it a standard I

7  think is improper, and so I thought it was important that

8  our people should go through some of that just to, just

9  to see what's being taught.

10        I would argue that it's a great course for

11  someone like you, Counselor, if you wanted to learn

12  everything there was about roofing products for the first

13  two or three days and about how to install them and those

14  kinds of things, it's great.  I think the second part

15  that gets into some of their causation theories and what

16  causes damage is problematic.

17     Q.   We talked a little bit about wind damage to the

18  property.  Would it be a fair statement that the majority

19  of the damage that you and your team discovered was hail

20  damage?

21     A.   Yes.

22     Q.   You also identify a number of the resources and

23  materials, 3 of 37 and 4 of 37, that were reviewed or

24  considered in formulating your opinions, correct?

25     A.   Yes.

1    Q.   Even though those materials weren't relied upon

2  for formulating a specific opinion, they were considered

3  in putting together your report, is that correct?

4    A.   Yes, yes.

5    Q.   We talked a little bit about the application

6  process.  You would defer to Mr. Johnson as far as what

7  the city would, the Village of Streamwood would approve

8  or not approve as far as applications for permits and

9  whether or not variances would be allowed, correct?

10   A.   Yes.

11   Q.   Okay.  And to the extent permits were pulled

12  with the replacement of the 16 roofs, or partial requests

13  for partial, were requested for partial replacements, you

14  would defer to him?

15   A.   Yes.

16   Q.   All of the materials that we've looked at today,

17  as well as those discussed within your report, is it

18  reasonable and customary for someone such as yourself in

19  putting together a report like this and formulating

20  opinions to rely on that information?

21   A.   Yes.

22   Q.   Okay.  And have all of the opinions that you've

23  offered here today, as well as those contained within

24  your report, been to a reasonable degree of certainty in

25  the field of building causation failures, as well as

```
 1   based on your experience in estimating?

 2        A.   Yes, yes.

 3             MS. PHILLIPS:  I don't have anything

 4   further.

 5                  FURTHER EXAMINATION

 6   BY MR. RUDA:

 7        Q.   Mr. Irmiter, what California federal court

 8   qualified you?

 9        A.   Colorado.

10        Q.   Was it federal or state?

11        A.   Federal.

12        Q.   So what was the name of that case that you were

13   qualified in?

14        A.   It's in my CV.

15        Q.   Can you tell me which one it is?

16        A.   Let me take a look and I'll tell you.

17   (Examining document.)  Windsor Court, LLC versus American

18   Family.

19        Q.   So Windsor Court, LLC versus American Family?

20        A.   Yep.

21        Q.   Do you have the number of the case in there,

22   too?

23        A.   Yes.  It's Colorado Case

24   No. 2011-CV-01904-CMA-KLM.

25        Q.   All right.  And is that the only case in which
```

**Thomas Irmiter**
5/13/2014                                            Page: 206

1  you've been qualified in court to testify as to a weather

2  event similar to this one that caused damage because of

3  wind and hail?

4      A.   No.  Interlachen Property Owners Association

5  versus American Family, 2013, Hennepin County, Minnesota

6  Court, 27-CV-11-12855, Judge Bruce Peterson.

7      Q.   Well, was that a lawsuit against American Family

8  or was it a dispute over whether the appraisal was

9  proper?

10     A.   That's a lawsuit against American Family.

11     Q.   Was that after the appraisal was determined to

12  be --

13     A.   Yes.

14     Q.   -- invalid?

15     A.   It was determined to be invalid and then it went

16  to the jury and I testified as to causation and damages.

17     Q.   Let me ask you.  Have you ever been determined

18  to not be qualified to offer up opinions in any matter in

19  which you've been retained, sir?

20     A.   One time, yes.

21     Q.   What's the name of that case?

22     A.   Eight years ago.  I don't remember.  Morrissey,

23  I think.  Something like that.

24     Q.   That's here in Minnesota, wasn't it?

25     A.   Yep.

**Thomas Irmiter**
5/13/2014                                                        Page: 207

```
 1        Q.    Morrissey versus who, do you know?

 2        A.    I can't remember.

 3        Q.    Is it in your CV?

 4        A.    No.

 5        Q.    Can you find that case?  Do you have a record of

 6   it back at your office somewhere?

 7        A.    I don't know if I do or not.

 8        Q.    Who was the lawyer that retained you in that

 9   case?

10        A.    Briggs and Morgan.

11        Q.    Why were you determined not to be an expert in

12   that case, as you understand it?

13        A.    As I understand it, it was a fraudulent

14   concealment case of a contractor who was hired to remodel

15   a home and during the remodeling process found rot and

16   mold and covered it over without disclosing it and

17   finished a massive whole-house remodeling for a client.

18        Q.    So how is it that you were, as you understand

19   it, what the court said why you weren't qualified to

20   offer opinions in that case?  What was the basis for the

21   judge's decision?

22        A.    I was asked to give an opinion on the duties and

23   responsibilities of a licensed general contractor when I

24   did not hold a license as a contractor at the time.

25        Q.    Okay.
```

**Thomas Irmiter**
5/13/2014                                                      Page: 208

```
 1        A.   My licensing as a building code official
 2   supersedes that and allows me to make those kind of
 3   opinions today, but back at that period of time I didn't
 4   have one.
 5        Q.   You're not a licensed general contractor in
 6   Illinois, is that correct?
 7        A.   No, no.
 8        Q.   You're not a licensed building official in
 9   Illinois, is that?
10        A.   No, they don't offer it.  If they did, I would
11   be.
12        Q.   You are not?
13        A.   I am not, that is correct.
14        Q.   And you hold no licenses whatsoever in Illinois,
15   is that correct?
16        A.   That is correct.
17        Q.   You mentioned just moments ago that you had,
18   your opinion in this matter is predicated not upon any
19   code upgrade requirements, I believe.  I think your
20   opinion is that because of the hail event and the
21   physical loss sustained to the roofs and the siding at
22   the Southgate complex, that that's why you have the
23   opinion that they all need to be replaced in order to be
24   returned to their pre-loss condition; is that a correct
25   summation of your opinion?
```

**Thomas Irmiter**
**5/13/2014**                                                    **Page: 209**

```
 1                MS. PHILLIPS:  Objection to the form.

 2        A.   No, it's not correct.

 3        Q.   BY MR. RUDA:  All right.  Let's go back then.

 4    You agree with me that you are suggesting that shingles

 5    that are undamaged need to be replaced based upon what

 6    we've been discussing?

 7        A.   Well, a roof is a system.

 8        Q.   I understand.

 9        A.   So the entire roofs have to be replaced because

10    of the physical damage caused by the hail.

11        Q.   Okay.  So it is your opinion that all the roofs

12    have to be replaced because of the physical damage caused

13    by the hail that you and your employees determined, is

14    that correct?

15        A.   Yes.

16        Q.   Even the undamaged shingles need to be replaced,

17    is that correct?

18        A.   Yes.

19        Q.   And in regard to siding, do you have the opinion

20    that undamaged siding, let's say on the side of the

21    building, has to be replaced as well?

22        A.   There are some buildings that have three sides

23    damaged, there are some buildings that have two sides

24    damaged, and there are some buildings that have one side

25    damaged.  We calculated that in our report.
```

1        Q.    So is that --

2        A.    All of those physically damaged sides must be

3    replaced as a result of the damage.  The remaining sides

4    that are undamaged must be replaced, in my opinion,

5    because of the fact that the siding is no longer

6    manufactured and it does not match.

7        Q.    Okay.  All right.  So let's go to matching.  In

8    the state of Illinois, is matching of siding required in

9    your opinion, sir?  Let's say there's an undamaged side

10   of the building and -- strike that.  In Illinois, as you

11   understand it, does it require the matching of siding for

12   undamaged sides of the building, assuming there's one

13   side that has some damage?

14             MS. PHILLIPS:  Objection to the form of the

15   question, calls for a legal conclusion.

16       A.    Yeah.  That's a legal conclusion.  I don't think

17   that's been vetted out in your court system yet.

18       Q.    BY MR. RUDA:  I may disagree, but --

19       A.    I'm sure you will.

20       Q.    -- you just offered the opinion that matching is

21   required.  What do you base your opinion on?

22       A.    What's that?

23       Q.    You just offered the opinion that matching --

24       A.    No, I said the siding is no longer manufactured

25   so how am I going to put siding that is no longer

**Thomas Irmiter**
5/13/2014                                                    Page: 211

1    manufactured into siding that is currently manufactured

2    and have it work?  It's not tested that way.  The siding

3    has to be installed per the manufacturer's published

4    instructions, just like the roofing.  So tell me,

5    Counselor, how am I going to take siding that I don't

6    know who manufactures it, who makes it, and I have no

7    installation instructions, and now I have new siding made

8    by Alcoa, or whoever, that is tested for wind resistance,

9    it's tested for water intrusion resistance, it meets all

10   of the code requirements, it has an ICC code report on

11   it, and how am I going to put that on the building and

12   tie it into something that isn't tested?  I can take the

13   insides of her pen and I can take the insides of your pen

14   and I can take them apart and I can jam them together and

15   I can get them to work but that's not how they were

16   designed to work, and they will fail much quicker than if

17   they were left alone, the way they were tested.  That's

18   why the siding needs to be replaced.

19        Q.   So it's your opinion that undamaged sides to

20   individual buildings at Southgate have to be replaced

21   because you have to replace, let's say, one side of one

22   of the buildings?

23        A.   Yeah.  Siding is a system.

24        Q.   Okay.

25        A.   It's a cladding component system under the

**Thomas Irmiter**
5/13/2014                                          Page: 212

```
 1   building code.
 2        Q.   It has nothing to do with matching, sir?
 3        A.   I don't care about the matching issue.  I'm
 4   not --
 5        Q.   I do.  I'm asking a question.  That has nothing
 6   to do with matching, is that correct?
 7        A.   No.
 8        Q.   Yes or no?
 9        A.   It has nothing to do with matching.
10        Q.   Okay, you agree with me.  So your opinion that
11   in regard to the siding, all of it being replaced, is
12   because if you replace a single piece of siding on a
13   building in order for the building, as you've described
14   it, to be properly secure from water intrusion, et
15   cetera, all the siding must be replaced, is that correct?
16        A.   Correct.
17        Q.   Now you just offered up the opinion that you
18   don't believe the Illinois courts have spoken as to the
19   issue of matching.  What do you base that statement on?
20        A.   Just my, in the practice that I'm in I enjoy, as
21   an avocation, reading case law.  It's one of the things I
22   like doing.  And I haven't found anything in the case law
23   work that I've done in terms of reviewing stuff in
24   Illinois that's really addressed the matching issue the
25   way that Minnesota has, for example, recently.
```

Thomas Irmiter
5/13/2014                                                    Page: 213

1       Q.    Well, Minnesota has a statute, pardon me,

2   Minnesota law requires matching, correct?

3       A.    Yes, it does.

4       Q.    Is that pursuant to a court opinion or a

5   statutory --

6       A.    I think it's been codified by the courts

7   recently within the last six months.

8       Q.    And you haven't read in your studies any

9   Illinois cases that address the concept of matching, is

10  that correct?

11      A.    Oh, I have, I just think it's an open question

12  at this point.  But, again, that's a legal opinion.  I'm

13  not an attorney.  That's a layman giving you his take on

14  it.

15      Q.    And again, just so we're clear, none of your

16  opinions are based upon your understanding of, I guess to

17  use your term, the law of matching as you understand it,

18  is that correct?

19            MS. PHILLIPS:  I'm going to object to the

20  form of the question, calls for a legal conclusion.

21      A.    Yeah, I mean I've already said that I think it's

22  an open question in your state right now.

23      Q.    BY MR. RUDA:  Are your opinions based upon what

24  your perspective is concerning matching and the concept

25  that you just described; that is, obviously we're talking

Thomas Irmiter
5/13/2014                                              Page: 214

1    about insurance policies and matching?

2         A.    No, not in terms of insurance policies.

3         Q.    Okay.  In your own --

4         A.    In terms of what makes common sense to a

5    consumer and the expectation that they might have, and

6    that I might have as a consumer living at this

7    association and not wanting to have buildings that all

8    look different, I have an opinion on that.  I get to have

9    that opinion, you know.

10        Q.    In regard to, you were asked a few questions

11   moments ago about the permitting process and the building

12   code requirements.  The building code that was in place

13   before the amendment, which was, I guess, after this loss

14   occurred, so would you turn to page 28 of 37 of your

15   report?

16        A.    Okay.  28, you said?

17        Q.    Yeah, 28 of 37 in your report.

18        A.    Okay.

19        Q.    You wrote in the middle of the report, that's

20   the old code provision, correct?

21        A.    Yes.

22        Q.    And you said that that requires replacement of

23   shingles and replacement of siding in the event that

24   there's any damage, correct?

25        A.    Right.

Thomas Irmiter
5/13/2014                                                    Page: 215

1      Q.   So did you address the part of this ordinance

2   that says, "where the covenants and the restrictions on

3   the property require the exterior of the units to have

4   consistent colors and materials," is that part of your

5   assessment in this matter?

6      A.   Yes.

7      Q.   Well, did you also assess the fact that the

8   section states at the end, and I quote, "if the entire

9   multi-family structure is not replaced at the same time,

10  and subject to subsection D2 herein, a letter of approval

11  is required by the other dwelling unit owners prior to

12  the permit being issued," did you address that in any of

13  your opinions in this matter?

14     A.   Well, no, I mean it speaks for itself.

15     Q.   Right.

16     A.   Yeah.

17     Q.   So actually the code provision actually says

18  that, by saying that you get permission from other unit

19  owners to do partial replacement contemplates partial

20  replacement, does it not?

21     A.   No.

22          MS. PHILLIPS:   Objection, form of the

23  question, foundation.

24     A.   No, that's not what it says.

25     Q.   BY MR. RUDA:   Is that your understanding of the

1   section --

2       A.   That's not my interpretation as a trained

3   building code official.  No, it just says, you know,

4   what, you can go ahead and start doing three at a time if

5   you want, but you can't -- it doesn't say you can do

6   partials.  It says you can sequence these jobs depending

7   on your cash flow and your ability to pay for them.  It's

8   not saying you have to, you have to be held to do all 56

9   within a two-week period or something like that.

10      Q.   And you would agree --

11      A.   It contemplates that these are going to take a

12  period of time to do.

13      Q.   And you agree that on page 27 of 37, which is

14  the current code requirement, doesn't it say the entire

15  thing at the end of the first section on page 27, as I

16  just read, if the entire multi-family structure is not

17  replaced at the same time, and subject to subsection D2

18  herein, a letter of approval is required by the other

19  dwelling unit owners prior to the permit being issued?

20      A.   Yeah, it says the same thing.  They both say the

21  same thing.

22      Q.   And so I assume your interpretation of that is

23  it only relates to when you're doing replacements over a

24  period of time as opposed to at the same time?

25      A.   Correct.

Thomas Irmiter
5/13/2014                                                    Page: 217

 1      Q.    In a 56 --

 2      A.    It's a cash flow issue.

 3      Q.    In a 56-unit complex, you would agree with me

 4   that not every roof would be replaced the same day,

 5   correct?

 6      A.    Oh, no, they wouldn't at all.

 7      Q.    They would be replaced over a period of time, is

 8   that correct?

 9      A.    Correct.

10      Q.    So in regard to any roof replacement, are you

11   saying that with both of these ordinances, the older one

12   and the current one say that the other owners have to

13   agree that when roofs are being replaced they have to all

14   agree to that for the process to take place?

15      A.    Yes.

16            MS. PHILLIPS:  Objection, foundation.

17      Q.    BY MR. RUDA:  Okay.  Would you look at the new

18   section of the code a second?  The line that says, "Where

19   the structure consists of multi dwelling units, the

20   improvement for all of the dwelling units shall be

21   replaced at the same time whenever possible."  Do you see

22   that?  Second line of the --

23      A.    Yes, yep.

24      Q.    Do you understand that to mean that when it's

25   possible they should all be replaced at the same time?

1          MS. PHILLIPS:  Objection, foundation, form

2     of the question.

3          A.   They're not talking about 56 buildings in that

4     sentence.  They're talking about a building that has

5     eight dwelling units.  So they don't want you to replace

6     the siding on your dwelling unit and the siding on

7     Christina's dwelling unit on the other side of the

8     building but not replace the court reporter's and mine.

9     They want you to do the whole building.

10         Q.   BY MR. RUDA:  Okay.  And you would agree that

11    the --

12         A.   That's what a dwelling, that's how that's

13    defined in the building code.  It's the dwelling unit is

14    the individual unit.  You can have anywhere from one

15    dwelling, which is a single-family dwelling, up to a

16    ten-plex, which is, you know, ten units.

17         Q.   Sure.  But here we're talking about all four --

18         A.   Four units, right.  So they're saying, and the

19    way that I interpret this and our discussions with the

20    building code official, they're basically saying when you

21    go ahead and start doing these things and you're going to

22    do Building No. 35, you're doing Building 35.  You're not

23    doing half of Building 35, you're doing the whole thing.

24         Q.   So you read this ordinance to mean, where it

25    says, "Where the structure consist of multi dwelling

Thomas Irmiter
5/13/2014                                                    Page: 219

1    units, the improvement for all the dwelling units," you

2    construe that to mean that the ordinance is only talking

3    about a single structure?

4         A.   Exactly, with how many -- dwelling units and

5    building structure are two different things within the

6    building code, yeah.

7         Q.   And you would agree with me that this, both the

8    old and the new section of the statutes apply to

9    single-family homes, correct?

10        A.   Yes.

11        Q.   In terms of the opinions you just offered here

12   about Mr. Moe failing to calculate siding replacement on

13   certain buildings?

14        A.   Yeah.

15        Q.   It's based upon your review of his estimate?

16        A.   That's all it is, yeah.

17        Q.   Okay.

18        A.   Yeah.

19             MR. RUDA:  I have no other questions.

20             MS. PHILLIPS:  We'll reserve signature.

21             (Proceedings concluded at 2:52 p.m.)

22

23

24

25

**Thomas Irmiter**
**5/13/2014**                                                          **Page: 220**

```
1                      REPORTER'S CERTIFICATE

2    STATE OF MINNESOTA )
                        ) ss.
3    COUNTY OF CARVER   )

4

5         I hereby certify that I reported the deposition of
     THOMAS IRMITER on the 13th day of May, 2014, in
6    Minneapolis, Minnesota, and that the witness was by me
     first duly sworn to tell the truth;
7

8         That the testimony was transcribed by me and is a
     true record of the testimony of the witness;
9

10        That the cost of the original has been charged to
     the party who noticed the deposition, and that all
11   parties who ordered copies have been charged at the same
     rate for such copies;
12

13        That I am not a relative or employee or attorney or
     counsel of any of the parties, or a relative or employee
14   of such attorney or counsel;

15        That I am not financially interested in the action
     and have no contract with the parties, attorneys, or
16   persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;
17

18        That the right to read and sign the deposition by
     the witness was reserved;
19

20        WITNESS MY HAND AND SEAL THIS 18th day of May, 2014.

21

22        Elizabeth J. Gangl

23

24        Elizabeth J. Gangl
          Notary Public, Carver County, Minnesota
25        My commission expires 01/31/2015
```

UPLOADED

JUN 06 2014

Errata Sheet For The Deposition Of:

**_Thomas Irmiter_**, _05/13/2014_ , # *78869*

Case Name: **_Southgate Townhome Association, v. Allstate Insurance Company_**

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |
| ------ | ------ | ------------------------------------- | ------------------------------------- |

Witness Signature

6-2-14

Date

Please return this sheet <u>within 30 days of</u>  _**05/20/2014**_:
**Paradigm Reporting & Captioning**
1400 Rand Tower, 527 Marquette Ave. S., Minneapolis, MN 55402-1331

TM
**78869**
_Reporter: Elizabeth Gangl_

RECEIVED

JUN 2 4 2014