**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FOREST RIDGE HOMEOWNERS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-04193 |
| | ) | Honorable Edmond E. Chang |
| GREATER NEW YORK MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3) RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S COMBINED STATEMENT OF ADDITIONAL FACTS IN RESPONSE & PLAINTIFF'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(b)(3), the Plaintiff, Forest Ridge Homeowners Association ("Plaintiff" or "Forest Ridge"), by and through its attorneys, Thompson, Brody & Kaplan, LLP, hereby submits the following Response to the Statement of Material Facts of the Defendant, Greater New York Mutual Insurance Company ("Defendant" or "GNY") as well as Plaintiff's Combined Statement of Additional Facts in opposition to GNY's Motion for Summary Judgment and Plaintiff's own Local Rule 56.1(a)(3) Statement of Material Facts in Support of Plaintiff's Partial Motion for Summary Judgment.

## I. RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. Defendant, GNY, is a New York corporation with its principal place of business in New York. See Doc. 32, Pl.'s First Am. Compl., ¶ 3.

**Response:** Undisputed.

2. Plaintiff, Forest Ridge, is an Illinois corporation with its principal place of business in Illinois. Id. at ¶ 1.

**Response:** Undisputed.

3. Plaintiff operates a townhome community in Streamwood, Illinois consisting of 51 separate structures housing 193 residential units. ("the Property"). Id. at ¶ 2.

**Response:** Undisputed.

4. GNY issued a commercial property insurance policy to Plaintiff effective from January 21, 2015 to January 21, 2016 ("the Policy"), a copy of which is attached as Exhibit A to Plaintiff's First Amended Complaint. See Doc. 32-2 at p. 11.

**Response:** Undisputed.

5. The Policy insured the Property against risks of direct physical loss or damage subject to certain terms, conditions, limitations, and exclusions. Id. at pp. 11, 115, 132.

**Response:** Undisputed.

6. The Policy contains the following provision:

> **3. Duties in the Event of Loss or Damage**
>
> a. You must see that the following are done in the event of loss or damage to Covered Property.
>
> (2) Give us prompt notice of the loss or damage. Include a description of the property involved.

Doc. 32-2 at p. 115.

**Response:** Undisputed.

7. The Policy contains the following provision:

> **Concealment, Misrepresentation or Fraud**

a. This Coverage Part or Coverage Form is void if you or any other insured ("insured") at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

(1) This Coverage Part or Coverage Form;

(2) The Covered Property;

(3) Your interest in the Covered Property; or

(4) A claim under this Coverage Part or Coverage Form.

Doc. 32-2 at pp. 24, 121.

**Response:** Undisputed.

8. The Policy contains the following provision:

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:

a. During the policy period shown in the Declarations; and

b. Within the coverage territory.

Doc. 32-2 at p. 121.

**Response:** Undisputed.

9. Plaintiff alleges that on August 2, 2015, the Property was damaged by a hail storm ("the Loss Event"). See Doc. 32 at ¶ 11.

**Response:** Undisputed.

10. At the time, Henry Kolbe was the Vice President of Plaintiff's Board of Directors. Ex. 1, Deposition of Henry Kolbe as Plaintiff's Fed. R. Civ. P. 30(b)(6) Representative ("Kolbe Dep."), at 17:1-15.

**Response:** Undisputed.

11. Kolbe has lived at Forest Ridge since approximately 2005 and has been a member of Plaintiff's Board of Directors since approximately 2006. Id. at 16:23 – 17:15, 20:4-11.

**Response:** Undisputed.

12. Kolbe claims to have seen golf ball size hail from his window the evening of August 2, 2015. Id. at 65:17 – 66:3, 134:11 – 135:12.

**Response:** Undisputed.

13. Kolbe recognized that the August 2, 2015 hail event may have caused damage to the Property. Id. at 89:15 – 90:2.

**Response:** Undisputed.

14. However, Plaintiff did nothing to investigate the extent of damage to the Property, if any, for months. Id. at 90:3 – 91:7.

**Response:** Disputed. Kolbe testified that the Association was conducting a reserve study and also a roof inspection and, in fact, GNY performed its own roof inspection within the following two months. Id. at 90:3-18, 91:8-18.

15. Despite 193 residential units on the Property, Kolbe is the only person that claims to have observed, heard, or otherwise personally experienced the August 2, 2015 storm. Ex. 2, Pl.'s Answ. to Interrog. No. 12.

**Response:** Disputed in part. One of the other Board Members, Michael Moravec, indicated that he observed the storm as well. Ex. 1, Kolbe Dep, at 70:8-10.

16. Despite 193 residential units on the Property, Plaintiff did not receive a single complaint, comment, or request for maintenance or repairs from any owners or occupants of the Property as a result of the August 2, 2015 storm. Id. at No. 20.

**Response:** Undisputed.

17. In March 2016, Plaintiff hired Powerhouse Restoration, Inc., to evaluate the roofs at the Property as part of a reserve study. Ex. 3, Deposition of Glen Hankins ("Hankins Dep."), at 71:1-3, 84:13 – 85:2.

**Response:** Undisputed.

18. According to Forest Ridge, hail damage to the roofs at the Property was "discovered" by Glen Hankins in April 2016. See Ex. 1, Kolbe Dep., at 94:13-17.

**Response:** Undisputed.

19. The damage, according to Hankins, "was detected very easily," adding "[i]t's not something that was hard to find." Ex. 3, Hankins Dep., at 95:13-16.

**Response:** Undisputed.

20. Hankins is the sole shareholder of both Powerhouse Restoration, Inc., and Maximum Recovery, Inc., a public adjusting company. Id. at 16:4 – 17:5, 55:13-15.

**Response:** Undisputed.

21. Based on Hankins' recommendation, Forest Ridge resolved to make an insurance claim for replacement of the roofs on all 51 buildings at the Property. Ex. 1, Kolbe Dep., at 123:9– 124:3.

**Response:** Disputed in part. Hankins testified that the claim was submitted to GNY for all roofs so that Forest Ridge could get a GNY adjuster involved to determine the amount of damage. Ex. 3, Hankins Dep., at 130:2-11.

22. On May 13, 2016, Plaintiff finally notified GNY of the loss. Id. at 128:17-24.

**Response:** Disputed in part. Plaintiffs notified GNY of the loss only days after discovering the hail damage. See Ex. 1, Kolbe Dep., at 94:13-17 and 128:17-24.

23. Forest Ridge has no specific reason for waiting until May 13, 2016 to notify GNY of the loss. Id. at 129:11-16.

**Response:** Disputed. Mr. Kolbe actually stated he believed "we acted in a prompt manner." See Ex. 1, Kolbe Dep., 128:17-24. Plaintiffs notified GNY of the loss only days after discovering the hail damage. See Ex. 1, Kolbe Dep., at 94:13-17 and 128:17-24.

24. The loss was initially, though apparently mistakenly, reported to GNY as having occurred on August 2, 2014. Plaintiff subsequently corrected the reported date of loss to August 2, 2015. Ex. 3, Hankins Dep., at 151:8-15.

**Response:** Undisputed.

25. On or about May 20, 2016, Forest Ridge entered into a "Contract for Insurance Representation and Work Authorization for Repairs" with Powerhouse Restoration, Inc., which authorized Powerhouse to negotiate the insurance claim with GNY on Forest Ridge's behalf and to perform repairs to the Property at a cost not to exceed the amount of any insurance proceeds received from GNY. See Ex. 4, Powerhouse Contract; Ex. 1, Kolbe Dep., at 125:3-12, 126:11-14, 127:23 – 128:2; Ex. 3, Hankins Dep., at 162:15 – 163:9.

**Response:** Undisputed.

26. On or about May 21, 2016, Forest Ridge entered into a Public Adjuster Contract with Maximum Recovery, Inc., whereby Maximum Recovery agreed to advise and assist Forest Ridge in the adjustment of the insurance claim in exchange for a fee of 5 percent of the total amount paid by GNY in settlement of the insurance claim. See Ex. 5, Maximum Recovery Contract; Ex. 1, Kolbe Dep., at 125:13-18, 126:11-14, 127:19-22; Ex. 3, Hankins Dep., at 167:9-22, 168:10-17.

**Response:** Undisputed.

27. Forest Ridge relied on Hankins, as its public adjuster, throughout the claim process, including in the determination that the loss and damage occurred on August 2, 2015. See Ex. 1, Kolbe Dep., at 149:14 – 150:13; Ex. 3, Hankins Dep., at 225:8-10.

**Response:** Disputed in part. Kolbe actually testified that Hankins may not have identified the loss date, but rather he may have obtained that information from third party records or possibly even GNY. Id.

28. Hankins chose August 2, 2015 as the date of loss because it was the most recent hail event and had larger hail and stronger winds than prior hail events. See Ex. 3, Hankins Dep., at 221:6-14.

**Response:** Disputed in part. In addition to Hankins' review of the meteorological records, Hankins also indicated that there was no hail damage found by GNY during its 2011 and 2013 inspections. See Ex. 2 to Plaintiff's Response in Opposition (2011 GNY Survey Report) at pp.4, 9 and Ex. 4 to Plaintiff's Response in Opposition (2013 GNY Survey Report) at pp.4, 5.

29. On May 26, 2016, GNY sent Plaintiff a letter acknowledging receipt of notice of the loss and, due to the late notice, reserving it rights pending completion of its investigation. See Ex. 6, Reservation of Rights Letter; Ex. 1, Kolbe Dep., at 128:17-24.

**Response:** Disputed. The alleged recipient of the letter, Melanie Kuhn, testified that she never received the letter. See Ex. 1 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Kuhn Deposition) at 220: 1-16. When the files of the alleged recipients of that letter, Powerhouse Restoration, Inc., US Underwriters Insurance Group, Property Specialists, Inc. and York Risk Services Group were produced in response to subpoena in this case, none of the files contained a copy of the May 26, 2016 Reservation of Rights letter. See Ex. 25 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Affidavit of Matthew McLean).

30. On June 13 and 14, 2016, at GNY's request, Derek Boggi of J.S. Held conducted an inspection of the roofs of the Property. Ex. 7, Deposition of Derek Boggi ("Boggi Dep."), at 39:3-9, 47:14-19.

**Response:** Undisputed.

31. Boggi observed hail impact marks to the asphalt shingles and soft metals at the Property and was able to rule out the August 2, 2015 storm event as the cause due, in part, to the absence of "spatter" markings at the time of his inspection. Id. at 123:16 – 127:2.

**Response:** Disputed. Boggi indicated the damage was from a hail event prior to 2012, however there was no existing hail damage in 2013. See Ex. 2 to Plaintiff's Response in Opposition (2011 GNY Survey Report) at pp.4, 9 and Ex. 4 to Plaintiff's Response in Opposition (2013 GNY Survey Report) at pp.4, 5.

32. Spatter markings are temporary and tend to fade away entirely within a year or two after the event that caused them. Id. at 121:14 – 123:12; Ex. 8, Deposition of Tom Irmiter ("Irmiter Dep."), at 99:14 – 100:6.

**Response:** Disputed. Hail spatters can be seen up to two years later. Ex. 8 to Defendant's Memorandum of Law, 100:5-6.

33. Due to the absence of spatter markings, Boggi was unable to rule out storms that occurred more than two years prior to his inspection as a potential cause of the hail impacts he observed. See Ex. 7, Boggi Dep., at 125:4 – 127:2.

**Response:** Disputed. GNY had already ruled out those storms as potential causes. See Ex. 2 to Plaintiff's Response in Opposition (2011 GNY Survey Report) at pp.4, 9 and Ex. 4 to Plaintiff's Response in Opposition (2013 GNY Survey Report) at pp.4, 5.

34. When attempting to differentiate between damage caused by different hail events, it is important to look for "collateral" indications that a property was impacted by a recent event, such as "spatter" marks on certain materials, shredded leaves or other damage to trees and plants, and cars, and shingles granules displaced into gutters. Ex. 8, Irmiter Dep., at 89:7-12, 96:1-20, 102:6-

18, 103:13 – 104:11.

**Response:** Disputed in part. Irmiter never testified as to the "importance" of any of those "collateral" indications.

35. Over time, signs that the Property had experienced a significant hail event on August 2, 2015 fade or disappear. See Ex. 7, Boggi Dep., at 126:10 – 127:2, 129:20 – 131:23; Ex. 8, Irmiter Dep., at 96:1 – 98:8, 102:6 – 103:12.

**Response:** Disputed. These portions of the Deposition testimony reference generalities, not the specific inspection of the Forest Ridge Property. Further, Irmiter also testified that damage will worsen and become more visible over time. Ex. 8, Irmiter Dep., at 97:17 – 98:8.

36. A mark left by a "fresh" hailstone strike has a different appearance and color than one that has grayed and weathered for years. See Ex. 7, Boggi Dep., at 126:10 – 127:2, 129:20 – 131:23; Ex. 8, Irmiter Dep., at 102:6 – 103:8, 116:24 – 118:10.

**Response:** Undisputed.

37. As a result, when attempting to differentiate damage caused by multiple storms, an ideal hail investigation will include an inspection of the property immediately after the suspected hail event. Ex. 8, Irmiter Dep., at 97:4 – 98:8.

**Response:** Disputed. Irmiter actually testified that an ideal investigation would occur over a prolonged timeframe with multiple inspections taking place over that span. Ex. 8, Irmiter Dep., at 97:10 – 97:16.

38. According to Boggi, it is easiest to differentiate hail from a recent event from damage caused by an older event by inspecting the Property within weeks of the recent event. See Ex. 7, Boggi Dep., at 126:10 – 127:2, 129:20 – 131:23.

**Response:** Disputed. This is a misstated paraphrasing of the cited deposition testimony.

39. On or about September 23, 2016, GNY sent a letter to Hankins requesting certain documents to assist in GNY's investigation of the claim and expressing doubts as to whether the damage to the roofs occurred on August 2, 2015, as opposed to an earlier storm event. See Ex. 9, Sept. 23, 2016 Letter, at p. 2; Ex. 3, Hankins Dep., at 232:17 – 233:5, 246:11 – 247:3.

**Response:** Disputed. The correspondence actually specifically requested documents "supporting the insured's contention that the loss and damage …. occurred on or about August 2, 2015" and not any other storm event. See Ex. 9, at p.2 par. 3.

40. Forest Ridge understood that GNY questioned whether the loss and damage at the Property actually occurred on August 2, 2015, and suspected that the damage may have occurred prior to 2015. See Ex. 1, Kolbe Dep., at 79:2-8.

**Response:** Disputed. Kolbe testified that "at some point in time" he learned that GNY believed the loss may have occurred earlier, but the transcript does not reflect the specific point in time.

41. The documents requested included, among other things, all weather reports and any other documents supporting Forest Ridge's contention that the loss and damage occurred on August 2, 2015. Ex. 9, Sept. 23, 2016 Letter, at p. 2; Ex. 3, Hankins Dep., at 236:10-18.

**Response:** Disputed. The correspondence actually specifically requested documents "supporting the insured's contention that the loss and damage …. occurred on or about August 2, 2015, including the weather reports upon which you are relying" and not any other storm event. See Ex. 9, at p.2 par. 3.

42. On October 11, 2016, Hankins responded to GNY's request for documents via email. Ex. 10, Oct. 11, 2016 Email, at p. 1; Ex. 1, Kolbe Dep., at 74:17 – 75:5; Ex. 3, Hankins Dep., at 232:17 – 233:16.

**Response:** Undisputed.

43. With respect to GNY's request for weather reports supporting Plaintiff's position regarding the date of loss, Hankins' email stated that he had attached "a hail report for one of the addresses in the Subdivision." Ex. 10, Oct. 11, 2016 Email, at p. 1; Ex. 3, Hankins Dep., at 236:10 – 237:7.

**Response:** Disputed. Hankins actually stated in his email "Attached is a hail report for one of the address in the Subdivision. Weather bulletins from the Weather Channel and Weather.gov, accuweather.com, etc. This was a large storm that produced high winds and hail and tornadoes". Ex. 10, Oct. 11, 2016 Email, at p. 1.

44. The document Hankins was referring to, and which was attached to his email, is attached hereto as Exhibit 11. See Ex. 11; Ex. 10, Oct. 11, 2016 Email, at p. 62; Ex. 3, Hankins Dep., at 236:10 – 237:7.

**Response:** Disputed. Exhibit 11 is only one of the many reports Hankins referenced in his email.

45. Exhibit 11, on its face, appears to be a 1-page "Hail Facts" "Address-Specific Hail Report" for an address at the Forest Ridge community created on April 21, 2016, and listing three hail events during the search period of January 1, 2006 to April 20, 2016. The dates of those three events are April 9, 2015, July 17, 2015, and August 2, 2015. The largest hail at the search address – up to 0.90 inches – belongs to the August 2, 2015 event. See Ex. 11.

**Response:** Undisputed.

46. When Hankins sent the email attaching Exhibit 11 to GNY he also had in his possession another "Hail Facts" report, which is attached hereto as Exhibit 12. See Ex. 12; Ex. 3, Hankins Dep., at 124:21-24, 125:18 – 126:8; 253:18-24.

**Response:** Disputed. Hankins actually testified that he did not recall obtaining the report.

47. Exhibit 12, on its face, appears to be a 2-page "Hail Facts" "Address-Specific Hail Report" for the same address at the Forest Ridge community created on April 21, 2016, and listing fourteen hail events during the period from January 1, 2006 to April 20, 2016. See Ex. 12.

**Response:** Disputed. The report only references five instances of Hail at the Forest Ridge location, two of which preceded the most recent in person inspection by GNY.

48. The fourteen events listed in Exhibit 12 include eleven events between April 2, 2006 and November 17, 2013. The largest hail at the search address – up to 0.90 inches – belongs to events occurring on March 21, 2007, April 5, 2010, and August 2, 2015. See Ex. 12.

**Response:** Disputed. The report only references five instances of Hail at the Forest Ridge location, two of which preceded the most recent in person inspection by GNY.

49. Hankins was unable to explain how he obtained Exhibit 11 or why the two Hail Facts reports are different despite being created on the same date and having the same search address and search period. See Ex. 3, Hankins Dep., at 237:22 – 238:22, 241:3-14, 243:6 – 244:2, 244:8 – 245:1, 246:24 – 248:9.

**Response:** Disputed. Hankins actually testified that one was an abbreviated version.

50. On November 9, 2016, GNY requested an examination under oath of Plaintiff's Vice President, Henry Kolbe. Ex. 13, Nov. 9, 2016 Letter, at p. 1; Ex. 3, Hankins Dep., at 256:14-20.

**Response:** Undisputed.

51. On November 22, 2016, Kolbe appeared for an examination under oath accompanied by Hankins. Ex. 14, EUO Transcript, at p. 1.

**Response:** Undisputed.

52. During the EUO, Kolbe was asked about the Hail Facts report attached to Hankins' October 11, 2016 email, but neither Kolbe nor Hankins disclosed the existence of the other Hail Facts

report in Hankins' possession. Id. at 57:4 – 59:14.

**Response:** Disputed. Kolbe was never questioned about any other Hail Facts reports and, in fact, Kolbe indicated he had never seen the Hail Facts report presented to him at his examination under oath.

53. On January 3, 2017, GNY denied coverage for Forest Ridge's claim due, in large part, to its failure to give prompt notice of the loss and damage. See Ex. 15, Jan. 3, 2017 Denial Letter; Ex. 16, Deposition of Deryk Martinez ("Martinez Dep."), at 121:14-18; Ex. 1, Kolbe Dep., at 150:14 – 151:2.

**Response:** Disputed. The January 3, 2017, correspondence sets forth multiple bases for the claim denial without specifying the degree to which GNY relied upon each.

54. As explained in the denial letter, the time that had elapsed between the alleged date of loss and Forest Ridge's reporting of the loss to GNY prejudiced GNY in its ability to discern what, if any, of the damage to the Property occurred on August 2, 2015. See Ex. 15, Jan. 3, 2017 Denial Letter.

**Response:** Disputed. The record in its entirety demonstrates that GNY was not prejudiced in any way by the notice provided by Forest Ridge.

55. Forest Ridge does not disagree that hail as large as 1.50 inches in diameter fell at the Property in April 2010. See Ex. 1, Kolbe Dep., at 152:9 – 153:3.

**Response:** Undisputed.

56. GNY's meteorology expert, Dr. Jason Webster, concluded that it is highly likely that the Property was impacted by hail of diameter equal to or greater than 1.25 inches on April 5, 2010. See Ex. 17, Deposition of Dr. Jason Webster ("Webster Dep."), at 12:21 – 13:4, 108:8-17; Ex. 18, AtmoSci Report (Narrative Portion Only), at p. 21.

**Response:** Plaintiff does not dispute that Dr. Webster rendered this testimony.

57. According to Dr. Webster, any hail that impacted the Property on August 2, 2015 was no greater than 0.75 inches in diameter. Ex. 17, Webster Dep., at 159:21 – 161:13; Ex. 18, AtmoSci Report, at p. 21.

**Response:** Plaintiff does not dispute that Dr. Webster rendered this testimony.

58. Plaintiff's meteorology expert, Rocco Calaci, concluded that the Property was impacted by hail up to 1.00 inch in diameter on August 2, 2015. Ex. 19, Deposition of Rocco Calaci ("Calaci Dep."), at 169:8-10.

**Response:** Disputed. Calaci testified that 1 inch was an average and that some could have been bigger than an inch. See Ex. 19, Calaci Dep., at 169:2-7. See also Ex. 5 to Plaintiff's Combined Response in Opposition and Memorandum in Support (LRC Services Report) at p. 13 wherein Calaci indicates that the hail on August 2, 2015 was up to and including 1 inch.

59. One of Plaintiff's causation experts, Tom Irmiter of Forensic Building Sciences ("FBS"), attributed nearly all the hail damage FBS observed at the Property to the August 2, 2015 storm. Ex. 8, Irmiter Dep., at 75:5-8; Ex. 20, FBS Joint Storm Damage Report ("FBS Report"), at p. 51.

**Response:** Undisputed.

60. FBS inspected the Property in October and November 2017. Ex. 20, FBS Report, at p. 5.

**Response:** Undisputed.

61. With the exception of a handful of hail impact marks on one building – Building 37 – Irmiter attributed all the hail damage he observed at the Property to the August 2, 2015 storm. Ex. 8, Irmiter Dep., at 120:17-21.

**Response:** Undisputed.

62. Another of Plaintiff's retained experts, Ryan Nierengarten of FBS, opined that a "small

amount" of hail damage at the Property pre-dates the August 2, 2015 storm. See Ex. 21, Deposition of Ryan Nierengarten ("Nierengarten Dep."), at 111:3 – 112:10.

**Response:** Disputed. This misstates Nierengarten's testimony. He indicated he "could not say for sure" whether there was existing damage but a small amount "appeared" to be older than 2015.

63. FBS observed hail damage at the Property consistent with hail larger than 1.00 inch in diameter, and as large as 1.25 inches in diameter. See Ex. 20, FBS Report, at pp. 7-8; Ex. 8, Irmiter Dep., at 135:17 – 136:1, 153:16-21; Ex. 21, Nierengarten Dep., at 115:4-20, 160:4-19, 161:2-9.

**Response:** Disputed. Irmiter testified that he did not measure the hail impact marks. Rather, he put his finger next to the marks and could see that they were consistent with "either side of one-inch hail". Ex. 8, Irmiter Dep., at 106:5-11.

64. The hail damage to the Property that Irmiter attributes to the August 2, 2015 storm includes damage consistent with hail larger than 1.00 inch in diameter. See Ex. 20, FBS Report, at pp. 7-8; Ex. 8, Irmiter Dep., at 135:17 – 136:1, 153:16-21; Ex. 21, Nierengarten Dep., at 115:4-20, 160:4-19, 161:2-9.

**Response:** Disputed. Irmiter testified that he did not measure the hail impact marks. Rather, he put his finger next to the marks and could see that they were consistent with "either side of one-inch hail". Ex. 8, Irmiter Dep., at 106:5-11.

65. Irmiter ruled out the April 2010 storm as the cause of damage at the Property due, in part, to its "signature pattern" of 2.50 to 2.75 inch hail, which was not consistent with the damage FBS observed at the Property. Ex. 8, Irmiter Dep., at 153:6-15, 157:1-8, 161:4-15.

**Response:** Disputed. GNY had already ruled out those storms as potential causes. See Ex. 2 to Plaintiff's Response in Opposition (2011 GNY Survey Report) at pp.4, 9 and Ex. 4 to Plaintiff's Response in Opposition (2013 GNY Survey Report) at pp.4, 5.

66. The "signature pattern" of the August 2, 2015 hail storm, in contrast, was 1.00 to 1.25 inch hail. Id. at 153:16-21.

**Response:** Disputed in part. Irmiter also testified that he did not measure the hail impact marks. Rather, he put his finger next to the marks and could see that they were consistent with "either side of one-inch hail". Ex. 8, Irmiter Dep., at 106:5-11.

67. Irmiter does not hold himself out as an expert in the field of forensic meteorology and will not offer forensic meteorological opinions in this matter. Id. at 23:5-7, 130:4-13.

**Response:** Undisputed.t

68. In 2013, Irmiter inspected the Southgate Townhome Association in Streamwood, Illinois, approximately three miles from Forest Ridge, for hail damage. Ex. 8, Irmiter Dep., at 41:12 – 42:20, Ex. 22, FBS Report for Southgate Townhome Association ("FBS Southgate Report"), at p. 3.

**Response:** Undisputed.

69. As an expert witness in litigation between Southgate and its property insurer Irmiter testified that the hail damage at Southgate was more likely than not caused by the April 5, 2010 storm. Ex. 23, Deposition of Tom Irmiter in Southgate Townhome Association v. Allstate Ins. Co., Case No. 12 L 3185, Cir. Ct. Cook Cty., May 13, 2014 ("Irmiter Southgate Dep."), at 43:3 – 44:8; Ex. 22, FBS Southgate Report, at p. 2.

**Response:** Undisputed.

70. The hail damage at Southgate, which Irmiter attributed to the April 5, 2010 storm, was

consistent with hail ranging from 1.43 to 2.16 inches in diameter. Ex. 23, Irmiter Southgate Dep., at 46:3-22, 56:18 –57:7, 66:19 – 67:15, 192:2 – 193:11; Ex. 22, FBS Southgate Report, at pp. 2, 25.

**Response:** Undisputed.

71. The Village of Streamwood's 2011 Budget states that the Village "saw significantly higher building activity" in 2010 "as a result of a hail storm in April." Ex. 24, Village of Streamwood 2011 Budget, at p. 73.

**Response:** Undisputed.

72. According to data obtained from the Village of Streamwood in response to a public records request, in 2010 the Village issued 3,412 roofing permits. See Ex. 25, Village of Streamwood Monthly Report Permits Summary, 2007 – 2017, at p. 8.

**Response:** Undisputed.

73. In 2009, the Village of Streamwood issued 299 roofing permits. Id. at p. 6.

**Response:** Undisputed.

74. Between January 1, 2011 and December 31, 2017, the Village of Streamwood issued 1,864 roofing permits. Id. at pp. 10, 12, 14, 16, 18, 20, 22.

**Response:** Undisputed.

## II. PLAINTIFF'S COMBINED STATEMENT OF ADDITIONAL MATERIAL FACTS AND STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT[1]

1. Forest Ridge has been insured by GNY continuously from 2011 through the present. See Ex. 1 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Deposition of Plaintiff's Property Manager, Melanie Kuhn ("Kuhn Dep") at 220: 1-16.

2. Prior to insuring Forest Ridge, GNY conducted a "Comprehensive Loss Control Survey" inspection of Forest Ridge on February 14, 2011. As a result of this inspection, a "GNY Survey Report" was created which stated, in regard to the roofs, that there was no evidence of leakage, no loss history noted, and that the "[b]uildings have roofs that are in good condition" and no past history of wind damage within the last 3 years. See Ex. 2 to Plaintiff's Combined Response in Opposition and Memorandum in Support, (2011 GNY Survey Report), at pp.4, 9.

3. In 2012, Forest Ridge Conducted a Reserve Study at which time the roofs were deemed to be in "good to fair overall condition" with no indication of existing hail damage. See Ex. 10 to Defendant's Memorandum of Law (GNY_001086).

4. GNY conducted a second "Comprehensive Loss Control Survey" inspection on October 8, 2013 which noted there was no significant history of wind damage in the past 3 years and there was no evidence of roof deterioration/leaks. See Ex. 3 to Plaintiff's Combined Response in Opposition and Memorandum in Support, (2013 GNY Survey Report), at pp.4, 5.

5. On August 2, 2015, between 10:31 and 10:37 p.m., wind gusts between 57 and 67 mph passed through Forest Ridge. Between 10:36 p.m. and approximately 10:40 p.m. hail stones with

[1] Counsel for the Parties conferred and agreed that, in order to comply with the Court's request that Forest Ridge submit a singular brief in response to GNY's Motion and also in support of Forest Ridge's own Motion, that Plaintiff should also present a Combined Statement of Additional Facts and Material Facts since the combination did not exceed the number of facts allotted by the rules and served to avoid duplication of the same facts in multiple sections.

diameters up to and including 1.0 inch affected the Forest Ridge property. See Exhibit 4 to Plaintiff's Combined Response in Opposition and Memorandum in Support, (LRC Services Report), at p. 13.

6. Henry Kolbe, Vice-President of the Board of the Association, has resided at Forest Ridge since it was built and does not recall any other hail events at the property other than the one on August 2, 2015. See Ex. 1 to Defendant’s Memorandum of Law, Kolbe Dep., at p. 66: 4-6.

7. Kolbe has a bachelor’s degree in finance and works in software sales. He has no insurance, construction, engineering or meteorology background. See Ex. 1 to Defendant’s Memorandum of Law, Kolbe Dep., at 13: 17-24 – 14: 1-9.

8. Prior to August 2, 2015, Ms. Kuhn does not recall receiving any complaints or work order requests from community members regarding roof leaks resulting from storm damage. See Ex. 1 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Kuhn Dep., at 235: 23-34, 236: 1-3.

9. The damage was discovered during Powerhouse's roof evaluation and reported to the Association on April 25, 2016. See Ex. 5 to Plaintiff's Combined Response in Opposition and Memorandum in Support (4/25/16 Update on Reserve Study for Roofs).

10. The Association was made aware of the damage to the roofs when Powerhouse started its inspection. See Ex. 1 to Defendant’s Memorandum of Law, Kolbe Dep., at p. 98; 10-14.

11. There is no record of any other hailstorm at the property having occurred between the second Loss Control Survey on October 8, 2013 and the August 2, 2015, storm. See Ex. 12 to Defendant’s Memorandum of Law.

12. On May 12, 2016, Forest Ridge, through its property manager and management company, Ms. Kuhn of Property Specialists, Inc., submitted a Property Loss Notice to Forest Ridge's

insurance broker, US Underwriters Insurance Group, Inc. which also enclosed the April 25, 2016 Update on Reserve Study for Roofs. See Ex. 6 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Initial Property Loss Notice).

13. On May 13, 2016, US Underwriters Insurance Group, Inc. provided the Initial Property Loss Notice to GNY. See Ex. 7 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Initial Notice to GNY).

14. On May 18, 2016, Forest Ridge, through Property Specialists, Inc. submitted a revised Property Loss Notice to US Underwriters correcting the typo in the date of loss from August 2, 2014 to August 2, 2015. See Ex. 8 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Revised Property Loss Notice).

15. On May 18, 2016, US Underwriters submitted the Revised Property Loss Notice to GNY and explained that the date of loss on the Initial Property Loss Notice was a typo. See Ex. 9 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Revised Property Loss Notice).

16. On May 18, 2016, GNY's adjuster, Rick Reisterer, obtained CoreLogic Hail and Wind Verification Reports for Forest Ridge for the date range of January 1, 2006 through May 17, 2016. The Hail Verification report noted 1" hail at Forest Ridge on August 2, 2015. It also identified hail events on April 5, 2010 and March 21, 2007. See Ex. 10 to Plaintiff's Combined Response in Opposition and Memorandum in Support. REISTERER_000306 (Core Logic Report).

17. On June 1, 2016, through Reisterer, GNY retained J.S. Held as its damage consultant in regard to the claim. See Ex. 11 to Plaintiff's Combined Response in Opposition and Memorandum in Support (Correspondence to JS Held).

18. On June 28, 2016, Boggi provided the J.S. Held estimate to Reisterer which establishes the RCV measure of $1,469,149.19 and ACV measure of $989,246.69. See Ex. 12 Plaintiff's Combined Response in Opposition and Memorandum in Support (JS Held Report).

19. On July 5, 2018, based upon the JS Held Estimate, Hankins requested release of the Undisputed ACV. See Ex. 13 Plaintiff's Combined Response in Opposition and Memorandum in Support. (Request for ACV).

20. On July 8, 2016 Reisterer submitted a Report to GNY which enclosed the Boggi/JS Held Estimate in the RCV amount of $1,469,149.19 and the "Undisputed ACV loss" of $989,246.69 The Report noted the following:

- "Based on weather data researched and provided with our investigation to date, I can identify two storms in 2015: August 2 and July 17, 2015. My recommendation is application of two deductibles at $5000 each."
- "My loss settlement recommendation is $979,246.69 at net Undisputed ACV subject to coverage confirmation that this loss falls within a policy period covered by your company and your office concurs with my deductible application."
- "Our investigation confirmed hail impact to composition shingle roofs, west to southwest gutter and downspout exposures and minor damage to vinyl siding."
- "Hail impact averaged 10+ this per test square consistently on every roof in the complex (51 buildings)."
- "The weather data (the WeatherGuidance and CoreLogic Reports) identifies two storms in 2015: August 2 and July 17 with similar size hail confirmation at the risk locale. These are the only two storms that generate hail size that we can correlate to the risk location and the damage we found on the roofs and exteriors of the buildings."

See Ex. 14 to Plaintiff's Combined Response in Opposition and Memorandum in Support at REISTERER_000163, 164, 166 (Report to GNY with CoreLogic).

21. Reisterer represented to Hankins that the ACV would be paid and there was no question about coverage of the claim. See Ex. 3 to Defendant's Memorandum of Law, Hankins Dep., at p. 208: 8-11, 212: 11-23.

22. In response to follow up inquiries from Hankins, on July 18, 2016, Reisterer responded that "[w]e are on board with 8/2/15 but also 7/17/15" in regard to the date of loss. See Ex. 15 to Combined Response in Opposition and Memorandum in Support at p. 1 (7/18/16 Reisterer E-mail).

23. At the end of July/beginning of August 2016, GNY (through counsel) retained a second damage consultant, Roofing Consultants, Ltd. ("RCL") and Brian Horvath, to conduct an inspection of the roofs at Forest Ridge. The inspection by Horvath/RCL began on August 22, 2018. As early as August 23, 2018, Horvath had inspection results to report to GNY. See Ex. 16 of Plaintiff's Combined Response in Opposition and Memorandum in Support at p. 1. (GNY 1460-1467).

24. GNY retained RCL to go out, scope the damage that was observed, provide an estimate, and tell GNY if the observed damage was consistent with the storm as reported. See Ex. 17 of Plaintiff's Combined Response in Opposition and Memorandum in Support, Deposition of Deryk Martinez (Martinez Dep.) at 102: 20-25, 103: 1-9.

25. On or about September 23, 2016, GNY sent a letter to Hankins requesting certain documents "supporting the insured's contention that the loss and damage …. occurred on or about August 2, 2015". See Ex. 9 to Defendant's Memorandum of Law, Sept. 23, 2016 Letter, at p. 2.

26. In a responsive email, Hankins stated "Attached is a hail report for one of the address in the Subdivision. Weather bulletins from the Weather Channel and Weather.gov, accuweather.com, etc. This was a large storm that produced high winds and hail and tornadoes." See Ex. 10 to Defendant's Memorandum of Law, Oct. 11, 2016 Email, at p. 1.

27. The HailFacts Report lists two additional hail events at Forest Ridge before 2015, one occurring on April 5, 2010 and the other on March 21, 2007. See Ex. 12 to Defendant's Memorandum of Law.

28. On June 7, 2016 GNY's Expert, Derek Boggi provided GNY with a report from WeatherGuidance which identified verifiable instances of hail greater than or equal to 3/4 of an inch at the property between May 31, 2006 - May 31, 2016. The WeatherGuidance report states that on August 2, 2015 hail of .75-1.0 inch in diameter fell at the property. It also identified hail events on April 5, 2010 and March 22, 2007. See Ex. 18 to Plaintiff's Combined Response in Opposition and Memorandum in Support at (Boggi e-mail and WeatherGuidance Report) at pp.1, 5.

29. After obtaining the WeatherGuidance Report on June 13, 2016, Boggi began his inspection of all of the roofs at Forest Ridge. See Ex. 7 to Defendant's Memorandum of Law, Boggi Dep., at 47:14-17).

30. Plaintiff's expert, Tom Irmiter, testified that the hail marks were consistent with "either side of one-inch hail". See Ex. 8 to Defendant's Memorandum of Law, Irmiter Dep., at 106:5-11.

31. Plaintiff's meteorologist, Rocco Calaci, testified that hail with an average diameter of one inch fell during the August 2, 2015, storm with some larger than one inch. See Ex. 19 to Defendant's Memorandum of Law, Calaci Dep., at 169:2-7.

32. Irmiter and FBS inspected each of the 51 roofs at the property and determined that all 51 needed to be replaced as a result of the August 2, 2015, storm. See Ex. 8 to Defendant's Memorandum of Law, Irmiter Dep., at 181:13-16.

33. Defendant's Senior Claims Examiner assigned to Forest Ridge's claim, Deryk Martinez, testified that "prompt notice" is not defined under the Policy but that he defines "prompt notice"

as it is used in the GNY Policy as being "as soon as you are aware there has been damage sustained to your property". See Ex. 17 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Martinez Dep., at 65:12 – 66:11.

34. On September 26, 2018, Martinez e-mailed Hankins indicating that the insured should cover/tarp the damaged roofs. See Ex. 19 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (GNY 1195).

35. A September 28, 2016 Claims Review Memo completed by Martinez states "[b]ased on this report (RCL), we will also issue an advance of $75,000 for the damage the expert believes is the result of hail on the reported date of loss." The Memo is silent as to a Reservation of Rights. See Ex. 20 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (GNY 001142-001143).

36. The Indemnity Requisition form completed by Martinez for the $75,000 check states "[i]n Payment Of: Bldg - advance payment for hail damage to roofs @ Yellowstone Drive." (emphasis original). See Ex. 21 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Check Request).

37. On September 29, 2016, GNY issued a check in the amount of $75,000 to Forest Ridge for "Advance Payment for Hail Damage to Roofs" and sent it to Forest Ridge's management company, Property Specialists, Inc. It was stamped "RECEIVED OCT 03, 2016." See Ex. 22 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Advance Check).

38. The advance check was signed over by Forest Ridge to Mr. Hankins and used for temporary fixes and tarping on the damaged roofs throughout Forest Ridge. See Ex. 1 to Defendant's Memorandum of Law, Kolbe Dep. at p. 144: 11-24, p. 145: 1-11.

39. Forest Ridge understood the issuance of the advance check to mean that GNY had accepted the claim and was acknowledging the damage. See Ex. 1 to Defendant's Memorandum of Law, Kolbe Dep., at p. 153: 15-24.

40. On October 31, 2016, RCL issued its estimate establishing an RCV measure of damages in the amount of $690,359.01. See Ex. 23 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (RCL Estimate).

41. On December 8, 2016, GNY offered to pay Forest Ridge $690,359, the RCL valuation for the hail damage which, if not accepted, would expire on December 31, 2016. See Ex. 24 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Settlement Offer).

42. During discovery in this litigation, GNY produced a four (4) page letter dated May 26, 2016 titled "Reservation of Rights" and addressed to the Association c/o Property Specialists, Inc. Attn: Ms. Melanie Kuhn. Powerhouse Restoration, Inc., US Underwriters Insurance Group, and York Risk Services Group are listed as carbon copy ("cc") recipients of the letter. See Ex. 6 to Defendant's Memorandum of Law (ROR Letter).

43. The files of Powerhouse Restoration, Inc., US Underwriters Insurance Group, Property Specialists, Inc. and York Risk Services Group relative to this claim were produced in response to subpoena in this case. None of the files contained a copy of the May 26, 2016 Reservation of Rights letter. See Ex. 25 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Affidavit of Matthew McLean).

44. Ms. Kuhn never received any documentation from GNY that contained the term "reservation of rights." See Ex. 1 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Kuhn dep., at 226: 12-15.

45. Ms. Kuhn denies receipt of the May 26, 2016 Reservation of Rights letter. If she had received it, it would have been maintained in her file for Forest Ridge in the ordinary course of her business. See Ex. 1 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Kuhn dep., at 245: 3-16.

46. Anything that seems pertinent is addressed in the GNY file notes for a particular claim, including when a reservation of rights letter is sent out. See Ex. 17 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Martinez dep., at 111: 10-16.

47. The two GNY File Notes made on May 26, 2016 do not mention a reservation of rights letter was sent on that date. A later file note on July 1, 2016 states "[a]n ROR is needed immediately." See Ex. 26 to Plaintiff's Combined Response in Opposition and Memorandum in Support. GNY 000006. (ROR Request).

48. On December 29, 2016, GNY prepared a draft denial letter while its offer to pay the RCL measure of the damage was still open. See Ex. 17 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Martinez dep., at p. 116: 8-23.

49. On January 3, 2017, GNY sent Forest Ridge, care of Property Specialists, Inc., a letter denying the insurance claim stating "[y]ou failed to give prompt notice of the loss and damage to GNY and were unable to demonstrate that the hail storm that occurred on the reported date of loss caused any damage. Additionally, some, or all of the damage may have occurred prior to the policy period. For the reasons stated above and based on the foregoing policy provisions, GNY is unable to provide coverage in this matter." See Ex. 27 to Plaintiff's Combined Response in Opposition and Memorandum in Support. GNY_000115. (GNY Denial).

50. Any reasoning that was used in the process of denying the claim was included in the denial letter and Martinez made the denial letter clear as to the reasons the claim was being denied. See

Ex. 17 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Martinez dep., at 123: 7-11, 135: 14-17.

51. As the Claims Examiner, it was Martinez's responsibility to inform the insured exactly why their claim is being denied. See Ex. 17 to Plaintiff's Combined Response in Opposition and Memorandum in Support, Martinez dep, at 129: 13-19.

52. For its First Affirmative Defense GNY alleges that Forest Ridge cannot recover because it provided late notice of the loss and damage and GNY was prejudiced by same based upon the following condition in the Policy:

> "**3. Duties in the Event of Loss or Damage**
>
> **a.** You must see that the following are done in the event of loss or damage to Covered Property.
>
> **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved."
>
> See (Policy, Condominium Association Coverage Form, p. 9 of 14) (emphasis original). (First Affirmative Defense)(Dkt. #34 at pp. 8-9).

53. As additional Affirmative Defenses, GNY further alleges that Forest Ridge cannot recover to the extent the loss and damage caused was caused by the following excluded causes of loss:

> "**2.** We will not pay for the loss and damage caused by or resulting from any of the following:
> **(d)(1)** Wear and tear; "
>
> See (Policy, Causes of Loss - Special Form, pp. 2-3 of 10) (emphasis original). (Second Affirmative Defense; Dkt. #34 at p. 9).
>
> "**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c**. But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Loss.
>
> **c.** Faulty, inadequate, or defective:

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compacting;
**(3)** Materials used in repair, construction, renovation or remodeling; Or
**(4)** Maintenance;
Of part or all of any property on or off the described premises."

(Policy, Causes of Loss - Special Form, pp. 2-3 of 10) (emphasis original)
(Third Affirmative Defense; Dkt. #34 at p. 9)

"**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or
**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or
**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

(Policy, Causes of Loss - Special Form, p. 1 of 10) (emphasis original).
(Fifth Affirmative Defense; Dkt. #34 at p. 10)

54. On February 26, 2018, during this litigation, GNY asserted for the first time that Forest Ridge allegedly intentionally concealed or misrepresented material facts or circumstances relating to its insurance claim through its public adjuster withholding a weather report showing additional hail events and also by submitting a proof of loss stating a value for the loss which was false and/or

had no basis. See Dkt. #34 (Defendant's Answer and Affirmative Defenses to Second Amended Complaint) at pp. 12-15.

55. GNY stipulates that it did not rely upon any alleged intentional concealments or misrepresentations of material facts made by Forest Ridge or its representatives in violation of the concealment, misrepresentation, or fraud provision of the policy as a basis for its denial of the claim on January 3, 2017 or in preparing and issuing the January 3, 2017 letter informing Forest Ridge of the denial of the claim. See Ex. 28 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (May 8, 2018 Deposition of Steven Baroncini) at 7: 15-24 - 8: 1-2.

56. Despite claiming the policy is "void", GNY continues to collect insurance premiums from Forest Ridge and continues to insure the Forest Ridge Homeowner's Association. See Ex. 29 to Plaintiff's Combined Response in Opposition and Memorandum in Support. (Certificate of Insurance and Payment Records).

Respectfully submitted,

FOREST RIDGE HOMEOWNERS ASSOCIATION,

/s/ Steven M. Thompson
One of its Attorneys

Steven M. Thompson, Esq.
Emilie G. Kaplan, Esq.
Thompson, Brody & Kaplan, LLP
161 North Clark Street, Suite 3575
Chicago, IL 60601
Phone No. (312) 782-9320
Fax No. (312) 782-3787
E-Mail: Thompson@tbkllp.com
E-Mail: Kaplan@tbkllp.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing. A copy of this document will be sent to all attorneys below via the CM/ECF filing system:

Matthew S. Ponzi
Matthew P. Fortin
Foran Glennon Palandech Onzi & Rudloff PC
222 N. Lasalle St., Suite 1400
Chicago, Illinois 60601
Mponzi@fgppr.com
Mfortin@fgppr.com

/s/ Steven M. Thompson